```
————FILED ————ENTERED
————LODGED————RECEIVED
```

**APR 0 6 2004** **MR**

AT SEATTLE
CLERK U.S. DISTRICT COURT
By        WESTERN DISTRICT OF WASHINGTON
Deputy

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

Lieutenant Commander CHARLES SWIFT, a
resident of the State of Washington, as next
friend for SALIM AHMED HAMDAN,

    Military Commission Detainee,
    Camp Echo,
    Guantanamo Bay Naval Base,
    Guantanamo Bay, Cuba,

        Petitioner,

    v.

DONALD H. RUMSFELD, United States
Secretary of Defense; JOHN D.
ALTENBURG, Jr., Appointing Authority for
Military Commissions, Department of Defense;
Brigadier General THOMAS L.
HEMINGWAY, Legal Advisor to the
Appointing Authority for Military
Commissions; Brigadier General JAY HOOD,
Commander Joint Task Force, Guantanamo,
Camp Echo, Guantanamo Bay, Cuba;
GEORGE W. BUSH, President of the United
States,

        Respondents.

NO: CV 04 - 0777 L

DECLARATION OF
LIEUTENANT COMMANDER
CHARLES SWIFT



04-CV-00777-DECL

Lieutenant Commander Charles Swift hereby declares and states as follows:

1.    I am over the age of eighteen (18) years. The following is true and correct to the best of my knowledge. I have personal knowledge of the matters stated herein and, if called upon to testify, could competently testify thereto.

DECLARATION OF LIEUTENANT COMMANDER
CHARLES SWIFT - 1
[43439-0001/SL040920.020]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

2.     I am presently serving on active duty with the United States Navy. I am currently stationed in the Office of the Chief Defense Counsel for Military Commissions, located at 1931 Jefferson Davis Highway, Suite 103, Arlington, VA 22202.

3.     I originally entered military service in conjunction with attendance at the U.S. Naval Academy in Annapolis, Maryland. At the time I entered the Naval Academy, I resided with my parents in the state of North Carolina. I maintained North Carolina as my legal domicile throughout my academic career at the Naval Academy and my subsequent first term of active military service. I left active military service in June of 1990 to attend law school at Puget Sound School of Law in Tacoma, Washington. Puget Sound School of Law was acquired by Seattle University in 1994.

4.     I established residency and legal domicile in the Western District of Washington, concurrent with my attendance of law school. In conjunction with the establishment of legal domicile in Washington State, I established a permanent residence, registered my vehicle, and registered to vote. Following graduation I re-entered active military service as a Judge Advocate in the United States Navy in November 1994. In conjunction with my acceptance into the Navy JAG Corps, I took and passed the North Carolina Bar Exam. I chose North Carolina as a matter of convenience because North Carolina results allowed me to enter the Basic Lawyer Course in November and North Carolina does not require bar fees or continuing education to remain in good standing for members in the military service. At the time that I took the North Carolina Bar Exam, I did not have nor have I since had an intention of practicing law in the state of North Carolina.

5.     At the time of re-entry into the Naval service as a Judge Advocate, I listed my home of record as Washington State. I was initially stationed at Naval Legal Service Office Northwest, located in Bremerton, Washington. In November 1997, I was transferred

DECLARATION OF LIEUTENANT COMMANDER
CHARLES SWIFT - 2
[43439-0001/SL040920.020]

pursuant to military orders to Naval Station Roosevelt Roads, Puerto Rico to serve as the station Judge Advocate. While in Puerto Rico, I resided in on-base housing, voted via absentee ballot in Washington State and Federal elections and continued to register the vehicle I had acquired in the state of Washington. In Puerto Rico, I registered a second vehicle acquired in Puerto Rico as a matter of convenience.

6.      In July 2000, I was transferred to Naval Legal Service Office Detachment Mayport, Florida as the Officer-in-Charge. While in Florida, I again voted in state and federal elections via absentee ballot and continued to register my vehicle I had acquired in Washington. I also registered two other vehicles I acquired in Florida as a matter of convenience. Additionally I acquired a Florida driver's license as a matter of convenience. My Washington driver's license had expired and following the events of September 11, 2001, two forms of picture identification became standard for traveling. Consequently I chose to get a Florida drivers license based on my temporary residence to ensure that I had two forms of picture identification. In October 2003, I was then transferred to the Office of Military Commissions as Defense Counsel. I intend to vote in the upcoming state and federal elections via absentee ballot in the state of Washington. Upon my move to Northern Virginia, based on my temporary residency I re-registered my leased vehicle in Virginia as a matter of convenience.

7.      At no relevant time have I ever sought or intended to change my legal domicile from the state of Washington. Throughout my present military service, Washington State has been the last place that I lived with intent to remain permanently.

8.      Attached hereto as Exhibit A is a true and correct copy of the Press Briefing of Senior Department of Defense Official and Senior Military Officer, Jul. 3, 2004.

DECLARATION OF LIEUTENANT COMMANDER
CHARLES SWIFT - 3
[43439-0001/SL040920.020]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

9.     Attached hereto as Exhibit B is a true and correct copy of President George W. Bush's Military Order, Nov. 13, 2001.

10.    Attached hereto as Exhibit C is a true and correct copy of the Press Briefing of Army Major General Geoffrey D. Miller, Feb. 13, 2004.

11.    Attached hereto as Exhibit D is a true and correct copy of the Memorandum for the Appointing Authority, Feb. 12, 2004.

12.    Attached hereto as Exhibit E is a true and correct copy of the Appointing Authority Opinion Letter, Feb. 23, 2004.

13.    Attached hereto as Exhibit F is a true and correct copy of the Official Change Duty Orders for Lieutenant Commander Swift, Sept. 2003.

14.    Attached hereto as Exhibit G is a true and correct copy of various Press Interviews of Lieutenant Commander Swift.

15.    Attached hereto as Exhibit H is a true and correct copy of the Appointment Letter, Dec. 18, 2003.

16.    Attached hereto as Exhibit I is a true and correct copy of the Next Friend Authorization.

17.    Attached hereto as Exhibit J is a true and correct copy of the Target Letter, Dec. 15, 2003.

18.    Attached hereto as Exhibit K is a true and correct copy of Army Regulation 190-8, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees*, § 1-6(a) (1997).

19.    Attached hereto as Exhibit L is a true and correct copy of the Department of the Navy, NWP 1-14M: *Commander's Handbook on the Law of Naval Operations*, 11-3 (1995).

DECLARATION OF LIEUTENANT COMMANDER
CHARLES SWIFT - 4
[43439-0001/SL040920.020]

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47

**I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.**

DATED this 5th day of April, 2004.

_____
Lieutenant Commander Charles Swift

DECLARATION OF LIEUTENANT COMMANDER
CHARLES SWIFT - 5
[43439-0001/SL040920.020]

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

# Exhibit A

Updated 03 Jul 2003



United States Department of Defense

# News Transcript

On the web: http://www.defenselink.mil/cgi-bin/dlprint.cgi?
http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html
Media contact: +1 (703) 697-5131
Public contact: http://www.dod.mil/faq/comment.html or +1 (703) 428-0711

**THE PENTAGON**
WASHINGTON

---

**Presenter:** Senior Defense Official                              Thursday, July 3, 2003

---

## Background Briefing on Military Commissions

Senior Defense Official: I just really wanted to put out some information very quickly and then we'll go right to questions and answers.

Today the President has determined that six enemy combatants currently detained by the United States are subject to his military order of November 13, 2001. The President determined that there is reason to believe that each of these enemy combatants was a member of al Qaeda or was otherwise involved in terrorism directed against the United States.

I think with that setup, there are obviously a lot of questions, I assume, on your mind and we'll be happy to take those.

Charlie?

Q: We assume that Dr. Wolfowitz will determine whether or not they will be subject to commissions. In other words, the President has determined that they are eligible to go before commissions, and the Pentagon now determines whether or not they will in fact be charged, what they will be charged with --

Senior Defense Official: Why don't I talk just a little bit about the process.

Senior Defense Official: I think you're in effect correct. In effect, it is a grant of jurisdiction over the person. Then after that the prosecution would look at the cases, determine if there were appropriate charges, would then present the charges to the appointing authority, and at that time it would be up to the appointing authority, Dr. Wolfowitz in this case, who would determine whether or not to approve the charges and perhaps to appoint a commission and refer those charges to the commission.

Q: These six, we assume, are among those held at GTMO, and why these six? Are the things that they have done especially egregious to single them out?

Senior Defense Official: It's really not so much -- These are people among others who have been evaluated. There are a lot of factors. The quality of the evidence we have against them, how far along we are in intelligence gathering, and it's really mostly that these are people who are available, and according to the process we've established for gathering this information we've determined that we have sufficient action -- The President has indeed determined that he's got reason to believe that they are as I described them.

Q: And they are at GTMO. They're among those being held at GTMO?

Senior Defense Official: We're not talking about the individual cases and I don't think we need to discuss exactly where they're being held because that's a little bit more specificity than I think we're prepared to discuss.

Q: Will they be moved from wherever they are now, assuming GTMO, to a regular military prison?

Senior Defense Official: I think that also would be premature to discuss that since in fact there have been no charges approved in any of these cases, nor has there been a commission appointed or any specific directions given by the appointing authority. So at this juncture we just don't have --

Q: How fast do you expect that to happen?

Senior Defense Official: Again, I think it would be best -- We'll discuss process and the kinds of things that can happen because there will be so many factors involved in --

Q: Should we see something before the end of the year, or is this going to be --

Senior Defense Official: -- kinds of steps that are involved. Again, repeating what we told Charlie.

Q: I wrote it down. So what about timeline? Will it take six months to do this or is it going to be on a fast track? We have the what, where, when, why thing, and this is the when part. So when?

Senior Defense Official: It's like a what part, too. We gave you a lot of what --

Senior Defense Official: As you can tell in the past we've been proceeding very methodically and deliberately and carefully and I think that that will continue to guide the military commission process. In that regard it probably wouldn't be prudent to set any kind of a timeline because the criminal justice system should not be driven by timelines, they should be driven by the facts of the case. That's what's the next step is for the chief prosecutor to look at the facts of the case and see if there are appropriate charges for those facts. So I think that's the reason we wouldn't want to set ourselves to a timeline. We want to look at each individual case on a case-by-case basis and do the right thing.

Q: Can you take us a little further on the who's and what's of these? Are they Afghan, are they al Qaeda, are they terrorists that you found in this country?

Senior Defense Official: Again, we're not going to discuss particular aspects of any of the individual cases because it's just premature to do that.

Q: How about a ballpark? Are the majority of them one or the other?

Senior Defense Official: All I think we're really prepared to say is there's evidence that they may have attended terrorist training camps.

Q: In Afghanistan? And --

Senior Defense Official: I'm not going to discuss those kinds of details. They may have attended training camps, they may have been involved in the kinds of activities that are consistent with terrorist activities -- financing, recruiting. Those are the kinds of things that would lead us to the kind of determination that the President made today.

Do you have any more to add?

Senior Defense Official: I'd just say that is a summary of the kind of evidence involved in the six cases that we've seen come back from the President today. But we wouldn't want to discuss any specific case or a specific kind of evidence associated with those activities.

Q: Will you hold the trials in the same place if they are held? Will they be in GTMO, will they be in this country?

Senior Defense Official: Again, that's a decision that gets made at a later point in this process. That would be at the point when the appointing authority in fact refers charges to a commission.

Q: But not -- I mean are the options in this country or another country or --

Senior Defense Official: The military commission order that the Secretary of Defense signed March 21, 2002 and the Military Commission Instructions were written, designed to give us the flexibility to do what was appropriate in every case so we have a large range of options. That's why the rules were written the way they were written.

Q: Will we find out the identities of these people and the specificity of the charges when they are actually referred to a commission, when a commission is appointed? Or when?

Senior Defense Official: We may indeed at the time of charging provide that information. At the time of charging or perhaps at the time when a defense counsel would be assigned to an individual.

It would be inappropriate at this time since in fact no charges have been brought against any of these detainees.

Senior Defense Official: And let me just emphasize one point the Colonel made is that we may identify those things, and we may not. We will at the point of a commission should any of these get to a commission, the objective is as much transparency as practicable, and those are the kinds of things we consider at the time.

Q: So it's possible you won't ever identify them to us?

Senior Defense Official: I suppose that is possible. Yeah, I suppose that is possible.

Senior Defense Official: But the intent is, as directed by the Secretary of Defense, that these proceedings will be as open as practicable.

Senior Defense Official: Remembering again that one of the principal objectives of this third

- 9

way, the President sought a third way, we have an Article 3 system of justice, we have courts-martial, a third way to be able to set up a body of rules that will allow us to protect information to achieve additional intelligence gathering purposes that may lead to the capture of more terrorists. So it's important to remember.

Q: Can you describe the makeup of a commission?

Senior Defense Official: In general, you mean?

Q: How these commissions will be made up.

Senior Defense Official: There may not be commissions in this case. It's important to keep that in mind. We may have commissions, we may not. But in general, commissions.

Senior Defense Official: Under the Military Commission Order No. 1 you see that the commissions are constituted by a three to seven member panel of commissioned officers from the armed forces, one of whom is a presiding officer who must be a judge advocate.

Q: And for a guilty verdict, what's the percentage of commission members that have to vote
--

Senior Defense Official: A two-thirds vote of the three to seven member panel.

Q: Do the six know that they've been chosen?

[Laughter]

Senior Defense Official: Again, I don't think we want to answer specific questions that might involve those individuals.

Q: Can you say a little bit more about what this means in terms of status now or change of status? Are they still to be described as enemy combatants? How should they be described then?

Senior Defense Official: Legally there is no change to the status. They are being held as enemy combatants right now. They are being held simply as a function of the war on terrorism and detained because they are a threat to the United States.

A criminal process has not begun in any of these cases. Again, it's a decision the President has made that's akin to a granting of jurisdiction but there's been no exercise of that jurisdiction so therefore no criminal process or rights and procedures that normally attend a criminal process are in place yet.

Q: So their right to representation doesn't start until they're charged?

Senior Defense Official: The way the order reads, they will be given a defense counsel sufficiently in advance of any trial to make sure that they can prepare an adequate defense. Certainly there's no trial that has been directed at this point in time.

Q: Are these six the first ones who've been put in this jurisdiction? And is it a rolling process where we might expect to see more down the line? Have you looked at the entire universe of enemy

combatants and decided these are the only six that will --

Senior Defense Official: Yes, to both your questions. It is the first time that the President has made a "reason to believe" determination; and there may well be more.

Q: Secretary Wolfowitz, as I understand, sent a report over to the White House and gave reasons why the six should be eligible for possible commissions or possible trials. Were these six the only ones that were pulled initially? Or was there a large list and the President just picked six from it initially? Or are these six -- Are these the only six suggested initially?

Senior Defense Official: First of all, there are a number of factors beyond what may have been recommended from this building that have led to the President's determination that he has reason to believe that these are people engaged in terrorism against the United States. So it's more than just the recommendations or suggestions that may have come from here.

With regard to whether there are others that the President has considered, I don't think we have anything to say on that, do we?

Senior Defense Official: The only legally relevant thing that has happened today is the President's decision to provide these "reason to believe" determinations. It wasn't an action by the Pentagon.

Q: A couple of procedural questions.

The appointing authority is responsible both for deciding which if any of these half dozen are to be charged; and the appointing authority also is responsible for forming the commissions.

Should any of these be charged and decide to plead guilty, some sort of plea bargain, is it necessary for them to go before a commission to execute that bargain? Need there be a commission for a plea bargain to be finalized?

Senior Defense Official: Yes. The way the rules are written there needs to be a commission in any event. And in fact the commission does have responsibilities even for a plea agreement in that they have to determine whether or not a plea is voluntary and informed.

Q: And in the sequence of those two chores of the appointing authority, does either one necessarily come first? Deciding to charge somebody and then creating a commission? Must the commission be created first?

They're both chores in separate sections of the order.

Senior Defense Official: I think you've read the order correctly and the order does not specify a particular chronology as to how those events would have to occur.

Q: Lastly, if you had a couple of questions from here and there about where it could be and you're declining to say where, but someone said could they be brought to a military base, surely you can say you don't wish to bring them into U.S. territory after winning a case that says they have no habeas corpus rights outside of U.S. territory. You're not suggesting that's an open question to bring them to the United States --

- 11

Case 1:04-cv-01519-JR   Document 1-3   Filed 09/02/04   Page 12 of 76

Senior Defense Official: We're not suggesting anything with respect to locale. I think that's the way to take it. That's speculation on your part.

Senior Defense Official: In view of the day and the hour I think we probably have time for maybe two more.

Q: This might be putting the cart before the horse, but if no charges are preferred against one of these six or if they come through and the tribunal finds them not guilty, are they automatically set free? Or would they go back into detention for intelligence purposes?

Senior Defense Official: We can't really answer that right now.

I can say this, that as this process develops we certainly will be getting more information about those people. If one of them were to go through a commission process, at the end of that process we would know much more than we know now.

So any decision like that would have to be made at that time.

It would also be a bit misleading to say that we wouldn't consider sending one of these people before a commission. Certainly the acting chief prosecutor will be looking at potential charges on these cases that have had determinations made on them.

Senior Defense Official: Let me talk about one thing in terms of your question about after a potential commission what might happen. Remember the purpose of the commission, and that was to have a third way, something different, and the rules were structured in a very deliberate fashion but deliberately flexible. So there are a lot of things.

As the colonel said, there's going to be further intelligence gathering. And that, by the way, is the second point. A principal purpose of this third way is to be able to protect intelligence and what intelligence may be gathered during the process would help determine sort of the ultimate outcome of any of these individuals.

Q: So is it possible then that somebody could go through a commission, be found not guilty, and then have them say well, congratulations, you're not guilty but you're still an enemy combatant so back into wherever we're holding you?

Senior Defense Official: As a legal matter, they're two completely different questions. They're not being held because of any criminal activity or any charges. They're being held because they're enemy combatants in an ongoing armed conflict.

What we're talking about with military commissions is a criminal process so in that regard they're two distinct issues.

With respect to factually whether or not the Department of Defense would want to continue holding someone, that's an issue -- My only point there is if a military commission process starts up certainly the facts available to decision makers will be greater. So that's a decision they'll make at that point in time.

Senior Defense Official: Anything else?

- 12

Thank you very much. Have a great 4th of July.

Q:  Is there any [inaudible], like does this set any kind of process going that says at the end of five years they have to be done or is it still open ended?

Senior Defense Official:  The war on terrorism is open ended.

Q:  All right.

http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html

# Exhibit  B

*the*
*White House*
President George W. Bush

Click to Print
this document

For Immediate Release
Office of the Press Secretary
November 13, 2001

## President Issues Military Order
Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism

By the authority vested in me as President and as Commander in Chief of the Armed Forces of the United States by the Constitution and the laws of the United States of America, including the Authorization for Use of Military Force Joint Resolution (Public Law 107-40, 115 Stat. 224) and sections 821 and 836 of title 10, United States Code, it is hereby ordered as follows:

Section 1. Findings.

(a) International terrorists, including members of al Qaida, have carried out attacks on United States diplomatic and military personnel and facilities abroad and on citizens and property within the United States on a scale that has created a state of armed conflict that requires the use of the United States Armed Forces.

(b) In light of grave acts of terrorism and threats of terrorism, including the terrorist attacks on September 11, 2001, on the headquarters of the United States Department of Defense in the national capital region, on the World Trade Center in New York, and on civilian aircraft such as in Pennsylvania, I proclaimed a national emergency on September 14, 2001 (Proc. 7463, Declaration of National Emergency by Reason of Certain Terrorist Attacks).

(c) Individuals acting alone and in concert involved in international terrorism possess both the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United States Government.

(d) The ability of the United States to protect the United States and its citizens, and to help its allies and other cooperating nations protect their nations and their citizens, from such further terrorist attacks depends in significant part upon using the United States Armed Forces to identify terrorists and those who support them, to disrupt their activities, and to eliminate their ability to conduct or support such attacks.

(e) To protect the United States and its citizens, and for the effective conduct of military operations and prevention of terrorist attacks, it is necessary for individuals subject to this order pursuant to section 2 hereof to be detained, and, when tried, to be tried for violations of the laws of war and other applicable laws by military tribunals.

(f) Given the danger to the safety of the United States and the nature of international terrorism, and to the extent provided by and under this order, I find consistent with section 836 of title 10, United States Code, that it is not practicable to apply in military commissions under this order the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts.

(g) Having fully considered the magnitude of the potential deaths, injuries, and property destruction that would result from potential acts of terrorism against the United States, and the probability that such acts will occur, I have determined that an extraordinary emergency exists for national defense purposes, that this emergency constitutes an urgent and compelling govern-ment interest, and that issuance of this order is necessary to meet the emergency.

Sec. 2. Definition and Policy.

(a) The term "individual subject to this order" shall mean any individual who is not a United States citizen with respect to whom I determine from time to time in writing that:

- 15

(1) there is reason to believe that such individual, at the relevant

times,

(i) is or was a member of the organization known as al Qaida;

(ii) has engaged in, aided or abetted, or conspired to commit,

acts of international terrorism, or acts in preparation therefor,

that have caused, threaten to cause, or have as their aim to

cause, injury to or adverse effects on the United States, its

citizens, national security, foreign policy, or economy; or

(iii) has knowingly harbored one or more individuals described in

subparagraphs (i) or (ii) of subsection 2(a)(1) of this order;

and

(2) it is in the interest of the United States that such individual

be subject to this order.

(b) It is the policy of the United States that the Secretary of Defense shall take all necessary measures to ensure that any individual subject to this order is detained in accordance with section 3, and, if the individual is to be tried, that such individual is tried only in accordance with section 4.

(c) It is further the policy of the United States that any individual subject to this order who is not already under the control of the Secretary of Defense but who is under the control of any other officer or agent of the United States or any State shall, upon delivery of a copy of such written determination to such officer or agent, forthwith be placed under the control of the Secretary of Defense.

Sec. 3. Detention Authority of the Secretary of Defense. Any individual subject to this order shall be --

(a) detained at an appropriate location designated by the Secretary of Defense outside or within the United States;

(b) treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or any similar criteria;

(c) afforded adequate food, drinking water, shelter, clothing, and medical treatment;

(d) allowed the free exercise of religion consistent with the requirements of such detention; and

(e) detained in accordance with such other conditions as the Secretary of Defense may prescribe.

Sec. 4. Authority of the Secretary of Defense Regarding Trials of Individuals Subject to this Order.

(a) Any individual subject to this order shall, when tried, be tried by military commission for any and all offenses triable by military commission that such individual is alleged to have committed, and may be punished in accordance with the penalties provided under applicable law, including life imprisonment or death.

(b) As a military function and in light of the findings in section 1, including subsection (f) thereof, the Secretary of Defense shall issue such orders and regulations, including orders for the appointment of one or more military commissions, as may be necessary to carry out subsection (a) of this section.

(c) Orders and regulations issued under subsection (b) of this section shall include, but not be limited to, rules for the conduct of the proceedings of military commissions, including pretrial, trial, and post-trial procedures, modes of proof, issuance of process, and qualifications of attorneys, which shall at a minimum provide for --

(1) military commissions to sit at any time and any place, consistent

with such guidance regarding time and place as the Secretary of

Defense may provide;

(2) a full and fair trial, with the military commission sitting as

the triers of both fact and law;

(3) admission of such evidence as would, in the opinion of the

presiding officer of the military commission (or instead, if any other

member of the commission so requests at the time the presiding officer

renders that opinion, the opinion of the commission rendered at that

time by a majority of the commission), have probative value to a

reasonable person;

(4) in a manner consistent with the protection of information

classified or classifiable under Executive Order 12958 of April 17,

1995, as amended, or any successor Executive Order, protected by

statute or rule from unauthorized disclosure, or otherwise protected

by law, (A) the handling of, admission into evidence of, and access to

materials and information, and (B) the conduct, closure of, and access

to proceedings;

(5) conduct of the prosecution by one or more attorneys designated by

the Secretary of Defense and conduct of the defense by attorneys for

the individual subject to this order;

(6) conviction only upon the concurrence of two-thirds of the members

of the commission present at the time of the vote, a majority being

present;

(7)  sentencing only upon the concurrence of two-thirds of the members

of the commission present at the time of the vote, a majority being

present; and

(8)  submission of the record of the trial, including any conviction

or sentence, for review and final decision by me or by the Secretary

of Defense if so designated by me for that purpose.

Sec. 5.  Obligation of Other Agencies to Assist the Secretary of Defense.

Departments, agencies, entities, and officers of the United States shall, to the maximum extent permitted by law,
provide to the Secretary of Defense such assistance as he may request to implement this order.

Sec. 6.  Additional Authorities of the Secretary of Defense.

(a)  As a military function and in light of the findings in section 1, the Secretary of Defense shall issue such orders
and regulations as may be necessary to carry out any of the provisions of this order.

(b)  The Secretary of Defense may perform any of his functions or duties, and may exercise any of the powers
provided to him under this order (other than under section 4(c)(8) hereof) in accordance with section 113(d) of title
10, United States Code.

Sec. 7.  Relationship to Other Law and Forums.

(a)  Nothing in this order shall be construed to –

(1)  authorize the disclosure of state secrets to any person not

otherwise authorized to have access to them;

(2)  limit the authority of the President as Commander in Chief of the

Armed Forces or the power of the President to grant reprieves and

pardons; or

(3)  limit the lawful authority of the Secretary of Defense, any

military commander, or any other officer or agent of the United States

or of any State to detain or try any person who is not an individual

subject to this order.

(b)  With respect to any individual subject to this order –

(1)  military tribunals shall have exclusive jurisdiction with respect

- 18

to offenses by the individual; and

(2) the individual shall not be privileged to seek any remedy or

maintain any proceeding, directly or indirectly, or to have any such

remedy or proceeding sought on the individual's behalf, in (i) any

court of the United States, or any State thereof, (ii) any court of

any foreign nation, or (iii) any international tribunal.

(c) This order is not intended to and does not create any right, benefit, or privilege, substantive or procedural, enforceable at law or equity by any party, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

(d) For purposes of this order, the term "State" includes any State, district, territory, or possession of the United States.

(e) I reserve the authority to direct the Secretary of Defense, at any time hereafter, to transfer to a governmental authority control of any individual subject to this order. Nothing in this order shall be construed to limit the authority of any such governmental authority to prosecute any individual for whom control is transferred.

Sec. 8. Publication.

This order shall be published in the Federal Register.

GEORGE W. BUSH

THE WHITE HOUSE,

November 13, 2001.

### ###

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2001/11/20011113-27.html

**Click to Print
this document**

- 19

# Exhibit  C



United States Department of Defense.

# News Transcript

On the web: http://www.defenselink.mil/transcripts/2004/tr20040213-0443.html
Media contact: +1 (703) 697-5131
Public contact: http://www.dod.mil/faq/comment.html or +1 (703) 428-0711



Updated:

DoD
Adv
Cor
Live
Pho
Rel
Slic
Spe
Too
Tra

Amer
News
Arti
Rac
Tele
Spe
. . . . . .
DoD :
———
Abou
News
News
. . . .
Othe

**Presenter:** Paul Butler, PDASD (SO/LIC)        Friday, February 13, 2004 2:33 p.m. EST

## Briefing on Detainee Operations at Guantanamo Bay

(Participating were Paul Butler, principal deputy assistant secretary of defense for special operations and low intensity conflict, and Army Maj. Gen. Geoffrey D. Miller, commander, Joint Task Force Guantanamo.)

Bryan Whitman [deputy assistant secretary of defense for public affairs (media operations)]: Good afternoon and thank you for joining us this afternoon.

As most of you know, the secretary of Defense is in Miami today and has just spoken to the Miami Chamber of Commerce. And he touched upon the importance and the progress that's being made in the global war on terror and discussed the importance of our detainee operations that are taking place at Guantanamo Bay.

And to provide some more information on that, because there has been some interest in it lately, we have two individuals: Paul Butler, who is the Principal Deputy to the Assistant Secretary of Defense for Special Operations and Low Intensity Conflict; and Major General Geoffrey Miller, who is the Commanding General for Joint Task Force Guantanamo. And they're here today to talk to you about the importance of the Guantanamo facility and bring you up to date on some of our processes at that facility.

So with that, I'll turn it over to these two.

Butler: Good afternoon.

As the secretary indicated earlier today in his speech, the key insight I think into our policy at Guantanamo is that we remain in an active war with al Qaeda, the Taliban and its affiliated terrorist organizations.

And I think it helps just to remind ourselves on how we got here a little bit. And that is that in 1996, Osama bin Laden issued a public fatwa declaring war on the United States. In February 1998 he issued another public fatwa and said -- in which he said that it was the absolute obligation of his followers to kill Americans, civilian or military, wherever they could be found. After that followed the attempted millennium plot in 1999. Before that al Qaeda attacked our embassies in East Africa and killed over 200 people and injured close to

- 21

5,000.  In October 2000, al Qaeda attacked the USS Cole, a warship in Aden, where they killed 17 service members and injured 39 others. Al Qaeda then made a recruiting video which celebrated that attack and was used as a recruitment tool for al Qaeda operatives.

And then, of course, there was 9/11, where close to 3,000 people died in one day on American soil; something that hadn't happened since Pearl Harbor in World War II; something that hadn't happened on the continental United States since the battle of Antietam; and an act that destroyed a building at the center of American power, which hadn't taken place since the War of 1812.  Of course, the president responded pursuant to his duties as commander in chief.  Congress endorsed the use of force in self-defense against those responsible for September 11th, and NATO and the U.N. Security Council both recognized 9/11 as an attack upon the United States.

In November of 2001, President Bush stated that, quote, "International terrorists have carried out attacks on the United States on a scale that has created a state of armed conflict that requires the use of United States armed forces."  Close quote.

But unfortunately, that wasn't the end of the story.  The war goes on.  On December 22nd, 2001, there was an attempted bombing of a commercial transatlantic flight by shoe-bomber Richard Reid linked to al Qaeda.

In April 2002, there was an al Qaeda firebombing of a synagogue in Djerba Tunisia, which killed 19 people and injured 22.  In June 2002, al Qaeda was likely responsible for a bomb that exploded outside the U.S. consulate in Karachi, Pakistan, killing 11 persons and injuring 51 others.  In October 2002, there was a recording attributed to Ayman al-Zawahiri, bin Laden's deputy, saying, "God willing, we will continue targeting the keys of the American economy."  On October 6, 2002, al Qaeda directed a suicide attack on the French oil tanker MV Limburg off the coast of Yemen that killed one and injured four.  On October 8, 2002, al Qaeda gunmen attacked U.S. soldiers on Failaka Island in Kuwait, killing one Marine and wounding another.  On October 12, 2002, al Qaeda affiliate Jemaah Islamiyah bombed the nightclub in Bali, Indonesia, which killed more than 200 international tourists and injured about 300.  On November 28th, 2002, in Mombasa, Kenya, a vehicle containing three suicide bombers drove into the front of the Paradise Hotel, killing 15 persons and wounding 40 others.  Al Qaeda claimed responsibility.  That same day, two anti-aircraft missiles were launched, but missed downing a Boeing 757 taking off from Mombasa on route to Israel.  Al Qaeda claimed responsibility for that as well.

On May 12th in 2003, in Saudi Arabia, al Qaeda suicide bombers attacked three residential compounds for foreign workers, killing 34, including 10 U.S. citizens.  On August 5th, 2003, a car bomb exploded outside the J.W. Marriott Hotel in Jakarta, Indonesia, killing 10 and wounding 150.  Once again, al Qaeda-affiliated group Jemaah Islamiyah was responsible.

Between February and October of 2003, bin Laden issued further tapes urging his followers to take up jihad and stating, "We stress the importance of the martyrdom operations against the enemy, operations that inflicted harm on the United States."

Between September 2003 and December 2003, Taliban militants stepped up the insurgency in southern and eastern provinces in Afghanistan, including attacks on innocent civilians and coalition forces.  On November 15th, 2003, two suicide truck bombs exploded

- 22

outside the Neve Shalom and Beth Israel Synagogues in Istanbul, killing 25 and wounding 300 more. An al Qaeda-related group claimed responsibility. On November 20th, 2003, two suicide truck bombs exploded near the British consulate and the HSBC Bank in Istanbul, killing 25, including the British consul general, and injuring more than 309. Al Qaeda claimed responsibility. In November 2003, Taliban bombings killed U.S. and Romanian soldiers and several Afghan civilians. In November 2003, al Qaeda also struck again in Riyadh, Saudi Arabia, killing 17 and injuring more than 100. In January 2004, Taliban bombings in Afghanistan killed soldiers from the United Kingdom and Canada. And since August of 2003, 11 U.S. soldiers have died in the war in Afghanistan.

This is not even a full, comprehensive listing of all the attacks but surely indicates that we remain at war with Osama bin Laden and al Qaeda. So when you put it in that context, what we're doing at Guantanamo Bay is not that surprising. We are holding enemy combatants in a global war on terrorism for security reasons, to prevent them from returning to the battlefield and injuring American soldiers and civilians -- and civilians throughout the world.

So the law of armed conflict governs what we're doing here. Some people ask us, well, what about the Geneva Convention? And we believe that we -- our policies are treating the detainees entirely consistent with the framework of the Geneva Convention. The Geneva Convention requires that combatants in a war fight according to certain rules, and there are several reasons why the enemy combatants at Guantanamo are not entitled to the full range of protection under the Geneva Conventions.

First of all, neither al Qaeda nor the Taliban were state parties to the Geneva Conventions. Second of all, they did not fight in uniform or subject to a clear chain of command. But most importantly, the Geneva Conventions were designed in large part to protect civilian populations, and al Qaeda, the Taliban and its affiliates, as you can see by that litany of events, deliberately violates those rules. Not only do they attack civilian populations, but they blend in with civilian populations, thereby increasing the possibility of civilian casualties. If the Geneva Conventions are to be enforceable law, there need to be incentives built in. And what kind of incentives would we send if we allow the full treatment under the Geneva Conventions to be extended to enemy combatants who deliberately and purposely violate them?

However, we are treating the detainees at Guantanamo Bay humanely and consistent with the conditions under customary international law for humane treatment. The detainees are getting three meals a day that meet cultural dietary requirements, they have adequate shelter and clothing, the opportunity to worship, including copies of the Koran and prayer beads, the means to send and receive mail, reading materials, and excellent medical care.

There is also a thorough process to determine who comes to Guantanamo. The secretary described this in his speech a little bit, but I'd like to give a little bit more detail.

First of all, there is an elaborate screening process that takes place in the field in Afghanistan. Over 10,000 detainees were taken into some form of custody; less than 800 have been brought to Guantanamo Bay. First, in a hostile environment, soldiers detain those who are posing a threat to U.S. and coalition forces based on available information or direct combat.

- 23

Case 1:04-cv-01519-JR   Document 1-3   Filed 09/02/04   Page 24 of 76

After an initial period of detention, the individual is sent to a centralized holding area. At that time, a military screening team at the central holding area reviews all available information, including interviews with the detainees.

With assistance from other U.S. government officials on the ground, including military lawyers, intelligence officers and federal law enforcement officials, and considering all relevant information, including the facts from capture and detention, the threat posed by the individual and the intelligence and law enforcement value of the individual, the military screening team assesses whether the detainee should continue to be detained and whether transfer to Guantanamo is warranted.

A general officer designated by the commander of Central Command then makes a third assessment of those enemy combatants who are recommended for transfer to Guantanamo Bay. The general officer reviews recommendations from the central holding area screening teams and determines whether enemy combatants should be transferred to Guantanamo. In determining whether a detainee should be transferred, the combatant commander considers the threat posed by the detainee, his seniority within hostile forces, possible intelligence that may be gained from the detainee through questioning, and any other relevant factors.

Once that determination is made, Department of Defense officials in Washington also review the proposed detainee for transfer to Guantanamo. An internal Department of Defense review panel, including legal advisors and individuals from policy and the Joint Staff, assess the information and ask questions about whether the detainee should be sent. There is also -- that's part of the process.

Now, what happens once the detainee arrives at Guantanamo? Once the detainee is at Guantanamo, there is a very detailed and elaborate process for gauging the threat posed by each detainee to determine whether, notwithstanding his status as an enemy combatant, he can be released or transferred to the custody of a foreign government consistent with our security interests.

Each individual case is reviewed by an integrated team of interrogators, analysts, behavioral scientists and regional experts. Individual detainee cases are assessed according to the threat posed to the national security interests of the United States and our allies. Threat assessments are based on all available information from interagency sources and are provided to Southern Command for review.

During questioning of the detainees, new information is constantly revealed, confirmed and analyzed to determine its reliability. Unfortunately, many detainees are deceptive and prefer to conceal their identities and actions. Some of you may be familiar with a document called the Manchester Manual. This was a document that was picked up in a search in Manchester, England and has surfaced in various other venues, including in Afghanistan. It's really the al Qaeda manual, and in it is a large section which teaches al Qaeda operatives counterinterrogation techniques: how to lie, how to minimize your role.

The commander of Southern Command or his designee then makes a recommendation in each individual case based on the threat the detainee poses to the United States as well as intelligence value or law enforcement interest. Those recommendations are then sent up to the Pentagon, where a group -- a panel of experts from the Pentagon -- from Policy, from Joint Staff, from the Office of General Counsel -- collect that information and make a

- 24

recommendation on whether the detainee should be released, transferred to the custody of a foreign government or continue to be detained.

Those recommendations are then sent out to an interagency experts group, composed of -- not only of the Department of Defense, but the Department of Justice, including the FBI; the CIA; the Department of State; the Department of Homeland Security; and NSC staff. Each one of the interagency experts votes on the recommendation and the entire package is then sent up to the Secretary of Defense or his designee for review. A decision is then made on whether somebody will be released, transferred or remain in detention.

There are two components down in Guantanamo that actually do this work. There is General Miller, the commander of JTF-GTMO, and his military intelligence teams that are debriefing the detainees for intelligence purposes. There is also a separate team called the Criminal Investigative Task Force, which is made up of components of Army CID, Air Force OSI, Navy NCIS, FBI and other law enforcement agencies, who also evaluate each detainee for threat and whether there is law enforcement interest.

I'd like to talk a little bit now about the process for transferring detainees. As you know, there have been over 80 detainees who have been released. There have been now five who have been transferred, including four to Saudi Arabia and recently one to Spain. Various factors must be considered before any decision to transfer to a foreign government is reached, including the threat posed by the detainee, any law enforcement interest in him or intelligence interest in him, and whether we can reach appropriate transfer agreements with the foreign government. This is a complex process, and we're actively involved in negotiations with many different countries about transferring their detainees to their custody. But we want -- we're asking foreign governments to take responsibility for these detainees, to provide with assurances that we think will address the risks that these detainees pose once they're transferred to the custody of the foreign government.

And that's because there are very dangerous people at Guantanamo. Enemy combatants at Guantanamo include not only rank-and-file jihadists who took up arms against the United States, but also senior al Qaeda operatives and leaders and Taliban leaders.

For example, enemy combatants captured during the course of hostilities include terrorists linked to most major al Qaeda attacks, including the East Africa embassy bombings and the USS Cole attack; terrorists who taught or received training on arms and explosives, surveillance and interrogation resistance techniques at al Qaeda camps in Afghanistan and elsewhere; terrorists who continue to express their commitment to kill Americans and conduct suicide attacks if released; terrorists who have sworn personal allegiance to Osama bin Laden; terrorists linked to several al Qaeda operational plans, including possible targeting of specific facilities in the United States.

For example, we have an individual in Guantanamo with links to a financier of the 9/11 plot, who attempted to enter the United States through Orlando, Florida, in August 2001. Phone records suggest that 9/11 hijacker Mohamed Atta was also at the Orlando airport that day. This individual was later captured in Pakistan after fleeing Tora Bora.

There are two individuals associated with senior al Qaeda members who were working on remotely detonated explosive devices for use against U.S. forces in Afghanistan.

- 25

There's a member of an al Qaeda-supported terrorist cell in Afghanistan that targeted civilians, especially journalists and foreign aid workers, and who is responsible for a grenade attack on a foreign journalist's automobile.

There's an al Qaeda member who was plotting to attack oil tankers in the Persian Gulf using explosive-laden fishing boats.

There's an individual who fought with an al Qaeda-supported terrorist cell in Afghanistan, personally establishing reconnaissance and ambush positions around the Kandahar air base.

There's an individual who served as a bodyguard for Osama bin Laden and escorted him to Tora Bora, Afghanistan, following the fall of Jalalabad.

There's an al Qaeda member who served as explosives trainer for al Qaeda and designed a prototype shoe bomb for destroying airplanes and a magnetic mine for attacking ships.

There's an individual who trained al Qaeda associates in the use of explosives and worked on a plot to use cell phones to detonate bombs.

And there's an individual who served as an al Qaeda translator and managed operating funds for al Qaeda and who helped stockpile weapons for use against U.S. forces in Afghanistan.

These examples are merely illustrative, they're not comprehensive. But they demonstrate the importance in maintaining the security of the United States by holding dangerous enemy combatants off the battlefield.

Now, the intelligence -- I would like to talk a little bit about the intelligence that we're gaining from these individuals because that's a substantial part of the mission at Guantanamo. And perhaps General Miller could address that a little bit later. But these individuals are providing us important information, which General Miller likes to refer to as "the golden threads of intelligence" that help us understand the al Qaeda network and to help us defend ourselves against them.

Now, I mentioned there are three basic ways in which the enemy combatants are categorized down there: those who will potentially be eligible for release, those who will be eligible for transfer to their foreign governments, and those who will remain in continued detention.

As you may know, for those who will remain in continued detention, the Secretary announced some additional procedures that we are going to implement, and that is an Administrative Review Panel. And this will be a panel that will meet annually -- it will meet more than annually. It will review each detainee's case annually to determine whether that detainee continues to pose a threat to the United States. The detainee will have the opportunity to appear in person before that panel. The detainee's foreign government will have the opportunity to submit information on the detainee's behalf. And the panel will consider all of the information, including intelligence information gained on the detainee and the information presented by the detainee and his government, and to make an independent recommendation about whether the detainee should be held.

And with that, I think we'll take any questions that you might have.

Q: Will a detainee have the right to have a lawyer when he appears before the review panel? And also, if people being held in Guantanamo pose such a threat, why not bring them to a speedy trial on charges and give them lawyers?

Butler: Well, it's important to remember that military commissions are not the reason that people are being held at Guantanamo. As I stated, under the laws of war, we have a right to hold enemy combatants who represent a threat to the United States and its forces off the battlefield. Military commissions are designed to punish those who have committed war crimes during the course of a war. And we have a process -- there has been an appointing authority appointed. And I won't speak to the military commissions in too much detail, but that process will take its own course.

What we're doing is we're reviewing people to determine whether they're still a threat. And if they are determined to be a threat, then we will continue to hold them until such time that they're not a threat anymore.

Q: How about lawyers when they appear before the review panel?

Butler: The details of that haven't been worked out. There will be someone available to help the detainee understand what the process and procedures are, what the board is, but it's unclear yet what, exactly, the details of the panel will be.

Q: But as of right now, you haven't decided that this person is entitled to a lawyer when he comes before the review panel.

Butler: That's correct.

Q: Do you know when the first of these boards would meet, approximately?

Butler: Not yet. I'm not prepared to talk about that now. But it's under active review.

Q: But I mean within the next year, within the next six months?

Butler: I just can't answer that question right now. I don't know.

Q: Could you say a little bit more about the makeup of the panel, who it is going to involve, who makes the appointments? Is this something that's going to be entirely within the Department of Defense or within the administration, or will there be any kind of independent elements in this?

Butler: Again, that's all under active consideration now and I don't have any further information on the composition of the panel, who will appoint it and who will be on it.

Q: Can you say whether the panel's decision will be final, or is it subject to review in other places in the administration?

Butler: Well, the panel will make a recommendation.

Q: To whom?

Butler: That's still under consideration, but most likely to the Secretary.

Q: And so this decision is not final.

Butler: Again, the details of the panel have not yet been worked out.

Q: Could you just step back a minute and help us understand why you're here today, why the Secretary's making this speech, why, suddenly out of the clear, blue sky, so much information today about what you're doing, but yet not final information about the panel? You put it out there and you're telling us, but you're clearly undecided on any number of things. Why are you telling everybody all of this today?

Butler: Well, there's been a lot of interest in what we're doing at Guantanamo, and there have been some events in the recent past, including the transfer of the one detainee to Spain, and so we thought it was an appropriate time to share some of the information about the vigorous procedures down here that we're using at Guantanamo.

There is an elaborate process. Detainees are not in a legal black hole. There is an enormous amount of time spent scrutinizing each individual case through various agencies of the government to help us determine who these people are. We are not interested in holding anyone for one more day than we have to. We want to evaluate them. If we can reach the conclusion that they're no longer a threat, we will release them. If we believe that we can reach transfer agreements with foreign governments who will take responsibility for them so that they're no longer a threat to us or to their populations, we want to do that. So we are -- we have sensed the interest in Guantanamo and we are responding to make sure that everybody is clear on what our policies are.

Q: Do you have any information that indicates anyone released from Guantanamo Bay and returned to wherever they came from has actually returned to the battlefield, so to speak, and has again joined the war on terrorism?

Butler: That's a -- it's a very important concern. I'm not going to go any further than that. I don't want to get into areas that involve intelligence. Needless to say -- I mentioned the Manchester Manual. When you have people that were picked up in a chaotic war, who are often trained on how to resist interrogations, who you don't have always tremendous amounts of information on before they come into your custody, you are always concerned that -- you make sure that you have full information on them before they're released.

Q: Is the establishment of this panel part of a concerted effort by the U.S. military to get these detainees into the hands of foreign governments; get them out of U.S. hands and limit the numbers that are being detained at Guantanamo Bay?

Butler: No, I don't think so. The panel is designed to ensure that there is continued process that addresses the concerns that we all share that nobody be there any longer than they have to be. And if through our present procedures, the elaborate procedures that I just talked about, the detainee has not been released, these are additional procedures to make sure that -- the war -- the end of this war, of course -- I think the secretary has alluded to

- 28

this is uncertain. And one thing we can say is it's not over now, but over time we want to make sure that, even perhaps if the war ends in stages, that there's constant review of these detainees to make sure that nobody's there any longer than they have to be.

Q: Is that an acknowledgement --

Whitman: We've got time for about one or two more. And it's not often we get General Miller here, so if you have one for General Miller it might be a good time to ask him.

Q: Could I just follow with one question? Is that an acknowledgement by the Pentagon that the processes so far established -- established to date, are not adequate to address those concerns of people being held too long?

Butler: Not at all. We have a certain set of processes, and as I think I mentioned to you, they're very vigorous, very elaborate. People spend enormous amounts of time scrutinizing each one of these detainees. This is just an additional procedure to once again ensure that we want to do the right thing here. We want to make sure we're holding people who are a threat and releasing people who we think no longer pose a threat.

Q: A number of these folks have been in custody two years or more now. Do they lose their intelligence value? Certainly, my two-year-old knowledge on things is dated. I mean, what kind of insight can you get on al Qaeda and their operatives?

Butler: Thank you -- sir?

Miller: There are -- they've had enemy combatants here at JTF Guantanamo -- some for almost two years, some for as little as two months. And so as we go about determining their intelligence value and their threat, we go through this very thorough process. There are three types of intelligence: technical intelligence -- that what the enemy combatant was doing when he was captured, if he had a weapon; and then there is operational and strategic intelligence, that allows us to better understand how terrorists are recruited, how terrorism is sustained, how the financial networks power terrorism. And so we developed this intelligence and are continuing to develop this intelligence. We continue to get extraordinarily valuable intelligence from the detainees who are at Guantanamo.

Q: So there is an acknowledgment that if these folks have served their useful time, you're trying to figure out a way to get rid of them?

Miller: It's my responsibility to make an assessment and recommendation on the detainee's intelligence value and their risk. We do that every day and that process is ongoing. Some are getting very close for us to make a recommendation; others, who are enormously dangerous and have enormous -- intelligence of enormous value, are still in this process.

Q: General, is there construction under way for a more permanent facility to house the more hard-core detainees once we seek an eventual release of the detainees?

Miller: There is another camp facility that's under construction. It is our interrogation facility which will replace the temporary facilities that we've been using for the last year and one half.

- 29

Q:  How much of a number of detainees will that facility house?  And --

Miller:  That facility -- I'm sorry.  That facility --

Q:  And why the construction?

Miller:  That facility can house up to 100 enemy combatants who we will conduct interrogation upon.  And to be frank with you, we're replacing interrogation facilities that were trailers with better facilities that allow us to more effectively and rapidly do this job of interrogation.

Q:  Is it a housing facility then or is it more strictly just for interrogation?

Miller:  It is a interrogation facility.  But we can house an enemy combatant there to accelerate and help us in the interrogation process.

Q:  Mr. Butler, why aren't some of the al Qaeda people you described being charged criminally?  Because previously the U.S. government has prosecuted al Qaeda operatives, like the guy you mentioned who was at the U.S. airport shortly before 9/11?

Butler:  All of these detainees were captured in the context of the global war on terrorism.  They are enemy combatants in the war.  There is a decision process in place, an independent appointing authority, who will eventually make decisions on who should be charged for war crimes.

But the great insight of the president, and the secretary, and others in the administration, I think, after 9/11, was that we are at war now, and that the criminal justice model, although very important to fighting the war on terrorism, is not the sole tools right now, and therefore, enemy combatants are being held for security reasons.  And again, the appointing authority will decide who is charged.

Whitman:  We'll take one last one, if we could.  Somebody that hasn't had one.

Q:  Can you tell us about what Camp Echo is, how it differs from the existing Camp Delta facility?  And in connection to that, how much is the overall operation costing?

Miller:  Camp Echo is our facility where we hold the pre-commissions detainees.  Once the president has decided to move forward in this process, we separate these enemy combatants from the general population and move them into Camp Echo, in that facility, to allow us to separate them, plus, to allow their lawyers, when they're appointed, to have access to the enemy combatants to hold private conversations.

Q:  (Off mike.) -- just like Camp Delta but separate?  Or is it a different layout?  Well, it sounded almost like it might be a suite; there's a room for lawyers, I read somewhere.  What does it look like?

Miller:  There are individual buildings, so the enemy combatant is in his own cell with an area where the lawyer may come in and have a private discussion with him.

- 30

Whitman: All right, thank you very much, ladies and gentlemen.

Q: And the second part was how much is it costing?

Whitman: Who did he ask? I guess the assistant secretary?

Butler: I'm sorry, I don't have that information.

Miller: We don't normally discuss the operational costs of the JTF. It's an ongoing operational unit.

Q: Thank you.

Miller: But I will tell you we're a great buy!

Copyright © 2003 by Federal News Service Inc., Ste. 220, 1919 M St. NW, Washington, D.C. 20036 USA. Federal News Service is a private firm not affiliated with the federal government. No portion of this transcript may be copied, sold or retransmitted without the written authority of Federal News Service Inc. Copyright is not claimed as to any part of the original work prepared by a U.S. government officer or employee as a part of that person's official duties. For information on subscribing to the FNS Internet Service, please visit www.fednews.com or call (202) 347-1400.

 Printer-friendly Version          Email A Copy

Site Map | Privacy & Security Notice | External Link Disclaimer | Web Policy | About DefenseLINK | Contact Us

# Exhibit  D



**DEPARTMENT OF DEFENSE**
**OFFICE OF GENERAL COUNSEL**
1600 DEFENSE PENTAGON
WASHINGTON, DC 20301-1600



12 Feb 04

MEMORANDUM FOR THE APPOINTING AUTHORITY

FROM: Detailed Defense Counsel

TO:     Appointing Authority

THRU: Prosecution in the case of U.S. v. Hamdan

SUBJ: UNITED STATES v. HAMDAN

1.      On 15 December 2003 the defense received from the Chief Prosecutor a letter
requesting the Chief Defense Counsel detail defense counsel in the subject case to begin
preparations for trial. Pursuant to this letter a deadline of 9 January 2004 was imposed in
when the defense was to respond to the prosecutor concerning Mr. Hamdan's willingness
to enter into a pretrial agreement.

2.      Following notification from the defense on 9 January 2004, that the defense had
been unable to meet with Mr. Hamdan due to the absence of qualified interpreter, the
original deadline was rescinded and a second deadline of 12 February 2004 was imposed.

3.      The defense met with Mr. Hamdan on 30 January through 1 February 2004, and
again on 7 through 9 February 2004. After extensive consultation, Mr. Hamdan is
unwilling to enter into pretrial negotiations until such time as he is lawfully charged
before a Military Commission.

4.      As a consequence of his pending trial, Mr. Hamdan has moved out of detention in
Camp Delta with his fellow detainees into Camp Echo, where he is being held in what is
deemed by Joint Task Force Guantanamo as "pre-commission segregation." Pre-
commission segregation has materially altered the conditions of Mr. Hamdan's
confinement. He is held in what amounts to solitary confinement, is unable to exercise in
daylight and has no contact with any other detainee. Consequently the defense considers
that based on the conditions of Mr. Hamdan's confinement, and the legal actions to date,
Mr. Hamdan is being held in pretrial confinement rather than war time detention.

5.      Mr. Hamdan, pursuant to Article 10 of the Uniform Code of Military Justice
(UCMJ) Mr. Hamdan demands to be informed of the specific charges against him or to
be released from pre-commission segregation into general detention. Article 10, UCMJ
holds "when any person subject to this chapter is placed in arrest or confinement prior to
trial, immediate steps shall be taken to inform him of the specific wrong of which he is
accused and to try him or to dismiss the charges and release him." Military order of 15
November 2001 relies in part on UCMJ Articles 21 and 36. Article 36 allows the



President to prescribe rules for military courts-martial and military commissions, so far as they are not inconsistent with "this chapter" (Uniform Code of Military Justice), consequently Article 10 as a general provision of the Uniform Code of Military Justice is applicable to military commissions and the protections granted there-under should be afforded to a detainee in pre-commission segregation.

C. D. SWIFT
LCDR, JAGC, U.S. NAVY
Detailed Defense Counsel

CC:
CDC

# Exhibit  E

FOR OFFICIAL USE ONLY



**DEPARTMENT OF DEFENSE
OFFICE OF GENERAL COUNSEL**
1600 DEFENSE PENTAGON
WASHINGTON. DC 20301-1600



February 23, 2004

MEMORANDUM FOR Lieutenant Commander C.D. Swift, USN, Detailed Defense
Counsel for Salem Ahmed Hamdan

SUBJECT:   In the Case of Salem Ahmed Hamdan:  Question Regarding the Application of
Article 10, UCMJ

I am in receipt of your February 12, 2004 memorandum requesting a determination
that Article 10, UCMJ, applies to the Department of Defense detention of Salem Ahmed
Hamdan. The Department of Defense is detaining Mr. Hamdan as an unlawful enemy
combatant. Article 10, UCMJ, does not apply to Mr. Hamdan's detention.

Thomas L. Hemingway
Brig Gen, USAF
Legal Advisor to the Appointing Authority
Office of Military Commissions

cc: Chief Defense Counsel



FOR OFFICIAL USE ONLY

# Exhibit  F

UNCLASSIFIED//

RATUZYUW RUCCBWF2510 2460006-UUUU--RHFJFGJ.
ZNR UUUUU ZUI RUCOMCB5023 2461544
R 021232Z SEP 03   ZYB PSN 648855J36
FM DEPCHNAVPERS MILLINGTON TN//PERS4416/PERS4G2//
TO RHFJFGJ/NAVLEGSVCOFF SE DET MAYPORT FL//JJJ//
RULSADO/NAVCIVLAWSUPPACT WASHINGTON DC//JJJ//
RULSADO/NAVY JAG WASHINGTON DC//JJJ//
RHFJFGS/PERSUPP DET MAYPORT FL//JJJ//
RHMFIUU/PERSUPP DET WASHINGTON DC//JJJ//
RULSTGU/PERSUPP DET WASHINGTON DC//JJJ//
BT
UNCLAS //N01321//
MSGID/GENADMIN/CHNAVPERS//
SUBJ/BUPERS ORDER//
RMKS/
   BUPERS ORDER: 2453     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/2500   (PERS-4416B)
      OFFICIAL CHANGE DUTY ORDERS FOR
         LCDR CHARLES DAVIDSON SWIFT, JAGC USN
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
   IN CARRYING OUT/PROCESSING THESE ORDERS, BOTH PARTS ONE AND TWO
         MUST BE READ AND LISTED INSTRUCTIONS COMPLIED WITH.
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
                     P A R T    O N E
              ------- DETACHING ACTIVITY (M) -------
WHEN DIRECTED BY REPORTING SENIOR, DETACH IN SEP 03    EDD: SEP 03
FROM NAVLEGSVCOFF SE DET MAYPORT FL                    UIC: 39292
PERMANENT DUTY STATION  FL, MAYPORT
FROM DUTY                                             ACC: 100
PERSONNEL ACCOUNTING SUPPORT: PERSUPPDET MAYPORT FL
                                                      UIC: 42975
              ------- ULTIMATE ACTIVITY (M) -------
REPORT NOT LATER THAN SEP 03                           EDA: SEP 03
TO NAV CIVIL LAW SUPPORT ACTIVITY                      UIC: 44690
PERMANENT DUTY STATION  VA, ALEXANDRIA
FOR DUTY                                               ACC: 100
                                                      BSC: 40140
                                                      PRD: 0609
PERSONNEL ACCOUNTING SUPPORT: PERSUPPDET WASHINGTON DC
                                                      UIC: 42557
- REPORT AS MILITARY COMMISSION DEFENSE COUNSEL.
              ------- ACCOUNTING DATA -------
MAC CIC: 3N4I32389207110
CIC: A24I31BB
PCS ACCOUNTING DATA:
N4I3 1731453.2252 U 068566 A2 4I3/1/B/B 4I3238920711
                     P A R T    T W O
BUPERS ORDER:  2453     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/2500      (PERS-4416B)
OFFICIAL CHANGE DUTY ORDERS FOR
LCDR CHARLES DAVIDSON SWIFT, JAGC USN
              ------- DETACHING ACTIVITY (M) -------
- DETACHING COMMAND AND PERSONNEL SUPPORT OFFICE DIRECTED TO ENSURE
MEMBER COMPLETES, WITHIN THREE DAYS PRIOR DETACHMENT, APPLICABLE
ITEMS ON BOTH SIDES OF TRAVEL INFORMATION FORM (NAVPERS 7041/1) AS
REQUIRED BY BUPERSINST 7040.6 OR 7040.7.  UPON COMPLETION SUBMIT FORM
TO DIRECTOR, PERMANENT CHANGE OF STATION, VARIANCE COMPONENT, 1240

EAST 9TH STREET, SUITE 967, CLEVELAND, OHIO 44199-2088.
- IF DETACHING FROM A UNIT WHEN IT'S AWAY FROM HOMEPORTS/PDS, MEMBER
IS AUTHORIZED TRAVEL VIA THE UNIT'S HOMEPORT/PDS TO ASSIST WITH
TRANSPORTATION OF DEPENDENTS AND/OR HHG, PICK UP PERSONAL ITEMS OR
PERSONNALY DRIVE HIS/HER POV FROM THE HOMEPORT PER JFTR U5120F2.
- COMMAND DELIVERING ORDERS AND ULTIMATE COMMAND: DIRECTED TO COMPLY
WITH MILPERSMAN 1740-010 REGARDING THE NAVY SPONSOR PROGRAM.
MEMBER ADVISED: INFORMATION ON ULTIMATE DUTY STATION CAN BE
OBTAINED FROM YOUR LOCAL FAMILY SERVICE CENTER.
- MEMBER ADVISED:  REQUIRED TO CONTACT HIS/HER NEAREST MILITARY
TREATMENT FACILITY (MTF), MEDICAL DEPARTMENT REPRESENTATIVE, OR
TRICARE SERVICE CENTER PRIOR TO TRANSFER FOR COUNSELING ON URGENT
OR EMERGENCY MEDICAL CARE DURING PCS MOVES.  UPON ARRIVAL AT NEW DUTY
STATION, MEMBER IS REQUIRED TO CONTACT THE NEAREST MTF, MEDICAL
DEPARTMENT REPRESENTATIVE, OR TRICARE SERVICE CENTER TO SELECT A
PRIMARY CARE PROVIDER.  THESE POINTS OF CONTACT CAN ALSO PROVIDE
INFORMATION ON HEALTH CARE OPTIONS AVAILABLE FOR FAMILY MEMBERS NOT
ENROLLED IN TRICARE PRIME.  GENERAL TRICARE INFORMATION IS AVAILABLE
ON THE WEB AT: HTTP://WWW.TRICARE.OSD.MIL.
- FOR MORE INFORMATION ON YOUR NEXT PERMANENT CHANGE OF STATION (PCS)
VISIT HTTP://WWW.HOUSING.NAVY.MIL/PCSHOUSE.  THIS WEBSITE PROVIDES
ON AND OFF BASE HOUSING AND GENERAL INFORMATION ABOUT NAVY AND MARINE
CORPS LOCATIONS WORLDWIDE.
- DETACHING COMMAND: IF TRANSOCEANIC TRAVEL WILL BE PERFORMED
BY MEMBER, PORT CALL ASSIGNED BY THE NAVY PASSENGER TRANSPORTATION
OFFICE WILL CANCEL THE REPORT NOT LATER THAN DATE, AT RECEIVING
COMMAND, AND SHALL CONSTITUTE THE SPECIFIC DATE MEMBER IS TO REPORT
FOR TRANSPORTATION.  IF THIS IS AN ORDER MODIFICATION, CANCELLATION
OR MODIFICATION OF PORT CALL MAY BE REQUIRED.  IF SO, IMMEDIATELY
CONTACT SERVICING NPTO.  OPNAVINST 4650.18 SERIES REFERS.
- DETACHING COMMAND:  ENSURE MEMBER HAS A COMPLETED AND DOCUMENTED
HIV TEST WITHIN TWELVE MONTHS OF EDD.  EVERY EFFORT SHOULD BE MADE
TO ENSURE RESULTS ARE RECEIVED PRIOR TO TRANSFER.  HOWEVER, IF
RESULTS ARE NOT RECEIVED, ENSURE MEMBER'S MEDICAL/DENTAL RECORD
REFLECTS THAT THE MEMBER'S TEST WAS COMPLETED AND AWAITING RESULTS.
TEST RESULTS SHOULD BE FORWARDED TO NEW DUTY STATION UPON RECEIPT FOR
INCORPORATION IN MEDICAL/DENTAL RECORDS.
                ------- ULTIMATE ACTIVITY (M) -------
- MEMBER ADVISED: FOR NAVY LODGE INFORMATION VISIT WEBSITE WWW.NAVY-
LODGE.COM  CALL THE NAVY LODGE CENTRAL RESERVATION TOLL FREE (1-800-
NAVY-INN/1-800-628-9466) TO DETERMINE NAVY LODGE AVAILABILITY IN THE
VICINITY OF OLD AND NEW PERMANENT DUTY STATIONS. RESERVATIONS ARE
REQUIRED TO ENSURE ROOM AVAILABILITY. FOR A MEMBER TRAVELING IN A
"PCS WITH FAMILY" STATUS, RESERVATIONS MAY BE MADE ANYTIME. REFER TO
SECNAVINST 11107.2 SERIES.
- SAVE MONEY  THE WELCOME CENTERS HAVE NEW PROGRAM INITIATIVES THAT
SAVE MONEY ON RENT, SECURITY DEPOSITS, AND HOME BUYING COST. REDUCE
TIME SPENT ON FINDING SUITABLE AND AFFORDABLE HOUSING. LEARN ABOUT
PROGRAMS THAT WILL SAVE TIME AND MONEY BY VISITING THE LOCAL WELCOME
CENTER.
- NO GOVERNMENT TRANSPORTATION IS AVAILABLE UPON ARRIVAL IN
WASHINGTON, DC.  CONTACT THE INFORMATION BOOTH AT TRANSPORTATION
TERMINAL FOR LOCAL TRANSPORTATION INFORMATION.  KEEP RECEIPTS FOR
TRAVEL CLAIMS AND REIMBURSEMENT.
                ------- SPECIAL INSTRUCTIONS -------
- MEMBER ADVISED: FOR QUESTIONS AND GUIDANCE CONCERNING SHIPMENT OF
YOUR HOUSEHOLD GOODS, TRANSPORTATION SPECIALIST ARE ON DUTY TO SERVE

YOU AND CAN BE CONTACTED AT 1-800-444-7759 MONDAY THROUGH FRIDAY
0800-1700 EASTERN TIME. ARRANGE YOUR HOUSEHOLD GOODS SHIPMENT (S)
ONLINE USING SMARTWEB MOVE (SWM) AT WWW.SMARTWEBMOVE.NAVSUP.NAVY.MIL
SWM HANDLES MOST PCS MOVE ARRANGEMENTS AND ELIMINATES THE NEED FOR A
PERSONAL VISIT TO YOUR LOCAL PERSONAL PROPERTY OFFICE FOR A
COUNSELING SESSION. WHEN YOU KNOW YOUR NEW ADDRESS, YOU CAN USE THE
FREE ON-LINE NEX MOVING CENTER AT WWW.NAVY-NEX.COM TO SET UP
ESSENTIAL UTILITIES AND SERVICES FOR YOUR NEW HOME ANYWHERE IN CONUS
AND HAWAII.
- MEMBER DIRECTED:  FOR INFORMATION REGARDING YOUR ULTIMATE DUTY
STATION CONTACT THE NEAREST DEPARTMENT OF DEFENSE FAMILY SERVICE
CENTER OR RELOCATION ASSISTANCE OFFICE.
- COMPLY WITH MILPERSMAN 1320-090 AND 1320-100 REGARDING TRAVEL AND
AUTHORIZED PROCEED TIME IN EXECUTION OF THESE ORDERS.
- WHEN PCSING, AN EXCELLENT AND VERY USEFUL SOURCE OF INFORMATION IS
THE NAVY AND MARINE CORPS LIFELINES SERVICES NETWORK (LSN) AVAILABLE
ON THE INTERNET AT HTTP://WWW.LIFELINES2000.ORG.  YOU'LL FIND TIPS ON
MOVING YOUR HOUSEHOLD GOODS OR SHIPPING YOUR CAR, INFORMATION ON YOUR
NEW DUTY STATION, HOW TO STAY CONNECTED WITH FAMILIES, MOVING PETS,
HOW TO FIND HOUSING AT YOUR NEW DUTY STATION, AND A WEALTH OF
RELOCATION AND SUPPORT RESOURCES FOR YOU AND YOUR FAMILY.
- FOR COMMAND MAILING ADDRESS CONSULT THE STANDARD NAVAL DISTRIBUTION
LIST (SNDL) ONLINE AT HTTP://NEDS.NEBT.DAPS.MIL/SNDL.HTM OR VISIT
YOUR PSA, PSD OR ADMIN OFFICE.
- COMMANDING OFFICER: ENSURE SERVICEMEMBER COMPLETES ARGUS
QUESTIONNAIRE (AS REQUIRED BY OPNAV 1040.10) PRIOR TO EXECUTION
OF ORDERS. WEBSITE: HTTP://WWW.STAYNAVY.NAVY.MIL/
                              (SIGNED)
                              J. W. TOWNES, III
                              REAR ADMIRAL, U. S. NAVY
                              DEPUTY CHIEF OF NAVAL PERSONNEL
   PERS4416
BT
#2510
NNNN
RTD:000-000/COPIES:

# Exhibit  G

(Publication page references are not available for this document.)

The Wall Street Journal
(Copyright (c) 2004, Dow Jones & Company, Inc.)

Thursday, March 18, 2004

Defending the Enemy: Critics of Tribunals Gain
Unlikely Allies: Lawyers in
Uniform
---
JAGs Mount Spirited Attack On System for Trying
Guantanamo Detainees
---
Bin Laden Hires a Driver
By Jess Bravin

On Jan. 31, a military officer showed up at the cell of Osama bin Laden's former driver in Guantanamo Bay with an unusual mission: to try to set the man free. Lt. Cmdr. Charles Swift is a Navy lawyer assigned to defend Salim Ahmed Hamdan before a military tribunal. After 15 meetings with his client, Cmdr. Swift says he's shed any misgivings he harbored about Mr. Hamdan, a 34-year-old Yemeni who has been in detention since being captured in Afghanistan in late 2001.

Cmdr. Swift, 42, plans to argue that statements made against his client by other detainees were coerced and that Mr. Hamdan was merely a poorly educated functionary desperate for a job to support his family. "He has two beautiful kids -- one's 4, one's 2," Cmdr. Swift says, noting that his client has never met his younger child.

In November 2001, when President Bush authorized the first U.S. military tribunals since World War II, the process drew fire from human-rights groups and some legal experts. Now the critics have an unexpected set of allies: the detainees' five military lawyers, who have launched a surprisingly vigorous assault on the system that hired them.

The five JAGs -- as members of the Judge Advocate General's Corps, the military's legal arm, are known -- have attacked the tribunals as inherently unfair, contrary to international law and susceptible to political influence. In a brief they submitted to the Supreme Court, Cmdr. Swift wrote a section comparing the president with King George III and likening the treatment of tribunal defendants to the injustices that helped spark the American Revolution.

Ultimately, the JAGs are expected to challenge virtually every aspect of the administration's policies on Guantanamo detainees, from the denial of protections of the Geneva Conventions to the interrogation methods used in extracting statements. As the first trials draw near, the JAGs' approach could force the administration either to answer in open court or risk undercutting its longstanding promise that the tribunals will be "full and fair."

Citing national-security concerns, Mr. Bush decreed the tribunals free from federal court review, "the principles of law and the rules of evidence" used in civilian trials and the rights afforded U.S. military defendants in courts- martial. That gives the tribunal members, who are military officers selected by the Pentagon, vast leeway to consider hearsay, unsworn statements and other evidence that wouldn't pass muster under normal court procedures. Defendants are entitled to a military defense lawyer and, at their own expense, a civilian lawyer who can pass security checks. But they aren't guaranteed the right to see all the evidence against them.

As military officers defending accused enemies of the U.S., the JAGs say they are motivated by a mix of patriotic duty, personal values and a desire to help shape legal history. Air Force Col. Will Gunn, the Harvard-trained lawyer who heads the defense office, says he wants to show future generations that "even under fire we held firm to our ideals."

For Cmdr. Swift, the cause is in part personal. He says the hazing he experienced as a first-year "plebe" at Annapolis gave him "an affinity for people who get in trouble." As the navigator on the frigate Rathburne in 1989, he bailed out four sailors jailed in Malaysia for possessing a marijuana cigarette, sparing them a potential life term. He says the experience made him realize that "I'm a defense attorney. In my heart I've always been."

The JAGs know they are in a tricky position. People may wonder why they are defending presumed enemies of the U.S., while others may believe they are merely putting on a show to lend legitimacy to the process. Indeed, the Defense Department has

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(Publication page references are not available for this document.)

cited their vigorous stance as evidence that the tribunal system is just.

The JAGs say they are fighting to win. "I have absolutely no desire to be the loyal opposition," says Navy Lt. Cmdr. Philip Sundel, 39, one of two JAGs assigned to defend Ali Hamza Ahmed Sulayman al Bahlul, a Yemeni accused of producing al Qaeda propaganda videos. "I do not want to be the person whose impassioned but unsuccessful arguments help show the system was fair."

So far, the JAGs have won praise from human-rights groups and legal experts who initially expected to see little more than a perfunctory defense. "I was shocked to discover just how good these military lawyers were," says Neal Katyal, a Georgetown University law professor and national-security adviser in the Clinton Justice Department who helped the JAGs draft their Supreme Court brief.

In December, the government denied the JAGs permission to hold a joint press conference where they planned to criticize tribunal rules. Maj. Michael Mori, the Marine lawyer representing Australian prisoner David Hicks, is publicly complaining that prosecuting foreigners before tribunals considered unfit for American defendants represents a double standard. Referring to the U.S. Army officer who served only 3 1/2 years for the 1968 My Lai massacre in Vietnam, Maj. Mori asks, "How hard do we hold our own people accountable? How many people did Lt. [William] Calley kill?"

The Pentagon declined to comment on the JAGs' defense tactics. The tribunal system's top lawyer, retired Air Force Brig. Gen. Thomas Hemingway, says they should only speak publicly to help their clients, not aim "to make a big splash."

So far, President Bush has deemed only six of the roughly 660 prisoners at Guantanamo to be eligible for prosecution before tribunals, or commissions, as they are formally known. Four have been assigned lawyers, although only two have been charged. No trial dates have been set, but a courtroom stands ready at the sealed-off navy base on Cuba's southern coast.

To assemble the defense team, each military branch -- all have their own JAG corps -- was asked to nominate a handful of candidates. They were interviewed by Col. Gunn and approved by the Pentagon's general counsel, William J. Haynes II. Even within the military, Col. Gunn says, there was "a perception that they're probably not going to put their best over there."

What's more, the JAGs, including Col. Gunn, each had to consider what effect their new job might have on their military careers. Instead of moving into a top post in the Air Force JAG Corps, as he had expected, "I am now being asked to coordinate the defense efforts of . . . people who are identified as enemies of the nation," Col. Gunn says. That's "a fairly high-risk proposition."

Most of the defense JAGs say they expect to remain in the military after the trials.

From their nondescript offices in a Pentagon annex, decorated with service pennants and maps of Afghanistan, the attorneys spent months scouring texts on World War II tribunals and modern commentaries on the law of war. They sought out Arabic interpreters and outside attorneys skilled in the complicated constitutional, criminal and military issues they are facing. None was assigned a specific defendant until December.

Along the way, the JAGs say, they have continually run into impediments in the tribunal procedures, which were devised by lawyers working for Mr. Haynes, whom President Bush has nominated to a federal appeals court. For one, the general counsel selected, and now oversees, both Col. Gunn and the chief prosecutor, Army Col. Fred Borch. The defense lawyers maintain that they should report to a separate agency, such as the Army or Navy JAG Corps, as is standard procedure in the regular military justice system.

"I have to ask the person who drafted the military commission instructions whether I can do certain things to fight against the military commission instructions," says Cmdr. Sundel. The connections between Bush administration political appointees, the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**(Publication page references are not available for this document.)**

prosecution and the tribunal judges seem "a little incestuous," he says.

The defense JAGs also complain that they are required to tell the tribunal apparatus anything they may plan to say to people outside the office. The information must be screened for what the Pentagon calls "protected information," a category created for the tribunals that covers material the government deems relevant to national security. This forces the JAGs to decide between disclosing "exactly what I'm going to say" in a conversation with an outside legal expert, for instance, or not asking to having the conversation at all, says Cmdr. Sundel.

The JAGs say they are especially troubled by regulations that deny Col. Gunn the attorney-client privilege with tribunal defendants. Col. Gunn acknowledges his staff's dilemma: "Is the boss a government plant to provide high-level officials with information about what they're going to do with their cases?" His solution has been to keep a distance from much of the legal work undertaken by the JAGs.

Gen. Hemingway says many of the lawyers' concerns are overblown. Regarding protected information, for instance, he says, "We're trying to set up some training programs for them to reduce whatever fog they feel exists in that area." He says the Pentagon designed "a very, very effective process" and that he sees no reason "to scrap what we've already done and go back to something that they assert would be more comfortable."

Still, the defense JAGs say the tribunal system allows for the potential of conflicts of interest that wouldn't be tolerated in courts-martial. In naming the panel that will review tribunal verdicts, Defense Secretary Donald Rumsfeld appointed lawyers with whom he has longstanding relationships, the JAGs say.

"There is an enormous number of people in this country that would have been fully qualified to sit on the review panel," says Cmdr. Sundel. "Yet they couldn't move beyond picking their friends."

Panel member William Coleman, who served with Mr. Rumsfeld in President Ford's cabinet, says their

history together won't influence his decisions. "I started my career as a law clerk to Mr. Justice [Felix] Frankfurter, so I'm well aware of the responsibilities" judges have to act ethically, says Mr. Coleman.

(MORE)

Gen. Hemingway says the panel members, who also include Rhode Island's chief justice, a former Pennsylvania congressman and President Carter's attorney general, are "very, very distinguished members of the bar" whose "reputation speaks for itself."

Prof. Katyal offered his services to the defense last May. After receiving clearance from Col. Gunn, he began meeting with the JAGs to discuss legal attacks on the tribunals. They saw an opening in November, when the Supreme Court agreed to decide whether federal courts held jurisdiction over non-U.S. citizens jailed at Guantanamo, in a case brought by relatives of the detainees.

Prof. Katyal urged the JAGs to file their own brief before the high court, arguing that apart from the legality of offshore detention without charge, civilian courts should have the power to review decisions of military tribunals. The JAGs agreed, debating only whether they should notify Mr. Haynes of their plans in advance. When they did, "questions were raised by the general counsel's office about whether it would be appropriate," says Army Maj. Mark Bridges, one of the defense JAGs.

The team resolved to prepare a brief and submit it as private citizens if necessary. They worked on the project out of uniform at Prof. Katyal's law-school offices. Sometimes, after work, they met at an Irish pub near Georgetown to discuss the brief over beers or coffee. The effort "reminded me of law school," says Cmdr. Swift.

Ultimately, the Bush administration allowed the team to submit the brief in their official capacity.

Aware of the vast cultural gap he faced with his new client, Cmdr. Swift read up on Arab culture and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(Publication page references are not available for this document.)

searched for a way to connect with his client. Mr. Hamdan knew of Islamic Sharia law but had no grasp of the adversarial legal system used by the U.S., Cmdr. Swift says. So the lawyer found a common denominator: their mutual love of chess, which allowed him to explain the roles of the prosecution and defense. "It's been the first metaphor that really works," Cmdr. Swift says.

Pentagon officials have said they expect to strike plea bargains with some defendants willing to testify against others. Although he has not himself been charged, Mr. Hamdan is identified as a co-conspirator in charges issued last month against two other Guantanamo prisoners accused of helping Mr. bin Laden run his terrorist network. A Pentagon spokesman declined to discuss the specifics of Mr. Hamdan's case prior to charges being filed.

Should Mr. Hamdan stand trial, Cmdr. Swift is preparing a double-barreled defense, attacking the procedures and evidence while arguing that his client was a hired hand ignorant of Mr. bin Laden's schemes.

Cmdr. Swift says he will contest statements extracted from other prisoners as coerced. Detainees who don't talk to interrogators "get up to 30 days in solitary [confinement]," he says, something especially onerous to Muslims used to a communal culture. Moreover, he adds, posters at Guantanamo promise "Freedom through Cooperation," a strong hint that detainees should give incriminating statements. "What is the incentive not to tell them exactly what they want to hear?" he asks.

Pentagon officials say Guantanamo prisoners are treated humanely and that the U.S. complies with an international treaty banning torture. But they acknowledge that interrogators can use such harsh techniques as forcing prisoners to stand in uncomfortable "stress" positions and depriving them of sleep.

Cmdr. Swift says his client left Yemen in 1995 or 1996 for Tajikistan, where he sought to aid Islamic fundamentalists fighting the former Soviet republic's post-Communist government. But "weather and politics" closed the border, Cmdr. Swift says, and a dejected Mr. Hamdan planned to return home when he was offered a job as a driver. The client: Mr. bin Laden.

At the time, Mr. bin Laden was known to many Muslims as a wealthy benefactor who had aided the Islamic resistance to the Soviets in Afghanistan in the 1980s. To Mr. Hamdan, a steady paycheck from such a boss sounded better than returning to impoverished Yemen, Cmdr. Swift says.

Cmdr. Swift declines to say how much Mr. Hamdan knew about Mr. bin Laden's affairs. But he argues that the terrorist kept his plans secret. Moreover, he says, "Osama bin Laden didn't just blow people up. One of his appeals -- and one of our problems in catching him -- is that he also does things like build roads and set up agricultural co-ops and stuff like that."

Many people had dealings with Mr. bin Laden, he adds, "from [Mohammed] Atta who is sitting there beside him planning a horrific attack, to the guy in town who may have sold him a tea beverage in Kandahar," says Cmdr. Swift. "Are you guilty because you liked or worked for a bad man?"

---

Question of the Day: Is the U.S. moving quickly enough in processing Guantanamo Bay prisoners? Visit WSJ.com/Question to vote.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Crime/Courts (GCRIM); Acts of Terror (GTERR); Political/General News (GCAT); Armed Forces (GDEF); Law Enforcement (GHOME); Domestic Politics (GPOL); Defense Department (GVDEF); Executive Branch (GVEXE); Page-One Story (NPAG); Risk News (GRISK); Government Bodies (GVBOD); Content Types (NCAT))

REGION: (United States (USA); Afghanistan (AFGH); Caribbean Countries (CARIBZ); Cuba (CUBA); Iraq (IRAQ); Asian Countries (ASIAZ);

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

3/18/04 Wall St. J. A1
2004 WL-WSJ 56923337
**(Publication page references are not available for this document.)**

Central Asian Countries (CASIAZ); Developing
Economics (DVPCOZ); Persian Gulf Countries
(GULFSTZ); Latin American Countries (LAMZ);
Middle Eastern Countries (MEASTZ); North
American Countries (NAMZ); Western Asian
Countries (WASIAZ))


LANGUAGE:      EN


OTHER INDEXING      WSJ; CRM; DJWI; FRT;
GEN; LEN; PAG; PLT; AFG; CU; FE; FEO; IZ;
LTM; ML; NME; US; WIS, DEF; EXE; USG;
MMR; NND; LFT; PGO


Word Count: 2532

3/18/04 WSJ A1

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2/12/04 FOXNWSRDGR (No Page) Case 1:04-cv-01519-JR   Document 1-3   Filed 09/02/04   Page 47 of 76 Page 1
2/12/04 Fox news: On Record with Greta Van Susteren (Pg. Unavail. Online)
2004 WL 62849973
**(Publication page references are not available for this document.)**

Fox news: On the Record with Greta Van Susteren
(c) 2004 Federal Document Clearing House. All Rights Reserved.

Thursday, February 12, 2004

News; International

Interview With Military Defense Attorney Lieutenant Commander Charles Swift
Greta Van Susteren

VAN SUSTEREN: Tonight, thousands turned out to remember 11-year-old Carlie Brucia who was kidnapped and killed in Florida last week.  Carlie was kidnapped Super Bowl Sunday while walking home after a sleepover at a friend's house. Her kidnapping was caught on a car wash surveillance video, and Carlie's body was found behind a Sarasota church early last Friday morning.

Thirty-seven-year-old Joseph Smith is charged with her kidnapping and her murder. Tonight, there's still no word on whether the judge will grant the defense's request for a gag order.

Now to the capture of Usama bin Laden's driver who is being held at Guantanamo Bay, Cuba, tonight. He's a 34-year-old Yemeni who may be the first to face a military tribunal.

We're joined now by his military defense lawyer Lieutenant Commander Charles Swift.

Welcome, sir.

LT. CMDR. CHARLES SWIFT, ATTORNEY FOR SALIM AHMED SALIM HAMDAN: Good evening, Greta.

VAN SUSTEREN: All right. So you are a lawyer in the Navy, right?

SWIFT: That's correct, yes.

VAN SUSTEREN: And you've been appointed to represent this man down in Guantanamo Bay?

SWIFT: Yes, Greta, I have.

VAN SUSTEREN: When he first saw you, did you show up to meet him in your

Case 1:04-cv-01519-JR   Document 1-3   Filed 09/02/04   Page 48 of 76

2/12/04 FOXNWSEDGE (No Page)                                                          Page 2
2/12/04 Fox news: On Record with Greta Van Susteren (Pg. Unavail. Online)
2004 WL 62849973
(Publication page references are not available for this document.)

uniform?


SWIFT: I sure did.


VAN SUSTEREN: Does he seem to have any sort of problem trusting you?


SWIFT: We've worked at it, and it's a developing relationship. The last time I left, he was worried that I might be relieved. So I think we've made real progress there.


VAN SUSTEREN: All right. Is there any sort of restriction on you? What can you say and what can't you see about this case?


SWIFT: Well, in this particular case because of the security concerns, I have to get clearance to talk about any of the direct facts. I have clearance talk about his basic biographical data, how he was captured, and to address some of the allegations that have been made about detainees in general.


VAN SUSTEREN: All right. Your client is Mr. Hamdan, right?


SWIFT: That's correct.


VAN SUSTEREN: He -- was he Usama bin Laden's driver?


SWIFT: Yes. He -- Mr. Hamdan fully admits that he was employed by Usama bin Laden prior to 9/11. He, however, denies that he was ever a member of al Qaeda or that he was a member of the Taliban or a terrorist.


VAN SUSTEREN: And what was he specifically employed to do?


SWIFT: He was employed to do exactly that, drive him and other agricultural workers. There were agricultural workers also at the compound. That's what he started doing originally, and then, after a while, he was -- also would drive around Usama bin Laden himself on occasion.


VAN SUSTEREN: How does this Yemeni get this job in Afghanistan?


SWIFT: Well, he had gone to Afghanistan, he'd left Yemen for the purpose of helping the freedom -- Muslim freedom fighters in Tajikistan, and he never got there.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2/12/04 FOXNWSEDGE (No Page)
Case 1:04-cv-01519-JR   Document 1-3   Filed 09/02/04   Page 49 of 76
Page 3
2/12/04 Fox news: On Record with Greta Van Susteren (Pg. Unavail. Online)
2004 WL 62849973
(Publication page references are not available for this document.)

The weather in combination with the political situation prevented him from
getting to Tajikistan -- sorry about that -- and he was on his way back to
Yemen when he was offered a job. That was $200 a month as a driver. That's very
good money for a Yemeni, so he took it.

VAN SUSTEREN: And what year did he first get this job?

SWIFT: Nineteen ninety-six.

VAN SUSTEREN: Did he tell you what -- anything about Usama bin Laden, what he
thought of him?

SWIFT: Well, that's one of those areas of the security area that I can't really
go into.

VAN SUSTEREN: OK. Fair enough. All right. Is being a driver for Usama bin
Laden -- just being a driver for Usama bin Laden -- is that against the law?

SWIFT: I don't know. You're a lawyer. What do you think?

VAN SUSTEREN: Well, I -- I don't know under -- he hasn't been charged yet,
right?

SWIFT: That's right.

VAN SUSTEREN: OK. So you don't even -- so, right now, he was moved into a
special segregation in December, right?

SWIFT: That's correct.

VAN SUSTEREN: What was the segregation -- what's it called, the segregation
he's in?

SWIFT: It's called precommission segregation. For him, it's solitary
confinement. He has no more contact with any other detainees.

VAN SUSTEREN: All right.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2/12/04 Fox news: On Record with Greta Van Susteren (Pg. Unavail. Online)
2004 WL 62849973
**(Publication page references are not available for this document.)**

SWIFT: He's simply held alone.


VAN SUSTEREN: And by -- precommission means precharges?


SWIFT: Precharges.


VAN SUSTEREN: So he -- so when I ask the question whether it's against the law, so to speak, to be a driver for Usama bin Laden, we don't even know what the charges are or what the allegation is?


SWIFT: Not yet.


VAN SUSTEREN: Can you -- do you have some sort of hypothesis of what it might be?


SWIFT: Well, it could be possibly -- an associate in any criminal enterprise, if there's a person engaged in a criminal enterprise, could be possibly charged as accessory or conspiracy. In Mr. Hamdan's case, I have trouble seeing it because that would mean that he would have to have foreknowledge and be participating, as you know, as a lawyer, and I don't see that.


VAN SUSTEREN: How did he get picked up?


SWIFT: He was captured when he was returning a vehicle. As the war had gotten to a point where the fronts were breaking down, he had left Usama bin Laden and he was trying to get his family back to Yemen via Pakistan, . and, because his wife was pregnant and he had 2-year-old girl, he borrowed a car, and he took the car and drove them to Pakistan, and then, because he'd borrowed it, he was bringing it back when he was captured by Afghan forces.


VAN SUSTEREN: And did -- and is this one of those gray areas? I guess -- let me ask you and you can tell me whether it's one of those gray areas. Did -- when he got picked up by the American forces, did he say I'm a driver for Usama bin Laden?


SWIFT: I can't...


VAN SUSTEREN: That's one of the gray areas? OK.


SWIFT: I can't discuss the level of his cooperation today.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 62849973
(Publication page references are not available for this document.)

VAN SUSTEREN: All right. So now he's held down in December -- I mean
December -- in this sort of segregation, and you've actually seen how he's been
held.

SWIFT: Yes, I have.

VAN SUSTEREN: And describe it for me.

SWIFT: Well he's held in a -- what I would characterize as a four-by- eight-
foot cell, similar to a normal prison cell. It has the same sort of amenities,
a toilet, a place to wash your hands, a bed. And he is held completely alone.

It's ironic. This is the most ironic thing in it. He's actually very
uncomfortable because it has air conditioning. He's from Yemen, and he's not
used to it being cold, and so -- the area is air conditioned, so he complains
that he's cold all the time.

VAN SUSTEREN: All right. Well, we only have about 20 seconds left. Any idea --
I know he hasn't been charged, but when he's going to finally have a trial?

SWIFT: Well, today, I've submitted a letter to the appointing authority
requesting that he get charges immediately. Article 10 of the Uniform Code of
Military Justice, which we believe applies...

VAN SUSTEREN: So the guess is? I've got to go.

SWIFT: Well, I would hope as soon as possible given his standard, given the
position that he's in.

VAN SUSTEREN: Nice to see you, sir. I hope you'll come back. Thank you very
much.

SWIFT: You're welcome.

VAN SUSTEREN: Lieutenant Commander Charles Swift.

Thank you, sir.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2004 WL 62849973
(Publication page references are not available for this document.)

Up next, ripped from the headlines. The made-for-TV movie on the Laci Peterson murder will air tomorrow night. One of the stars is here. Is she worried her role will jeopardize his right to a fair trial?

And later, new information on the murder of Jonathan Luna. The federal prosecutor's body was dumped in Pennsylvania.

(COMMERCIAL BREAK)

VAN SUSTEREN: Up next ON THE RECORD, the made-for-TV movie on Laci Peterson's murder airs tomorrow. How does it end? I'll ask one of the stars next.

And later, who made a stink about being questioned with the unsolved murder of a federal prosecutor?

(COMMERCIAL BREAK)

#### ---- INDEX REFERENCES ----

NEWS SUBJECT:    (Crime/Courts (GCRIM); Acts of Terror (GTERR); Military Action (GVIO); Armed Forces (GDEF); Interview (NITV); Transcript (NTRA); Political/General News (GCAT); Risk News (GRISK); Content Types (NCAT); IWE Filter (NIWE))

REGION:    (Afghanistan (AFGH); United States (USA); Yemen (YEMAR); Asian Countries (ASIAZ); Central Asian Countries (CASIAZ); Developing Economies (DVPCOZ); Middle Eastern Countries (MEASTZ); North American Countries (NAMZ); Western Asian Countries (WASIAZ))

OTHER INDEXING:    Show; Charles Swift; Military; Salim Ahmed Salim Hamdan; Terrorism; Trials; EN

Word Count: 1435

2/12/04 FOXNWSEDGE (No Page)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(Publication page references are not available for this document.)

Associated Press Newswires
c) 2004.  The Associated Press.  All Rights Reserved.

Wednesday, February 11, 2004

Defense lawyer says Bin Laden's driver among the prisoners at Guantanamo

MIAMI (AP) - A Yemeni captive in isolation at the Guantanamo Bay prison
acknowledges being Osama bin Laden's $200-a-month driver in Afghanistan but
denies being a member of al-Qaida, The Miami Herald reported Wednesday.  "He
fully admits that he was an employee of Osama bin Laden" from 1997 until the
U.S. attack on Afghanistan in 2001, Navy Lt. Cmdr. Charles Swift told the
newspaper. "He worked for Osama bin Laden solely for the purpose of supporting
himself and his family."

Swift, a lawyer, has been assigned to represent the captive, 34-year-old Salim
Ahmed Salim Hamdan.

Pentagon policy has prohibited troops and civilians at the Navy base in Cuba
from disclosing specifics about prisoners being held there. The Herald said
Swift received special Pentagon clearances. Swift said he has met with Hamdan
for about 25 hours using an Arabic translator -- making him the first
Guantanamo detainee publicly identified as having a link to bin Laden.

Swift said Pentagon rules prevented him from describing his client physically,
saying how long he had been in the prison or whether Hamdan has cooperated with
interrogators.

Hamdan began working for bin Laden in 1997 on his farm in the Afghan city of
Kandahar, and drove a Toyota pickup truck, Swift said. His responsibilities
included moving workers to the fields and the al-Qaida mastermind around
Afghanistan.

Hamdan first went to Afghanistan in 1996, and had planned to travel to
Tajikistan to join Muslims fighting former Soviet communists, the lawyer said.
He never made the trip but found the job with bin Laden that paid $200 a month,
a large salary in Afghanistan.

"In respect to the prospect of a trial by military commission, he denies that
he's a terrorist, al-Qaida or a combatant in the international conflict in
Afghanistan. He is a civilian worker who was caught up in the war," Swift said.

Air Force Col. Will Gunn, chief of the tribunal defense team, said this week he
assigned Swift to represent the Yemeni after prosecutors named Hamdan as a
candidate for plea negotiations.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(Publication page references are not available for this document.)

None of the four terrorism suspects at Guantanamo who have been given lawyers has been charged with any crime. Gunn said the charges have not been identified but they would likely involve conspiracy.

Hamdan, who is married and has a 2- and 4-year-old daughter, was captured by Afghan forces during the U.S. attacks and turned over to the Americans about two years ago, Swift said.

Since Hamdan was given counsel on Dec. 18, he has been held in solitary confinement in a windowless air-conditioned cell and permitted exercise only at night, "so he never sees the sun," Swift said.

"He has asked me to implore the president to allow him a civilian trial in which he may demonstrate his innocence," Swift said. "He's adamant that he is a civilian and belongs in a civilian court."

: 7

---- INDEX REFERENCES ----

NEWS SUBJECT:        (Crime/Courts (GCRIM); Acts of Terror (GTERR); Military
                     Action (GVIO); Political/General News (GCAT); Risk News
                     (GRISK))


REGION:              (Afghanistan (AFGH); United States (USA); Asian Countries
                     (ASIAZ); Central Asian Countries (CASIAZ); Developing
                     Economies (DVPCOZ); North American Countries (NAMZ))


OTHER INDEXING:      AP National News; Domestic US; Guantanamo Bin Laden Driver;
                     D80L3VI01; tagdsa; sel-----; cata; EN

Word Count: 500

2/11/04 APWIRES 14:44:20

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2/11/04 Miami Herald 1
2004 WL 67039356
**(Publication page references are not available for this document.)**

The Miami Herald
(c) Copyright 2004, The Miami Herald. All Rights Reserved.

Wednesday, February 11, 2004

A

Driver for bin Laden in a Guantánamo cell; Osama bin Laden's driver is among
the prisoners being held at the Guantánamo terrorism prison, his Pentagon-
appointed defense lawyer discloses. WAR ON TERRORISM
BY CAROL ROSENBERG
crosenberg@herald.com

A Yemeni captive at the Guantánamo Bay prison admits he was Osama bin Laden's
$200-a-month driver in Afghanistan but says he was neither a member of al Qaeda
nor a terrorist, his Pentagon-appointed lawyer said for the first time
Tuesday.  Salim Ahmed Salim Hamdan, 34, is now held in isolation at the
terrorism prison in Cuba in segregated accommodations for prisoners facing
possible military tribunals, said his lawyer, Navy Lt. Cmdr. Charles Swift.

"He fully admits that he was an employee of Osama bin Laden" from 1997 until
the U.S. attack on Afghanistan in 2001. "But he adamantly denies that he was
ever a member of al Qaeda or engaged in any terrorist attack. He worked for
Osama bin Laden solely for the purpose of supporting himself and his family."

SPECIAL CLEARANCE

Swift spoke about Hamdan for the first time in an exclusive interview with The
Herald. Pentagon policy has prohibited troops and civilians at the Guantánamo
prison from disclosing specifics about prisoners.

He obtained special Pentagon clearances to discuss his client, whom he has met
for about 25 hours using an Arabic translator -- making him the first detainee
at the terrorism prison publicly identified as having a link to bin Laden.

Starting in 1997, Hamdan worked for bin Laden on his farm in the southern
Afghan city of Kandahar, Swift said, and drove a Toyota pickup truck. He
sometimes ferried farm workers to the fields and sometimes transported around
Afghanistan the al Qaeda mastermind of the Sept. 11 attacks.

EIGHT YEARS AGO

Hamdan first went to Afghanistan in 1996, the lawyer said, intending to travel
to Tajikistan to join Muslims there fighting former Soviet communists. He never
made the trip but found the job with bin Laden that paid $200 a month, a huge

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2/11/04 MIAMIHD 1
2/11/04 Miami Herald 1
2004 WL 67039356
(Publication page references are not available for this document.)

sum for a poor Yemeni in impoverished Afghanistan.

"In respect to the prospect of a trial by military commission, he denies that he's a terrorist, al Qaeda or a combatant in the international conflict in Afghanistan. He is a civilian worker who was caught up in the war," Swift said.

If his lawyer doesn't get a plea agreement with the U.S. government, Hamdan is likely to be among the first Guantánamo captives to face a military trial. Air Force Col. Will Gunn, chief of the tribunal defense team, said this week that he assigned Swift to represent the Yemeni after prosecutors named Hamdan in a "target letter" as a candidate for "plea negotiations."

None of the four terrorism suspects at Guantánamo who have been given lawyers has been charged with any crime. Gunn said the charges have not been identified but they would likely involve "conspiracy."

Hamdan, who is married and has two daughters, ages 2 and 4, was captured by Afghan forces during the U.S. attacks, Swift said, and turned over to the Americans about two years ago.

DRIVING ALONE

At the time of his capture, he was alone and driving a borrowed car in a mountainous portion of eastern Afghanistan near Pakistan. He had just evacuated his pregnant wife and daughter to the safety of Pakistan, the lawyer said, and was returning the car.

Swift said Pentagon rules prevented him from describing his client physically, saying how long Hamdan had been in the terror prison in southeastern Cuba or answering a question on whether the Yemeni had cooperated with his interrogators.

An early goal of the terrorism prison was gathering intelligence in the hunt for bin Laden. Commanders now say interrogations are more concerned with understanding the inner workings, appeal and training of al Qaeda.

Since Hamdan was given counsel Dec. 18, Swift said, he has been held in solitary confinement, segregated from the other Camp Delta prisoners in a windowless air-conditioned cell and permitted exercise only at night, "so he never sees the sun."

ARTHRITIS PAIN

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2/11/04 MIAMIHD 1  Case 1:04-cv-01519-JR   Document 1-3   Filed 09/02/04   Page 57 of 76  Page 3
2/11/04 Miami Herald 1
2004 WL 67039356
(Publication page references are not available for this document.)

He suffers from arthritis, Swift said, which is aggravated by the prison's air conditioning.

"He gets cold, ironic in Cuba," he said.

"I find him to be engaging and pleasant and upbeat at times," he said. "His conditions make him despair at times."

Hamdan has a fourth-grade education but has a sophisticated understanding of the difference between a military and a civilian court proceeding, Swift said. And he wants a civilian trial.

"He has asked me to implore the president to allow him a civilian trial in which he may demonstrate his innocence," the lawyer said. "He's adamant that he is a civilian and belongs in a civilian court."

The Pentagon has created a military defense team for the Guantánamo tribunals even before a decision on whether to charge any of the 650 prisoners there.

The team includes career Army, Navy, Air Force and Marine lawyers who usually defend U.S. servicemen.

---- INDEX REFERENCES ----

NEWS SUBJECT:    (Crime/Courts (GCRIM); Acts of Terror (GTERR); Military
                 Action (GVIO); Page-One Story (NPAG); Political/General
                 News (GCAT); Risk News (GRISK); Content Types (NCAT))

REGION:          (Afghanistan (AFGH); United States (USA); Asian Countries
                 (ASIAZ); Central Asian Countries (CASIAZ); Developing
                 Economies (DVPCOZ); North American Countries (NAMZ))

EDITION:         F2

OTHER INDEXING:  natnews; FRONT; 5news; EN

Word Count: 840

2/11/04 MIAMIHD 1

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2/11/04 Miami Herald 1
2004 WL 67039356
(Publication page references are not available for this document.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# Exhibit  H



**DEPARTMENT OF DEFENSE**
**OFFICE OF GENERAL COUNSEL**
1600 DEFENSE PENTAGON
WASHINGTON, DC 20301-1600



18 December 2003

MEMORANDUM DETAILING DEFENSE COUNSEL

TO:     LCDR Charles Swift, USN
SUBJECT:  Detailing Letter re Military Commission Proceedings of Mr. Salem Ahmed Salem
                Hamden

Pursuant to the authority granted to me by my appointment as Acting Chief Defense Counsel and
Sections 4C and 5D of Military Order No. 1, dated March 21, 2002, you are hereby detailed as
Military Counsel for all matters relating to Military Commission proceedings involving Mr.
Salem Ahmed Salem Hamden. Your appointment exists until such time any findings and
sentence become final as defined in Section 6(H)(2) unless you are excused from representing
Mr. Hamden by me or my successor. I deem your detailing to be appropriate based on the
government's assertion in enclosure (1) that on July 3, 2003, the President determined that Mr.
Hamden is subject to the Military Order of November 13, 2001 and as such "shall when tried, be
tried by military commission for any and all offenses triable by military commission that [he] is
alleged to have committed, and may be punished in accordance with the penalties provided under
applicable law, including life imprisonment or death."

In your representation of Mr. Hamden, you are directed to review and comply with Presidential
Military Order of November 13, 2001, "Detention, Treatment, and Trial of Certain Non-Citizens
in the War Against Terrorism," (66 FR 57833); Military Commission Orders No. 1 and 2 and
Military Commission Instructions 1 through 8 and all Supplementary Regulations and
Instructions issued in accordance therewith. Specifically, you are directed to ensure that your
conduct and activities are consistent with the prescriptions and proscriptions specified in Section
II of the Affidavit And Agreement By Civilian Defense Counsel at Appendix B to Military
Instruction No. 5.

You are directed to inform Mr. Hamden of his rights before a Military Commission. In the event
that Mr. Hamden chooses to exercise his rights to Selected Military Counsel or his right to
Civilian Defense Counsel at his own expense, you shall inform me as soon as possible.
Consistent with paragraph 3B(8) of Military Instruction No. 4, I am detailing Legalman First
Class Jason E. Kreinhop as a member of the defense team to assist you in representing Mr.
Hamden.

In the event that you become aware of a conflict of interest arising from the representation of Mr.
Hamden before a Military Commission, you shall immediately inform me of the nature and facts
concerning such conflict. You should be aware that in addition to your State Bar and Service
Rules of Professional Conduct that by virtue of your appointment to the Office of Military
Commissions you will be attached to the Defense Legal Services Agency and will be subject to
professional supervision by Department of Defense General Counsel.



You are directed to inform me of all requirements for personnel, office space, equipment, and supplies necessary for preparation of the defense of Mr. Hamden.

Colonel Will A. Gunn, USAF
Chief Defense Counsel (Acting)
Office of Military Commissions

Enclosure:
Target Letter re Mr. David Hamden dated December 15, 2003

cc:
LN1 Kreinhop
Col Borch
General Hemingway
Mr. Koffsky

# Exhibit  I

I, Salim Ahmed Hamdan, request that Lieutenant Commander
Charles Swift serve as my "next friend" to authorize the
filing of habeas and mandamus petitions on my behalf in the
United States District Court for the Western District of
Washington State. Lt. Commander Swift has been detailed to
serve as my military counsel by the Department of Defense.
I am inaccessible because I am detained at Guantanamo Bay,
Cuba and I have no family presently in the United States.
I understand that Professor Neal Katyal of Georgetown
University Law Center will bring the legal action on behalf
of Charles Swift.

_____     ٥-١-٢-١
SALIM AHMED HAMDAN              DATE

# Exhibit  J

# EXHIBIT  J,  (PAGES  65 – 66)

# FILED UNDER SEAL

# Exhibit  K

Army Regulation 190–8
OPNAVINST 3461.6
AFJI 31-304
MCO 3461.1

Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

**UNCLASSIFIED**

Headquarters
Departments of the Army,
the Navy, the Air Force,
and the Marine Corps
Washington, DC
1 October 1997

*Army Regulation 190–8
*OPNAVINST 3461.6
*AFJI 31–304
*MCO 3461.1

Effective 1 November 1997

## Military Police

# Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees

By Order of the Secretary of
the Navy:

J.L. JOHNSON
Admiral, United States Navy
Chief of Naval Operations
Acting

By Order of the Secretary of
the Air Force:

RICHARD A. COLEMAN
Colonel, USAF
Chief of Security Police

By Order of the Secretary of
the Navy:

LT GENERAL J.L. JONES, USMC
Marine Corps Deputy Chief of Staff
for Plans, Policies and Operations

TOGO D. WEST, JR
Secretary of the Army

J.S. Mobley
Rear Admiral, United States Navy
Director, Navy Staff

**History.** This printing publishes a revision of this publication. Because the publication has been extensively revised the changed portions have not been highlighted.

**Summary.** This regulation implements Department Of Defense Directive 2310.1 and establishes policies and planning guidance for the treatment, care, accountability, legal status, and administrative procedures for Enemy Prisoners of War, Civilian Internees, Retained Persons, and Other Detainees. This regulation is a consolidation of Army Regulation 190-8 and Army Regulation 190-57 and incorporates SECNAV Instruction 3461. 3 and Air Force Joint Instruction 31-304. Policy and procedures established herein apply to the services and their capabilities to the extent that they are resourced and organized for enemy prisoner of war operations.

**Applicability.** This is a multi-service regulation. It applies to the Army, Navy, Air Force and Marine Corps and to their Reserve components when lawfully ordered to active duty under the provisions of Title 10 United States Code.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff for Operations and Plans. The proponent has the authority to approve

exceptions to this regulation that are consistent with controlling law and regulation. Proponents may delegate the approval authority, in writing, to a division chief within the proponent agency in the grade of colonel or the civilian equivalent.

**Army management control process.** The Regulation contains management control provisions in accordance with AR 11-2, but does not contain checklists for conducting management control. Reviews are used to accomplish assessment of management controls.

**Supplementation.** Army supplementation of this regulation and establishment of command or local forms is prohibited without prior approval from HQDA (DAMO-ODL), WASH DC 20310. Navy, Marine Corps and Air Force supplementation of this regulation is authorized, but is not required. If supplements are issued, major or second echelon commands will furnish one copy of each supplement to their headquarters, as follows: Navy, to the Chief of Naval Operations (N511), 2000 Navy Pentagon, Washington DC 20350-2000, Marine Corps, to the Commandant of the Marine Corps, HQ USMC (POS-10) 2 Navy Annex, Washington DC, 20380-1775 11), and Air Force, to HQ USAF/SPO,

1340 Air Force Pentagon, Washington, DC 20330-1340.

**Suggested Improvements.** Users are invited to send comments and suggested improvements through channels as follows: HQDA (DAMO-ODL), WASH DC 20310-0440.

**Distribution.** *Army:* Distribution of this regulation is made in accordance with initial distribution number (IDN) 092120, intended for command levels A, B, C, D, and E for Active Army, Army National Guard, U. S. Army Reserve.

*Navy:* SNDL A (Navy Department); B5 (Coast Guard); (COMDTCOGARD, only) 21A (Fleet Commanders in Chief); 22A (Fleet Commanders); 23 (Force Commanders); 24 (Type Commanders); 26A (Amphibious Groups); 28 (Squadron, Division, and Group Commanders- Ships); 41A (COMSC); SECNAV/OPNAV Directives Control Office, Washington Navy Yard Bldg 200, 901 M Street SE, Washington DC 20374-5074

*Air Force:* F

*Marine Corps:* PCN 10203324000

---

*This regulation supersedes AR 190-8, 1 June 1982, and rescinds AR 190-57, 4 March 1987. This regulation also rescinds DA Form 5451-R, August 1985; DA Form 5452-R, August 1985; and DA Form 5976, January 1991.

AR 190–8/OPNAVINST 3461.6/AFJI 31–304/MCO 3461.1 • 1 October 1997                    i

# UNCLASSIFIED

medical annex of OPLANs, OPORDs and contingency plans includes procedures for treatment of EPW, CI, RP, and ODs. Medical support will specifically include:

(a) First aid and all sanitary aspects of food service including provisions for potable water, pest management, and entomological support.

(b) Preventive medicine.

(c) Professional medical services and medical supply.

(d) Reviewing, recommending, and coordinating the use and assignment of medically trained EPW, CI, RP and OD personnel and medical material.

(e) Establishing policy for medical repatriation of EPW, CI and RP and monitoring the actions of the Mixed Medical Commission.

h. U. S. Army Criminal Investigation Command (USACIDC). USACIDC will provide criminal investigative support to EPW, CI and RP Camp Commanders per AR 195-2.

## 1-5. General protection policy

a. U.S. policy, relative to the treatment of EPW, CI and RP in the custody of the U.S. Armed Forces, is as follows:

(1) All persons captured, detained, interned, or otherwise held in U.S. Armed Forces custody during the course of conflict will be given humanitarian care and treatment from the moment they fall into the hands of U.S. forces until final release or repatriation.

(2) All persons taken into custody by U.S. forces will be provided with the protections of the GPW until some other legal status is determined by competent authority.

(3) The punishment of EPW, CI and RP known to have, or suspected of having, committed serious offenses will be administered IAW due process of law and under legally constituted authority per the GPW, GC, the Uniform Code of Military Justice and the Manual for Courts Martial.

(4) The inhumane treatment of EPW, CI, RP is prohibited and is not justified by the stress of combat or with deep provocation. Inhumane treatment is a serious and punishable violation under international law and the Uniform Code of Military Justice (UCMJ).

b. All prisoners will receive humane treatment without regard to race, nationality, religion, political opinion, sex, or other criteria. The following acts are prohibited: murder, torture, corporal punishment, mutilation, the taking of hostages, sensory deprivation, collective punishments, execution without trial by proper authority, and all cruel and degrading treatment.

c. All persons will be respected as human beings. They will be protected against all acts of violence to include rape, forced prostitution, assault and theft, insults, public curiosity, bodily injury, and reprisals of any kind. They will not be subjected to medical or scientific experiments. This list is not exclusive. EPW/RP are to be protected from all threats or acts of violence.

d. Photographing, filming, and video taping of individual EPW, CI and RP for other than internal Internment Facility administration or intelligence/counterintelligence purposes is strictly prohibited. No group, wide area or aerial photographs of EPW, CI and RP or facilities will be taken unless approved by the senior Military Police officer in the Internment Facility commander's chain of command.

e. A neutral state or an international humanitarian organization, such as the ICRC, may be designated by the U.S. Government as a Protecting Power (PP) to monitor whether protected persons are receiving humane treatment as required by the Geneva Conventions. The text of the Geneva Convention, its annexes, and any special agreements, will be posted in each camp in the language of the EPW, CI and RP.

f. Medical Personnel. Retained medical personnel shall receive as a minimum the benefits and protection given to EPW and shall also be granted all facilities necessary to provide for the medical care of EPW. They shall continue to exercise their medical functions for the benefit of EPW, preferably those belonging to the armed forces upon which they depend, within the scope of the military laws and regulations of the United States Armed Forces. They shall be provided with necessary transport and allowed to periodically visit EPW situated in working detachments or in hospitals outside the

EPW camp. Although subject to the internal discipline of the camp in which they are retained such personnel may not be compelled to carry out any work other than that concerned with their medical duties. The senior medical officer shall be responsible to the camp military authorities for everything connected with the activities of retained medical personnel.

g. Religion.

(1) EPW, and RP will enjoy latitude in the exercise of their religious practices, including attendance at the service of their faith, on condition that they comply with the disciplinary routine prescribed by the military authorities. Adequate space will be provided where religious services may be held.

(2) Military chaplains who fall into the hands of the U.S. and who remain or are retained to assist EPW, and RP, will be allowed to minister to EPW, RP, of the same religion. Chaplains will be allocated among various camps and labor detachments containing EPW, RP, belonging to the same forces, speaking the same language, or practicing the same religion. They will enjoy the necessary facilities, including the means of transport provided in the Geneva Convention, for visiting the EPW, RP, outside their camp. They will be free to correspond, subject to censorship, on matters concerning their religious duties with the ecclesiastical authorities in the country of detention and with international religious organizations. Chaplains shall not be compelled to carry out any work other than their religious duties.

(3) Enemy Prisoners of War, who are ministers of religion, without having officiated as chaplains to their own forces, will be at liberty, whatever their denomination, to minister freely to the members of their faith in U.S. custody. For this purpose, they will receive the same treatment as the chaplains retained by the United States. They are not to be obligated to do any additional work.

(4) If EPW, RP, do not have the assistance of a chaplain or a minister of their faith. A minister belonging to the prisoner's denomination, or in a minister's absence, a qualified layman, will be appointed, at the request of the prisoners, to fill this office. This appointment, subject to approval of the camp commander, will take place with agreement from the religious community of prisoners concerned and, wherever necessary, with approval of the local religious authorities of the same faith. The appointed person will comply with all regulations established by the United States.

## 1-6. Tribunals

a. In accordance with Article 5, GPW, if any doubt arises as to whether a person, having committed a belligerent act and been taken into custody by the US Armed Forces, belongs to any of the categories enumerated in Article 4, GPW, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

b. A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.

c. A competent tribunal shall be composed of three commissioned officers, one of whom must be of a field grade. The senior officer shall serve as President of the Tribunal. Another non-voting officer, preferably an officer in the Judge Advocate General Corps, shall serve as the recorder.

d. The convening authority shall be a commander exercising general courts-martial convening authority.

e. Procedures.

(1) Members of the Tribunal and the recorder shall be sworn. The recorder shall be sworn first by the President of the Tribunal. The recorder will then administer the oath to all voting members of the Tribunal to include the President.

(2) A written record shall be made of proceedings.

(3) Proceedings shall be open except for deliberation and voting by the members and testimony or other matters which would compromise security if held in the open.

(4) Persons whose status is to be determined shall be advised of their rights at the beginning of their hearings.

(5) Persons whose status is to be determined shall be allowed to attend all open sessions and will be provided with an interpreter if necessary.

(6) Persons whose status is to be determined shall be allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal. Witnesses shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would affect combat or support operations. In these cases, written statements, preferably sworn, may be submitted and considered as evidence.

(7) Persons whose status is to be determined have a right to testify or otherwise address the Tribunal.

(8) Persons whose status is to be determined may not be compelled to testify before the Tribunal.

(9) Following the hearing of testimony and the review of documents and other evidence, the Tribunal shall determine the status of the subject of the proceeding in closed session by majority vote. Preponderance of evidence shall be the standard used in reaching this determination.

(10) A written report of the tribunal decision is completed in each case. Possible board determinations are:

*(a)* EPW.

*(b)* Recommended RP, entitled to EPW protections, who should be considered for certification as a medical, religious, or volunteer aid society RP.

*(c)* Innocent civilian who should be immediately returned to his home or released.

*(d)* Civilian internee who for reasons of operational security, or probable cause incident to criminal investigation, should be detained.

*f.* The recorder shall prepare the record of the Tribunal within three work days of the announcement of the tribunal's decision. The record will then be forwarded to the first Staff Judge Advocate in the internment facility's chain of command.

*g.* Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed. The record of every Tribunal proceeding resulting in a determination denying EPW status shall be reviewed for legal sufficiency when the record is received at the office of the Staff Judge Advocate for the convening authority.

## 1–7. The National Prisoner of War Information Center (NPWIC)

The NPWIC will—

*a.* Forward blocks of ISNs to designated Branch PWIC in Theater and CONUS, as required.

*b.* Obtain and store information concerning EPW, CI and RP, and their confiscated personal property. Information will be collected and stored on each EPW, CI, and RP captured and detained by U.S. Armed Forces. This includes those EPW, RP, who were captured by the United States but are in custody of other powers and those who *have been released or repatriated.* EPW, CI and RP cannot be forced to reveal any information however they are required to provide their name, rank, serial number and date of birth. The Geneva Convention requires the NPWIC to collect and store the following information for EPW, RP:

(1) Complete name.

(2) ISN.

(3) Rank.

(4) Serial number.

(5) Date of birth.

(6) City of birth.

(7) Country of birth.

(8) Name and address of next of kin.

(9) Date of capture.

(10) Place of capture.

(11) Capturing unit.

(12) Circumstances of capture.

(13) Location of confiscated personal property.

(14) Nationality.

(15) General statement of health.

(16) Nation in whose armed services the individual is serving.

(17) Name and address of a person to be notified of the individual's capture.

(18) Address to which correspondence may be sent.

(19) Certificates of death or duly authenticated lists of the dead.

(20) Information showing the exact location of war graves together with particulars of the dead.

(21) Notification of capture.

(22) List of personal articles of value not restored upon repatriation.

*c.* Obtain and store information concerning CI and ODs who are kept in the custody of U.S. Armed Forces who are subjected to assigned residence, or who were interned and then released. The following information will be collected:

(1) Any particulars that may assist in the individual's *identification.* This information shall include at least the person's surname, first names, place and date of birth, nationality, last residence and distinguishing characteristics, the first name of the father and the maiden name of the mother, the date, place and nature of the action taken with regard to the individual, the address at which correspondence may be sent and the name and address of the person to be informed.

(2) The individual's personal data for notification of his or her internment, state of health, and changes to this data.

(3) Certificates of death or authenticated lists of the dead and information showing the location of graves.

(4) Authenticated lists of personal valuables left by these protected persons.

(5) Information pertaining to children living in territories occupied by the United States. This will include all data necessary for identifying children whose identity is in doubt.

*d.* Process all inquiries concerning EPW and RP captured by U.S. Armed Forces.

*e.* Make reports to the ICRC, the State Department, and other Federal agencies as required.

*f.* Provide to the adverse party via the ICRC's Central Tracing Agency (CTA) all pertinent information pertaining to EPW, CI, and RP, in custody of the U.S. Armed Forces.

*g.* Transmit via the CTA/ICRC/PP, all official documents and information on judicial proceedings concerning EPW and RP captured, interned, retained or detained by U.S. Armed Forces.

*h.* Information and Property Transfers.

(1) In response to an inquiry, the NPWIC will forward all information and documents to the CTA or PP.

(2) Valuables and personal property which can be returned to a released or repatriated person will be forwarded through the CTA or PP.

(3) Valuables and personal property of deceased EPW/RP, which can be released, will be forwarded to the next of kin through the CTA or PP.

*i.* The ICRC/PP transmits information, documents, and personal effects to the State it represents as follows:

(1) If civilians are concerned, to their countries of origin and/or residence.

(2) If combatants or EPW, CI, and RP are concerned, to their country of origin or to the Power on which they depend.

## 1–8. The Branch PWIC

*a.* The Branch PWIC functions as the field operations agency for the NPWIC. It is the central agency responsible to maintain information on all EPW, CI and RP and their personal property within an assigned theater of operations or in CONUS.

*b.* The Branch PWIC serves as the theater repository for information pertaining to:

(1) Accountability of EPW, CI, and RP and implementation of DOD policy.

- 71

# Exhibit  L

# NAVAL WARFARE PUBLICATION

# THE COMMANDER'S HANDBOOK

# ON THE LAW OF NAVAL

# OPERATIONS

# NWP 1-14M

# (Formerly NWP 9)

# FMFM 1-10

# COMDTPUB P5800.7

DEPARTMENT OF THE NAVY

OFFICE OF THE CHIEF OF NAVAL OPERATIONS

**TABLE OF CONTENTS**

- 73

# CHAPTER 11

# Noncombatant Persons

## 11.1 INTRODUCTION

As discussed in Chapter 5, the law of armed conflict is premised largely on the distinction to be made between combatants and noncombatants. Noncombatants are those individuals who do not form a part of the armed forces and who otherwise refrain from the commission of hostile acts. Noncombatants also include those members of the armed forces who enjoy special protected status, such as medical personnel and chaplains, or who have been rendered incapable of combat by wounds, sickness, shipwreck, or capture. This chapter reviews the categories of noncombatants and outlines the general rules of the law of armed conflict designed to protect them from direct attack.

## 11.2 PROTECTED STATUS

The law of armed conflict prohibits making noncombatant persons the object of intentional attack and requires that they be safeguarded against injury not incidental to military operations directed against military objectives. When circumstances permit, advance warning should be given of attacks that might endanger noncombatants in the vicinity. Such warnings are not required, however, if mission accomplishment requires the element of surprise or the security of the attacking forces would be otherwise compromised. On the other hand, a party to an armed conflict has an affirmative duty to remove civilians under its control as well as the wounded, sick, shipwrecked, and prisoners of war from the vicinity of targets of likely enemy attack. Deliberate use of noncombatants to shield military objectives from enemy attack is prohibited. Although the principle of proportionality underlying the concept of collateral damage and incidental injury continues to apply in such cases, the presence of noncombatants within or adjacent to a legitimate target does not preclude attack of it.

## 11.3 THE CIVILIAN POPULATION

The civilian population as such, as well as individual civilians, may not be the object of attack or of threats or acts of intentional terrorization. The civilian population consists of all persons not serving in the armed forces, militia, or paramilitary forces and not otherwise taking a direct part in the hostilities. Women and children are entitled to special respect and protection. Unlike military personnel (other than those in a specially protected status such as medical personnel and the sick and wounded) who are always subject to attack whether on duty or in a leave capacity, civilians, as a class, are not to be the object of attack. However, civilians that are engaged in direct support of the enemy's war-fighting or war-sustaining effort are at risk of incidental injury from attack on such activities.

- 74

Civilians who take a direct part in hostilities by taking up arms or otherwise trying to kill, injure, or capture enemy personnel or destroy enemy property lose their immunity and may be attacked. Direct participation may also include civilians serving as guards, intelligence agents, or lookouts on behalf of military forces. Direct participation in hostilities must be judged on a case-by-case basis. Combatants in the field must make an honest determination as to whether a particular civilian is or is not subject to deliberate attack based on the person's behavior, location and attire, and other information available at the time.

- 
  - ### 11.4 THE WOUNDED, SICK, AND SHIPWRECKED

Members of the armed forces incapable of participating in combat due to injury or illness may not be the object of attack. Moreover, parties to the conflict must, after each engagement and without delay, take all possible measures to search for and collect the wounded and sick on the field of battle, protect them from harm, and ensure their care. When circumstances permit, an armistice or cease-fire should be arranged to enable the wounded and sick to be located and removed to safety and medical care. Wounded and sick personnel falling into enemy hands must be treated humanely and cared for without adverse distinction along with the enemy's own casualties. Priority in order of treatment may only be justified by urgent medical considerations. The physical or mental well-being of enemy wounded and sick personnel may not be unjustifiably endangered, nor may they be subjected to any medical procedure not called for by their condition or inconsistent with accepted medical standards.

Similarly, shipwrecked persons, whether military or civilian, may not be the object of attack. Shipwrecked persons include those in peril at sea or in other waters as a result of either the sinking, grounding, or other damage to a vessel in which they are embarked, or of the downing or distress of an aircraft. It is immaterial whether the peril was the result of enemy action or nonmilitary causes. Following each naval engagement at sea, the belligerents are obligated to take all possible measures, consistent with the security of their forces, to search for and rescue the shipwrecked.

- 
  - ### 11.5 MEDICAL PERSONNEL AND CHAPLAINS

Medical personnel, including medical and dental officers, technicians and corpsmen, nurses, and medical service personnel, have special protected status when engaged exclusively in medical duties and may not be attacked. Possession of small arms for self-protection, for the protection of the wounded and sick, and for protection from marauders and others violating the law of armed conflict does not disqualify medical personnel from protected status. Medical personnel may not use such arms against enemy forces acting in conformity with the law of armed conflict. Chaplains attached to the armed forces are entitled to respect and protection. Medical personnel and chaplains should display the distinctive emblem of the red cross or red crescent when engaged in their respective medical and religious activities. Failure to wear the distinctive emblem does not, by itself, justify attacking a medical person or chaplain, recognized as such. Medical personnel and chaplains falling into enemy hands do

- 75

not become prisoners of war. Unless their retention by the enemy is required to provide for the medical or religious needs of prisoners of war, medical personnel and chaplains must be repatriated at the earliest opportunity.

Shipwrecked persons do not include combatant personnel engaged in amphibious, underwater, or airborne attacks who are proceeding ashore, unless they are clearly in distress and require assistance. In the latter case they may qualify as shipwrecked persons only if they cease all active combat activity and the enemy has an opportunity to recognize their condition of distress. Shipwrecked combatants falling into enemy hands become prisoners of war.

## 11.6 PARACHUTISTS

Parachutists descending from disabled aircraft may not be attacked while in the air unless they engage in combatant acts while descending. Upon reaching the ground, such parachutists must be provided an opportunity to surrender. Airborne troops, special warfare infiltrators, and intelligence agents parachuting into combat areas or behind enemy lines are not so protected and may be attacked in the air as well as on the ground. Such personnel may not be attacked, however, if they clearly indicate in a timely manner their intention to surrender.

## 11.7 PRISONERS OF WAR

Combatants cease to be subject to attack when they have individually laid down their arms to surrender, when they are no longer capable of resistance, or when the unit in which they are serving or embarked has surrendered or been captured. However, the law of armed conflict does not precisely define when surrender takes effect or how it may be accomplished in practical terms. Surrender involves an offer by the surrendering party (a unit or individual combatant) and an ability to accept on the part of the opponent. The latter may not refuse an offer of surrender when communicated, but that communication must be made at a time when it can be received and properly acted upon--an attempt to surrender in the midst of a hard-fought battle is neither easily communicated nor received. The issue is one of reasonableness.

Combatants that have surrendered or otherwise fallen into enemy hands are entitled to prisoner-of-war status and, as such, must be treated humanely and protected against violence, intimidation, insult, and public curiosity. When prisoners of war are given medical treatment, no distinction among them will be based on any grounds other than medical ones. (See paragraph 11.4 for further discussion of the medical treatment to be accorded captured enemy wounded and sick personnel.) Prisoners of war may be interrogated upon capture but are required to disclose only their name, rank, date of birth, and military serial number. Torture, threats, or other coercive acts are prohibited.

- 76

Persons entitled to prisoner-of-war status upon capture include members of the regular armed forces, the militia and volunteer units fighting with the regular armed forces, and civilians accompanying the armed forces. Militia, volunteers, guerrillas, and other partisans not fighting in association with the regular armed forces qualify for prisoner-of-war status upon capture, provided they are commanded by a person responsible for their conduct, are uniformed or bear a fixed distinctive sign recognizable at a distance, carry their arms openly, and conduct their operations in accordance with the law of armed conflict.

Should a question arise regarding a captive's entitlement to prisoner-of-war status, that individual should be accorded prisoner-of-war treatment until a competent tribunal convened by the captor determines the status to which that individual is properly entitled. Individuals captured as spies or as illegal combatants have the right to assert their claim of entitlement to prisoner-of-war status before a judicial tribunal and to have the question adjudicated. Such persons have a right to be fairly tried for violations of the law of armed conflict and may not be summarily executed.

**11.7.1 Trial and Punishment.** Prisoners of war may not be punished for hostile acts directed against opposing forces prior to capture, unless those acts constituted violations of the law of armed conflict. Prisoners of war prosecuted for war crimes committed prior to or after capture are entitled to be tried by the same courts as try the captor's own forces and are to be accorded the same procedural rights. At a minimum, these rights must include the assistance of lawyer counsel, an interpreter, and a fellow prisoner.

Although prisoners of war may be subjected to disciplinary action for minor offenses committed during captivity, punishment may not exceed 30 days confinement. Prisoners of war may not be subjected to collective punishment nor may reprisal action be taken against them.

**11.7.2 Labor.** Enlisted prisoners of war may be required to engage in labor having no military character or purpose. Noncommissioned officers may be required to perform only supervisory work. Officers may not be required to work.

**11.7.3 Escape.** Prisoners of war may not be punished for acts committed in attempting to escape, unless they cause death or injury to someone in the process. Disciplinary punishment may, however, be imposed upon them for the escape attempt. Prisoners of war who make good their escape by rejoining friendly forces or leaving enemy controlled territory, may not be subjected to such disciplinary punishment if recaptured. However, they remain subject to punishment for causing death or injury in the course of their previous escape.

- 77