furthermore Congress has expressly commanded shall not be received in such cases tried by military commissions and other military tribunals. [FN18]

FN18 Cf. Text infra Part IV.

Moreover counsel assert in the brief, and this also is not denied, that the sole proof made of certain of the specifications ***54** in the bills of particulars was by ex parte affidavits. It was in relation to this also vital phase of the proof that there occurred one of the commission's reversals of its earlier rulings in favor of the defense, [FN19] a fact in itself conclusive demonstration of the necessity to the prosecution's case of the prohibited type of evidence and of its prejudicial effects upon the defense.

FN19 On November 1, early in the trial, the president of the commission stated: 'I think the Prosecution should consider the desirability of striking certain items. The Commission feels that there must be witnesses introduced on each of the specifications or items. It has no objection to considering affidavits, but it is unwilling to form an opinion of a particular item based solely on an affidavit. Therefore, until evidence is introduced, these particular exhibits are rejected.' (Emphasis added.)
Later evidence of the excluded type was offered, to introduction of which the defense objected on various grounds including the prior ruling. At the prosecution's urging the commission withdrew to deliberate. Later it announced that 'after further consideration, the Commission reverses that ruling (of November 1) and affirms its prerogative of receiving and considering affidavits or depositions, if it chooses to do so, for whatever probative value the Commission believes they may have, without regard to the presentation of some partially corroborative oral testimony.' It then added: 'The Commission directs the prosecution again to introduce the affidavits or depositions then in question, and other documents of similar nature which the prosecution stated has been prepared for introduction.' (Emphasis added.)
Thereafter this type of evidence was consistently received and again, by the undisputed statement of counsel, as the sole proof of many of the specifications of the bills a procedure which they characterized correctly in my view as having 'in effect, stripped the proceeding of all semblance of a trial and converted it into an ex parte investigation.'

****366** These two basic elements in the proof, namely, proof of knowledge of the crimes and proof of the specifications in the bills, that is, of the atrocities themselves, constitute the most important instances perhaps, if not the most flagrant, [FN20] ***55** of departure not only from the express command of Congress against receiving such proof but from the whole British- American tradition of the common law and the Constitution, Many others occurred, which there is neither time nor space to mention. [FN21]

FN20 This perhaps consisted in the showing of the so-called 'propaganda' film, 'Orders from Tokyo,' portraying scenes of battle destruction in Manila, which counsel say 'was not in itself seriously objectionable.' Highly objectionable, inflammatory and prejudicial, however, was the accompanying sound track with comment that the film was 'evidence which will convict,' mentioning petitioner specifically by name.

FN21 Innumerable instances of hearsay, once or several times removed, relating to all manner of incidents, rumors, reports, etc., were among these. Many instances, too, are shown of the use of opinion evidence and conclusions of guilt, including reports made after ex parte investigations by the War Crimes Branch of the Judge Advocate General's Department, which it was and is urged had the effect of 'putting the prosecution on the witness stand' and of usurping the commission's function as judge of the law and the facts. It is said also that some of the reports were received as the sole proof of some of the specifications.

Petitioner asserts, and there can be no reason to doubt, that by the use of all this forbidden evidence he was deprived of the right of cross-examination and other means to establish the credibility of the deponents or affiants, not to speak of the authors of reports, letters, documents and newspaper articles; of opportunity to determine whether the multitudinous crimes specified in the bills were committed in fact by troops under his command or by naval or air force troops not

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







under his command at the time alleged; to ascertain whether the crimes attested were isolated acts of individual soldiers or were military acts committed by troop units acting under supervision of officers; and, finally, whether 'in short, there was such a 'pattern' of conduct as the prosecution alleged and its whole theory of the crime and the evidence required to be made out.'

He points out in this connection that the commission based its decision on a finding as to the extent and number ***56** of the atrocities and that this of itself establishes the prejudicial effect of the affidavits, etc., and of the denial resulting from their reception of any means of probing the evidence they contained, including all opportunity for cross-examination. Yet it is said there is no sufficient showing of prejudice. The effect could not have been other than highly prejudicial. The matter is not one merely of 'rules of evidence.' It goes, as will appear more fully later, to the basic right of defense, including some fair opportunity to test probative value.

Insufficient as this recital is to give a fair impression of what was done, it is enough to show that this was no trial in the traditions of the common law and the Constitution. If the tribunal itself was not strange to them otherwise, it was in its forms and modes of procedure, in the character and substance of the evidence it received, in the ****367** denial of all means to the accused and his counsel for testing the evidence, in the brevity and ambiguity of its findings made upon such a mass of material and, as will appear, in the denial of any reasonable opportunity for preparation of the defense. Because this last deprivation not only is important in itself, but is closely related to the departures from all limitations upon the character of and modes of making the proof, it will be considered before turning to the important legal questions relating to whether all these violations of our traditions can be brushed aside as not forbidden by the valid Acts of Congress, treaties and the Constitution, in that order. If all these traditions can be so put away, then indeed will we have entered upon a new but foreboding era of law.

III.

Denial of Opportunity to Prepare Defense.

Petitioner surrendered September 3, 1945, and was interned as a prisoner of war in conformity with Article 9 ***57** of the Geneva Convention of July 27, 1929. [FN22] He was served with the charge on September 25 and put in confinement as an accused war criminal. On October 8 he was arraigned and pleaded not guilty. On October 29 the trial began and it continued until December 7, when sentence was pronounced, exactly four years almost to the hour from the attack on Pearl Harbor.

FN22 Also with Paragraph 82 of the Rules of I and Warfare.

On the day of arraignment, October 8, three weeks before the trial began, petitioner was served with a bill of particulars specifying 64 items setting forth a vast number of atrocities and crimes allegedly committed by troops under his command. [FN23] The six officers appointed as defense counsel thus had three weeks, it is true at the prosecution's suggestion a week longer than they sought at first, to investigate and prepare to meet all these items and the large number of incidents they embodied, many of which had occurred in distant islands of the archipelago. There is some question whether they then anticipated the full scope and character of the charge or the evidence they would have to meet. But, as will appear, they worked night and day at the task. Even so it would have been impossible to do thoroughly, had nothing more occurred.

FN23 Typical of the items are allegations that members of the armed forces of Japan under the command of the accused committed the acts 'During the months of October, November and December 1944 (of) brutally mistreating and torturing numerous unarmed noncombatant civilians at the Japanese Military Police Headquarters located at Cortabitarte and Mabini Streets, Manila' and 'On or about 19 February 1945, in the Town of Cuenca, Batangas Province, brutally mistreating, massacring, and killing Jose M. Laguo, Esteban Magsamdol, Jose

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





Westlaw.

Lanbo, Felisa Apuntar, Elfidio Lunar, Victoriana Ramo, and 978 other persons, all unarmed noncombatant civilians, pillaging and unnecessarily, deliberately and wantonly devastating, burning and destroying large areas of that town.'

But there was more. On the first day of the trial, October 29, the prosecution filed a supplemental bill of particulars, ***58** containing 59 more specifications of the same general character, involving perhaps as many incidents occurring over an equally wide area. [FN24] A copy had been given the defense three days earlier. One item, No. 89, charged that American soldiers, prisoners of war, had been tried and executed without notice having been given to the protecting power of the United States in accordance with the requirements of the Geneva Convention, which it is now argued, strangely, the United States was not required to observe as to petitioner's trial. [FN25]

FN24 The supplemental bill contains allegations similar to those set out in the original bill. See note 23. For example, it charged that members of the armed forces of Japan under the command of the accused 'during the period from 9 October 1944 to about 1 February 1945, at Cavite City, Imus and elsewhere in Cavite Province,' were permitted to commit the acts of 'brutally mistreating, torturing, and killing or attempting to kill, without cause or trial, unarmed non-combatant civilians.'

FN25 See note 39 and text, Part V.

But what is more important is that defense counsel, as they felt was their duty, at once moved for a continuance. [FN26] The application was denied. However the commission indicated that if, at the end of the prosecution's presentation ***59** concerning ****368** the original bill, counsel should 'believe they require additional time * * *, the Commission will consider such a motion at that time,' before taking up the items of the supplemental bill. Counsel again indicated, without other result, that time was desired at once 'as much, if not more' to prepare for cross-examination 'as the Prosecutor's case goes in' as to prepare affirmative defense.

FN26 In support of the motion counsel indicated surprise by saying that, though it was assumed two or three new specifications might be added, there had been no expectation of 59 'about entirely new persons and times.' The statement continued:
'We have worked earnestly seven days a week in order to prepare the defense on 64 specifications. And when I say 'prepare the defense,' sir, I do not mean merely an affirmative defense, but to acquaint ourselves with the facts so that we could properly cross-examine the Prosecution's witnesses.
'* * * 'In advance of trial' means: Sufficient time to allow the Defense a chance to prepare its defense.
'We earnestly state that we must have this time in order adequately to prepare the defense. I might add, sir, we think this is important to the Accused, but far more important than any rights of this Accused, we believe, is the proposition that this Commission should not deviate from a fundamental American concept of fairness. * * *'

On the next day, October 30, the commission interrupted the prosecutor to say it would not then listen to testimony or discussion upon the supplemental bill. After colloquy it adhered to its prior ruling and, in response to inquiry from the prosecution, the defense indicated it would require two weeks before it could proceed on the supplemental bill. On November 1 the commission ruled it would not receive affidavits without corroboration by witnesses on any specification, a ruling reversed four days later.

On November 2, after the commission had received an affirmative answer to its inquiry whether the defense was prepared to proceed with an item in the supplemental bill which the prosecution proposed to prove, it announced: 'Hereafter, then, unless there is no (sic) objection by the Defense, the Commission will assume that you are prepared to proceed with any items in the Supplemental Bill.' On November 8, the question arose again upon the prosecution's inquiry as to when the defense would be ready to proceed on the supplemental bill, the prosecutor adding: 'Frankly, sir, it took the War Crimes Commission some three months to investigate these matters and I cannot conceive of the Defense undertaking a similar investigation with any less period of time.' Stating it

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







realized 'the tremendous burden which we have placed on the Defense' and its 'determination to give them the time they require,' the commission again adhered to its ruling of October 29.

***60** Four days later the commission announced it would grant a continuance 'only for the most urgent and unavoidable reasons.' [FN27]

FN27 The commission went on to question the need for all of the six officers representing the defense to be present during presentation of all the case, suggested one or two would be adequate and others 'should be out of the courtroom' engaged in other matters and strongly suggested bringing in additional counsel in the midst of the trial, all to the end that 'need to request continuance may not arise.'

On November 20, when the prosecution rested, senior defense counsel moved for a reasonable continuance, recalling the commission's indication that it would then consider such a motion and stating that since October 29 the defense had been 'working night and day,' with 'no time whatsoever to prepare any affirmative defense,' since counsel had been fully occupied trying 'to keep up with the new Bill of Particulars.'

The commission thereupon retired for deliberation and, on resuming its sessions shortly, denied the motion. Counsel then asked for 'a short recess of a day.' The commission suggested a recess until 1:30 in the afternoon. Counsel responded this would not suffice. The commission stated it felt 'that the Defense should be prepared at least on its opening statement, to which senior counsel answered: 'We haven't had time to do that, sir.' The commission then recessed until 8:30 the following morning.

Further comment is hardly required. Obviously the burden placed upon the defense, in the short time allowed for preparation on the original bill, was not only 'tremendous.' In view of all the facts, it was an impossible one, even though the time allowed was a week longer than asked. But ****369** the grosser vice was later when the burden was more than doubled by service of the supplemental bill on the eve of trial, a procedure which taken in connection with the consistent denials of continuance and the commission's later reversal of its rulings favorable to the defense ***61** was wholly arbitrary, cutting off the last vestige of adequate chance to prepare defense and imposing a burden the most able counsel could not bear. This sort of thing has no place in our system of justice, civil or military. Without more, this wide departure from the most elementary principles of fairness vitiated the proceeding. When added to the other denials of fundamental right sketched above, it deprived the proceeding of any semblance of trial as we know that institution.

IV.
Applicability of the Articles of War.

The Court's opinion puts the proceeding and the petitioner, in so far as any rights relating to his trial and conviction are concerned, wholly outside the Articles of War. In view of what has taken place, I think the decision's necessary effect is also to place them entirely beyond limitation and protection, respectively, by the Constitution. I disagree as to both conclusions or effects.

The Court rules that Congress has not made Article 25 and 38 applicable to this proceeding. It think it has made them applicable to this and all other military commissions or tribunals. If so the commission not only lost all power to punish petitioner by what occurred in the proceedings. It never acquired jurisdiction to try him. For the directive by which it was constituted, in the provisions of Section 16, [FN28] was squarely in conflict with Articles 25 and 38 of the Articles of War [FN29] and therefore was void.

FN28 See note 9.

FN29 Article 25 is as follows: 'A duly authenticated deposition taken upon reasonable notice to the opposite party may be read in evidence before any military court or commission in any case not capital, or in any proceeding before a court of inquiry or a military board, if such deposition be taken when the

witness resides, is found, or is about to go beyond the State, Territory, or district in which the court, commission, or board is ordered to sit, or beyond the distance of one hundred miles from the place of trial or hearing, or when it appears to the satisfaction of the court, commission, board, or appointing authority that the witness, by reason of age, sickness, bodily infirmity, imprisonment, or other reasonable cause, is unable to appear and testify in person at the place of trial or hearing: Provided, That testimony by deposition may be adduced for the defense in capital cases.' (Emphasis added.) 10 U.S.C. s 1496, 10 U.S.C.A. s 1496.

Article 38 reads: 'The President may, by regulations, which he may modify from time to time, prescribe the procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals, which regulations shall, in so far as he shall deem practicable, apply the rules of evidence generally recognized in the trial of criminal cases in the district courts of the United States: Provided, That nothing contrary to or inconsistent with these articles shall be so prescribed: Provided further, That all rules made in pursuance of this article shall be laid before the Congress annually.' (Emphasis added.) 10 U.S.C. s 1509, 10 U.S.C.A. s 1509.

***62** Article 25 allows reading of depositions in evidence, under prescribed conditions, in the plainest terms 'before any military court or commission in any case not capital,' providing, however, that 'testimony by deposition may be adduced for the defense in capital cases.' (Emphasis added.) This language clearly and broadly covers every kind of military tribunal, whether 'court' or 'commission.' It covers all capital cases. It makes no exception or distinction for any accused.

Article 38 authorizes the President by regulations to prescribe procedure, including modes of proof, even more all-inclusively if possible, 'in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals.' Language could not be more broadly inclusive. No exceptions are mentioned or suggested, whether of tribunals or of accused persons. Every kind of military body for performing the function of trial is covered. That is clear from the face of the Article.

Article 38 moreover limits the President's power. He is so far as practicable to prescribe 'the rules of evidence generally recognized in the trial of criminal cases in the ***63** district courts of the United States,' a clear mandate that Congress intended all military trials to conform as closely as possible ****370** to our customary procedural and evidentiary protections, constitutional and statutory, for accused persons. But there are also two unqualified limitations, one 'that nothing contrary to or inconsistent with these articles (specifically here Article 25) shall be so prescribed'; the other 'that all rules made in pursuance of this article shall be laid before the Congress annually.'

Notwithstanding these broad terms the Court, resting chiefly on Article 2, concludes the petitioner was not among the persons there declared to be subject to the Articles of War and therefore the commission which tries him is not subject to them. That Article does not cover prisoners of war or war criminals. Neither does it cover civilians in occupied territories, theatres of military operations or other places under military jurisdiction within or without the United States or territory subject to its sovereignty, whether they be neutrals or enemy aliens, even citizens of the United States, unless they are connected in the manner Article 2 prescribes with our armed forces, exclusive of the Navy.

The logic which excludes petitioner on the basic that prisoners of war are not mentioned in Article 2 would exclude all these. I strongly doubt the Court would go so far, if presented with a trial like this in such instances. Nor does it follow necessarily that, because some persons may not be mentioned in Article 2, they can be tried without regard to any of the limitations placed by any of the other Articles upon military tribunals.

Article 2 in defining persons 'subject to the articles of war' was, I think, specifying those to whom the Articles in general were applicable. And there is no dispute that most of the Articles are not applicable to the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





petitioner. It does not follow, however, and Article 2 does not provide, that there may not be in the Articles specific provisions ***64** covering persons other than those specified in Article 2. Had it so provided, Article 2 would have been contradictory not only of Articles 25 and 38 but also of Article 15 among others.

In 1916, when the last general revision of the Articles of War took place, [FN30] for the first time certain of the Articles were specifically made applicable to military commissions. Until then they had applied only to courts-martial. There were two purposes, the first to give statutory recognition to the military commission without loss of prior jurisdiction and the second to give those tried before military commissions some of the more important protections afforded persons tried by courts-martial.

FN30 Another revision of the Articles of War took place in 1920. At this time Article 15 was slightly amended.
In 1916 Article 15, 39 Stat. 653, was enacted to read: 'The provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by the law of war may be lawfully triable by such military commissions, provost courts, or other military tribunals.' (Emphasis added.)
The 1920 amendment put in the words 'by statute or' before the words 'by the law of war' and omitted the word 'lawfully.'

In order to effectuate the first purpose, the Army proposed Article 15. [FN31] To effectuate ****371** the second purpose, Articles ***66** 25 and 38 and several others were proposed. [FN32] But as the Court now construes the Articles of War, they have no application to military commissions before which alleged offenders against the laws of war are tried. What the Court holds in effect is that there are two types of military commissions, one to try offenses which might be cognizable by a court-martial, the other to try war crimes, ****372** and that Congress intended the Articles of War referring in terms to military commissions without exception to be applicable only to the first type.

FN31 Speaking at the Hearings before the Committee on Military Affairs, House of Representatives, 62nd Cong., 2d Sess., printed as an Appendix to S.Rep.229, 63rd Cong., 2d Sess., General Crowder said:
'The next article, No. 15, is entirely new, and the reasons for its insertion in the code are these: In our War with Mexico two war courts were brought into existence by orders of Gen. Scott, viz. the military commission and the council of war. By the military commission Gen. Scott tried cases cognizable in time of peace by civil courts, and by the council of war he tried offenses against the laws of war. The council of war did not survive the Mexican War period, and in our subsequent wars its jurisdiction has been taken over by the military commission, which during the Civil War period tried more than 2,000 cases. While the military commission has not been formally authorized by statute, its jurisdiction as a war court has been upheld by the Supreme Court of the United States. It is an institution of the greatest importance in a period of war and should be preserved. In the new code the jurisdiction of courts-martial has been somewhat amplified by the introduction of the phrase 'Persons subject to military law.' There will be more instances in the future than in the past when the jurisdiction of courts-martial will overlap that of the war courts, and the question would arise whether Congress having vested jurisdiction by statute the common law of war jurisdiction was not ousted. I wish to make it perfectly plain by the new article that in such cases the jurisdiction of the war court is concurrent.' S.Rep.No.229, 63rd Cong., 2d Sess., p. 53. (Emphasis added.)
And later, in 1916, speaking before the Subcommittee on Military Affairs of the Senate at their Hearings on S.3191, a project for the revision of the Articles of War, 64th Cong., 1st Sess., printed as an Appendix to S.Rep.230, 64th Cong., 1st Sess., General Crowder explained at greater length:
'Article 15 is new. We have included in article 2 as subject to military law a number of persons who are also subject to trial by military commissions. A military commission is our common-law war court. It has no statutory existence, though it is recognized by statute law. As long as the articles embraced them in the designation 'persons subject to military

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works








law,' and provided that they might be tried by court-martial, I was afraid that, having made a special provision for their court-martial, it might be held that the provision operated to exclude trials by military commission and other war courts; so this new article was introduced. * * *'

'It just saves to these war courts the jurisdiction they now have and makes it a concurrent jurisdiction with courts-martial, so that the military commander in the field in time of war will be at liberty to employ either form of court that happens to be convenient. Both classes of courts have the same procedure. For the information of the committee and in explanation of these war courts to which I have referred I insert here an explanation from Winthrop's Military Law and Precedents--

"The military commission--a war court--had its origin in G.O. 20, Headquarters of the Army at Tampico, February 19, 1847 (Gen. Scott). Its jurisdiction was confined mainly to criminal offenses of the class cognizable by civil courts in time of peace committed by inhabitants of the theater of hostilities. A further war court was originated by Gen. Scott at the same time, called 'council of war,' with jurisdiction to try the same classes of persons for violations of the laws of war, mainly guerillas. These two jurisdictions were united in the later war court of the Civil War and Spanish War periods, for which the general designation of 'military commission' was retained. The military commission was given statutory recognition in section 30, act of March 3, 1863, 12 Stat. 736, and in various other statutes of that period. The United States Supreme Court has acknowledged the validity of its judgments (Ex parte Vallandigham, 1 Wall. 243 (17 L.Ed. 589) and Coleman v. Tennessee, 97 U.S. 509 (24 L.Ed. 1118)). It tried more than 2,000 cases during the Civil War and reconstruction period. Its composition, constitution, and procedure follows the analogy of courts-martial. Another war court is the provost court, an inferior court with jurisdiction assimilated to that of justices of the peace and police courts; and other war courts variously designated 'courts of conciliation,' 'arbitrators,' 'military tribunals' have been convened by military commanders in the exercise of the war power as occasion and necessity dictated.'

'Yet, as I have said, these war courts never have been formally authorized by statute.'

'Senator Colt: They grew out of usage and necessity?

'Gen. Crowder: Out of usage and necessity. I thought it was just as well, as inquiries would arise, to put this information in the record.' S.Rep.No.130, 64th Cong., 1st Sess. (1916) p. 40. (Emphasis added.)

Article 15 was also explained in the 'Report of a committee on the proposed revision of the articles of war, pursuant to instructions of the Chief of Staff, March 10, 1915,' included in Revision of the Articles of War, Comparative Prints, Etc., 1904--1920. J.A.G.O., as follows:

'A number of articles * * * of the revision have the effect of giving courts-martial jurisdiction over certain offenders and offenses which, under the law of war or by statute, are also triable by military commissions, provost courts, etc. Article 15 is introduced for the purpose of making clear that in such cases a court martial has only a concurrent jurisdiction with such war tribunals.'

FN32 Of course, Articles 25 and 38, at the same time that they gave protection to defendants before military commissions, also provided for the application by such tribunals of modern rules of procedure and evidence.

***67** This misconceives both the history of military commissions and the legislative history of the Articles of War. There is only one kind of military commission. It is true, as the history noted shows, that what is now called 'the military commission' arose from two separate military courts instituted during the Mexican War. The first military court, called by General Scott a 'military commission,' was given jurisdiction in Mexico over criminal offenses of the class cognizable by civil courts in time of peace. The other military court, called a 'counsel of war' was given jurisdiction over offenses against the laws of war. Winthrop, Military Law and Precedents (2d ed., reprinted 1920) *1298-1299. During the Civil War 'the two jurisdictions of the earlier commission and council respectively * * * (were) united in the * * * war-court, for which the general designation of 'military commission' was retained as the preferable one.' Winthrop, supra, at *1299. Since that time there has been only one type of military tribunal called the military commission, though it may exercise different kinds of jurisdiction, [FN33] according to the circumstances under which

and purposes for which it is convened.

FN33 Winthrop, speaking of military commissions at the time he was writing, 1896, says: 'The offences cognizable by military commissions may thus be classed as follows: (1) Crimes and statutory offences cognizable by State or U.S. courts, and which would properly be tried by such courts if open and acting; (2) Violations of the laws and usages of war cognizable by military tribunals only; (3) Breaches of military orders or regulations for which offenders are not legally triable by court-martial under the Articles of War.' (Emphasis added.) Winthrop, at *1309. And cf. Fairman, The Law of Martial Rule (2d ed. 1943): 'Military commissions take cognizance of three categories of criminal cases: offenses against the laws of war, breaches of military regulations, and civil crimes which, where the ordinary courts have ceased to function, cannot be tried normally.' (Emphasis added.) Fairman, 265--266. See also Davis, A Treatise on the Military Law of the United States (1915) 309, 310.

The testimony of General Crowder is perhaps the most authoritative evidence of what was intended by the legislation, ***68** for he was its most active official sponsor, spending years in securing its adoption and revision. Articles 15, 25 and 38 particularly are traceable to his efforts. His concern to secure statutory recognition for military commissions was equalled by his concern that the statutory provisions giving this should not restrict their pre-existing jurisdiction. He did not wish by securing additional jurisdiction, overlapping partially that of the court-martial, to surrender other. Hence Article 15. That Article had one purpose and one only. It was to make sure that the acquisition of partially concurrent jurisdiction with courts-martial should not cause loss of any other. And it was jurisdiction, not procedure, which was covered by other Articles, with which he and Congress were concerned in that Article. It discloses no purpose to deal in any way with procedure or to qualify Articles 25 and 38. And it is clear that General Crowder at all times regarded all military commissions as being governed by the identical procedure. In fact, so far as Articles 25 and 38 are concerned, this seems obvious for all types of military tribunals. The same would appear to be true of other Articles also, e.g., 24, 10 U.S.C.A. s 1495, (prohibiting compulsory self-incrimination), 26, 27, 32, 10 U.S.C.A. ss 1497, 1498, 1503 (contempts), all except the last dealing with procedural matters.

Article 12 is especially significant. It empowers general courts-martial to try two classes of offenders: (1) 'any person subject to military law,' under the definition of Article 2, for any offense 'made punishable by these articles'; (2) 'and any other person who by the law of war is subject to trial by military tribunals,' not covered by the terms of Article 2. (Emphasis added.)

Article 12 thus, in conformity with Article 15, gives the general court- martial concurrent jurisdiction of war crimes and war criminals with military commissions. Neither it nor any other Article states or indicates there are to be two kinds of general courts-martial for trying war crimes; yet ****373 *69** this is the necessary result of the Court's decision, unless in the alternative that would be to imply that in exercising such jurisdiction there is only one kind of general court-martial, but there are two or more kinds of military commission, with wholly different procedures and with the result that 'the commander in the field' will not be free to determine whether general court-martial or military commission shall be used as the circumstances may dictate, but must govern his choice by the kind of procedure he wishes to have employed.

The only reasonable and, I think, possible conclusion to draw from the Articles is that the Articles which are in terms applicable to military commissions are so uniformly and those applicable to both such commissions and to courts-martial when exercising jurisdiction over offenders against the laws of war likewise are uniformly applicable, and not diversely according to the person or offense being tried.

Not only the face of the Articles, but specific statements in General Crowder's testimony support this view. Thus in the portion quoted above [FN34] from his 1916 statement, after stating expressly the purpose of Article 15 to preserve unimpaired the military

commission's jurisdiction, and to make it concurrent with that of courts-martial in so far as the two would overlap, 'so that the military commander in the field in time of war will be at liberty to employ either form of court that happens to be convenient,' he went on to say: 'Both classes of courts have the same procedure,' a statement so unequivocal as to leave no room for question. And his quotation from Winthrop supports his statement, namely: 'Its (i.e., the military commission's) composition, constitution and procedure follow the analogy of courts-martial.'

FN34. Note 31.

At no point in the testimony is there suggestion that there are two types of military commission, one bound by ***70** the procedural provisions of the Articles, the other wholly free from their restraints or, as the Court strangely puts the matter, that there is only one kind of commission, but that it is bound or not bound by the Articles applicable in terms, depending upon who is being tried and for what offense; for that very difference makes the difference between one and two. The history and the discussion show conclusively that General Crowder wished to secure and Congress intended to give statutory recognition to all forms of military tribunals; to enable commanding officers in the field to use either court-martial or military commission as convenience might dictate, thus broadening to this extent the latter's jurisdiction and utility; but at the same time to preserve its full preexisting jurisdiction; and also to lay down identical provisions for governing or providing for the government of the procedure and rules of evidence of every type of military tribunal, wherever and however constituted. [FN35]

FN35 In addition to the statements of General Crowder with relation to Article 15, set out in note 31, supra, see the following statements made with reference to Article 25, in 1912 at a hearing before the Committee on Military Affairs of the House: 'We come now to article 25, which relates to the admissibility of depositions. * * * It will be noted further that the application of the old article has been broadened to include military commissions, courts of inquiry, and military boards.
'Mr. Sweet. Please explain what you mean by military commission.
'Gen. Crowder. That is our common law of war court, and was referred to by me in a prior hearing. (The reference is to the discussion of Article 15.) This war court came into existence during the Mexican War, and was created by orders of Gen. Scott. It had jurisdiction to try all cases usually cognizable in time of peace by civil courts. Gen. Scott created another war court, called the 'council of war,' with jurisdiction to try offenses against the laws of war. The constitution, composition, and jurisdiction of these courts have never been regulated by statute. The council of war did not survive the Mexican War period, since which its jurisdiction has been taken over by the military commission. The military commission received express recognition in the reconstruction acts, and its jurisdiction has been affirmed and supported by all our courts. It was extensively employed during the Civil War period and also during the Spanish-American War. It is highly desirable that this important war court should be continued to be governed as heretofore, by the laws of war rather than by statute.' S.Rep.No.229, 63d Cong., 2d Sess., 59; cf. S.Rep.130, 64th Cong., 1st Sess., 54--55. (Emphasis added.) See also Hearings before the Subcommittee of the Committee on Military Affairs of the Senate on Establishment of Military Justice, 66th Cong., 1st Sess., 1182--1183. Further evidence that procedural provisions of the Articles were intended to apply to all forms of military tribunal is given by Article 24, 10 U.S.C. s 1495, 10 U.S.C.A. s 1495, which provides against compulsory self-incrimination 'before a military court, commission, court of injury, or board, or before any officer conducting an investigation.' This article was drafted so that 'The prohibition should reach all witnesses, irrespective of the class of military tribunal before which they appear. * * *' (Emphasis added.) Comparative Print showing S.3191 with the Present Articles of War and other Related Statutes, and Explanatory Notes, Printed for use of the Senate Committee on Military Affairs, 64th Cong., 1st Sess., 17, included in Revision of the Articles of War, Comparative Prints, Etc., 1904--1920, J.A.G.O.

****374 *71** Finally, unless Congress was legislating with regard to all military commissions, Article 38, which gives the President the power to 'prescribe the









procedure, including modes of proof, in cases before courts- martial, courts of inquiry, military commissions, and other military tribunals' takes on a rather senseless meaning; for the President would have such power only with respect to those military commissions exercising concurrent jurisdiction with courts-martial.

All this seems so obvious, upon a mere reading of the Articles themselves and the legislative history, as not to require demonstration. And all this Congress knew, as that history shows. In the face of that showing I cannot accept the Court's highly strained construction, first, because I think it is in plain contradiction of the facts disclosed by the history of Articles 15, 25 and 38 as well as their language; and also because that construction defeats at least two of the ends General Crowder had in mind, namely, to secure statutory recognition for every form of military tribunal and to provide for them a basic uniform *72 mode of procedure or method of providing for their procedure.

Accordingly, I think Articles 25 and 38 are applicable to this proceeding; that the provisions of the governing directive in Section 16 are in direct conflict with those Articles; and for that reason the commission was invalidly constituted, was without jurisdiction, and its sentence is therefore void.

V.
The Geneva Convention of 1929.

If the provisions of Articles 25 and 38 were not applicable to the proceeding by their own force as Acts of Congress, I think they would still be made applicable by virtue of the terms of the Geneva Convention of 1929, in particular Article 63. And in other respects, in my opinion, the petitioner's trial was not in accord with that treaty, namely with Article 60.

The Court does not hold that the Geneva Convention is not binding upon the United States and no such contention has been made in this case. [FN36] It relies on other **375 *73 arguments to show that Article 60, which provides that the protecting power shall be notified in advance of a judicial proceeding directed against a prisoner of war, and Article 63, which provides that a prisoner of war may be tried only by the same courts and according to the same procedure as in the case of persons belonging to the armed forces of the detaining power, are not properly invoked by the petitioner. Before considering the Court's view that these Articles are not applicable to this proceeding by their terms, it may be noted that on his surrender petitioner was interned in conformity with Article 9 of this Convention.

FN36 We are informed that Japan has not ratified the Geneva Convention. See discussion of Article 82 in the paragraphs below. We are also informed, however--and the record shows this at least as to Japan-- that at the beginning of the war both the United States and Japan announced their intention to adhere to the provisions of that treaty. The force of that understanding continues, perhaps with greater reason if not effect, despite the end of hostilities. See note 40 and text.
Article 82 provides:
'The provisions of the present Convention must be respected by the High Contracting Parties under all circumstances.
'In case, in time of war, one of the belligerents is not a party to the Convention, its provisions shall nevertheless remain in force as between the belligerents who are parties thereto.'
'It is not clear whether the Article means that during a war, when one of the belligerents is not a party to the Convention, the provisions must nevertheless be applied by all the other belligerents to the prisoners of war not only of one another but also of the power that was not a party thereto or whether it means that they need not be applied to soldiers of the nonparticipating party who have been captured. If the latter meaning is accepted, the first paragraph would seem to contradict the second.
'Legislative history' here is of some, if little, aid. A suggested draft of a convention on war prisoners drawn up in advance of the Geneva meeting by the International Committee of the Red Cross (Actes de la Confe rence Diplomatique de Gene ve, edited by Des Gouttes, pp. 21--34) provided in Article 92 that the provisions of the Convention 'ne cesseront d'e tre obligatories qu'au cas ou l'un des Etats bellige rents participant a la Convention se trouve avoir a

combattre les forces arme es d'un autre Etat que n'y serait par partie at a l'e gard de cet Etat seulement.' See Rasmussen, Code des Prisonniers de Guerre (1931) 70. The fact that this suggested article was not included in the Geneva Convention would indicate that the nations in attendance were avoiding a decision on this problem. But I think it shows more, that is, it manifests an intention not to foreclose a future holding that under the terms of the Convention a state is bound to apply the provisions to prisoners of war of nonparticipating state. And not to foreclose such a holding is to invite one. We should, in my opinion, so hold, for reasons of security to members of our own armed forces taken prisoner, if for no others.

Moreover, if this view is wrong and the Geneva Convention is not strictly binding upon the United States as a treaty, it is strong evidence of and should be held binding as representing what have become the civilized rules of international warfare. Yamashita is as much entitled to the benefit of such rules as to the benefit of a binding treaty which codifies them. See U.S. War Dep't Basic Field Manual, Rules of Land Warfare (1940), par. 5-b.

*74 The chief argument is that Articles 60 and 63 have reference only to offenses committed by a prisoner of war while a prisoner of war and not to violations of the law of war committed while a combatant. This conclusion is derived from the setting in which these articles are placed. I do not agree that the context gives any support to this argument. The argument is in essence of the same type as the argument the Court employs to nullify the application of Articles 25 and 38 of the Articles of War by restricting their own broader coverage by reference to Article 2. For reasons set forth in the margin, [FN37] I think it equally invalid here.

FN37 Title III of the Convention, which comprises Articles 7 to 67, is called 'Captivity.' It contains Section I, 'Evacuation of Prisoners of War' (Articles 7, 8); Section II, 'Prisoners-of-War Camps' (Articles 9-- 26); Section III, 'Labor of Prisoners of War' (Articles 27--34); Section IV, 'External Relations of Prisoners of War' (Articles 35--41); and Section V, 'Prisoners' Relations with the Authorities' (Articles 42--67). Thus Title III regulates all the various incidents of a prisoner of war's life while in captivity.

'Section V, with which we are immediately concerned, is divided into three chapters. Chapter 1 (Article 42) gives a prisoner of war the right to complain of his condition of captivity. Chapter 2 (Articles 43--44) gives prisoners of war the right to appoint agents to represent them. Chapter 3 is divided into three subsections and is termed 'Penalties Applicable to Prisoners of War.' Subsection 1 (Articles 45--53) contains various miscellaneous articles to be considered in detail later. Subsection 2 (Articles 54--59) contains provisions with respect to disciplinary punishments. And subsection 3 (Articles 60--67) which is termed 'Judicial Suits' contains vavious provisions for protection of a prisoner's rights in judicial proceedings instituted against him.

Thus, subsection 3, which contains Articles 60 and 63, as opposed to subsection 2, of Chapter 3, is concerned not with mere problems of discipline, as is the latter, but with the more serious matters of trial leading to imprisonment or possible sentence of death; cf. Brereton, The Administration of Justice Among Prisoners of War by Military Courts (1935) 1 Proc. Australian & New Zealand Society of International Law 143, 153. The Court, however, would have the distinction between subsection 2 and subsection 3 one between minor disciplinary action against a prisoner of war for acts committed while a prisoner and major judicial action against a prisoner of war for acts committed while a prisoner. This narrow view not only is highly strained, confusing the different situations and problems treated by the two subdivisions. It defeats the most important protections subsection 3 was intended to secure, for our own as well as for enemy captive military personnel.

At the most there would be logic in the Court's construction if it could be said that all of Chapter 3 deals with acts committed while a prisoner of war. Of course, subsection 2 does, because of the very nature of its subject-matter. Disciplinary action will be taken by a captor power against prisoners of war only for acts committed by prisoners after capture.

But it is said that subsection 7 deals exclusively with acts committed by a prisoner of war after having become a prisoner, and this indicates subsection 3 is limited similarly. This ignores the fact that some of the articles in subsection 1 appear, on their face, to apply to all judicial proceedings for whatever purpose instituted. Article 46, for example, provides in part:

'Punishments other than those provided for the same

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







acts for soldiers of the national armies may not be imposed upon prisoners of war by the military authorities and courts of the detaining Power.'

This seems to refer to war crimes as well as to other offenses; for surely a country cannot punish soldiers of another army for offenses against the law of war, when it would not punish its own soldiers for the same offences. Similarly, Article 47 in subsection 1 appears to refer to war crimes as well as to crimes committed by a prisoner after his capture. It reads in part:

'Judicial proceedings against prisoners of war shall be conducted as rapidly as the circumstances permit; preventive imprisonment shall be limited as much as possible.'

Thus, at the most, subjection 1 contains, in some of its articles, the same ambiguities and is open to the same problem that we are faced with in construing Articles 60 and 63. It cannot be said, therefore, that all of chapter 3 and especially subsection 3 relate only to acts committed by prisoners of war after capture, for the meaning of subsection 3, in this argument, is related to the meaning of subsection 1; and subsection 1 is no more clear restricted to punishments and proceedings in disciplinary matters than is subsection 3.

**376 *76 Neither Article 60 nor Article 63 contains such a restriction of meaning as the Court reads into them. [FN38] In the absence of any such limitation, it would seem that they were intended to cover all judicial proceedings, whether instituted for crimes allegedly committed before capture or later. Policy supports this view. For such a construction is required for the security of our own soldiers, taken prisoner, as much as for that of prisoners we take. And the opposite one leaves prisoners of war open to any form of trial and punishment for offenses against the law of war their captors may wish to use, while safeguarding them, to the extent of the treaty limitations, in cases of disciplinary offense. This, in many instances, would be to make the treaty strain at a gnat and swallow the camel.

FN38 Article 60 pertinently is as follows: 'At the opening of a judicial proceeding directed against a prisoner of war, the detaining Power shall advise the representative of the protecting Power thereof as soon as possible, and always before the date set for the opening of the trial.

'This advice shall contain the following information:

'a) Civil state and rank of prisoner;

'b) Place of sojourn or imprisonment;

'c) Specification of the (count) or counts of the indictment, giving the legal provisions applicable. 'If it is not possible to mention in that advice the court which will pass upon the matter, the date of opening the trial and the place where it will take place, this information must be furnished to the representative of the protecting Power later, as soon as possible, and at all events, at least three weeks before the opening of the trial.'

Article 63 reads: 'Sentence may be pronounced against a prisoner of war only by the same courts and according to the same procedure as in the case of persons belonging to the armed forces of the detaining Power.'

The United States has complied with neither of these Articles. It did not notify the protecting power of Japan in advance of trial as Article 60 requires it to do, although the supplemental bill charges the same failure to petitioner *77 in Item 89. [FN39] **377 It is said that, although this may be true, the proceeding is not thereby invalidated. The argument is that our noncompliance merely gives Japan a right of indemnity against us and that Article 60 was not intended to give Yamashita any personal rights. I cannot agree. The treaties made by the United States are by the Constitution made the supreme law of the land. In the absence of something in the treaty indicating that its provisions were not intended to be enforced, upon breach, by more than subsequent indemnification, it is, as I conceive it, the duty of the courts of this country to insure the nation's compliance with such treaties, except in the case of political questions. This is especially true where the treaty has provisions--such as Article 60--for the protection of a man being tried for an offense the punishment for which is death; for to say that it was intended to provide for enforcement of such provisions solely by claim, after breach, of indemnity would be in many instances, especially those involving trial of nationals of a defeated nation by a conquering one, to deprive the Articles of all force. Executed men are not much aided by post-war claims for indemnity. I do not think the

adhering powers' purpose was to provide only for such ineffective relief.

FN39. Item 89 charged the armed forces of Japan with subjecting to trial certain named and other prisoners of war 'without prior notice to a representative of the protecting power, without opportunity to defend, and without counsel; denying opportunity to appeal from the sentence rendered; failing to notify the protecting power of the sentence pronounced; and executed a death sentence without communicating to the representative of the protecting power the nature and circumstances of the offense charged.'

Finally, the Government has argued that Article 60 has no application after the actual cessation of hostilities, as there is no longer any need for an intervening power between the two belligerents. The premise is that Japan no longer needs Switzerland to intervene with the United ***78** States to protect the rights of Japanese nationals, since Japan is now in direct communication with this Government. This of course is in contradiction of the Government's theory, in other connections, that the war is not over and military necessity still requires use of all the power necessary for actual combat.

Furthermore the premise overlooks all the realities of the situation. Japan is a defeated power, having surrendered, if not unconditionally then under the most severe conditions. Her territory is occupied by American military forces. She is scarcely in a position to bargain with us or to assert her rights. Nor can her nationals. She no longer holds American prisoners of war. [FN40] Certainly, if there was the need of an independent neutral to protect her nationals during the war, there is more now. In my opinion the failure to give the notice required by Article 60 is only another instance of the commission's failure to observe the obligations of our law.

FN40 Nations adhere to international treaties regulating the conduct of war at least in part because of the fear of retaliation. Japan no longer has the means of retaliating.

What is more important, there was no compliance with Article 63 of the same Convention. Yamashita was not tried 'according to the same procedure as in the case of persons belonging to the armed forces of the detaining Power.' Had one of our soldiers or officers been tried for alleged war crimes, he would have been entitled to the benefits of the Articles of War. I think that Yamashita was equally entitled to the same protection. In any event, he was entitled to their benefits under the provisions of Article 63 of the Geneva Convention. Those benefits he did not receive. Accordingly, his trial was in violation of the Convention.

VI.
The Fifth Amendment.

Wholly apart from the violation of the Articles of War and of the Geneva Convention, I am completely unable to ***79** accept or to understand the Court's ruling concerning the applicability of the due process clause of the Fifth Amendment to this case. Not heretofore has it been held that any human being is beyond its universally protecting spread in the guaranty of a fair trial in the most fundamental sense. That door is dangerous to open. I will have no part in opening it. For once it is ajar, even for enemy belligerents, it can be pushed back wider for others, perhaps ultimately for all.

The Court does not declare expressly that petitioner as an enemy belligerent has no constitutional rights, a ruling I could understand but not accept. Neither does it ****378** affirm that he has some, if but little, constitutional protection. Nor does the Court defend what was done. I think the effect of what it does is in substance to deny him all such safeguards. And this is the great issue in the cause.

For it is exactly here we enter wholly untrodden ground. The safe signposts to the rear are not in the sum of protections surrounding jury trials or any other proceeding known to our law. Nor is the essence of the Fifth Amendment's elementary protection comprehended in any single one of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





our time-honored specific constitutional safeguards in trial, though there are some without which the words 'fair trial' and all they cannot become a mockery.

Apart from a tribunal concerned that the law as applied shall be an instrument of justice, albeit stern in measure to the guilt established, the heart of the security lies in two things. One is that conviction shall not rest in any essential part upon unchecked rumor, report, or the results of the prosecution's ex parte investigations, but shall stand on proven fact; the other, correlative, lies in a fair chance to defend. This embraces at the least the rights to know with reasonable clarity in advance of the trial the exact nature of the offense with which one is to be charged; to have reasonable time for preparing to meet the charge and to have the aid of counsel in doing so, as also in the ***80** trial itself; and if, during its course, one is taken by surprise, through the injection of new charges or reversal of rulings which brings forth new masses of evidence, then to have further reasonable time for meeting the unexpected shift.

So far as I know, it has not yet been held that any tribunal in our system, of whatever character, is free to receive 'such evidence 'as in its opinion" would be 'of assistance in proving or disproving the charge' or, again as in its opinion, 'would have probative value in the mind of a reasonable man'; and, having received what in its unlimited discretion it regards as sufficient, is also free to determine what weight may be given to the evidence received without restraint. [FN41]

FN41 There can be no limit either to the admissibility or the use of evidence if the only test to be applied concerns probative value and the only test of probative value, as the directive commanded and the commission followed out, lies 'in the Commission's opinion,' whether that be concerning the assistance the 'evidence' tendered would give in proving or disproving the charge or as it might think would 'have value in the mind of a reasonable man.' Nor is it enough to establish the semblance of a constitutional right that the commission declares, in receiving the evidence, that it comes in as having only such probative value, if any, as the commission decides to award it and this is accepted as conclusive.

When to this fatal defect in the directive, however innocently made, are added the broad departures from the fundamentals of fair play in the proof and in the right to defend which occurred throughout the proceeding, there can be no accommodation with the due process of law which the Fifth Amendment demands.

All this the Court puts to one side with the short assertion that no question of due process under the Fifth Amendment or jurisdiction reviewable here is presented. I do not think this meets the issue, standing alone or in conjunction with the suggestion which follows that the Court gives no intimation one way or the other concerning ***81** what Fifth Amendment due process might require in other situations.

It may be appropriate to add here that, although without doubt the directive was drawn in good faith in the belief that it would expedite the trial and that enemy belligerents in petitioner's position were not entitled to more, that state of mind and purpose cannot cure the nullification of basic constitutional standards which has taken place.

It is not necessary to recapitulate. The difference between the Court's view of this proceeding and my own comes down in the end to the view, on the one hand, that there is no law restrictive upon these proceedings other than whatever rules and regulations may be prescribed for their government by the executive authority or the military and, on the other hand, that the provisions of the Articles of War, of the Geneva Convention and the Fifth Amendment apply.

I cannot accept the view that anywhere in our system resides or lurks a power so unrestrained to deal with any human being ****379** through any process of trial. What military agencies or authorities may do with our enemies in battle or invasion, apart from proceedings in the nature of trial and some semblance of judicial action, is beside the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



point. Nor has any human being heretofore been held to be wholly beyond elementary procedural protection by the Fifth Amendment. I cannot consent to even implied departure from that great absolute.

It was a great patriot who said:

'He that would make his own liberty secure must guard even his enemy from oppression; for if he violates this duty he establishes a precedent that will reach himself.' [FN42]

FN42 2 The Complete Writings of Thomas Paine (edited by Foner, 1945) 588.

Mr. Justice MURPHY joins in this opinion.

66 S.Ct. 340, 327 U.S. 1, 90 L.Ed. 499

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







Supreme Court of the United States

**JOHNSON, Secretary of Defense, et al.,**
**v.**
**EISENTRAGER et al.**

**No. 306.**

Argued April 17, 1950.
Decided June 5, 1950.

Habeas corpus proceedings by Lothar Eisentrager, alias Ludwig Ehrhardt, on his own behalf and as next friend of Franz Siebert, and others, against Louis A. Johnson, Secretary of Defense of the United States, and others. A judgment of the United States District Court for the District of Columbia dismissing the petition for lack of jurisdiction was reversed by the United States Court of Appeals for the District of Columbia Circuit, E. Barrett Prettyman, Circuit Judge, 84 U.S.App.D.C. 396, 174 F.2d 961, and the respondents brought certiorari. The Supreme Court, Mr. Justice Jackson, held that German nationals, confined in custody of United States Army in Germany following conviction by military commission of having engaged in military activity against United States in China after surrender of Germany, had no right to writ of habeas corpus to test legality of their detention.

Judgment of Court of Appeals reversed and judgment of District Court affirmed.

Mr. Justice Black, Mr. Justice Douglas and Mr. Justice Burton, dissented.

West Headnotes

**[1] War and National Emergency ⚷ 11**
402k11 Most Cited Cases
(Formerly 402k1)

An "alien friend" is a subject of a foreign state at peace with United States while an "alien enemy" is the subject of a foreign state at war with United States.

**[2] Aliens ⚷ 3**
24k3 Most Cited Cases

Mere lawful presence in the country by an alien creates an implied assurance of safe conduct and gives him certain rights, and such rights become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.

**[3] War and National Emergency ⚷ 11**
402k11 Most Cited Cases
(Formerly 402k1)

An alien enemy is bound by an allegiance which commits him to lose no opportunity to forward the cause of the enemy, and hence United States, assuming him to be faithful to his allegiance, regards him as part of the enemy resources, and takes measures to disable him from commission of hostile acts imputed as his intention.

**[4] War and National Emergency ⚷ 11**
402k11 Most Cited Cases
(Formerly 402k1)

A resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a "declared war" exists and courts will entertain his plea for freedom from executive custody only to ascertain the existence of a state of war and whether he is an alien enemy and so subject to the Alien Enemy Act. Alien Enemy Act, as amended, 50 U.S.C.A. § 21.

**[5] War and National Emergency ⚷ 10(2)**
402k10(2) Most Cited Cases

Under rule of common law and law of nations, alien enemies resident in the country of the enemy cannot maintain an action in courts of the United States during the period of hostilities.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





**[6] Habeas Corpus ⚿ 685**
197k685 Most Cited Cases
(Formerly 197k82)

A basic consideration in habeas corpus is that the prisoner will be produced before the courts, though production of the prisoner may be dispensed with where it appears on face of the application that no cause for granting the writ exists. 28 U.S.C.A. § 2243.

**[7] Armed Services ⚿ 31**
34k31 Most Cited Cases

**[7] Constitutional Law ⚿ 278.6(1)**
92k278.6(1) Most Cited Cases
(Formerly 92k252, 197k82)

American citizens conscripted into the military service are thereby stripped of their Fifth Amendment rights and as members of the military establishment are subject to its discipline, including military trial for offenses against aliens or Americans. U.S.C.A.Const. Amend. 5.

**[8] War and National Emergency ⚿ 11**
402k11 Most Cited Cases

The federal Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in hostile service of a government at war with the United States. U.S.C.A.Const. Amend. 5.

**[9] War and National Emergency ⚿ 32**
402k32 Most Cited Cases

Military authorities have jurisdiction, during or following hostilities, to punish those guilty of offenses against the laws of war.

**[10] War and National Emergency ⚿ 32**
402k32 Most Cited Cases

The article of Geneva Convention requiring notice to the protecting power at the opening of a judicial proceeding directed against a prisoner of war before date set for opening of the trial applied only to proceedings for disciplinary offenses committed during captivity, and not in case of war crimes committed before capture. Geneva Convention July 27, 1929, art. 60, 47 Stat. 2051.

**[11] War and National Emergency ⚿ 32**
402k32 Most Cited Cases

The article of Geneva Convention providing that sentence be pronounced against the prisoner of war only by same course and according to same procedure as in case of persons belonging to armed forces of detaining power referred only to those proceedings for disciplinary offenses during captivity, and did not apply to a trial for war crimes. Geneva Convention, July, 27, 1929, art. 63, 47 Stat. 2052.

**[12] Habeas Corpus ⚿ 521**
197k521 Most Cited Cases
(Formerly 197k38)

German nationals, confined in custody of United States Army in Germany following conviction by military commission of having engaged in military activity against United States in China after surrender of Germany, had no right to writ of habeas corpus to test legality of their detention. U.S.C.A.Const. arts. 1, 2, § 2, art. 3; Amends. 5, 6; Geneva Convention, July 27, 1929, arts. 60, 63, 75, 47 Stat. 2021, 2051, 2052, 2055.

****937 *765** Mr. Solicitor General Philip B. Perlman, Washington, D.C., for petitioners.

Messrs. A. Frank Reel, Boston, Mass., Milton Sandberg, New York City, for respondents.

Mr. Justice JACKSON delivered the opinion of the Court.

The ultimate question in this case is one of jurisdiction of civil courts of the United States vis-a -vis military authorities in dealing with enemy aliens overseas. The issues come here in this way:

Twenty-one German nationals petitioned the District Court of the District of Columbia for writs of habeas corpus. They alleged that, prior to May 8, 1945, they were in service of German armed forces in China. They

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw. Westlaw.

amended to allege that their employment there was by civilian agencies of the German Government. Their exact affiliation is disputed, and, for our purposes, immaterial. On May 8, 1945, the German High Command ***766** executed an act of unconditional surrender, expressly obligating all forces under German control at once to cease active hostilities. These prisoners have been convicted of violating laws of war, by engaging in, permitting or ordering continued military activity against the United States after surrender of Germany and before surrender of Japan. Their hostile operations consisted principally of collecting and furnishing intelligence concerning American forces and their movements to the Japanese armed forces. They, with six others who were acquitted, were taken into custody by the United States Army after the Japanese surrender and were tried and convicted by a Military Commission constituted by our Commanding General at Nanking by delegation from the Commanding General, United States Forces, China Theatre, pursuant to authority specifically granted by the Joint Chiefs of Staff of the United States. The Commission sat in China, with express consent of the Chinese Government. The proceeding was conducted wholly under American auspices and involved no international participation. After conviction, the sentences were duly reviewed and, with immaterial modification, approved by military reviewing authority.

The prisoners were repatriated to Germany to serve their sentences. Their immediate custodian is Commandant of Landsberg Prison, an American Army officer under the Commending General, Third United States Army and the Commanding General, European Command. He could not be reached by process from ****938** the District Court. Respondents named in the petition are Secretary of Defense, Secretary of the Army, Chief of Staff of the Army, and the Joint Chiefs of Staff of the United States.

The petition alleges, and respondents denied, that the jailer is subject to their direction. The Court of Appeals assumed, and we do likewise, that, while prisoners are ***767** in immediate physical custody of an officer or officers not parties to the proceeding, respondents named in the petition have lawful authority to effect that release.

The petition prays an order that the prisoners be produced before the District Court, that it may inquire into their confinement and order them discharged from such offenses and confinement. It is claimed that their trial, conviction and imprisonment violate Articles I and III of the Constitution, and the Fifth Amendment thereto, and other provisions of the Constitution and laws of the United States and provisions of the Geneva Convention governing treatment of prisoners of war.

A rule to show cause issued, to which the United States made return. Thereupon the petition was dismissed on authority of Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898.

The Court of Appeals reversed and, reinstating the petition, remanded for further proceedings. 84 U.S.App.D.C. 396, 174 F.2d 961. It concluded that any person, including an enemy alien, deprived of his liberty anywhere under any purported authority of the United States is entitled to the writ if he can show that extension to his cases of any constitutional rights or limitations would show his imprisonment illegal; that, although no statutory jurisdiction of such cases is given, courts must be held to possess it as part of the judicial power of the United States; that where deprivation of liberty by an official act occurs outside the territorial jurisdiction of any District Court, the petition will lie in the District Court which has territorial jurisdiction over officials who have directive power over the immediate jailer.

The obvious importance of these holdings to both judicial administration and military operations impelled us to grant certiorari. 338 U.S. 877, 70 S.Ct. 158. The case is before us only on issues of law. The writ of habeas corpus must be granted 'unless it appears from the application' that the applicants are not entitled to it. 28 U.S.C. s 2243, 28 U.S.C.A. s

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2243.

***768** We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes. Absence of support from legislative or juridical sources is implicit in the statement of the court below that 'The answers stem directly from fundamentals. They cannot be found by casual reference to statutes or cases.' The breadth of the court's premises and solution requires us to consider questions basic to alien enemy and kindred litigation which for some years have been beating upon our doors. [FN1]

FN1. From January 1948 to today, motions for leave to file petitions for habeas corpus in this Court, and applications treated by the Court as such, on behalf of over 200 German enemy aliens confined by American military authorities abroad were filed and denied. Brandt v. United States, and 13 companion cases, 333 U.S. 836, 68 S.Ct. 603, 92 L.Ed. 1119; In re Eichel (one petition on behalf of three persons), 333 U.S. 865, 68 S.Ct. 787, 92 L.Ed. 1144; Everett v. Truman (one petition on behalf of 74 persons), 334 U.S. 824, 68 S.Ct. 1081, 92 L.Ed. 1753; In re Krautwurst, and 11 companion cases, 334 U.S. 826, 68 S.Ct. 1328, 92 L.Ed. 1754; In re Ehlen 'et al.,' and In re Girke 'et al.,' 334 U.S. 836, 68 S.Ct. 1491, 92 L.Ed. 1762; In re Gronwald 'et al.,' 334 U.S. 857, 68 S.Ct. 1522, 92 L.Ed. 1777; In re Stattmann, and 3 companion cases, 335 U.S. 805, 69 S.Ct. 18, 93 L.Ed. 362; In re Vetter, and 6 companion cases, 335 U.S. 841, 69 S.Ct. 59, 93 L.Ed. 392; In re Eckstein, 335 U.S. 851, 69 S.Ct. 79, 93 L.Ed. 399; In re Heim, 335 U.S. 856, 69 S.Ct. 126, 93 L.Ed. 404; In re Dammann, and 4 companion cases, 336 U.S. 922--923, 69 S.Ct. 644, 93 L.Ed. 1084; In re Muhlbauer, and 57 companion cases, covering at least 80 persons, 336 U.S. 964, 69 S.Ct. 930, 93 L.Ed. 1115; In re Felsch, 337 U.S. 953, 69 S.Ct. 1523, 93 L.Ed. 1754; In re Buerger, 338 U.S. 884, 70 S.Ct. 183; In re Hans, 339 U.S. 976, 70 S.Ct. 1007; In re Schmidt, 339 U.S. 976, 70 S.Ct. 1007; Lammers v. U.S., 339 U.S. 976, 70 S.Ct. 1008. And see also Milch v. United States, 332 U.S. 789, 68 S.Ct. 92, 92 L.Ed. 371.

These cases and the variety of questions they raised are analyzed and discussed by Fairman, Some New Problems of the Constitution Following the Flag, 1 Standard L.Rev. 587.

****939** I.

[1] Modern American law has come a long way since the time when outbreak of war made every enemy national ***769** an outlaw, subject to both public and private slaughter, cruelty and plunder. But even by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens, nor between aliens of friendly and of enemy allegiance, [FN2] nor between resident enemy aliens who have submitted themselves to our laws and nonresident enemy aliens who at all times have remained with, and adhered to, enemy governments.

FN2. '* * * In the primary meaning of the words, an alien friend is the subject of a foreign state at peace with the United States; an alien enemy is the subject of a foreign state at war with the United States. 1 Kent, Comm. p. 55; 2 Halleck, Int.L. (Rev.1908) p. 1; Hall, Int.Law (7th Ed.) p. 403, s 126; Baty & Morgan, 'War: Its Conduct and Legal Results,' p. 247; 1 Halsbury, Laws of England, p. 310; Sylvester's Case, 7 Mod. 150; The Roumanian, 1915, Prob.Div. 26; affd., 1916, 1 A.C. 124; Griswold v. Waddington, 16 Johns., N.Y., 438, 448; White v. Burnley, 20 How. 235, 249 (61 U.S. 235), 15 L.Ed. 886; The Benito Estenger, 176 U.S. 568, 571, 20 S.Ct. 489, 44 L.Ed. 592; Kershaw v. Kelsey, 100 Mass. 561, 97 Am.Dec. 124, 1 Am.Rep. 142; so all the lexicographers, as, e.g., Webster, Murray, Abbott, Black, Bouvier. * * *' Cardozo, J., in Techt v. Hughes, 229 N.Y. 222, 229, 128 N.E. 185, 186, 11 A.L.R. 166.

With the citizen we are now little concerned, except to set his case apart as untouched by this decision and to take measure of the difference between his status and that of all categories of aliens. Citizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar. The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







his government for protection. If a person's claim to United States citizenship is denied by any official, Congress has directed our courts to entertain his action to declare him to be a citizen 'regardless of whether he is within the United States or abroad.' 54 Stat. 1171, 8 U.S.C. s 903, 8 U.S.C.A. s 903. This Court long ago extended habeas corpus to one seeking admission to the country to assure fair hearing of his claims to citizenship, Chin Yow v. *770 United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369, and has secured citizenship against forfeiture by involuntary formal acts, Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320. [FN3] Because the Government's obligation of protection is correlative with the duty of loyal support inherent in the citizen's allegiance, Congress has directed the President to exert the full diplomatic and political power of the United States on behalf of any citizen, but of no other, in jeopardy abroad. When any citizen is deprived of his liberty by any foreign government, it is made the duty of the President to demand the reasons and, if the detention appears wrongful, to use means not amounting to acts of war to effectuate his release. [FN4] It is neither sentimentality nor chauvinism to repeat that 'Citizenship is a **940 high privilege.' United States v. Manzi, 276 U.S. 463, 467, 48 S.Ct. 328, 329, 72 L.Ed. 654.

FN3. For cases in lower courts, see Note, 18 Geo.Wash.L.Rev. 410.

FN4. 'Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.' 15 Stat. 224, 8 U.S.C. s 903b, 8 U.S.C.A. s 903b.

[2] The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization. During his probationary residence, *771 this Court has steadily enlarged his right against Executive deportation except upon full and fair hearing. The Japanese Immigrant Case (Yamatayo v. Fisher), 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721; Low Wah Suey v. Backus, 225 U.S. 460, 32 S.Ct. 734, 56 L.Ed. 1165; Tisi v. Tod, 264 U.S. 131, 44 S.Ct. 260, 68 L.Ed. 590; United States ex rel. Vajtauer v. Com'r, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560; Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103; Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445. And, at least since 1886, we have extended to the person and property of resident aliens important constitutional guaranties--such as the due process of law of the Fourteenth Amendment. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

But, in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act. In the pioneer case of Yick Wo v. Hopkins, the Court said of the Fourteenth Amendment, 'These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; * * *.' (Italics supplied.) 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220. And in The Japanese Immigrant Case, the Court held its processes available to 'an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here.' 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works




