Since most cases involving aliens afford this ground of jurisdiction, and the civil and property rights of immigrants or transients of foreign nationality so nearly approach equivalence to those of citizens, courts in peace time have little occasion to inquire whether litigants before them are alien or citizen.

It is war that exposes the relative vulnerability of the alien's status. The security and protection enjoyed while the nation of his allegiance remains in amity with the United States are greatly impaired when his nation takes up arms against us. While his lot is far more humane ***772** and endurable than the experience of our citizens in some enemy lands, it is still not a happy one. But disabilities this country lays upon the alien who becomes also an enemy are imposed temporarily as an incident of war and not as an incident of alienage. Judge Cardozo commented concerning this distinction: 'Much of the obscurity which surrounds the rights of aliens has its origin in this confusion of diverse subjects.' Techt v. Hughes, 229 N.Y. 222, 237, 128 N.E. 185, 189, 11 A.L.R. 166.

****941** [3] American doctrine as to effect of war upon the status of nationals of belligerents took permanent shape following our first foreign war. Chancellor Kent, after considering the leading authorities of his time, declared the law to be that '* * * in war, the subjects of each country were enemies to each other, and bound to regard and treat each other as such.' Griswold v. Waddington, 16 Johns., N.Y., 438, 480. If this was ever something of a fiction, it is one validated by the actualities of modern total warfare. Conscription, compulsory service and measures to mobilize every human and material resource and to utilize nationals--wherever they may be--in arms, intrigue and sabotage, attest the prophetic realism of what once may have seemed a doctrinaire and artificial principle. With confirmation of recent history, we may reiterate this Court's earlier teaching that in war 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy--because the enemy of his country.' The Rapid, 8 Cranch 155, 161, 3 L.Ed. 520. See also White v. Burnley, 20 How. 235, 249, 15 L.Ed. 886. Lamar v. Browne, 92 U.S. 187, 194, 23 L.Ed. 650. And this without regard to his individual sentiments or disposition. The Benito Estenger, 176 U.S. 568, 571, 20 S.Ct. 489, 490, 44 L.Ed. 592. The alien enemy is bound by an allegiance which commits him to lose no opportunity to forward the cause of our enemy; hence the United States, assuming him to be faithful to his allegiance, ***773** regards him as part of the enemy resources. It therefore takes measures to disable him from commission of hostile acts imputed as his intention because they are a duty to his sovereign.

The United States does not invoke this enemy allegiance only for its own interest, but respects it also when to the enemy's advantage. In World War I our conscription act did not subject the alien enemy to compulsory military service. 40 Stat. 885, c. XII, s 4. The Selective Service Act of 1948, 62 Stat. 604, 50 U.S.C.Appendix, s 454(a), 50 U.S.C.A.Appendix, s 454(a), exempts aliens who have not formally declared their intention to become citizens from military training, service and registration, if they make application, but if so relieved, they are barred from becoming citizens. Thus the alien enemy status carries important immunities as well as disadvantages. The United States does not ask him to violate his allegiance or to commit treason toward his own country for the sake of ours. This also is the doctrine and the practice of other states comprising our Western Civilization. [FN5]

FN5. See Delaney, The Alien Enemy and the Draft, 12 Brooklyn L.Rev. 91.

The essential pattern for seasonable Executive constraint of enemy aliens, not on the basis of individual prepossessions for their native land but on the basis of political and legal relations to the enemy government, was laid down in the very earliest days of the Republic and has endured to this day. It was established by the Alien Enemy Act of 1798. 1 Stat. 577, as amended, 50 U.S.C. s 21, 50 U.S.C.A. s 21. And it is to be noted that,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







while the Alien and Sedition Acts of that year provoked a reaction which helped sweep the party of Mr. Jefferson into power in 1800, and though his party proceeded to undo what was regarded as the mischievous legislation of the Federalists, ***774** this enactment was never repealed. [FN6] Executive power over enemy aliens, undelayed and unhampered by litigation, ****942** has been deemed, throughout our history, essential to war-time security. This is in keeping with the practices of the most enlightened of nations and has resulted in treatment of alien enemies more considerate than that ***775** which has prevailed among any of our enemies and some of our allies. This statute was enacted or suffered to continue by men who helped found the Republic and formulate the Bill of Rights, and although it obviously denies enemy aliens the constitutional immunities of citizens, it seems not then to have been supposed that a nation's obligations to its foes could ever be put on a parity with those to its defenders.

FN6. '* * * In 1798, the 5th Congress passed three acts in rapid succession, 'An Act concerning Aliens', approved June 25, 1798 (1 Stat. 570), 'An Act respecting Alien Enemies', approved July 6, 1798 (1 Stat. 577, 50 U.S.C.A. s 21 et seq.), and 'An Act in addition to the act, entitled 'An act for the punishment of certain crimes against the United States", approved July 14, 1798. (1 Stat. 596.) The first and last were the Alien and Sedition Acts, vigorously attacked in Congress and by the Virginia and Kentucky Resolutions as unconstitutional. But the members of Congress who vigorously fought the Alien Act saw no objection to the Alien Enemy Act. (8 Annals of Cong. 2035 (5th Cong., 1798).) In fact, Albert Gallatin, who led that opposition, was emphatic in distinguishing between the two bills and in affirming the constitutional power of Congress over alien enemies as part of the power to declare war. (Id. at 1980.) James Madison was the author of the Virginia Resolutions, and in his report to the Virginia House of Delegates the ensuing year after the deluge of controversy, he carefully and with some tartness asserted a distinction between alien members of a hostile nation and alien members of a friendly nation, disavowed any relation of the Resolutions to alien enemies, and declared, 'With respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war against any nation, and of course to treat it and all its members as enemies.' (Madison's Report, 4 Elliot's Deb. 546, 554 (1800).) Thomas Jefferson wrote the Kentucky Resolutions, and he was meticulous in identifying the Act under attack as the Alien Act 'which assumes power over alien friends'. (Kentucky Resolutions of 1798 and 1799, 4 Elliot's Deb. 540, 541.) It is certain that in the white light which beat about the subject in 1798, if there had been the slightest question in the minds of the authors of the Constitution or their contemporaries concerning the constitutionality of the Alien Enemy Act, it would have appeared. None did.

'The courts, in an unbroken line of cases from Fries' case (Case of Fries, C.C.D.Pa.1799, 9 Fed.Cas. at pages 826, 830 et seq., No. 5,126), in 1799 to Schwarzkopf's case (United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 1943, 137 F.2d 898) in 1943, have asserted or assumed the validity of the Act and based numerous decicions upon the assumption. (Brown v. United States, 1814, 8 Cranch 110, 3 L.Ed. 504; De Lacey v. United States, 9 Cir., 1918, 249 F. 625, L.R.A.1918E, 1011; Grahl v. United States, 7 Cir., 1919, 261 F. 487; Lockington's Case, 1813, Brightly, N.P., Pa., 269, 283; Lockington v. Smith, C.C.D.Pa., 1817, 15 Fed.Cas. page 758, No. 8,448; Ex parte Graber, D.C.N.D.Ala.1918, 247 F. 882; Minotto v. Bradley, D.C.N.D.Ill.1918, 252 F. 600; Ex parte Fronklin, D.C.Miss.1918, 253 F. 984; Ex parte Risse, D.C.S.D.N.Y.1919, 257 F. 102; Ex parte Gilroy, D.C.S.D.N.Y.1919, 257 F. 110.) The judicial view has been without dissent.

'At common law 'alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war.' (1 Blackstone * 372, 373.)' Prettyman, J. in Citizens Protective League v. Clark, 81 U.S.App.D.C. 116, 119, 155 F.2d 290, 293.

[4] The resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a 'declared war' exists. Courts will entertain his plea for freedom from Executive custody only to ascertain the existence of a state of war and whether he is an alien enemy and so subject to the Alien Enemy Act. Once these jurisdictional elements have been determined, courts will not inquire into any other issue as to his internment. Ludecke v. Watkins, 335

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881. [FN7]

FN7. See also Notes, 22 So.Cal.L.Rev. 307; 60 Harv.L.Rev. 456; 47 Mich.L.Rev. 404; 17 Geo.Wash.L.Rev. 578; 27 N.C.L.Rev. 238; 34 Corn.L.Q. 425. In this respect our courts follow the practice of the English courts. 44 Am.J.Int.L. 382.

***776** The standing of the enemy alien to maintain any action in the courts of the United States has been often challenged and sometimes denied. The general statement was early made on combined authority of Kent and Story 'That they have no power to sue in the public courts of the enemy nation.' Griswold v. Waddington, 16 Johns., N.Y., 438, 477. Our rule of generous access to the resident enemy alien was first laid down ****943** by Chancellor Kent in 1813, when, squarely faced with the plea that an alien enemy could not sue upon a debt contracted before the War of 1812, he reviewed the authorities to that time and broadly declared that 'A lawful residence implies protection, and a capacity to sue and be sued. A contrary doctrine would be repugnant to sound policy, no less than to justice and humanity.' Clarke v. Morey, 10 Johns., N.Y., 70, 72. A unanimous Court recently clarified both the privilege of access to our courts and the limitations upon it. We said: 'The ancient rule against suits by resident alien enemies has survived only so far as necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy. This may be taken as the sound principle of the common law today.' Ex parte Kawato, 317 U.S. 69, 75, 63 S.Ct. 115, 118, 87 L.Ed. 58.

[5] But the nonresident enemy alien, especially one who has remained in the service of the enemy, does not have been this qualified access to our courts, for he neither has comparable claims upon our institutions nor could his use of them fail to be helpful to the enemy. Our law on this subject first emerged about 1813 when the Supreme Court of the State of New York had occassion, in a series of cases, to examine the foremost authorities of the Continent and of England. It concluded the rule of the common law and the law of nations to be that alien enemies resident in the country of the enemy could not maintain an action in its courts during the period of hostilities. Bell v. Chapman, 10 Johns., N.Y., 183; Jackson ex dem. Johnston v. Decker, 11 ***777** Johns., N.Y., 418; Clarke v. Morey, 10 Johns., N.Y., 69, 70, 74--75. This Court has recognized that rule, Caperton v. Bowyer, 14 Wall. 216, 236, 20 L.Ed. 882; Masterson v. Howard, 18 Wall. 99, 105, 21 L.Ed. 764, and followed it, Ex parte Colonna, 314 U.S. 510, 62 S.Ct. 373, 86 L.Ed. 379, and it continues to be the law throughout this country and in England. [FN8]

FN8. See cases collected in Annotations, 137 A.L.R. 1335, 1355; 1918B L.R.A. 189, 191. See also Borchard, The Right of Alien Enemies to Sue in Our Courts, 27 Yale L.J. 104; Gordon, The Right of Alien Enemies to Sue in American Courts, 36 Ill.L.Rev. 809, 810; Battle, Enemy Litigants in Our Courts, 28 Va.L.Rev. 429; Rylee, Enemy Aliens as Litigants, 12 Geo.Wash.L.Rev. 55, 65; notes, 5 U. of Detroit L.J., 106, 22 Neb.L.Rev. 36, 30 Cal.L.Rev. 358, 54 Harv.L.Rev. 350.

II.

The foregoing demonstrates how much further we must go if we are to invest these enemy aliens, resident, captured and imprisoned abroad, with standing to demand access to our courts.

We are here confronted with a decision whose basic premise is that these prisoners are entitled, as a constitutional right, to sue in some court of the United States for a writ of habeas corpus. To support that assumption we must hold that a prisoner of our military authorities is constitutionally entitled to the writ, even though he (a) is an enemy alien; (b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States.

We have pointed out that the privilege of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







litigation has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied ***778** protection. No such basis can be invoked here, for these prisoners at no relevant time were within any territory over which the United States is sovereign, and the sences of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States.

Another reason for a limited opening of ****944** our courts to resident aliens is that among them are many of friendly personal disposition to whom the status of enemy is only one imputed by law. But these prisoners were actual enemies, active in the hostile service of an enemy power There is no fiction about their enmity. Yet the decision below confers upon them a right to use our courts, free even of the limitation we have imposed upon resident alien enemies, to whom we deny any use of our courts that would hamper our war effort or aid the enemy.

[6] A basic consideration in habeas corpus practice is that the prisoner will be produced before the court. This is the crux of the statutory scheme established by the Congress; [FN9] indeed, it is inherent in the very term 'habeas corpus.' [FN10] And though production of the prisoner may be dispensed with where it appears on the face of the application that no cause for granting the writ exists, Walker v. Johnston, 312 U.S. 275, 284, 61 S.Ct. 574, 578, 85 L.Ed. 830, we have consistently adhered to and recognized the general rule. Ahrens v. Clark, 335 U.S. 188, 190--191, 68 S.Ct. 1443, 1441, 92 L.Ed. 1898. To grant the ***779** writ to these prisoners might mean that our army must transport them across the seas for hearing. This would require allocation of shipping space, guarding personnel, billeting and rations. It might also require transportation for whatever witnesses the prisoners desired to call as well as transportation for those necessary to defend legality of the sentence. The writ, since it is held to be a matter of right, would be equally available to enemies during active hostilities as in the present twilight between war and peace. Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

FN9. 28 U.S.C. s 2243, 28 U.S.C.A. s 2243, provides in part: 'Unless the application for the writ and the return present only issues of law the person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.'

FN10. 'Habeas Corpus * * * thou (shalt) have the body (sc. in court).
'A writ issuing out of a court of justice * * * requiring the body of a person to be brought before the judge or into the court for the purpose specified in the writ; * * * requiring the body of a person restrained of liberty to be brought before the judge or into court, that the lawfulness of the restraint may be investigated and determined.' The Oxford English Dictionary (1933), Vol. V, p. 2.

Moreover, we could expect no reciprocity for placing the litigation weapon in unrestrained enemy hands. The right of judicial refuge from military action, which it is proposed to bestow on the enemy, can purchase no equivalent for benefit of our citizen soldiers. Except England, whose law appears to be in harmony with the views we have expressed, and other English-speaking peoples in whose practice nothing has been cited to the contrary, the writ of habeas corpus is generally unknown.

The prisoners rely, however, upon two decisions of this Court to get them over the threshold--Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3, and In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499. Reliance

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





Westlaw.

on the Quirin case is clearly mistaken. Those prisoners were in custody in the District of Columbia. One was, or ***780** claimed to be, a citizen. They were tried by a Military Commission sitting in the District of Columbia at a time when civil courts were open and functioning normally. ****945** They were arrested by civil authorities and the prosecution was personally directed by the Attorney General, a civilian prosecutor, for acts committed in the United States. They waived arraignment before a civil court and it was contended that the civil courts thereby acquired jurisdiction and could not be ousted by the Military. None of the places where they were acting, arrested, tried or imprisoned were, it was contended, in a zone of active military operations, were not under martial law or any other military control, and no circumstances justified transferring them from civil to military jurisdiction. None of these grave grounds for challenging military jurisdiction can be urged in the case now before us.

Nor can the Court's decision in the Yamashita case aid the prisoners. This Court refused to receive Yamashita's petition for a writ of habeas corpus. For hearing and opinion, it was consolidated with another application for a writ of certiorari to review the refusal of habeas corpus by the Supreme Court of the Philippines over whose decisions the statute then gave this Court a right of review. 28 U.S.C. s 349 (1940), repealed by Act of June 25, 1948, c. 646, s 39, 62 Stat. 992, 1000. By reason of our sovereignty at that time over these insular possessions, Yamashita stood much as did Quirin before American courts. Yamashita's offenses were committed on our territory, he was tried within the jurisdiction of our insular courts and he was imprisoned within territory of the United States. None of these heads of jurisdiction can be invoked by these prisoners.

Despite this, the doors of our courts have not been summarily closed upon these prisoners. Three courts have considered their application and have provided their counsel opportunity to advance every argument in their ***781** support and to show some reason in the petition why they should not be subject to the usual disabilities of non-resident enemy aliens. This is the same preliminary hearing as to sufficiency of application that was extended in Quirin, supra, Yamashita, supra, and Hirota v. MacArthur, 338 U.S. 197, 69 S.Ct. 197, 1238, 93 L.Ed. 1902. After hearing all contentions they have seen fit to advance and considering every contention we can base on their application and the holdings below, we arrive at the same conclusion the Court reached in each of those cases, viz.: that no right to the writ of habeas corpus appears.

III.

The Court of Appeals dispensed with all requirement of territorial jurisdiction based on place of residence, captivity, trial, offense, or confinement. It could not predicate relief upon any intraterritorial contact of these prisoners with our laws or institutions. Instead, it gave our Constitution an extraterritorial application to embrace our enemies in arms. Right to the writ, it reasoned, is a subsidiary procedural right that follows from possession of substantive constitutional rights. These prisoners, it considered, are invested with a right of personal liberty by our Constitution and therefore must have the right to the remedial writ. The court stated the steps in its own reasoning as follows: 'First. The Fifth Amendment, by its terms, applies to 'any person'. Second. Action of Government officials in violation of the Constitution is void. This is the ultimate essence of the present controversy. Third. A basic and inherent function of the judicial branch of a government built upon a constitution is to set aside void action by government officials, and so to restrict executive action to the confines of the constitution. In our jurisprudence, no Government action which is void under the Constitution is exempt from judicial power. Fourth. The writ ***782** of habeas corpus is the established, time-honored process in our law for testing the authority of one who deprives another of his liberty,--'the best and only sufficient defense of personal freedom.' * * *' 84 U.S.App.D.C. 396, 398--399, 174 F.2d 961, 963--964.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







The doctrine that the term 'any person' in the Fifth Amendment spreads its protection ****946** over alien enemies anywhere in the world engaged in hostilities against us, should be weighed in light of the full text of that Amendment: 'No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.'

When we analyze the claim prisoners are asserting and the court below sustained, it amounts to a right not to be tried at all for an offense against our armed forces. If the Fifth Amendment protects them from military trial, the Sixth Amendment as clearly prohibits their trial by civil courts. The latter requires in all criminal prosecutions that 'the accused' be tried 'by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law.' And if the Fifth be held to embrace these prisoners because it uses the inclusive term 'no person,' the Sixth must, for it applies to all 'accused.' No suggestion is advanced by the court below or by prisoners of any constitutional ***783** method by which any violations of the laws of war endangering the United States forces could be reached or punished, if it were not by a Military Commission in the theatre where the offense was committed.

The Court of Appeals has cited no authority whatever for holding that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses, except to quote extensively from a dissenting opinion in In re Yamashita, 327 U.S. 1, 26, 66 S.Ct. 340, 353, 90 L.Ed. 499. The holding of the Court in that case is, of course, to the contrary.

[7] If this Amendment invests enemy aliens in unlawful hostile action against us with immunity from military trial, it puts them in a more protected position than our own soldiers. American citizens conscripted into the military service are thereby stripped of their Fifth Amendment rights and as members of the military establishment are subject to its discipline, including military trials for offenses against aliens or Americans. Cf. Humphrey v. Smith, 336 U.S. 695, 69 S.Ct. 830, 93 L.Ed. 986; Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974. Can there be any doubt that our foes would also have been excepted, but for the assumption 'any person' would never be read to include those in arms against us? It would be a paradox indeed if what the Amendment denied to Americans it guaranteed to enemies. And, of course, it cannot be claimed that such shelter is due them as a matter of comity for any reciprocal rights conferred by enemy governments on American soldiers. [FN11]

FN11. 'All merchants, if they were not openly prohibited before, shall have their safe and sure conduct to depart out of England, to come into England, to tarry in, and go through England, as well by land as by water, to buy and sell without any manner of evil tolles by the old and rightful customs, except in time of war; and if they be of a land making war against us, and be found in our realm at the beginning of the wars, they shall be attached without harm of body or goods, until it be known unto us, or our chief justice, how our merchants be entreated who are then found in the land making war against us; and if our merchants be well intreated there, theirs shall be likewise with us.' (Emphasis added.) C. 30 of the Magna Carta, in 3 The Complete Statutes of England (Halsbury's Laws of England 1929) at p. 27.

***784** The decision below would extend coverage of our Constitution to nonresident alien enemies denied to resident alien enemies. The latter are entitled only to judicial hearing to determine what the petition of these prisoners admits: that they are really alien ****947** enemies. When that appears, those resident here may be deprived of liberty by Executive action without hearing. Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.





1429, 92 L.Ed. 1881. While this is preventive rather than punitive detention, no reason is apparent why an alien enemy charged with having committed a crime should have greater immunities from Executive action than one who it is only feared might at some future time commit a hostile act.

If the Fifth Amendment confers it rights on all the world except Americans engaged in defending it, the same must be true of the companion civil-rights Amendments, for none of them is limited by its express terms, territorially or as to persons. Such a construction would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and 'were-wolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments.

Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it could scarcely have failed to excite contemporary comment. Not one word can be cited. No decision of this Court supports such a view. Cf. Downes v. Bidwell, 182 U.S. ***785** 244, 21 S.Ct. 770, 45 L.Ed. 1088. None of the learned commentators on our Constitution has ever hinted at it. The practice of every modern government is opposed to it.

[8] We hold that the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States.

IV.

The Court of Appeals appears to have been of opinion that the petition shows some action by some official of the United States in excess of his authority which confers a private right to have it judicially voided. Its Second and Third propositions were that 'action of government officials in violation of the Constitution is void' and 'a basic and inherent function of the judicial branch * * * is to set aside void action by government officials * * *.' For this reason it thought the writ could be granted.

The petition specifies four reasons why conviction of the Military Commission was in excess of its jurisdiction: two based on the Geneva Convention on July 27, 1929, 47 Stat. 2021, with which we deal later; and two apparently designed to raise constitutional questions. The constitutional contentions are that 'the detention of the prisoners as convicted war criminals is illegal and in violation of Articles I and III of the Constitution of the United States and of the Fifth Amendment thereto, and of other provisions of said Constitution and laws of the United States * * *, in that:

'(a) There being no charge of an offense against the laws of war by the prisoners, the Military Commission was without jurisdiction.

'(b) In the absence of hostilities, martial law, or American military occupation of China, and in view of treaties between the United States and China ***786** dated February 4, 1943, and May 4, 1943, and between Germany and China, dated May 18, 1921, the Military Commission was without jurisdiction.'

The petition does not particularize and neither does the court below the specific respects in which it is claimed acts of the Military were ultra vires.

[9] The jurisdiction of military authorities, during or following hostilities, to punish those guilty of offenses against the laws of war is long-established. By the ****948** Treaty of Versailles, 'The German Government recognizes the right of the Allied and Associated Powers to bring before military tribunals persons accused of having committed acts in violation of the laws and customs of war.' Article 228. This Court has characterized as 'well- established' the 'power of the military to exercise jurisdiction over members of the armed forces, those directly

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





connected with such forces, or enemy belligerents, prisoners of war, or others charged with violating the laws of war.' Duncan v. Kahanamoku, 327 U.S. 304, 312, 313-314, 66 S.Ct. 606, 610, 90 L.Ed. 688. And we have held in the Quirin and Yamashita cases, supra, that the Military Commission is a lawful tribunal to adjudge enemy offenses against the laws of war. [FN12]

FN12. See Green, The Military Commission, 42 Am.J.Int.L. 832.

It is not for us to say whether these prisoners were or were not guilty of a war crime, or whether if we were to retry the case we would agree to the findings of fact or the application of the laws of war made by the Military Commission. The petition shows that these prisoners were formally accused of violating the laws of war and fully informed of particulars of these charges. As we observed in the Yamashita case, 'If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed ***787** facts. Correction of their errors of decision is not for the courts but for the military authorities which are alone authorized to review their decisions.' 327 U.S. 1, 8, 66 S.Ct. 340, 344, 90 L.Ed. 499. 'We consider here only the lawful power of the commission to try the petitioner for the offense charged.' Ibid.

That there is a basis in conventional and long-established law by which conduct ascribed to them might amount to a violation seems beyond question. Breach of the terms of an act of surrender is no novelty among war crimes. 'That capitulations must be scrupulously adhered to is an old customary rule, since enacted by Article 35 of the Hague Regulations. [FN13] Any act contrary to a capitulation would constitute an international delinquency if ordered by a belligerent Government, and a war crime if committed without such order. Such violation may be met by reprisals or punishment of the offenders as war criminals.' II Oppenheim, International Law 433 (6th ed. rev., Lauterpacht, 1944). Vattel tells us: 'If any of the subjects, whether military men or private citizens offend against the truce * * * the delinquents should be compelled to make ample compensation for the damage, and severely punished. * * *' Law of Nations, ***788** Book III, c. XVI, s 241. And so too, Lawrence, who says, 'If * * * the breach of the conditions agreed upon is the act of unauthorized individuals, the side that suffers * * * may demand the punishment of the guilty parties and an indemnity for any losses it has sustained.' Principles of International Law (5th ed.) p. 566. It being within the jurisdiction of a Military Commission to try the prisoners, it was for it to determine whether the laws of war applied and whether an offense against them had been committed.

FN13. Article XXXV of Convention IV signed at The Hague, October 18, 1907, 36 Stat. 2277, 2305, provides: 'Capitulations agreed upon between contracting parties must take into account the rules of military honour.

'Once settled, they must be scrupulously observed by both parties.'

And see VII Moore, International Law Digest (1906) 330: 'If there is one rule of the law of war more clear and peremptory than another, it is that compacts between enemies, such as truces and capitulations, shall be faithfully adhered to; and their non-observance is denounced as being manifestly at variance with the true interest any duty, not only of the immediate parties, but of all mankind. Mr. Webster, Sec. of State, to Mr. Thompson, Apr. 5, 1842, 6 Webster's Works, 438.'

We can only read '(b)' to mean either that the presence of the military forces of the United States in China at the times in question was unconstitutional or if lawfully there, that they had no right under ****949** the Constitution to set up a Military Commission on Chinese territory. But it can hardly be meant that it was unconstitutional for the Government of the United States to wage a war in foreign parts. Among powers granted to Congress by the Constitution is power to provide for the common defense, to declare war, to raise and support armies, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces, Art. I, s 8, Const. It also gives power to make

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







rules concerning captures on land and water, ibid., which this Court has construed as an independent substantive power. Brown v. United States, 8 Cranch 110, 126, 3 L.Ed. 504. Indeed, out of seventeen specific paragraphs of congressional power, eight of them are devoted in whole or in part to specification of powers connected with warfare. The first of the enumerated powers of the President is that he shall be Commander-in-Chief of the Army and Navy of the United States. Art. II, s 2, Const. And, of course, grant of war power includes all that is necessary and proper for carrying these powers into execution.

***789** Certainly it is not the function of the Judiciary to entertain private litigation--even by a citizen--which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region. China appears to have fully consented to the trial within her territories and, if China had complaint at the presence of American forces there, China's grievance does not become these prisoners' right. The issue tendered by '(b)' involves a challenge to conduct of diplomatic and foreign affairs, for which the President is exclusively responsible. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255; Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568.

These prisoners do not assert, and could not, that anything in the Geneva Convention makes them immune from prosecution or punishment for war crimes. [FN14] Article 75 thereof expressly provides that a prisoner of war may be detained until the end of such proceedings and, if necessary, until the expiration of the punishment. 47 Stat. 2021, 2055.

FN14. We are not holding that these prisoners have no right which the military authorities are bound to respect. The United States, by the Geneva Convention of July 27, 1929. 47 Stat. 2021, concluded with forty- six other countries, including the German Reich, an agreement upon the treatment to be accorded captives. These prisoners claim to be and are entitled to its protection. It is, however, the obvious scheme of the Agreement that responsibility for observance and enforcement of these rights is upon political and military authorities. Rights of alien enemies are vindicated under it only through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention.

[10] The petition, however, makes two claims in the nature of procedural irregularities said to deprive the Military Commission of jurisdiction. One is that the United States was obliged to give the protecting power of Germany ***790** notice of the trial as specified in Article 60 of the Convention. This claim the Court has twice considered and twice rejected, holding that such notice is required only of proceedings for disciplinary offenses committed during captivity and not in case of war crimes committed before capture. Ex parte Quirin, supra; Ex parte Yamashita, supra.

[11] The other claim is that they were denied trial 'by the same courts and according to the same procedure as in the case of persons belonging to the armed forces of the detaining power,' required by Article 63 of the Convention. It may be noted that no prejudicial disparity is pointed out as between the Commission that tried prisoners and those that would try an offending soldier of the American forces of like rank. By a parity of reasoning with that in the foregoing decisions, this Article also refers to those, and only to those, proceedings for ****950** disciplinary offenses during captivity. Neither applies to a trial for war crimes.

We are unable to find that the petition alleges any fact showing lack of jurisdiction in the military authorities to accuse, try and condemn these prisoners or that they acted in excess of their lawful powers.

V.

[12] The District Court dismissed this petition on authority of Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898. The Court of Appeals considered only questions which it regarded as reserved in that decision and in





Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243. Those cases dealt with persons both residing and detained within the United States and whose capacity and standing to invoke the process of federal courts somewhere was unquestioned. The issue was where.

Since in the present application we find no basis for invoking federal judicial power in any district, we need ***791** not debate as to where, if the case were otherwise, the petition should be filed.

For reasons stated, the judgment of the Court of Appeals is reversed and the judgment of the District Court dismissing the petition is affirmed.

Reversed.

Mr. Justice BLACK, with whom Mr. Justice DOUGLAS and Mr. Justice BURTON concur, dissenting.

Not only is United States citizenship a 'high privilege,' it is a priceless treasure. For that citizenship is enriched beyond price by our goal of equal justice under law--equal justice not for citizens alone, but for all persons coming within the ambit of our power. This ideal gave birth to the constitutional provision for an independent judiciary with authority to check abuses of executive power and to issue writs of habeas corpus liberating persons illegally imprisoned. [FN1]

FN1. Article I, s 9, cl. 2 of the Constitution provides: 'The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.'

This case tests the power of courts to exercise habeas corpus jurisdiction on behalf of aliens, imprisoned in Germany, under sentences imposed by the executive through military tribunals. The trial court held that, because the persons involved are imprisoned overseas, it had no territorial jurisdiction even to consider their petitions. The Court of Appeals reversed the District Court's dismissal on the ground that the judicial rather than the executive branch of government is vested with final authority to determine the legality of imprisonment for crime. 84 U.S.App.D.C. 396, 174 F.2d 961. This Court now affirms the District Court's dismissal. I agree with the Court of Appeals and need add little to the ***792** cogent reasons given for its decision. The board reach of today's opinion, however, requires discussion.

First. In Part IV of its opinion the Court apparently bases its holding that the District Court was without jurisdiction on its own conclusion that the petition for habeas corpus failed to show facts authorizing the relief prayed for. But jurisdiction of a federal district court does not depend on whether the initial pleading sufficiently states a cause of action; if a court has jurisdiction of subject matter and parties, it should proceed to try the case, beginning with consideration of the pleadings. Bell v. Hood, 327 U.S. 678, 682--683, 66 S.Ct. 773, 776, 90 L.Ed. 939; Ex parte Kawato, 317 U.S. 69, 71, 63 S.Ct. 115, 116, 87 L.Ed. 58. [FN2] Therefore Part IV of the opinion is wholly irrelevant and lends no support whatever to the Court's holding that the District Court was without jurisdiction.

FN2. Cases are occasionally dismissed where the claims are 'wholly insubstantial and frivolous', Bell v. Hood, supra, but the very complexity of this Court's opinion belies any such classification of this petition.

****951** Moreover, the question of whether the petition showed on its face that these prisoners had violated the laws of war, even if it were relevant, is not properly before this Court. The trial court did not reach that question because it concluded that their imprisonment outside its district barred it even from considering the petition; its doors were 'summarily closed.' And in reversing, the Court of Appeals specifically rejected requests that it consider the sufficiency of the petition, properly remanding the cause to the District Court for that determination--just as this Court did in the Hood and Kawato cases, supra. The Government's petition for certiorari here presented no question except that of jurisdiction; and neither party has









argued, orally or in briefs, that this Court should pass on the sufficiency of the petition. ***793** To decide this unargued question under these circumstances seems an unwarranted and highly improper deviation from ordinary judicial procedure. At the very least, fairness requires that the Court hear argument on this point.

Despite these objections, the Court now proceeds to find a 'war crime' in the fact that after Germany had surrendered these prisoners gave certain information to Japanese military forces. I am not convinced that this unargued question is correctly decided. The petition alleges that when the information was given, the accused were 'under the control of the armed forces of the Japanese Empire,' in Japanese-occupied territory. Whether obedience to commands of their Japanese superiors would in itself constitute 'unlawful' belligerency in violation of the laws of war is not so simple a question as the Court assumes. The alleged circumstances, if proven, would place these Germans in much the same position as patriotic French, Dutch, or Norwegian soldiers who fought on with the British after their homelands officially surrendered to Nazi Germany. There is not the slightest intimation that the accused were spies, or engaged in cruelty, torture, or any conduct other than that which soldiers or civilians might properly perform when entangled in their country's war. It must be remembered that legitimate 'acts of warfare,' however murderous, do not justify criminal conviction. In Ex parte Quirin, 317 U.S. 1, 30--31, 63 S.Ct. 2, 11--12, 87 L.Ed. 3, we cautioned that military tribunals can punish only 'unlawful' combatants; it is no 'crime' to be a soldier. See also Dow v. Johnson, 100 U.S. 158, 169, 25 L.Ed. 632; Ford v. Surget, 97 U.S. 594, 605--606, 24 L.Ed. 1018. Certainly decisions by the trial court and the Court of Appeals concerning applicability of that principle to these facts would be helpful, as would briefs and arguments by the adversary parties. It should not be decided by this Court now without that assistance, particularly since ***794** failure to remand deprives these petitioners of any right to meet alleged deficiencies by amending their petitions.

Second. In Parts I, II, and III of its opinion, the Court apparently holds that no American court can even consider the jurisdiction of the military tribunal to convict and sentence these prisoners for the alleged crime. Except insofar as this holding depends on the gratuitous conclusions in Part IV (and I cannot tell how far it does), it is based on the facts that (1) they were enemy aliens who were belligerents when captured, and (2) they were captured, tried, and imprisoned outside our realm, never having been in the United States.

The contention that enemy alien belligerents have no standing whatever to contest conviction for war crimes by habeas corpus proceedings has twice been emphatically rejected by a unanimous Court. In Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3, we held that status as an enemy alien did not foreclose 'consideration by the courts of petitioners' contentions that the Constitution and laws of the United States constitutionally enacted forbid their trial by military commission.' Id., 317 U.S. at 25, 63 S.Ct. at 9, 87 L.Ed. 3. This we did in the face of a presidential proclamation denying such prisoners access to our courts. Only after thus upholding jurisdiction of the courts to consider such ****952** habeas corpus petitions did we go on to deny those particular petitions upon a finding that the prisoners had been convicted by a military tribunal of competent jurisdiction for conduct that we found constituted an actual violation of the law of war. Similarly, in Re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499, we held that courts could inquire whether a military commission, promptly after hostilities had ceased, had lawful authority to try and condemn a Japanese general charged with violating the law of war before hostilities had ceased. There we stated: '(T)he Executive branch of the government could not, unless there was suspension of the writ, withdraw from the courts the duty and power to ***795** make such inquiry into the authority of the commission as may be made by habeas corpus.' Id., 327 U.S. at 9, 66 S.Ct. at 345, 90 L.Ed. 499. That we went on to deny the requested writ, as in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works








the Quirin case, in no way detracts from the clear holding that habeas corpus jurisdiction is available even to belligerent aliens convicted by a military tribunal for an offense committed in actual acts of warfare.

Since the Court expressly disavows conflict with the Quirin or Yamashita decisions, it must be relying not on the status of these petitioners as alien enemy belligerents but rather on the fact that they were captured, tried and imprisoned outside our territory. The Court cannot, and despite its rhetoric on the point does not, deny that if they were imprisoned in the United States our courts would clearly have jurisdiction to hear their habeas corpus complaints. Does a prisoner's right to test legality of a sentence then depend on where the Government chooses to imprison him? Certainly the Quirin and Yamashita opinions lend no support to that conclusion, for in upholding jurisdiction they place no reliance whatever on territorial location. The Court is fashioning wholly indefensible doctrine if it permits the executive branch, by deciding where its prisoners will be tried and imprisoned, to deprive all federal courts of their power to protect against a federal executive's illegal incarcerations.

If the opinion thus means, and it apparently does, that these petitioners are deprived of the privilege of habeas corpus solely because they were convicted and imprisoned overseas, the Court is adopting a broad and dangerous principle. The range of that principle is underlined by the argument of the Government brief that habeas corpus is not even available for American citizens convicted and imprisoned in Germany by American military tribunals. While the Court wisely disclaims any such necessary effect for its holding, rejection of the Government's argument is certainly made difficult by the logic of today's ***796** opinion. Conceivably a majority may hereafter find citizenship a sufficient substitute for territorial jurisdiction and thus permit courts to protect Americans from illegal sentences. But the Court's opinion inescapably denies courts power to afford the least bit of protection for any alien who is subject to our occupation government abroad, even if he is neither enemy nor belligerent and even after peace is officially declared. [FN3]

FN3. The Court indicates that not even today can a nonresident German or Japanese bring even a civil suit in American courts. With this restrictive philosophy compare Ex parte Kawato, 317 U.S. 69, 63 S.Ct. 115, 87 L.Ed. 58; see also McKenna v. Fisk, 1 How. 241, 249, 11 L.Ed. 117.

Third. It has always been recognized that actual warfare can be conducted successfully only if those in command are left the most ample independence in the theatre of operations. Our Constitution is not so impractical or inflexible that it unduly restricts such necessary independence. It would be fantastic to suggest that alien enemies could hail our military leaders into judicial tribunals to account for their day to day activities on the battlefront. Active fighting forces must be free to fight while hostilities are in progress. But that undisputable axiom has no bearing on this ****953** case or the general problem from which it arises.

When a foreign enemy surrenders, the situation changes markedly. If our country decides to occupy conquered territory either temporarily or permanently, it assumes the problem of deciding how the subjugated people will be ruled, what laws will govern, who will promulgate them, and what governmental agency of ours will see that they are properly administered. This responsibility immediately raises questions concerning the extent to which our domestic laws, constitutional and statutory, are transplanted abroad. Probably no one would suggest, and certainly I would not, that this nation either must or should attempt to apply every constitutional ***797** provision of the Bill of Rights in controlling temporarily occupied countries. But that does not mean that the Constitution is wholly inapplicable in foreign territories that we occupy and govern. See Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088.

The question here involves a far narrower

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







issue. Springing from recognition that our government is composed of three separate and independent branches, it is whether the judiciary has power in habeas corpus proceedings to test the legality of criminal sentences imposed by the executive through military tribunals in a country which we have occupied for years. The extent of such a judicial test of legality under charges like these, as we have already held in the Yamashita case, is of most limited scope. We ask only whether the military tribunal was legally constituted and whether it had jurisdiction to impose punishment for the conduct charged. Such a limited habeas corpus review is the right of every citizen of the United States, civilian or soldier (unless the Court adopts the Government's argument that Americans imprisoned abroad have lost their right to habeas corpus). Any contention that a similarly limited use of habeas corpus for these prisoners would somehow give them a preferred position in the law cannot be taken seriously.

Though the scope of habeas corpus review of military tribunal sentences is narrow, I think it should not be denied to these petitioners and others like them. We control that part of Germany we occupy. These prisoners were convicted by our own military tribunals under our own Articles of War, years after hostilities had ceased. However illegal their sentences might be, they can expect no relief from German courts or any other branch of the German Government we permit to function. Only our own courts can inquire into the legality of their imprisonment. Perhaps, as some nations believe, there is merit in leaving the administration of criminal laws ***798** to executive and military agencies completely free from judicial scrutiny. Our Constitution has emphatically expressed a contrary policy.

As the Court points out, Paul was fortunate enough to be a Roman citizen when he was made the victim of prejudicial charges; that privileged status afforded him an appeal to Rome, with a right to meet his 'accusers face to face.' Acts 25:16. But other martyrized disciples were not so fortunate. Our Constitution has led people everywhere to hope and believe that wherever our laws control, all people, whether our citizens or not, would have an equal chance before the bar of criminal justice.

Conquest by the United States, unlike conquest by many other nations, does not mean tyranny. For our people 'choose to maintain their greatness by justice rather than violence.' [FN4] Our constitutional principles are such that their mandate of equal justice under law should be applied as well when we occupy lands across the sea as when our flag flew only over thirteen colonies. Our nation proclaims a belief in the dignity of human beings as such, no matter what their nationality or where ****954** they happen to live. Habeas corpus, as an instrument to protect against illegal imprisonment, is written into the Constitution. Its use by courts cannot in my judgment be constitutionally abridged by Executive or by Congress. I would hold that our courts can exercise it whenever any United States official illegally imprisons any person in any land we govern. [FN5] Courts should not for any reason abdicate this, the loftiest power with which the Constitution has endowed them.

FN4. This goal for government is not new. According to Tacitus, it was achieved by another people almost 2,000 years ago. See 2 Works of Tacitus 326 (Oxford trans., New York, 1869).

FN5. See the concurring opinion of Mr. Justice Douglas in Koki Hirota v. MacArthur, 338 U.S. 197, 199, 69 S.Ct. 197, 1238, 93 L.Ed. 1902.

70 S.Ct. 936, 339 U.S. 763, 94 L.Ed. 1255

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







Supreme Court of the United States

**Rockwell KENT and Walter Briehl, Petitioners,**
**v.**
**John Foster DULLES, Secretary of State.**

**No. 481.**

Argued April 10, 1958.
Decided June 16, 1958.

Separate actions against Secretary of State for declaration, inter alia, that plaintiffs were entitled to passports. The United States District Court for the District of Columbia, in both cases, granted motions of Secretary and plaintiffs appealed. The United States Court of Appeals for the District of Columbia Circuit, 101 U.S.App.D.C. 239, 248 F.2d 561, 101 U.S.App.D.C. 278, 248 F.2d 600, affirmed and Supreme Court granted certiorari. The Supreme Court, Mr. Justice Douglas, held that under statutes providing that passports may be issued under such rules as President shall prescribe and that it is unlawful for citizen to enter or leave United States without a valid passport, Secretary of State did not have authority to promulgate regulations denying passports, in effect, to Communists and to persons whom evidence showed were going abroad to further Communist causes, or regulation giving authority to demand a non-Communist affidavit from citizen applying for passport.

Reversed.

Mr. Justice Clark, Mr. Justice Burton, Mr. Justice Harlan and Mr. Justice Whittaker dissented.

West Headnotes

**[1] Constitutional Law ⚷ 274(6)**
92k274(6) Most Cited Cases
(Formerly 92k255)

Right to travel is a part of "liberty" of which citizens cannot be deprived without due process of law. U.S.C.A.Const. Amend. 5.

**[2] Constitutional Law ⚷ 83(1)**
92k83(1) Most Cited Cases

Where activity exercised by an American citizen is included in constitutional protection, court will not readily infer that Congress gave government department unbridled discretion to grant or withhold it.

**[3] Constitutional Law ⚷ 77**
92k77 Most Cited Cases

If right of exit from the United States, which is a personal right, is to be regulated it must be pursuant to lawmaking function of Congress. U.S.C.A.Const. Amend. 5; 22 U.S.C.A. § 211a.

**[4] Constitutional Law ⚷ 62(9)**
92k62(9) Most Cited Cases
(Formerly 92k62)

If power to regulate exit of citizens from United States is delegated by Congress standards must be adequate to pass scrutiny by accepted tests. 22 U.S.C.A. § 211a.

**[5] Citizens ⚷ 10.1**
77k10.1 Most Cited Cases
(Formerly 77k10)

Where activities or enjoyment, natural and often necessary to well-being of American citizens, such as travel, are involved, court construes narrowly all delegated powers that curtail or dilute them. U.S.C.A.Const. Amend. 5; Immigration and Nationality Act, § 215, 8 U.S.C.A. § 1185; Internal Security Act of 1950, §§ 2, 6, 50 U.S.C.A. §§ 781, 785.

**[6] Citizens ⚷ 10.2**
77k10.2 Most Cited Cases
(Formerly 77k10)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works








Under statutes providing that passports may be issued under such rules as President shall prescribe and that it is unlawful for citizen to enter or leave United States without a valid passport, Secretary of State did not have authority to adopt regulations denying passports, in effect, to Communists and to persons whom evidence showed were going abroad to further Communist causes, or regulation giving authority to demand a non-Communist affidavit from citizen applying for passport. 22 U.S.C.A. §§ 211a, 212; Immigration and Nationality Act, § 215, 8 U.S.C.A. § 1185; Internal Security Act of 1950, §§ 2, 6, 50 U.S.C.A. §§ 781, 785; Proclamation Jan. 17, 1953, No. 3004, 67 Stat. C31.

****1113 *117** Mr. Leonard B. Boudin, New York City, for petitioners.

****1114** Mr. J. Lee Rankin, Sol. Gen., Washington, D.C., for respondent.

Mr. Justice DOUGLAS delivered the opinion of the Court.

This case concerns two applications for passports, denied by the Secretary of State. One was by Rockwell Kent who desired to visit England and attend a meeting of an organization known as the 'World Council of Peace' in Helsinki, Finland. The Director of the Passport Office informed Kent that issuance of a passport was precluded by s 51.135 of the Regulations promulgated by the Secretary of State on two grounds: [FN1] (1) that he was a ***118** Communist and (2) that he had had 'a consistent and prolonged adherence to the Communist Party line.' The letter of denial specified in some detail the facts on which those conclusions were based. Kent was also advised of his right to an informal hearing under s 51.137 of the Regulations. But he was also told that whether or not a hearing was requested it would be necessary, before a passport would be issued, to submit an affidavit as to whether he was then or ever had been a Communist. [FN2] Kent did not ask for a hearing but filed a new passport application listing several European countries he desired to visit. When advised that a hearing was still available to him, his attorney replied that Kent took the position ***119** that the requirement of an affidavit concerning Communist Party membership 'is unlawful and that for that reason and as a matter of conscience,' he would not supply one. He did, however, have a hearing at which the principal evidence against him was from his book It's Me O Lord, which Kent agreed was accurate. He again refused to submit the affidavit, maintaining that any matters unrelated to the question of his citizenship were irrelevant to the Department's consideration of his application. The Department advised him that no further consideration of his application would be given until he satisfied the requirements of the Regulations.

FN1. 22 CFR s 51.135 provides:
'In order to promote the national interest by assuring that persons who support the world Communist movement of which the Communist Party is an integral unit may not, through use of United States passports, further the purposes of that movement, no passport, except one limited for direct and immediate return to the United States, shall be issued to:
'(a) Persons who are members of the Communist Party or who have recently terminated such membership under such circumstances as to warrant the conclusion--not otherwise rebutted by the evidence--that they continue to act in furtherance of the interests and under the discipline of the Communist Party;
'(b) Persons, regardless of the formal state of their affiliation with the Communist Party, who engage in activities which support the Communist movement under such circumstances as to warrant the conclusion--not otherwise rebutted by the evidence--that they have engaged in such activities as a result of direction, domination, or control exercised over them by the Communist movement;
'(c) Persons, regardless of the formal state of their affiliation with the Communist Party, as to whom there is reason to believe, on the balance of all the evidence, that they are going abroad to engage in activities which will advance the Communist movement for the purpose, knowingly and wilfully of advancing that movement.'

FN2. Section 51.142 of the Regulations provides:
'At any stage of the proceedings in the Passport Division or before the Board, if it is deemed

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







necessary, the applicant may be required, as a part of his application, to subscribe, under oath or affirmation, to a statement with respect to present or past membership in the Communist Party. If applicant states that he is a Communist, refusal of a passport in his case will be without further proceedings.'

Thereupon Kent sued in the District Court for declaratory relief. The District Court granted summary judgment for respondent. On appeal the case of Kent was heard with that of Dr. Walter Briehl, a psychiatrist. When Briehl applied for a passport, the Director of the ****1115** Passport Office asked him to supply the affidavit covering membership in the Communist Party. Briehl, like Kent, refused. The Director then tentatively disapproved the application on the following grounds:

'In your case it has been alleged that you were a Communist. Specifically it is alleged that you were a member of the Los Angeles County Communist Party; that you were a member of the Bookshop Association, St. Louis, Missouri; that you held Communist Party meetings; that in 1936 and 1941 you contributed articles to the Communist Publication 'Social Work Today'; that in 1939, 1940 and 1941 you were a sponsor to raise funds for veterans of the Abraham Lincoln Brigade in calling on the President of the United States by a petition to defend the rights of the Communist Party and its members; that you contributed to the Civil Rights Congress bail fund to be used in raising bail on behalf of convicted Communist leaders in New York City; that ***120** you were a member of the Hollywood Arts, Sciences and Professions Council and a contact of the Los Angeles Committee for Protection of Foreign Born and a contact of the Freedom Stage, Incorporated.'

The Director advised Briehl of his right to a hearing but stated that whether or not a hearing was held, an affidavit concerning membership in the Communist Party would be necessary. Briehl asked for a hearing and one was held. At that hearing he raised three objections: (1) that his 'political affiliations' were irrelevant to his right to a passport; (2) that 'every American citizen has the right to travel regardless of politics'; and (3) that the burden was on the Department to prove illegal activities by Briehl. Briehl persisted in his refusal to supply the affidavit. Because of that refusal Briehl was advised that the Board of Passport Appeals could not under the Regulations entertain an appeal.

Briehl filed his complaint in the District Court which held that his case was indistinguishable from Kent's and dismissed the complaint.

The Court of Appeals heard the two cases en banc and affirmed the District Court by a divided vote. 101 U.S.App.D.C. 278, 248 F.2d 600; 101 U.S.App.D.C. 239, 248 F.2d 561. The cases are here on writ of certiorari. 355 U.S. 881, 78 S.Ct. 149, 2 L.Ed. 111.

The Court first noted the function that the passport performed in American law in the case of Urtetiqui v. D'Arbel, 9 Pet. 692, 699, 9 L.Ed. 276, decided in 1835:

'There is no law of the United States, in any manner regulating the issuing of passports, or directing upon what evidence it may be done, or declaring their legal effect. It is understood, as matter of practice, that some evidence of citizenship is required, by the secretary of state, before issuing a passport. This, however, is entirely discretionary ***121** with him. No inquiry is instituted by him to ascertain the fact of citizenship, or any proceedings had, that will in any manner bear the character of a judicial inquiry. It is a document, which, from its nature and object, is addressed to foreign power; purporting only to be a request, that the bearer of it may pass safely and freely; and is to be considered rather in the character of a political document, by which the bearer is recognized, in foreign countries, as an American citizen; and which, by usage and the law of nations, is received as evidence of the fact.'

A passport not only is of great value--indeed necessary--abroad; it is also an aid in establishing citizenship for purposes of re-entry into the United States. See Browder v. United States, 312 U.S. ****1116** 335, 339, 61

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





S.Ct. 599, 602, 85 L.Ed. 862; 3 Moore, International Law Digest (1906), s 512. But throughout most of our history--until indeed quite recently--a passport, though a great convenience in foreign travel, was not a legal requirement for leaving or entering the United States. See Jaffe, The Right to Travel: The Passport Problem, 35 Foreign Affairs 17. Apart from minor exceptions to be noted, it was first [FN3] made a requirement by s 215 of the Act of June 27, 1952, 66 Stat. 190, 8 U.S.C. s 1185, 8 U.S.C.A. s 1185, which states that, after a prescribed proclamation by the President, it is 'unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United ***122** States unless he bears a valid passport.' [FN4] And the Proclamation necessary to make the restrictions of this Act applicable and in force has been made. [FN5]

FN3. Sections 2 and 6 of the Act of September 23, 1950, known as the Internal Security Act of 1950, 64 Stat. 987, 993, 50 U.S.C. ss 781, 785, 50 U.S.C.A. ss 781, 785, provide that it shall be unlawful, when a Communist organization is registered under the Act or when 'there is in effect a final order of the Board requiring an organization to register,' for any member having knowledge of such registry and order to apply for a passport or for any official to issue him one. But the conditions precedent have not yet materialized.

FN4. That section provides in relevant part:
'(a) When the United States is at war or during the existence of any national emergency proclaimed by the President, * * * and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or the Congress, be unlawful-- '(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe;
'(3) for any person knowingly to make any false statement in an application for permission to depart from or enter the United States with intent to induce or secure the granting of such permission either for himself or for another;
'(b) After such proclamation as is provided for in subsection (a) has been made and published and while such proclamation is in force, it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport.'

FN5. Proc.No.3004, 67 Stat. C31.

Prior to 1952 there were numerous laws enacted by Congress regulating passports and many decisions, rulings, and regulations by the Executive Department concerning them. Thus in 1803 Congress made it unlawful for an official knowingly to issue a passport to an alien certifying that he is a citizen. 2 Stat. 205. In 1815, just prior to the termination of the War of 1812, it made it illegal for a citizen to 'cross the frontier' into enemy ***123** territory, to board vessels of the enemy on waters of the United States or to visit any of his camps within the limits of the United States, 'without a passport first obtained' from the Secretary of State or other designated official. 3 Stat. 199--200. The Secretary of State took similar steps during the Civil War. See Dept. of State, The American Passport (1898), 50. In 1850 Congress ratified a treaty with Switzerland requiring passports from citizens of the two nations. 11 Stat. 587, 589--590. Finally in 1856 Congress enacted what remains today as our basic passport statute. Prior to that time various federal officials, state and local officials, and notaries public had undertaken to issue either certificates of citizenship or other documents in the nature of letters of introduction to foreign officials requesting treatment according ****1117** to the usages of international law. By the Act of August 18, 1856, 11 Stat. 52, 60--61, 22 U.S.C. s 211a, 22 U.S.C.A. s 211a, Congress put an end to those practices. [FN6] This provision, as codified by the Act of July 3, 1926, 44 Stat., Part 2, 887, reads,

FN6. See & Op.Atty.Gen. 350, 352.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works







'The Secretary of State may grant and issue passports * * * under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports.'

Thus for most of our history a passport was not a condition to entry or exit.

It is true that, at intervals, a passport has been required for travel. Mention has already been made of the restrictions imposed during the War of 1812 and during the Civil War. A like restriction, which was the forerunner of that contained in the 1952 Act, was imposed by Congress in 1918.

*124 The Act of May 22, 1918, 40 Stat. 559, made it unlawful, while a Presidential Proclamation was in force, for a citizen to leave or enter the United States 'unless he bears a valid passport.' See H.R.Rep. No. 485, 65th Cong., 2d Sess. That statute was invoked by Presidential Proclamation No. 1473 on August 8, 1918, 40 Stat. 1829, which continued in effect until March 3, 1921. 41 Stat. 1359.

The 1918 Act was effective only in wartime. It was amended in 1941 so that it could be invoked in the then-existing emergency. 55 Stat. 252. See S.Rep. No. 444, 77th Cong., 1st Sess. It was invoked by Presidential Proclamation. Proc. No. 2523, November 14, 1941, 55 Stat. 1696. That emergency continued until April 28, 1952. Proc. No. 2974, 66 Stat. C31, 50 U.S.C.A.Appendix, note preceding section 1. Congress extended the statutory provisions until April 1, 1953. 66 Stat. 54, 57, 96, 137, 330, 333. It was during this extension period that the Secretary of State issued the Regulations here complained of. [FN7]

FN7. Dept.Reg.No.108.162, effective August 28, 1952, 17 Fed.Reg. 8013.

Under the 1926 Act and its predecessor a large body of precedents grew up which repeat over and again that the issuance of passports is 'a discretionary act' on the part of the Secretary of State. The scholars, [FN8] the courts, [FN9] the Chief Executive, [FN10] and the Attorneys General, [FN11] all *125 **1118 so said. This long-continued executive construction should be enough, it is said, to warrant the inference that Congress had adopted it. See Allen v. Grand Central Aircraft Co., 347 U.S. 535, 544--545, 74 S.Ct. 745, 750--751, 98 L.Ed. 933; United States v. Allen- Bradley Co., 352 U.S. 306, 310, 77 S.Ct. 343, 345, 1 L.Ed.2d 347. But the key to that problem, as we shall see, is in the manner in which the Secretary's discretion was exercised, not in the bare fact that he had discretion.

FN8. See 2 Hyde, International Law (2d rev. ed. 1945), s 399; 3 Hackworth, Digest of International Law (1942), s 268.

FN9. See Perkins v. Elg, 307 U.S. 325, 350, 59 S.Ct. 884, 896, 83 L.Ed. 1320.

FN10. Exec.Order No. 654, June 13, 1907; id., No. 2119--A Jan. 12, 1915; id., No. 2286--A Dec. 17, 1915; id., No. 2362-- A, Apr. 17, 1916; id., No. 2519--A, Jan. 24, 1917; id., No. 4382--A, Feb. 12, 1926; id., No. 4800, Jan. 31, 1928; id., No. 5860, June 22, 1932; id., No. 7856, Mar. 31, 1938, 3 Fed.Reg. 681, 22 CFR s 51.75. The present provision is that last listed and reads in part as follows:
'The Secretary of State is authorized in his discretion to refuse to issue a passport, to restrict a passport for use only in certain countries, to restrict it against use in certain countries, to withdraw or cancel a passport already issued, and to withdraw a passport for the purpose of restricting its validity or use in certain countries.'
The Department, however, did not feel that the Secretary of State could exercise his discretion willfully without cause. Acting Secretary Wilson wrote on April 27, 1907, 'The issuance of passports is a discretionary act on the part of the Secretary of State, and he may, for reasons deemed by him to be sufficient, direct the refusal of a passport to an American citizen; but a passport is not to be refused to an American citizen, even if his character is doubtful, unless there is reason to believe that he will put the passports to an improper or unlawful use.' Foreign Relations of the United States, Pt. II, (1910), 1083. See 3 Moore, International Law Digest (1906), s 512. Freund, Administrative Powers over

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works





Westlaw.

Persons and Property (1928), 97, states '* * * in practice it is clear that the Department of State acts upon the theory that it must grant the passport unless there is some circumstance making it a duty to refuse it. Any other attitude would indeed to intolerable; it would mean an executive power of a political character over individuals quite out of harmony with traditional American legislative practice.'

FN11. 13 Op.Atty.Gen. 89, 92; 23 Op.Atty.Gen. 509, 511.

[1] The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment. So much is conceded by the Solicitor General. In Anglo-Saxon law that right was emerging at least as early as the Magna Carta. [FN12] Chafee, ***126** Three Human Rights in the Constitution of 1787 (1956), 171--181, 187 et seq., shows how deeply engrained in our history this freedom of movement is. Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values. See Crandall v. State of Nevada, 6 Wall. 35, 44, 18 L.Ed. 744; Williams v. Fears, 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186; Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119. 'Our nation,' wrote Chafee, 'has thrived on the principle that, outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases.' Id., at 197.

FN12. Article 42 reads as follows:
'It shall be lawful to any person, for the future, to go out of our kingdom, and to return, safely and securely, by land or by water, saving his allegiance to us, unless it be in time of war, for some short space, for the common good of the kingdon: excepting prisoners and outlaws, according to the laws of the land, and of the people of the nation at war against us, and Merchants who shall be treated as it is said above.' And see Jaffe, op. cit. supra, 19--20; Sibley, The Passport System, 7 J.Soc.Comp.Leg.(N.S.) 26, 32--33; 1 Blackstone Commentaries 134--135.

Freedom of movement also has large social values. As Chafee put it:
'Foreign correspondents and lecturers on public affairs need first-hand information. Scientists and scholars gain greatly from consultations with colleagues in other countries. Students equip themselves for more fruitful careers in the United States by instruction in foreign universities. [FN13] Then there are reasons close to the core of personal life--marriage, reuniting families, spending hours with old friends. Finally, travel abroad enables American citizens to understand that people like themselves live in Europe and helps them to be well-informed ***127** on public issues. An American who has crossed the ocean is not obliged to form his opinions about our foreign policy merely from what he is told by officials of our government or by a few correspondents of American ****1119** newspapers. Moreover, his views on domestic questions are enriched by seeing how foreigners are trying to solve similar problems. In many different ways direct contact with other countries contributes to sounder decisions at home.' Id., at 195--196. And see Vestal, Freedom of Movement, 41 Iowa L.Rev. 6, 13--14.

FN13. The use of foreign travel to promote educational interests is reviewed by Francis J. Colligan in 30 Dept. State Bull. 663.

Freedom to travel is, indeed, an important aspect of the citizen's 'liberty.' We need not decide the extent to which it can be curtailed. We are first concerned with the extent, if any, to which Congress has authorized its curtailment.

The difficulty is that while the power of the Secretary of State over the issuance of passports is expressed in broad terms, it was apparently long exercised quite narrowly. So far as material here, the cases of refusal of passports generally fell into two categories. First, questions pertinent to the citizenship of the applicant and his allegiance to the United States had to be resolved by the Secretary, for


Copr. © West 2004 No Claim to Orig. U.S. Govt. Works


Westlaw.

the command of Congress was that 'No passport shall be granted or issued to or verified for any other persons than those owing allegiance, whether citizens or not, to the United States.' 32 Stat. 386, 22 U.S.C. s 212, 22 U.S.C.A. s 212. Second, was the question whether the applicant was participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States. See 3 Moore, International Law Digest (1906), s 512; 3 Hackworth, Digest of International Law (1942), s 268; 2 Hyde, International Law (2d rev. ed.), s 401.

***128** The grounds for refusal asserted here do not relate to citizenship or allegiance on the one hand or to criminal or unlawful conduct on the other. Yet, so far as relevant here, those two are the only ones which it could fairly be argued were adopted by Congress in light of prior administrative practice. One can find in the records of the State Department rulings of subordinates covering a wider range of activities than the two indicated. But as respects Communists these are scattered rulings and not consistently of one pattern. We can say with assurance that whatever may have been the practice after 1926, at the time the Act of July 3, 1926, was adopted, the administrative practice, so far as relevant here, had jelled only around the two categories mentioned. We, therefore, hesitate to impute to Congress, when in 1952 it made a passport necessary for foreign travel and left its issuance to the discretion of the Secretary of State, a purpose to give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose.

More restrictive regulations were applied in 1918 and in 1941 as war measures. We are not compelled to equate this present problem of statutory construction with problems that may arise under the war power. Cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153.

In a case of comparable magnitude, Korematsu v. United States, 323 U.S. 214, 218, 65 S.Ct. 193, 195, 89 L.Ed. 194, we allowed the Government in time of war to exclude citizens from their homes and restrict their freedom of movement only on a showing of 'the gravest imminent danger to the public safety.' There the Congress and the Chief Executive moved in coordinated action; and, as we said, the Nation was then at war. No such condition presently exists. No such showing of extremity, no such showing of joint action by the Chief Executive and the Congress to curtail a constitutional right of the citizen has been made here.

***129** [2][3][4][5] Since we start with an exercise by an American citizen of an activity included in constitutional protection, we ****1120** will not readily infer that Congress gave the Secretary of State unbridled discretion to grant or withhold it. If we were dealing with political questions entrusted to the Chief Executive by the Constitution we would have a different case. But there is more involved here. In part, of course, the issuance of the passport carries some implication of intention to extend the bearer diplomatic protection, though it does no more than 'request all whom it may concern to permit safely and freely to pass, and in case of need to give all lawful aid and protection' to this citizen of the United States. But that function of the passport is subordinate. Its crucial function today is control over exit. And, as we have seen, the right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment. If that 'liberty' is to be regulated, it must be pursuant to the lawmaking functions of the Congress. Youngstown Sheet & Tube Co. v. Sawyer, supra. And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests. See Panama Refining Co. v. Ryan, 293 U.S. 388, 420--430, 55 S.Ct. 241, 248--252, 79 L.Ed. 446. Cf. Cantwell v. State of Connecticut, 310 U.S. 296, 307, 60 S.Ct. 900, 904. 84 L.Ed. 1213; Niemotko v. State of Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267. Where activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute


Copr. © West 2004 No Claim to Orig. U.S. Govt. Works






