IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
                                          )
SALIM AHMED HAMDAN,                       )
              *Petitioner*,               )
                                          )        Judge Robertson
       *v.*                               )        [No. 04-CV-1519-JR]
                                          )
                                          )
ROBERT GATES, *et al.*,                   )
                   *Respondents*.         )
                                          )
_____  )

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITIONER'S MOTION FOR PRELIMINARY INJUNCTION

Petitioner faces imminent prosecution before a military commission at
Guantanamo Bay convened pursuant to the Military Commissions Act of 2006 ("MCA"),
Pub. L. No. 109-366, 120 Stat. 2600. To preserve the status quo, Hamdan seeks a
preliminary injunction staying his trial until this Court resolves the merits of his claims.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

The facts and procedural history are familiar to this Court and warrant only a brief
recitation. In 2004, Hamdan filed a petition challenging the legality of the military
commission slated to try him at Guantanamo Bay. This Court ruled in Hamdan's favor.
344 F. Supp. 2d 152 (D.D.C. 2004). The Court of Appeals for the District of Columbia
Circuit then reversed. 415 F.3d 33 (D.C. Cir. 2005). The Supreme Court subsequently
reversed the Court of Appeals. In so doing, it held that a statute enacted after certiorari
was granted, the Detainee Treatment Act of 2005 ("DTA"), Pub. L. 109-148, 119 Stat.
2680, did not preclude federal jurisdiction over Hamdan's habeas petition, that abstention
from reaching the merits of Hamdan's habeas petition was unwarranted, that the

Guantanamo military commission lacked authority to try Hamdan, and that Hamdan was protected by portions of the Geneva Conventions. 126 S. Ct. 2749 (2006).

In October 2006, the President signed the MCA into law. On December 13, 2006, this Court granted the Government's motion to dismiss Hamdan's petition for a writ of habeas corpus under section 7 of the MCA. This Court rejected Hamdan's constitutional challenge to section 7, concluding that Hamdan's "connection to the United States lacks the geographical and volitional predicates necessary to claim a constitutional right." *Hamdan v. Rumsfeld*, 464 F. Supp. 2d 9, 18 (D.D.C. 2006).

Hamdan took a timely appeal of that decision. Shortly after this Court issued its ruling, the D.C. Circuit likewise concluded, in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), that non-citizens detained at Guantanamo Bay could not invoke any constitutional protection and that the MCA divested federal courts of jurisdiction.[1]

Then, in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), the Supreme Court held that "§ 7 of the Military Commissions Act of 2006 (MCA) operates as an unconstitutional suspension of the writ." *Id*. at 2240 (citation omitted). Hamdan and the Government then filed a joint expedited motion asking the D.C. Circuit to vacate this Court's 2006 order dismissing Hamdan's petition, and to remand the case. The Court of Appeals granted that motion. *Hamdan v. Gates*, No. 07-5042 (D.C. Cir. June 26, 2008) (order).

## JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1361, 1391, 1651, 2201,

---

[1] Hamdan sought initial en banc review by the D.C. Circuit in light of the overlap between the *Boumediene* panel decision and his case. The Court of Appeals deferred that request. *Hamdan v. Gates*, No. 07-5042 (D.C. Cir. July 24, 2007) (order). Hamdan subsequently asked the Court of Appeals to stay his commission trial pending the Supreme Court's decision in *Boumediene*. The Court of Appeals denied that motion without prejudice, upon renewal following the Supreme Court's decision in *Boumediene*. *Hamdan v. Gates*, No. 07-5042 (D.C. Cir. May 15, 2008) (order).

2202, 2241-42; 5 U.S.C. § 702; and U.S. Const. Art. I, § 9, cl. 2. *See In re Yamashita*, 327 U.S. 1, 9 (1946) ("[T]he Executive branch of the government could not, unless there was suspension of the writ, withdraw from the courts the duty and power to make such inquiry into the authority of the commission as may be made by habeas corpus.").

## DISCUSSION

This case raises the question whether the constitutional right to habeas corpus can be rendered illusory merely by subjecting an individual to an unconstitutional trial by military commission. This Court should issue a preliminary injunction to preserve Hamdan's right to vindicate his challenges to the legality of his military commission.

This Court considers four factors in assessing whether to grant preliminary injunctive relief: (1) whether the moving party has "demonstrate[d] at least some irreparable injury," *Hicks v. Bush*, 397 F. Supp. 2d 36, 40 (D.D.C. 2005) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)); (2) whether a stay would substantially injure other interested parties; (3) whether the public interest would be furthered by the stay; and (4) whether the movant is likely to succeed on the merits. *See, e.g.*, *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).

"To justify the granting of a stay, a movant need not always establish a high probability of success on the merits." *Cuomo v. United States NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985). Thus, "[a] stay may be granted with either a high probability of success and some injury, or vice versa." *Id.* In this case, as explained in detail below, all four factors weigh heavily in favor of a stay. Moreover, "[a]n order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict

irreparable injury on the movant." *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977). Hamdan's challenge raises a number of "serious legal question[s]." His trial should thus be stayed to preserve the status quo, until those "serious legal question[s]" have been properly and finally resolved.

## I.     Hamdan Will Face Serious and Irreparable Injuries if Tried by the Military Commission

Hamdan's petition challenges the jurisdiction and constitutionality of the commission itself, as well as its rules and procedures. These claims go to the facial legality of his trial. Without an opportunity to resolve these challenges before trial, Hamdan will be irreparably harmed; his right not to be tried by an unlawful commission will be forever lost. As the D.C. Circuit has previously explained in Hamdan's case, "setting aside the judgment after trial and conviction insufficiently redresses the defendant's right not to be tried by a tribunal that has no jurisdiction." *Hamdan v. Rumsfeld*, 415 F.3d at 36, *rev'd on other grounds*, 126 S. Ct. at 2798.

Moreover, permitting the trial to go forward would irrevocably prejudice Hamdan by revealing his defense strategy and by providing for the introduction of evidence against Hamdan that would be inadmissible under any constitutional regime. In addition, without knowing in advance whether the commission has jurisdiction over him, what evidence it may consider, and for which offenses he may be tried, he will be unable to develop an effective defense strategy. He will be forced to evaluate any plea offer without knowing whether the proceedings and the tribunal itself (not to mention its procedural rules and the charges against him) are lawful. To require a defendant to mount a defense against such a fluid body of jurisdictional, procedural, and substantive rules risks rendering entirely illusory the constitutional protections attendant to a fair trial.

The D.C. Circuit has previously held that requiring an individual to submit to a procedure that may be facially unlawful will cause him "a significant and irreparable injury." *Rafeedie v. INS*, 880 F.2d 506, 517-18 (D.C. Cir. 1989). In that case, the Court of Appeals affirmed a preliminary injunction that prevented an alien from having to participate in a summary exclusion proceeding. In an opinion written by Judge Douglas Ginsburg, the Court concluded that Rafeedie "would be irreparably and seriously injured" merely by being forced to participate in this possibly inapplicable procedure. *Id.* As the Court explained, an individual "will suffer a judicially cognizable injury" and "be deprived of a substantial practical litigation advantage." *Id.* (internal quotation marks omitted). For if an individual actively "presents his defense" in a proceeding that is subsequently found unlawful, the Government will "know his defense in advance of any subsequent . . . proceeding." *Id.* But, if to avoid this harm, the individual "does not present his factual defense now, he risks forsaking his only opportunity to" do so. *Id.*

Hamdan faces the same "judicially cognizable injury" that merited injunctive relief in *Rafeedie*. If he offers his full factual defense before the very commission that he believes is unlawful, then the Government will know his defense in any subsequent proceeding. But if, in order not to prejudice himself in later proceedings, Hamdan "does not present his factual defense" before the commission, then "he risks forsaking his only opportunity" to defend himself. *Id*. Accordingly, like *Rafeedie*, Hamdan will suffer "a significant and irreparable injury" if forced to undergo trial now. The balance of equities—particularly after six years have elapsed without trial—tips heavily in his favor.

For similar reasons, another judge of this District Court has required that a military commission be enjoined until it is clear that it is proceeding on firm legal

footing. *See Hicks*, 397 F. Supp. 2d at 45. A delay in the military commission is appropriate here, as in that case, because the "Petitioner faces the clear and imminent risk of being subjected to a military commission which has not been ultimately determined by the Supreme Court to have jurisdiction over Petitioner." *Id.* at 42. The "irreparable injury," that court explained, is "the fact that [the Petitioner] would have been tried by a tribunal without any authority to adjudicate the charges against him in the first place, potentially subjecting him to a second trial before a different tribunal." *Id.*

The Supreme Court has recognized the necessity of allowing a pre-trial habeas challenge to a military trial in this very case. In 2006, it observed that "abstention is not appropriate in cases in which individuals raise 'substantial arguments denying the right of the military to try them at all.'" 126 S. Ct. at 2770 n.16. Given the unprecedented nature of the MCA scheme, Hamdan continues to have a "compelling interest in knowing in advance whether [he] may be tried by a military commission that arguably is without any basis in law." *Id.* at 2772. Indeed, had this Court (or the Supreme Court) accepted the government's previous abstention claim in this very case, Hamdan would have been placed in *Rafeedie*'s "catch 22"—forced to decide whether to preview his defense in a trial lacking jurisdiction over him or risk mounting no defense at all. That trial (and dozens of others) would have been invalidated, and they all would have been forced to start over, with the government handed a preview of their defenses.

In addition, forcing Hamdan to defend himself before an invalid military commission would frustrate his constitutional habeas right to challenge the legality of his detention. One purpose of habeas is to determine unlawful enemy combatancy. Based on a flawed CSRT and December 2007 hearing, the commission will proceed on the

assumption that Hamdan is an enemy combatant. *See* 19 December 2007 Ruling on Reconsideration, Ex. A to the Declaration of Joseph McMillan in Support of Motion for Preliminary Injunction ("McMillan Decl."). Given that assumption, one of the few possible defenses available to Hamdan will be to argue that he is entitled to POW status and immune from prosecution. However, for Hamdan to raise such a defense at his commission could prejudice his ability to argue in his constitutional habeas hearing that he is not a combatant at all, *i.e.*, that he was never directly engaged in hostilities against the United States. Requiring Hamdan to participate in the commission in advance of his habeas hearing would thus create a vicious catch-22, forcing Hamdan to either abandon one of the few possible defenses in his trial, or to forfeit much of his habeas hearing and thereby waive his right to challenge the CSRT's flawed determination of enemy combatancy.[2] *Parhat v. Gates*, No. 06-1397 (D.C. Cir. June 20, 2008) (order) (finding that a CSRT failed to satisfy the Government's own standard of enemy combatancy).

As Hamdan is thus likely to suffer irreparable harm if his military commission proceeds, the first factor weighs heavily in favor of granting a preliminary injunction.

## II.     The Government Is Not Prejudiced By a Delay To Resolve Hamdan's Facial Challenges to the Military Commission

Hamdan was captured in November 2001 and has been detained in U.S. custody ever since. Given that Hamdan has already been detained for over six years, and has been

---

[2] Moreover, a central tenet of *Boumediene* is that the delay in considering the Guantanamo detainees' habeas petitions challenging their detention has already been far too long, and that "[t]he detainees in these cases are entitled to a *prompt* habeas corpus hearing." *Boumediene*, 128 S. Ct. at 2275 (emphasis added). As the Court explained, "[i]n some of these cases six years have elapsed without the judicial oversight that habeas corpus or an adequate substitute demands" and "the costs of delay can no longer be borne by those who are held in custody." *Id.* Just as the Supreme Court held that proceeding through the DTA review process in the D.C. Circuit is not an acceptable ground for further delay of habeas review, so too the military commission cannot be the cause of a continued delay in Hamdan's constitutional right to a "prompt habeas corpus hearing" concerning the legality of his detention. Otherwise, the Government could use the specter of future military commission proceedings as an end-run around *Boumediene* not just in Hamdan's case, but in the case of each of the Guantánamo detainees.

awaiting trial for five years (since the President's July 2003 written determination to bring him to trial), a short delay cannot prejudice the Government. There can be no possible evidentiary loss or other harm to the Government.[3] In fact, the Supreme Court has explained that not just Hamdan but also "the Government ha[s] a compelling interest in knowing in advance whether Hamdan may be tried by a military commission that arguably is without any basis in law . . . ." *Hamdan*, 126 S. Ct. at 2772.

Further, regardless of when and whether Hamdan is tried, he will be detained pending resolution of his habeas petition. A brief delay does not create any risk that he will be released and cannot in any way endanger national security. As Justice Kennedy stated, "the circumstances of Hamdan's trial present no exigency requiring special speed or precluding careful consideration of evidence. For roughly four years, Hamdan has been detained at a permanent United States military base in Guantanamo Bay, Cuba. And regardless of the outcome of the criminal proceedings at issue, the Government claims authority to continue to detain him based on his status as an enemy combatant."[4]

## III.   The Public Interest Strongly Counsels in Favor of a Preliminary Injunction

An injunction to stay Hamdan's commission until this Court resolves his

---

[3] In other cases before the D.C. Circuit related to the Guantanamo detainees, the Government itself has recently sought delays pending action by the Supreme Court, indicating its willingness to halt proceedings under the DTA and MCA until they are on proper legal footing. *See, e.g.*, Motion to Stay Order to File Certified Index of Record, *Paracha v. Gates*, No. 06-1038 (D.C. Cir. Feb. 8, 2008) (seeking a stay "pending the disposition of the Government's petition for certiorari in *Bismullah v. Gates*"). If a short delay imposes any harm at all, it is not of a type that is cognizable in this Court. *See* Josh White, *Pressure Alleged in Detainees' Hearings, Ex-Prosecutor Says Pentagon Pushing 'Sexy' Cases in '08*, Wash. Post, Oct. 21, 2007, at A15 ("Politically motivated officials at the Pentagon have pushed for convictions of high-profile detainees ahead of the 2008 elections, the former lead prosecutor for terrorism trials at Guantanamo Bay said last night, adding that the pressure played a part in his decision to resign earlier this month.").
[4] *Hamdan*, 126 S. Ct. at 2805 (Kennedy, J., concurring in part); *see also Hicks*, 397 F. Supp. 2d at 42 ("Considering that Petitioner in this case has been held by the U.S. government since November of 2002 and in the event of an injunction that he will simply continue to be detained by the government, the Court fails to see how further delay will harm the government. . . . [T]he minor logistical reshuffling caused by an injunction [is not] injury to Respondents in any material fashion.").

challenge will further the public interest. As Judge Kollar-Kotelly previously explained, "It would not be in the public interest to subject Petitioner to a process which the highest court in the land may determine to be invalid. It is in the public interest to have a final decision, leaving no doubts as to this key jurisdictional issue, before Petitioner's military commission proceedings begin." *Hicks*, 397 F. Supp. 2d at 43.

There are several reasons why the public interest warrants a stay. First, it will increase judicial economy and military efficiency by avoiding the need for a second set of trials if this Court ultimately rules the commissions unlawful. Second, a failure to resolve the legality of Hamdan's trial before it begins will create inefficiencies during trial, as neither the parties nor the judge will be able to resolve motions with any certainty.

Third, trying Hamdan before an unconstitutional commission at the same time that his habeas petition challenging his detention is under consideration before this Court would cause considerable confusion, judicial inefficiency, and uncertainty for all parties involved. Most seriously, the two proceedings could reach conflicting results. Using unfair and untested procedures and standards, the Guantanamo commission might convict Hamdan of certain offenses and sentence him to lengthy continued detention. At the same time, the federal habeas court might conclude that Hamdan is not an enemy combatant, and so the President lacks authority to detain him in Guantanamo as such.

Even if the ultimate outcomes of the two proceedings are not in conflict, interim procedural decisions and rulings—on, for example, the admissibility of evidence, access to witnesses, ability to review classified evidence, and attorney-client relations—might well conflict with each other. For example, the commission could deny Hamdan the ability to call certain witnesses whereas this Court, in a habeas proceeding to determine

the legality of Hamdan's detention, could grant such access. The likelihood of such confusion between different tribunals and branches is not in the public interest.

Finally, trying Hamdan under a dubious regime whose very legality has been called into question by the Supreme Court would reduce the legitimacy of the proceedings in this country and in the eyes of the world. The rule of law requires that a criminal defendant know, in advance, the charges for which he may be tried and the procedures that will be used to try him. The issues at stake in Hamdan's case are foundational to our Constitution as well as the laws of war.

## IV.   Hamdan Is Likely To Succeed on the Merits of His Claim that the Commission Slated To Try Him Is Unlawful

*Boumediene* cast aside the legal underpinnings of the commission slated to try Hamdan. Congress established the commission under the belief that Guantanamo was a law-free zone. *Boumediene*, 128 S. Ct. at 2266 (Congress acted with the assumption that the Constitution did not apply at Guantanamo Bay).[5] *Boumediene* rejects that premise. Now that the commissions must comport with the Constitution, Hamdan's trial is likely to be held unlawful on the merits. The Commission lacks personal and subject-matter jurisdiction. It violates structural elements of the Constitution as well as the laws of war.

Of course, this Court need not resolve any of these legal issues at this time. The

---

[5] *See, e.g.*, Hamdan v. Rumsfeld: *Establishing a Constitutional Process*: *Before the S. Comm. on the Judiciary*, 109th Cong. 36 (statement of Sen. Sessions) (July 2006) ("But all the provisions that are engrafted in the United States Code, State law, and Federal constitutional privileges are not required in military commissions. They never have been.") (on file with the S. Comm. on the Judiciary); 152 CONG. REC. S10243, 10273 (daily ed. Sept. 27, 2006) (statement of Sen. Cornyn) (stating that Guantanamo Bay detainees do not have constitutional rights); 152 CONG. REC. S10243, 10263 (daily ed. Sept. 27, 2006) (remarks of Sen. Warner & Sen. Levin); *Legal Issues Regarding Individuals Detained by the Department of Defense as Unlawful Enemy Combatants*: *Hearing Before the S. Comm. on Armed Services*, 110th Cong. 94 (2007) (testimony of Daniel J. Dell'Orto, Principal Deputy Gen. Counsel, Department of Defense) ("If we talk about, now, moving [military commissions] to the United States, I think then you bump up against the legal aspect, and that is, are we going to have the full panoply of constitutional protections for those individuals, by virtue of their presence on U.S. soil?").

serious and irreparable injuries that Hamdan will face if tried by the commission, and the strong public interest in delaying the trial until it rests on firm legal grounds, counsel strongly in favor of a preliminary injunction. *See Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844. Accordingly, the discussion below is intended only to demonstrate the vast number of serious deficiencies that would attend Hamdan's trial. Petitioner would welcome the opportunity to more fully brief and argue these issues before this Court.

**A.  This Court Has Jurisdiction to Hear Hamdan's Habeas Petition**

**1.  Habeas Corpus is an Appropriate Vehicle for Hamdan's Claims**

The Supreme Court has long recognized the authority and obligation of Article III courts to entertain pretrial collateral challenges to the "jurisdiction" of military tribunals. *See, e.g.*, *United States* v. *Grimley*, 137 U.S. 147, 150 (1890); *In re Yamashita*, 327 U.S. 1, 8 (1946). And since the Civil War, the Court has recognized habeas corpus as the appropriate procedural vehicle through which to vindicate such claims. *E.g.*, *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866); *see also Ex parte Reed*, 100 U.S. 13 (1879).

Although the precise line of demarcation separating "jurisdictional" challenges from other claims is, at best, unclear, a number of decisions illustrate that this Court may hear Hamdan's pretrial habeas challenge. For example, in habeas petitions the Supreme Court has reviewed the merits of claims that (1) the assertion of military jurisdiction is unconstitutional on its face, *see, e.g.*, *Ex parte Quirin*, 317 U.S. 1 (1942); *Milligan*, 71 U.S. (4 Wall.) 2; (2) the court-martial or military commission lacks personal jurisdiction over the defendant, *see, e.g.*, *Kinsella* v. *United States ex rel. Singleton*, 361 U.S. 234 (1960); *Reid* v. *Covert*, 354 U.S. 1 (1957) (plurality); *United States ex rel. Toth* v. *Quarles*, 350 U.S. 11 (1955); *Madsen* v. *Kinsella*, 343 U.S. 341 (1952); *see also Ex parte*

*Yerger*, 75 U.S. (8 Wall.) 85 (1869); or (3) the court-martial or military commission lacks subject-matter jurisdiction over the charged offenses, *see, e.g.*, *Hamdan*, 126 S. Ct. 2749; *Duncan* v. *Kahanamoku*, 327 U.S. 304 (1946).

Indeed, the Court has even considered a challenge to a court-martial on the ground that the military failed to "fully and fairly" consider whether its proceedings had deprived the defendants of their constitutional rights. *See Burns* v. *Wilson*, 346 U.S. 137, 142–45 (1953) (plurality); *id.* at 149-50 (Frankfurter, J., agreeing with plurality on federal jurisdiction). Thus, where, as here, a petitioner raises colorable claims that his trial by a military tribunal would not just be voidable, but *void*, an unbroken line of precedent compels the conclusion that habeas corpus is appropriate.

### 2. Abstention Remains Inappropriate

None of the cases discussed above required that the habeas petition be held in abeyance pending the conclusion of the military proceedings, and for good reason. As the Supreme Court noted in *Parisi* v. *Davidson*, "Under accepted principles of comity, the court should stay its hand only if the relief the petitioner seeks . . . would also be available to him with reasonable promptness and certainty through the machinery of the military judicial system . . . ." 405 U.S. 34, 41–42 (1972). Where a petitioner raises claims for which relief is *not* necessarily available in the military system, including claims challenging his amenability to military jurisdiction in the first place, abstention is fundamentally inappropriate.[6]   The reasons why this claim has particular salience in

---

[6] A petitioner who has "raised substantial arguments denying the right of the military to try [him] at all" need not exhaust the remedies afforded him by the military before filing a habeas petition. *Schlesinger v. Councilman*, 420 U.S. 738, 763 (1975) (citing *Noyd v. Bond*, 395 U.S. 683, 696 n.8 (1969)); *accord United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955); *Parisi v. Davidson*, 405 U.S. 34, 41-42 (1972) (rejecting abstention from a habeas claim because "the relief the petitioner seeks" was not "available to him with reasonable promptness and certainty through the machinery of the military judicial system"); *cf. Duro v. Reina*, 495 U.S. 676 (1990) (granting pretrial habeas petition by Native American prosecuted by another

12

Hamdan's case are detailed in Section 3, *infra*.

Nor does *Schlesinger* v. *Councilman*, 420 U.S. 738 (1975), counsel to the contrary. First, the Supreme Court (echoing this Court's analysis) held previously that abstention was inappropriate in Hamdan's case. As Justice Stevens explained,

> [N]either of the comity considerations identified in *Councilman* weighs in favor of abstention in this case. First, Hamdan is not a member of our Nation's Armed Forces, so concerns about military discipline do not apply. Second, the tribunal convened to try Hamdan is not part of the integrated system of military courts, complete with independent review panels, that Congress has established. Unlike the officer in *Councilman* Hamdan has no right to appeal any conviction to the civilian judges of the [U.S. Court of Appeals for the Armed Forces]. Instead, . . . any conviction would be reviewed by a panel consisting of three military officers designated by the Secretary of Defense.

*Hamdan*, 126 S. Ct. at 2771 (citations omitted). It is true that the MCA, enacted after the Court's decision, provides for an appeal as of right from the military appellate panel (now called the "Court of Military Commission Review") to the D.C. Circuit.[7] But such an appeal was *already* available under the Detainee Treatment Act of 2005 at the time of the Supreme Court's decision. *See* DTA § 1005(e)(3)(B)(i), 119 Stat. 2680, 2743. Thus, the Court's analysis in *Hamdan* remains applicable here.

Second, *Councilman* itself rightly concluded that it would be "'especially unfair to require exhaustion . . . when the complainants raise[] substantial arguments denying the right of the military to try them at all.'" 420 U.S. at 759 (quoting *Noyd* v. *Bond*, 395 U.S. 683, 696 n.8 (1969)); *see also Hamdan*, 126 S. Ct. at 2770 n.16. Hamdan raises such "substantial arguments" and it is entirely dubious whether "the relief the petitioner seeks . . . would also be available to him with reasonable promptness and certainty

---

tribe). *Quirin*, 317 U.S. at 19, on habeas heard the challenge before the trial was complete.

7. Nevertheless, there are reasons to doubt the adequacy of the D.C. Circuit's appellate jurisdiction under the MCA. *See infra* Section 3.

through the machinery of the military judicial system." *Parisi*, 405 U.S. at 41-42. As such, abstention would, in Justice Kennedy's words, "impose a *de facto* suspension" of the Writ, *Boumediene*, 128 S. Ct. at 2262, something this court cannot—and must not— do. *See id*. at 2275 ("In some of these cases six years have elapsed without the judicial oversight that habeas corpus or an adequate substitute demands. And there has been no showing that the Executive faces such onerous burdens that it cannot respond to habeas corpus actions. . . . While some delay in fashioning new procedures is unavoidable, the costs of delay can no longer be borne by those who are held in custody.").

### 3.   10 U.S.C. § 950j(b) Does Not Divest This Court of Jurisdiction

Notwithstanding the traditional availability of habeas corpus to attack military tribunals collaterally, and the inappropriateness of abstention from claims such as Hamdan's, the MCA contains a provision that might be argued to preclude jurisdiction:

> Except as otherwise provided in this chapter and notwithstanding any other provision of law (including section 2241 of title 28 or any other habeas corpus provision), no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever, including any action pending on or filed after the date of the enactment of the Military Commissions Act of 2006, relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter.

MCA § 3(a)(1), 120 Stat. at 2623 (codified at 10 U.S.C. § 950j(b)).

One reading of this provision is that it merely codifies, in the context of the MCA, the prudential rule that civilian courts lack supervisory jurisdiction over military tribunals. Such a reading is bolstered by the provision's plain text, which focuses on claims "relating to the prosecution, trial, or judgment of a military commission under this chapter, *including* challenges to the lawfulness of procedures of military commissions under this chapter" (emphasis added). In focusing on "prosecution, trial, or judgment,"

the provision does not seem to contemplate challenges to the *jurisdiction* of the military commission over either the defendant or the charges on which he is indicted, or, for that matter, challenges to the facial constitutionality of such proceedings.

Moreover, any doubt as to whether the MCA should be so interpreted is resolved by constitutional avoidance. See *Ashwander* v. *Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring); *TRW, Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001). Because 10 U.S.C. § 950j(b) would be unconstitutional if construed to preclude jurisdiction over Hamdan's habeas petition, *see infra*, and because an alternative construction of the provision *is* "fairly possible," that construction must be adopted.

If 10 U.S.C. § 950j(b) could only be interpreted as divesting jurisdiction over Hamdan's petition, it would violate the Suspension Clause by precluding access to the Great Writ without providing an adequate, alternative remedy. Although *Boumediene* concerned access to the Writ for the purpose of challenging executive detention, it follows that the right identified in *Boumediene* extends to jurisdictional challenges to military tribunals. Again, the Supreme Court's case law is instructive. As noted above, in a series of cases during the 1950s, the Court repeatedly reached the merits of habeas petitions brought by U.S. citizens held overseas who challenged whether they could properly be subjected to courts-martial or military commissions. At that time, though, the federal habeas *statute* had been interpreted as authorizing jurisdiction only in the district in which the petitioner was detained. *See Ahrens* v. *Clark*, 335 U.S. 188 (1948).

*Ahrens* thus should have precluded jurisdiction over petitions filed by individuals held outside the territorial jurisdiction of any district court, unless the Constitution *required* such access. *See, e.g.*, *Rasul* v. *Bush*, 542 U.S. 466, 476-79 (2004); *see also id*.

at 497 (Scalia, J., dissenting) ("The constitutional doubt that the Court of Appeals in *Eisentrager* had erroneously attributed to the lack of habeas for an alien abroad might indeed exist with regard to a *citizen* abroad—justifying a strained construction of the habeas statute, or (more honestly) a determination of constitutional right to habeas."). Thus, the negative inference to be drawn from the fact that the Court reached the merits in cases such as *Burns*, *Toth*, *Reid*, and *McElroy*, is that the right to habeas corpus protected by the Suspension Clause includes the right to contest military jurisdiction.[8]

As such, if 10 U.S.C. § 950j(b) applies to Hamdan's petition, its preclusion of this court's jurisdiction would only be constitutional if the MCA provides an adequate, alternative remedy. *Boumediene* rejected the government's argument that the MCA provides an adequate, alternative remedy, *see* 128 S. Ct. at 2266-74, and the claim of inadequacy is far stronger when it comes to Hamdan's challenge.

First, the crux of Hamdan's claims goes to his right not to be tried, a right that simply cannot be vindicated once the trial has taken place. Unless the MCA provides Hamdan with a meaningful opportunity to contest his right not to be tried before the trial takes place, it is an inadequate substitute for the Great Writ. The MCA does not allow defendants to take any interlocutory appeals to the Court of Military Commission Review, let alone to the D.C. Circuit. The D.C. Circuit confirmed this reading just a few weeks ago, holding that it lacks jurisdiction to review a defendant's interlocutory challenge to the military commission's personal jurisdiction, even where the defendant prevailed on that issue before the trial court, only to have that decision reversed on the

---

[8] Even if the reach of the Suspension Clause were unclear, that lack of clarity would itself be a reason to interpret 10 U.S.C. § 950j(b) as not precluding jurisdiction. *See INS* v. *St. Cyr*, 533 U.S. 289, 301 n.13 (2001) ("The fact that this Court would be required to answer the difficult question of what the Suspension Clause protects is in and of itself a reason to avoid answering the constitutional questions that would be raised by concluding that review was barred entirely.").

*government's* appeal to the Court of Military Commission Review.[9] *See Khadr* v. *United States*, No. 07-1405, 2008 WL 2468496 (D.C. Cir. June 20, 2008).[10] Thus, the MCA provides no opportunity to a military commission defendant to meaningfully vindicate his right not to be tried before anyone other than the trial judge.

Second, if it applies to Hamdan's petition, 10 U.S.C. § 950j(b) would not preclude just a *pre*-trial challenge to a military commission; it would preclude post-trial challenges, as well. For example, 10 U.S.C. § 950g(c) provides as follows:

> The jurisdiction of the Court of Appeals on an appeal [of a final judgment rendered by a commission] shall be limited to the consideration of —
> (1)   whether the final decision was consistent with the standards and procedures specified in this chapter; and
> (2)   to the extent applicable, the Constitution and the laws of the United States.

This section, in turn, is modeled after section 1005(e)(3)(D) of the DTA, which limited the scope of the D.C. Circuit's review to:

> (i)   whether the final decision was consistent with the standards and procedures specified in [Military Commission Order No. 1]; and
> (ii)  to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to reach the final decision is consistent with the Constitution and laws of the United States.

DTA § 1005(e)(3)(D), 119 Stat. at 2743. Thus, § 950g(c) appears intended to limit the

---

[9] In contrast, the statute *does* authorize a range of interlocutory appeals by the government both to the Court of Military Commission Review, 10 U.S.C. § 950d(a), and D.C. Circuit, 10 U.S.C. § 950d(d).

[10] Khadr's claim did not arise through a habeas petition, but instead concerned whether the MCA or the collateral order doctrine gave the D.C. Circuit appellate jurisdiction to review a specific interim decision of the Court of Military Commission Review. In contrast to Khadr, Hamdan argues, through his constitutional right to the Great Writ, that the entire commission slated to try him is unlawful. The relevant precedent for his claim is thus the Supreme Court's holding requiring pretrial habeas. *Hamdan*, 126 S. Ct. at 2772. Indeed, one reason why the court in *Khadr* may have declined to allow interlocutory review is the availability of the writ of habeas corpus to challenge the entire foundations of the commission.

Like Hamdan's previous challenge, he contests the entire legality of the system to try him, which makes this case unlike a typical criminal one. The difference is even starker because the legal foundations of Hamdan's trial apparatus have been discredited by *Boumediene*. It is as if Canadian law were suddenly made applicable in Vermont—every Vermont trial would have to be examined from the ground up.

scope of the D.C. Circuit's review to whether the "final decision" is consistent with the MCA, Constitution, and laws. However, as the Supreme Court held with respect to that DTA language in *Boumediene*, "If Congress had envisioned DTA review as coextensive with traditional habeas corpus, it would not have drafted the statute in this manner." 128 S. Ct. at 2265. Indeed, missing from the scope of D.C. Circuit review are claims that the commission lacks jurisdiction over the defendant, over the subject-matter, and over challenges to collateral trial orders not necessarily included in the "final decision."

Finally, the appellate review provided for by the MCA is only triggered once the "convening authority" approves the "final decision" of the commission, *see* 10 U.S.C. § 950c(a), even though the statute nowhere specifies a timeframe within which such action must be taken. *See, e.g.*, 10 U.S.C. § 950c(a). Although the language is mandatory, the timing is left entirely to the discretion of the convening authority.

The upshot of the above analysis is simple: habeas remains the appropriate vehicle for challenging, on a pre-trial basis, a military commission; abstention remains inappropriate in this case given that Hamdan claims—first and foremost—the right not to be tried; because of *Boumediene*, 10 U.S.C. § 950j(b) would be unconstitutional if read to preclude this Court's jurisdiction; therefore, 10 U.S.C. § 950j(b) should not be so read, and this Court should proceed to the merits of Hamdan's claims forthwith.

### B. The Constitution Applies at Guantanamo Bay and Protects Hamdan from a Facially Unconstitutional Trial

The Supreme Court's opinion in *Boumediene* establishes that the Constitution applies at Guantanamo Bay. It rejected the Government's contention that because the United States lacks "*de jure* sovereignty," the Constitution does not apply there. *See* 128 S. Ct. at 2253-59. Instead, taking "notice of the obvious and uncontested fact that the

United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory," *id.* at 2253, the Court made clear that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.* at 2258. In particular, when deciding whether the Constitution applies in a particular context extraterritorially, the Court considers "whether judicial enforcement of the provision would be 'impracticable and anomalous.'" *Id.* at 2255 (citations omitted).

The Court analyzed several "objective factors and practical concerns" in *Boumediene* to reach its holding that enforcing the Suspension Clause would be neither impracticable nor anomalous. The factors and concerns the *Boumediene* Court considered apply to Hamdan's challenge in the same way in which they applied to the *Boumediene* petitioner's challenge to the legality of the habeas suspension.

First, the Supreme Court noted that there was no security problem with applying the Constitution at Guantanamo Bay.[11] Second, the Court pointed out that, "[t]here is no indication, furthermore, that adjudicating a habeas corpus petition would cause friction with the host government." *Boumediene*, 128 S. Ct. at 2261. Third, the Court noted that the U.S. has complete control over Guantanamo Bay and no other sovereign has a stake in developments on the base: "While obligated to abide by the terms of the lease, the United States is, for all practicable purposes, answerable to no other sovereign for its acts on the base." *Id.* Fourth, the Court observed that Guantanamo Bay is not "located in an active theater of war" and so enforcing the Constitution could not endanger ongoing military operations. *Id.* at 2262 In light of these factors, the Court held that "there are few

---

[11] "[O]ther than the detainees themselves, the only long-term residents are American military personnel, their families, and a small number of workers. The detainees have been deemed enemies of the United States. At present, dangerous as they may be if released, they are contained in a secure prison facility located on an isolated and heavily fortified military base." *Boumediene*, 128 S. Ct. at 2261.

practical barriers to" enforcing the Suspension Clause at Guantanamo Bay. *Id.*

These factors identified by the *Boumediene* Court apply just as strongly, if not more so, to the constitutional provisions at issue in Hamdan's challenge. Hamdan's commission challenge could not possibly lead to his release; no one can say, as one Justice has with respect to the detention challenge at issue in *Boumediene*, that a decision in Hamdan's favor "will almost certainly cause more Americans to be killed." *Id.* at 2294 (Scalia, J., dissenting).[12]  Moreover, neither the Cuban Government nor any other foreign sovereign is any more interested in Hamdan's commission than it is in the status of detainees. Finally, whereas the detention of enemy combatants is a military function that serves national security goals, punishment through criminal trials is a judicial function that serves the goals of justice. Thus, deference to the Executive's claims about practical wartime concerns is even less appropriate in Hamdan's case than in *Boumediene*.[13] Trying Hamdan within the constraints of the Constitution is no more "impracticable or anomalous" than allowing detainees to challenge the legality of their detention.

The Supreme Court's doctrine is clear that structural constraints on the powers of the U.S. Government are in effect at Guantanamo Bay. For, wherever it acts, "[t]he United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution." *Reid*, 354 U.S. at 5-6 (plurality) (footnote omitted); *see also United States*

---

[12] Hamdan's habeas petition challenges his detention as well, but that issue presumably must await a resolution of this motion.

[13] The Government has repeatedly argued that the Court must defer to the President on matters of detention because detention serves military purposes. *See, e.g.*, Br. of Respondent at 4, *Rasul v. Bush*, 542 U.S. 466 (2004) ("[D]etention serves the vital military objectives of preventing captured combatants from rejoining the conflict and gathering intelligence to further the overall war effort and prevent additional attacks."); Br. of Respondent at 15, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). The Government has, in fact, gone to great lengths to distinguish detention from punishment. *See id.* at 15-16 ("The detention of captured combatants during an ongoing armed conflict is neither a punishment nor an act of vengeance, but rather a simple war measure.") (citations omitted); *id.* at 16 n.5.

*v. Verdugo-Urquidez*, 494 U.S. 259, 277 (1990) (Kennedy, J., concurring in the judgment) ("I take it to be correct, as the plurality opinion in *Reid v. Covert* sets forth, that the Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic.").

In *Boumediene*, the Court reaffirmed that the detainees may vindicate the Constitution's structural constraints. Noting that the MCA raised "troubling separation-of-powers concerns," 128 S. Ct. at 2258, the Court emphasized that the Congress and the President could not act beyond the powers granted them in the Constitution. As the Court explained, "[t]he Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply. Even when the United States acts outside its borders, its powers are not 'absolute and unlimited' but are subject 'to such restrictions as are expressed in the Constitution.'" *Id.* at 2259 (quoting *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885)).[14]

The Congress can no more switch off the Define and Punish Clause, the Ex Post Facto Clause, or the Bill of Attainder Clause than it can the Suspension Clause. *Boumediene*, 128 S. Ct. at 2259 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137,

---

[14] One of the leading *Insular Cases* cited in *Boumediene* is *Downes v. Bidwell*, 182 U.S. 244 (1901), which expressly identified the Ex Post Facto Clause as a constitutional provision that *always* limits congressional power, wherever and whenever it may be exercised: "There is a clear distinction between such prohibitions as go to the very root of the power of Congress to act at all, irrespective of time or place, and such as are operative only 'throughout the United States' or among the several states. Thus, when the Constitution declares that 'no bill of attainder or *ex post facto* law shall be passed,' . . . it goes to the competency of Congress to pass a bill *of that description*." *Id.* at 276–77. Indeed, the Supreme Court has repeatedly emphasized in military commission cases that "Congress and the President, like the courts, possess no power not derived from the Constitution." *Quirin*, 317 U.S. at 25. In *Hamdan*, for example, the Court held that the President's establishment of a military commission in a manner unauthorized by Congress violated separation of powers. *Hamdan*, 126 S. Ct. at 2774 n.23 ("[T]he President . . . may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers.") (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)). "Because the Constitution's separation-of-powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments, protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles." *Boumediene*, 128 S. Ct. at 2246 (citations omitted).

177 (1803)). ("To hold the political branches have the power to switch the Constitution on or off at will . . . would permit a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'"). The proximity of these Clauses in the original Constitutional text to the Suspension Clause provides further support for granting them "full effect at Guantanamo Bay." *Id*. at 2262. Although as explained below, Hamdan also has the benefit of certain fundamental constitutional rights, the Bill of Attainder and Ex Post Facto Clauses are not part of the Bill of Rights but are rather contained within the original text of the Constitution setting forth the powers of Government. That they are located immediately after the Suspension Clause—in Art. I, § 9, cl. 3—is no mere coincidence. For like the Suspension Clause they serve as a barrier against the Government abusing its power to arbitrarily deprive an individual of his freedom, no matter who the individual is. *See, e.g.*, *Boumediene*, 476 F.3d at 996-98 & n.2 (Rogers, J., dissenting).

Accordingly, close judicial scrutiny to ensure that the political branches act within the proper scope of their authority is essential to our constitutional system, for "[t]he test for determining the scope of th[ese] provision[s] must not be subject to manipulation by those whose power [they are] designed to restrain." *Boumediene*, 128 S. Ct. at 2259.

Finally, *Boumediene* makes clear that individuals at Guantanamo Bay are entitled to fundamental constitutional rights. More than 75 years ago, "the Court took for granted that even in unincorporated Territories the Government of the United States was bound to provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in the Constitution.'" *Id*. at 2255 (quoting *Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922)). Even then, the notion that noncitizens living outside the formally sovereign

United States were guaranteed fundamental constitutional rights was not new. *See Late Corp. of Church of Jesus Christ of Latter-day Saints v. United States*, 136 U.S. 1, 44 (1890). Among the most fundamental of these rights is due process. *Cf. Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring in the judgment) (stating that with respect to a trial in the United States, "[a]ll would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant").

### C.  The Military Commission Lacks Personal Jurisdiction Over Hamdan

The military commission at Guantanamo Bay lacks personal jurisdiction to try Hamdan. Both the MCA and the Constitution limit trial by military commission to individuals who have been properly determined to be unlawful enemy combatants. Hamdan is not an enemy combatant, let alone an unlawful one. *Boumediene* teaches that Hamdan is entitled to a habeas hearing before this Court to determine whether the Executive has properly designated him as an unlawful enemy combatant. In light of *Boumediene*, permitting Hamdan's trial before resolving the claims made within his habeas petition would violate both the MCA and the Constitution.

The MCA creates jurisdiction for the military commissions to try only "alien unlawful enemy combatant[s]." MCA § 948d(a). The military commissions lack jurisdiction to try "[l]awful enemy combatants who violate the law of war." MCA § 948d(b). Any trial of a lawful enemy combatant must be before a court-martial. *Id.* *Boumediene*, moreover, holds that a CSRT or military commission (which is not a "court of record," *see* 128 S. Ct. at 2268-69) cannot be an adequate substitute for a federal habeas proceeding in determining a detainee's status. For "the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held

pursuant to the erroneous application or interpretation of relevant law." *Id*. at 2266 (internal quotation marks and citation omitted). The commission in this case made a finding of unlawful enemy combatancy in December 2007 based on a misapplication of relevant law. The commission (1) failed to address Hamdan's constitutional arguments against the exercise of jurisdiction by relying on the now-reversed D.C. Circuit panel holding in *Boumediene*; (2) misapplied Article 4 of the Third Geneva Convention, which under the facts adduced at the hearing, confers POW status on Hamdan; and (3) utilized a flawed procedure, denying Hamdan his right to witnesses in his favor, *see infra* note 38.

Like the MCA, the Constitution forbids subjecting an individual who is not an enemy combatant to trial by military commission. As far back as *Ex parte Milligan*, the Supreme Court addressed the proper scope of the personal jurisdiction of military trials. *See* 71 U.S. (4 Wall.) at 118 ("The controlling question in the case is this: Upon the *facts* stated in Milligan's petition, and the exhibits filed, had the military commission mentioned in it *jurisdiction*, legally, to try and sentence him?"). As the Court subsequently explained in *Ex parte Quirin*:

> By universal agreement and practice, the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations and also between those who are lawful and unlawful combatants. Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. *Unlawful combatants* are likewise subject to capture and detention, *but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.*

317 U.S. at 30-31 (1942) (emphasis added); see also *Yamashita*, 327 U.S. at 11.[15]

---

[15] Individuals who are not enemy combatants may not be tried by a military tribunal. This boundary between civilians and combatants must be policed carefully, for "[t]here is no indication that the Founders contemplated setting up a rival system of military courts to compete with civilian courts for jurisdiction over civilians who might have some contact or relationship with the armed forces." *Reid*, 354 U.S. at 30 (plurality); see also *id*. at 31 ("In *Duncan* v. *Kahanamoku*, 327 U.S. 304, the Court reasserted the principles enunciated in *Ex parte Milligan* and reaffirmed the tradition of military subordination to civil authorities

Hamdan is not an unlawful enemy combatant, and so cannot be tried by military commission. Unlike General Yamashita or the German soldiers in *Quirin*, he is not a member of the armed forces of any nation at war with the United States. *Cf. Quirin*, 317 U.S. at 37-38 ("Citizens who associate themselves with the *military arm of the enemy government*, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of . . . the law of war.") (emphasis added). Hamdan is a citizen of Yemen, a country at peace with the United States. Affiliation with or membership in a terrorist organization does not create enemy combatant status. *See Milligan*, 71 U.S. (4 Wall.) at 130; *Al-Marri v. Wright*, 487 F.3d 160, 186-87 (4th Cir. 2007) ("Neither *Quirin* nor any other precedent even suggests, as the Government seems to believe, that individuals with constitutional rights, unaffiliated with the military arm of any enemy government, can be subjected to military jurisdiction and deprived of those rights solely on the basis of their conduct on behalf of an enemy organization."), *reh'g en banc granted*, No. 06-7427 (4th Cir. 2007); *see also Parhat v. Gates*, slip op. at 24 (holding that the Government's "bare assertions cannot sustain the [CSRT's] determination that Parhat is an enemy combatant."*)*. Finally, Hamdan has never participated directly or actively in any hostilities with the United States.[16]

In sum, both the MCA and the Constitution limit personal jurisdiction to persons

---

and institutions. It refused to sanction the military trial of civilians in Hawaii during wartime despite government claims that the needs of defense made martial law imperative.").

[16] Even if this Court were ultimately—following a proper habeas hearing—to determine that Hamdan were an enemy combatant, he is still not an *unlawful* enemy combatant, and so not subject to trial by a military commission. To the extent Hamdan is found to have participated in armed conflict, his participation qualifies him as a POW and so makes him ineligible for military trial. The Third Geneva Convention provides that "militias or volunteer corps forming part" of the armed forces of a Party to a conflict are lawful combatants entitled to POW status. Third Geneva Convention, Art. 4(A)(1),(2). So too are "[p]ersons who accompany the armed forces without actually being members thereof." *Id.* Art 4(A)(4), (5). As are "[i]nhabitants of a non-occupied territory, who on the approach of the enemy spontaneously take up arms to resist the invading forces . . . ." *Id.* Art 4(A)(6). Any or all of these provisions of the Geneva Conventions would suffice to grant Hamdan—were he ultimately determined to have been involved in hostilities—the status of a POW, and so remove a military commission's jurisdiction over him.

properly determined to be unlawful enemy combatants by a correct application of relevant law. Hamdan is not an enemy combatant, and to the extent this Court or some other appropriately convened habeas court ultimately determines that he is, he is certainly not an unlawful combatant. As such, Hamdan's commission lacks personal jurisdiction.

### D.  The Commission Violates the Ex Post Facto Clause

The offenses for which Hamdan is slated to be tried violate the Constitution's Ex Post Facto Clause. As a result, the commission lacks subject matter jurisdiction to prosecute Hamdan for these charges. Ex post facto laws are criminal statutes that retroactively: (1) punish previously innocent conduct; (2) aggravate the criminal nature of an act; (3) increase the punishment for a crime; or (4) change the rules of evidence to lower the government's burden of proof or reduce the quantum of evidence necessary to convict the defendant. *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798). The *Calder* definition remains authoritative. *See Stogner v. California*, 539 U.S. 607, 611 (2003) (*Calder* provides the "authoritative account of the scope of the *Ex Post Facto* Clause"). While a criminal statute fitting any one *Calder* category states an ex post facto violation, in this case, Hamdan's prosecution unfortunately falls into each of them.

The MCA was signed into law in October of 2006. By that time, Hamdan had been in U.S. custody for almost five years and had been charged once already. The first charge referred against Hamdan under the MCA is "Conspiracy," defined in the MCA at 10 U.S.C. § 950v(b)(28). The second charge is "Providing Material Support for Terrorism," defined at 10 U.S.C. § 950v(b)(25). These statutes purport to specify offenses under the international law of war, not offenses under the U.S. criminal code. However, the alleged conduct giving rise to these charges predates Hamdan's capture, and thus necessarily predates the definition of the offenses in the MCA. (*See* Charge Sheet, 10 May 2007, McMillan Decl., Ex. B.) On its face, then, the prosecution of the Conspiracy and Material Support charges represents the retroactive application of a

criminal statute in a manner prohibited by the Ex Post Facto Clause. *See Beazell v. Ohio*, 269 U.S. 167, 170 (1925) (laws "which purport to make innocent acts criminal after the event" violate the Ex Post Facto Clause).

Although the drafters of the MCA believed that the Guantanamo detainees had no constitutional rights, they nonetheless inserted § 950p into the statute in the hope of avoiding an Ex Post Facto violation. Section 950p provides:

(a)   PURPOSE.—The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

(b)   EFFECT.—Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

Implicit in this provision is the recognition that Congress cannot, and did not intend to, apply the MCA in a manner that would offend the Ex Post Facto Clause. The recital in the MCA that the offenses are those "that have traditionally been triable by military commissions" limits the jurisdiction of the Commission—at least with respect to individuals in custody prior to the enactment of the MCA, such as Hamdan—to traditional law-of-war offenses. Because, however, neither Conspiracy nor Material Support are "offenses that have traditionally been triable by military commissions" this bootstrapping provision cannot cure the Ex Post Facto Clause violation.

As an initial matter, the mere fact that Congress asserts that Conspiracy and Material Support are offenses triable by commissions does not make it so. "Whether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by Congress." *United States v. Arjona*, 120 U.S. 479, 488 (1887). As discussed in the following Section, the Supreme Court has long rejected arguments that Congress could, pursuant to its "Define and Punish" power, criminalize an

offense that was not, in the Court's view, a recognized violation of the law of nations.

In this very case, the Supreme Court has already held that Conspiracy is not an offense against the law of war that is triable by commission. Hamdan was initially charged with Conspiracy in a charge that was substantially identical to the Conspiracy charge that he now faces.[17] Justice Stevens, writing for the plurality, explained that Conspiracy did not state a law-of-war offense:

> At a minimum, the Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war. That burden is far from satisfied here. The crime of "conspiracy" has rarely if ever been tried as such in this country by any law-of-war military commission not exercising some other form of jurisdiction[[18]] and does not appear in either the Geneva Conventions or the Hague Conventions—the major treaties on the law of war. Winthrop explains that under the common law governing military commissions, it is not enough to intend to violate the law of war and commit overt acts in furtherance of that intention unless the overt acts either are themselves offenses against the law of war or constitute steps sufficiently substantial to qualify as an attempt.

126 S. Ct. at 2780-81 (citing Winthrop, *Military Law and Precedents* 841 (2d ed. 1920)).

The Court pointed out that under the law of war "an act does not become a crime without its foundations having been firmly established in precedent," and "the precedent must be plain and unambiguous." *Id*. at 2780 & n.34. This high standard was met in *Quirin*; the violation there alleged was, by "'universal agreement and practice' both in this country and internationally, recognized as an offense against the law of war." *Id*. at 2780 (quoting *Quirin*, 317 U.S. at 30). By contrast, there has been no "universal

---

[17] While the 10 May 2007 Conspiracy charge contains a second specification relating to transportation of one or more SA-7 surface-to-air missiles, these allegations were encompassed within the conspiracy to commit "murder by an unprivileged combatant," as Hamdan's prosecutor asserted in 2005.

[18] Elsewhere the Court explained that the military commission initially convened to try Hamdan was a law-of-war commission: "Since Guantanamo Bay is neither enemy-occupied territory nor under martial law, the law-of-war commission is the only model available." *Hamdan*, 126 S. Ct. at 2777. The commissions authorized by the MCA are likewise law-of-war commissions, as they only exercise jurisdiction over a subset of combatants and over offenses "made punishable by this chapter or the law of war," 10 U.S.C. § 948d(a), and each substantive offense punishable under the MCA has as an element the requirement that it "took place in the context of and was associated with armed conflict," Manual for Military Commissions, pt. IV, Crimes and Elements.

agreement and practice" recognizing conspiracy as a war crime. Indeed, both U.S. and "international sources confirm that the crime charged here [Conspiracy] is not a recognized violation of the law of war." *Id.* at 2784. As the Supreme Court noted, Winthrop ("the Blackstone of Military Law")[19] instructed that "'[t]he jurisdiction of the military commission should be restricted to cases of offence consisting in *overt acts*, *i.e.*, in unlawful commissions or actual attempts to commit, and not in intentions merely.'" *Id.* at 2781 (quoting Winthrop at 841). Likewise, conspiracy has been broadly rejected as an offense in international tribunals and treaties dealing with the law of war, including Nuremberg itself. *Id.* at 2784-85. The *Hamdan* discussion stands as the most authoritative treatment of whether conspiracy is a violation of the law of war[20]--and also independently serves as law of the case. *Arizona v. California*, 460 U.S. 605, 618 (1983).[21]

Like Conspiracy, Material Support for Terrorism is not recognized as a violation of the law of war. "Actionable violations of international law must be of a norm that is specific, universal, and obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (citations and quotation marks omitted). There never has been, and is not now, universal agreement and practice among nations concerning such an offense. It has never been tried by commission. *See* David Glazier, *Precedents Lost: The Neglected History of the Military Commission*, 46 Va. J. Int'l L. 5 (2005); Michael O. Lacey, *Military Commissions: A Historical Survey*, 2002 Army Law. 41 (2002). It is not identified as a war crime in the War Crimes Act, 18 U.S.C. § 2441, or in the *Law of War Handbook*, the

---

[19] *Reid*, 354 U.S. at 19 n.38 (plurality).

[20] Likewise, the UN Special Rapporteur has stated that conspiracy and material support for terrorism are both "offences which do not in fact form part of the laws of war." Special Rapporteur, *Report of the Special Rapporteur on the promotion and protection of human rights and fundamental freedoms while countering terrorism*, 12, *delivered to the Human Rights Council*, U.N. Doc. A/HRC/6/17/Add.3 (Nov. 22, 2007); *see also id.* ("[T]he offences listed in Section 950v(24)-(28) of the [MCA] (terrorism, providing material support for terrorism, wrongfully aiding the enemy, spying, and conspiracy) go beyond offences under the laws of war."). *See* Special Rapporteur's Report, McMillan Decl., Ex. C.

[21] A detailed discussion of past practice and history demonstrating that Conspiracy is not recognized as a violation of the law of war is set forth in the *Amicus Curiae* Brief of Specialists in Conspiracy and International Law in Support of Petitioner, *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) (No. 05-184), McMillan Decl., Ex. D.

principal statement published by the military on the law of war. Int'l & Operational Law Dep't, Judge Advocate General's Legal Ctr. & Sch., U.S. Army, *Law of War Handbook* 206-15 (Keith E. Puls ed., 2005).[22]   A recent Congressional Research Service report prepared for members of Congress concluded that "defining as a war crime the 'material support for terrorism' does not appear to be supported by historical precedent."[23]

Moreover, Material Support fails the test for a war crime recognized by Col. Winthrop and by the plurality in *Hamdan*. Those authorities instruct that only overt acts which themselves constitute war crimes, or acts substantial enough to constitute an attempt to commit a war crime, are triable under the law of war. *See, e.g.*, 126 S. Ct. at 2785. Providing services as a driver or bodyguard, transporting weapons, and receiving training are not substantive war crimes. Accordingly, until the passage of the MCA, there was no basis in U.S. law for the proposition that Material Support for Terrorism was a war crime. The same is true, and continues to be true, under international law.[24]

In short, there is no basis whatever for any contention that Conspiracy or Material Support are offenses condemned by universal agreement and practice throughout the international community.[25] Because they are newly enacted offenses that have not

---

[22] *Available at* http://www.loc.gov/rr/frd/Military_Law/pdf/law-war-handbook-2005.pdf.

[23] Jennifer K. Elsea, *The Military Commissions Act of 2006: Analysis of Procedural Rules and Comparison with Previous DOD Rules and the Uniform Code of Military Justice* 12 (CRS, updated Sept. 27, 2007), *available at* http://www.fas.org/sgp/crs/natsec/RL33688.pdf.

[24] Material Support for Terrorism is not mentioned in any of the treaties or statutes that define or address law-of-war violations. Neither the Hague Convention (IV) Respecting the Laws and Customs of War on Land nor the Geneva Conventions take cognizance of it. The Rome Statute of the International Criminal Court, which has over 120 signatory nations and is regarded as "the most comprehensive, definitive and authoritative list of war crimes," does not mention it. Robert Cryer, *International Criminal Law vs. State Sovereignty:  Another Round?*, 16 Eur. J. Int'l L. 979, 990 (2005) (internal quotation marks omitted). *See generally* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. Nor is the purported offense recognized or prosecuted by the International Criminal Tribunals for the Former Yugoslavia or Rwanda, the Special Court for Sierra Leone, or the Iraqi Special Tribunal.

[25] Recognition of Material Support for Terrorism as a war crime would require, in the first instance, universal agreement concerning the definition of "terrorism." There is a bewildering array of inconsistent definitions of terrorism under U.S. law alone, *see* Nicholas J. Perry, *The Numerous Federal Legal Definitions of Terrorism:  The Problem of Too Many Grails*, 30 J. Legis. 249, 254-55 (2004), and absolutely no consensus internationally on the meaning of the term, *see United States v. Yousef*, 327 F.3d 56, 97, 108 n.42 (2d Cir. 2003) (noting "the failure of States to achieve anything like consensus on the definition of terrorism" and, moreover, that "United States legislation has adopted several approaches to defining terrorism, demonstrating that, even within nations, no single definition of 'terrorism' or 'terrorist

"traditionally been triable by military commissions," 10 U.S.C. § 950p, they violate the Ex Post Facto Clause, and so the Commission lacks jurisdiction over these charges.

### E. The MCA Exceeds Congress' Powers Under the Define and Punish Clause

The Constitution places strict structural limits on Congress' power to define the subject-matter jurisdiction of any federal court, including military commissions. Congress has no general police power. Instead, "[t]he Constitution creates a Federal Government of enumerated powers. See Art. I, § 8." *United States v. Lopez*, 514 U.S. 549, 552 (1995). Article I, Section 8, Clause 10 grants Congress the power "To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." This Clause does not create a general police power allowing Congress to define and punish whatever criminal offenses it wishes any more than does the Commerce Clause. Rather, as the constitutional text makes clear, Congress is only empowered to define and punish "offenses against the law of nations." Just as the Commerce Clause limits Congress's power to define criminal offenses,[26] so too does the Define and Punish Clause. Unless a particular offense is "against the law of nations," Congress must rely on another source of authority. Otherwise, Congress could use the Define and Punish Clause to criminalize any offense it wished by merely characterizing certain activity as an offense against the law of nations.

---

act' prevails"); *Tel-Oren v. Libyan Arab Republic*, 726 F. 2d 774, 806-07 (D.C. Cir. 1984) (Bork, J., concurring) (the claim that a defendant "violated customary principles of international law against terrorism[] concerns an area of international law in which there is little or no consensus. . . . [N]o consensus has developed on how properly to define 'terrorism' generally.").

[26] The Supreme Court has held that Congress is not free to unilaterally determine what constitutes a substantial effect on interstate commerce when exercising its Commerce Clause power. *See United States v. Morrison*, 529 U.S. 598, 607 (2000) ("'The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.'") (quoting *Marbury*, 5 U.S. (1 Cranch) at 176 (Marshall, C.J.)). In *Morrison*, the Court held that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. . . . Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.* at 614 (internal quotation marks and citations omitted).

As the *Reid* plurality explained, "the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law." 354 U.S. at 21. Because "[u]nder the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes," it follows that "[e]very extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections." *Id.*

The Supreme Court has long guarded the limitations placed on Congress by the Define and Punish Clause, and rejected arguments that Congress could criminalize an offense under this Clause that was not, in the Court's view, a recognized violation of the law of nations. *See United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 198 (1820) (rejecting the claim that Congress had criminalized murder on the high seas by labeling it "piracy"—an offense against the law of nations—and suggesting that if Congress could do so, its power under the Define and Punish Clause would be limitless).[27]

In *Quirin*, the Supreme Court looked to the laws of war to identify the limits of Congress' power under the Define and Punish Clause: "We are concerned only with the question whether it is within the constitutional power of the National Government to

_____

[27] This was recognized at the Constitutional Convention, where James Wilson noted that "[t]o pretend to *define* the law of nations which depended on the authority of all the Civilized Nations of the World, would have a look of arrogance [] that would make us ridiculous." 2 The Records of the Federal Convention of 1787, at 615 (Max Farrand, ed., rev. ed. 1966). "[Gouverneur] Morris replied [to Wilson] by suggesting that 'define' was intended to suggest the need to provide detail, not to create offenses where none had previously existed." Beth Stephens, *Federalism and Foreign Affairs: Congress's Power to "Define and Punish... Offenses against the Law of Nations"*, 42 Wm. & Mary L. Rev. 447, 473 (2000). "The debates at the Constitutional Convention made clear that Congress would have the power to punish only actual violations of the law of nations, not to create new offenses." *Id*. at 474. See also A.J. Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law*, 48 Harv. Int'l L.J. 121, 141 (2007). Attorney General Speed later agreed: "To *define* is to give the limits or precise meaning of a word or thing in being; to make is to call into being. Congress has power to *define*, not to make, the laws of nations." 11 Op. Atty. Gen. 297, 299 (1865) (James Speed).

place petitioners upon trial before a military commission for the offenses with which they are charged. We must therefore first inquire whether any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial." 317 U.S. at 29.[28]

In this case, there is little difficulty in resolving subject-matter jurisdiction, for as explained in detail in the previous Section, the Supreme Court has already held that Conspiracy "is not a violation of the law of war," *Hamdan*, 126 S. Ct. at 2782, and neither U.S. nor international law consider Material Support a violation of the law of war. For these reasons, Hamdan's military commission charges exceed the limits of the Define and Punish Clause, and so the commission lacks subject-matter jurisdiction.

### F.  The Commission Violates the Bill of Attainder Clause

The commission slated to try Hamdan violates the prohibition on Bills of Attainder and therefore lacks subject matter jurisdiction. U.S. Const. Art. I, § 9, cl. 3 ("No Bill of Attainder…shall be passed."). Laws violate the Attainder Clause when they inflict "legislative punishment, of any form or severity, of specifically designated persons or groups." *United States v. Brown*, 381 U.S. 437, 447 (1965); *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003).[29]

---

[28] In *Quirin*, the charges levied were those which "according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Id.* As a result, the Court granted that "Congress . . . has thus exercised its authority to define and punish offenses against the law of nations . . . *within constitutional limitations.*" *Id.* (emphasis added); see also *Yamashita*, 327 U.S. at 13 (explaining that a Japanese general could only be tried by military tribunal if "the charge preferred against him is of a violation of the law of war."). While reaffirming the constitutional limitation on the subject matter jurisdiction of military commissions, *Quirin* and *Yamashita* place an outer limit on what Congress can punish as an offense against the law of nations. Even so, there may be instances in which an act is regarded by some as an offense against the law of war, but still is not within the subject matter jurisdiction of a military court. *Quirin*, 317 U.S. at 29 ("We may assume that there are acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury.").

[29] The Framers recognized that such concerns would be particularly salient during times of national crisis.

By prohibiting the punishment of disfavored persons or groups identified by past acts or other criteria beyond the control of the targets of the legislation, the Attainder Clause acts as a bulwark against congressional interference with the prerogatives of the judiciary. The Clause was thus "intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function." *Brown*, 381 U.S. at 442. The prohibition against bills of attainder was prompted by "the fear that the legislature, in seeking to pander to an inflamed popular constituency, will find it expedient openly to assume the mantle of judge—or, worse still, lynch mob." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 480 (1977).

The MCA violates the constitutional prohibition on attainders because it (1) singles out non-citizens whom the Government may unilaterally and extra-judicially label "unlawful enemy combatants," and then (2) punishes them by subjecting them to trial before unfair military commissions based solely on that label.

The MCA fits within the first prong because it targets a single, identifiable, class, *Nixon*, 433 U.S. at 468—individuals it labels "unlawful enemy combatants" (and labels without proper proceedings to determine whether the labels fit). *See, e.g.*, 151 CONG. REC. S10374 (Sept. 28, 2006) (remarks of Sen. Domenici) ("We cannot give terrorists the right to bring a habeas corpus petition that seeks release from prison on the grounds of unlawful imprisonment, as the Specter amendment would."). The statute does not survive simply because it fails to mention a particular person. The specificity requirement is met

---

"Bills of this sort have been most usually passed in England in times of rebellion, or gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free as the enslaved) to forget their duties, and to trample upon the rights and liberties of others." Story, Commentaries, § 1344 (quoted in *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866)).

"whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841, 847 (1984); *see also Brown*, 381 U.S. at 461 ("It was not uncommon for English acts of attainder to inflict their deprivations upon relatively large groups of people, sometimes by description rather than [name].").

The second prong of the Attainder Clause analysis requires the Court to examine whether the law in question imposes punishment on the identified group. Because of the creativity with which Congress may devise punishment, more than criminal sanctions qualify as attainders. Courts look to a three part inquiry to evaluate whether the law imposes punishment and so is unconstitutional:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of the burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Selective Service*, 468 U.S. at 852 (citing *Nixon*, 433 U.S. at 473, 475-76, 478).

Here, the MCA's creation of an alternative and unfair trial scheme satisfies all three criteria.[30] First, there can be little doubt that the commission trial system "falls

---

[30] Moreover, reading the MCA to remove this Court's jurisdiction to consider Hamdan's habeas petition for pre-trial relief would further violate the Attainder Clause. First, the purported deprivation of pretrial habeas imposes a severe punishment on Hamdan and similarly situated petitioners. As the Supreme Court held in this very case, Hamdan has a right to avoid trial by an otherwise unlawful or improper court. *Hamdan*, 126 S.Ct. at 2768. By purporting to strip this Court of jurisdiction to hear Hamdan's detention claim or a pre-trial challenge to the constitution of any commission that might try him, the MCA imposes a burden that is at the heart of the Attainder Clause's protections. For at least the past 140 years the Supreme Court has recognized that the deprivation of full and complete access to the courts qualifies as "punishment." In *Pierce v. Carskadon*, 83 U.S. 234, 238-39 (1873), the Supreme Court held that it was an unlawful attainder for the West Virginia legislature to limit access to the courts by refusing to allow petitioners to reopen a judgment attaching property in that State's courts solely because the petitioners refused to swear an oath disavowing allegiance to the Confederacy. *Id.* at 237-38. In *Pierce*, non-residents of West Virginia were required to swear the loyalty oath, but no such restriction applied to residents or to those who swore the oath. *Id.* at 236. The petitioners were denied review of a judgment attaching their property, based solely on their non-resident status and inability to take the loyalty oath. *Id.* Relying on *Cummings* and *Garland*, the Court summarily declared this lack of access to the courts an unlawful attainder. *Id.* at 239. Since that time, the Supreme Court has continued to read *Pierce* for the proposition that denying complete access to the courts qualifies as an attainder. *See Brown*, 381 U.S. at 449 n.21 ("[In *Pierce*] the Court voided as a bill of

within the historical meaning of legislative punishment." *Id.* Most obviously, the death penalty, as well as life imprisonment, are available punishments. Moreover, the Court has noted that at its core, the Attainder Clause is intended to prevent trial by unlawful means, citing a case involving trial by military commission to make that express point.

> [The Framers] intended to safeguard the people of this country from punishment without trial by duly constituted courts. *See Duncan v. Kahanamoku*, 66 S.Ct. 606. . . . An accused in court must be tried by an impartial jury . . . . the law which he is charged with violating must have been passed before he committed the act charged, he must be confronted by the witnesses against him....he cannot be twice put in jeopardy for the same offense . . . . When our Constitution and Bill of Rights were written, our ancestors had ample reason to know that legislative trials and punishments were too dangerous to liberty to exist in the nation of free men they envisioned. And so they proscribed bills of attainder.

*United States v. Lovett*, 328 U.S. 303, 317-18 (1946). Hence the burden imposed by the commission on Hamdan runs to the very core of the Attainder Clause's prohibition against congressionally sanctioned illegitimate trials.

Second, the sole purpose of the MCA's trial is to inflict punishment. Unlike the AUMF or the DTA, the MCA does not even purport to authorize or regulate preventive detention. There simply is no "nonpunitive legislative purpose," *Selective Service*, 468 U.S. at 852, to a military trial. The contention that trial by commission can prevent

---

attainder a West Virginia statute *conditioning access to the courts* upon the taking of an oath similar to those involved in *Cummings* and *Garland*.") (emphasis added); *Flemming v. Nestor*, 363 U.S. 603, 615 n.8 (1960) (same); *cf. Bellsouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998) (citing *Pierce* as an example of the Court striking down an attainder). Concerns about access are particularly salient here because, as previously explained, forcing Hamdan to endure a commission trial will compromise his ability to put on a defense in a future proceeding—be it a habeas corpus detention action or a subsequent criminal trial.

Second, the severe burden imposed on Hamdan by the jurisdiction-stripping provisions of the MCA far outweighs any possible non-punitive legislative purpose. Although it might be argued that removing jurisdiction aimed to improve governmental or judicial efficiency, this cannot be the case. For as Congress was well aware, its attempt to remove habeas jurisdiction would lead to both pre-trial challenges to the MCA in federal court as well as the post-trial review established by the MCA.

Third, Congress intended to remove pretrial habeas jurisdiction out of punitive intentions. *See, e.g.,* 152 Cong. Rec S10238-01(Sept. 27, 2006) (Statement of Sen. Lott) ("Now we have this huge discussion about habeas corpus. Bring on the lawyers. What a wonderful thing we can do to come up with words like this. Our forefathers were thinking about citizens, Americans. They were not conceiving of these terrorists who are killing these innocent men, women, and children.").

detainees from engaging in future acts of terrorism cannot cure it of its punitive nature.[31]

Third, the legislative history of the MCA makes clear that Congress set up commissions based on a desire to punish individuals that Congress viewed as terrorists.[32] For these reasons, prosecution by the military commission is an unconstitutional bill of attainder, and the commission lacks subject matter jurisdiction to try Hamdan.

### G.  The Commission Violates Hamdan's Right to Equal Protection

The MCA sets up a different, and inferior, trial system only for the powerless— the five billion foreigners and millions of green-card holders who lack a vote in the political process. Unlike immigration, where only noncitizens can violate the law, the case here concerns unlike treatment for like offenses. By drawing categorical distinctions between citizens and aliens even when each acts in the very same way, the MCA violates the Equal Protection component of the Due Process Clause of the Fifth Amendment. *See Graham v. Richardson*, 403 U.S. 365, 371 (1971) ("[C]lassifications based on alienage [are] inherently suspect and subject to close judicial scrutiny."); Katyal, *Equal Protection in the War on Terror*, 59 Stanford L. Rev. 1365, 1370-78 (2007).[33] Citizenship is no bar to belligerency, see *Quirin*, 317 U.S. at 37, and the Authorization for the Use of Military

---

[31] *See Nixon*, 433 U.S. at 476 n.40 ("*United States v. Brown* established that punishment is not restricted purely to retribution for past events, but may include inflicting deprivations on some blameworthy or tainted individuals in order to prevent his future misconduct.").

[32] E.g., 152 Cong. Rec. S10238-01 at S10239 (Sept. 27, 2006) (statement of Sen. Lott), *supra* n.32; 152 Cong. Rec. H7522-03, at H7538 (Sept. 27, 2006) (statement of Rep. McHugh) ("Why should an accused terrorist enjoy protections that exceed what the Constitution provides to every one of us as United States citizens?"); *Hearing Before the Senate Judiciary Committee* (Sept. 25, 2006) (statement of Sen. Cornyn) ("It is important to remember, and sometimes I think some forget, these are enemies of the United States, captured on the battlefield.  These are not individuals who have been arrested for committing crimes and then who are entitled to all of the process an American citizen would in an Article III court.").

[33] International law also recognizes a similar parity principle. *See* Art. 102, Geneva Convention Relative to the Treatment of Prisoners of War Aug. 12, 1949, 6 U.S.T. 3316; *id.* Art. 3(1)(d) (requiring trial before a "regularly constituted court"); International Committee of the Red Cross, Commentary: Convention (III) Relative to the Treatment of Prisoners of War Art. 129, Aug. 12, 1949, http://www.icrc.org/ihl.nsf/COM/375-590155. The International Covenant on Civil and Political Rights (ICCPR), which the U.S. government has ratified, sets out in article 14(1) that all persons "shall be equal before the courts and tribunals." International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976).

Force, 115 Stat. 224 (2001) draws no such distinction.

The Equal Protection Clause of the Fourteenth Amendment applies to all "persons" regardless of citizenship. As *Plyler v. Doe*, 457 U.S. 202, 210 (1982), directs "an alien is surely a 'person' in any ordinary sense of that term," and is entitled to equal protection of the laws. *See also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. . . .[Its] provisions are universal in their application to all persons within the territorial jurisdiction . . .."). The Supreme Court has recognized that the Fifth Amendment's Due Process Clause embraces the "concept of equal justice under law." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). Accordingly, the Fourteenth Amendment's Equal Protection Clause and the Fifth Amendment's Due Process Clause "require the same type of analysis." *Id.*; *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) ("the equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable"); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

The Constitution's guarantee of equal protection stands as a way to ensure that the most powerless are represented by the powerful—thereby ensuring better substantive treatment for all. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 300 (1990) (Scalia, J., concurring) ("[T]he democratic majority [must] accept for themselves and their loved ones what they impose on you and me."); *Ry. Express Agency, Inc. v. New York,* 336 U.S. 106, 112–13 (1949) (Jackson, J., concurring) ("[N]othing opens the door to arbitrary action so effectively as to allow . . . officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected."). Aliens are "a prime

example of a 'discrete and insular' minority" because they cannot vote. *Graham*, 403

U.S. at 372. The Court, therefore, has applied careful scrutiny to state laws that disfavor

aliens.[34]   *E.g., Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977); *In re Griffiths*, 413 U.S. 717,

721-22 (1973); *Sugarman v. Dougall*, 413 U.S. 634 (1973).[35]

The MCA violates equal protection by shunting only aliens into an inferior trial

procedure even when the alien is accused of the same crime as a citizen. Targeted at a

population who cannot vote, it seeks to ensure that alien detainees are subjected to

inferior tribunals while their citizen counterparts are brought to civilian court—even if

the citizen may have committed a far more egregious offense (such as the detonation of a

weapon of mass destruction). The MCA unconstitutionally singles out a class of people

---

[34] While the Supreme Court has been more accepting of alienage distinctions in the distribution of Medicare, social security, and other public entitlements, *see Mathews v. Diaz*, 426 U.S. 67, 77 (1976), the matter of who faces a trial with their life on the line is not a matter of government largesse. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (asserting that the writ of habeas corpus "has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law."); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001). Unlike the simple preferential treatment of American citizens for government employment or political leadership, *see Sugarman v. Dougall*, 413 U.S. 634 (1973); *Foley v. Connelie*, 435 U.S. 291 (1978), the MCA offends the very essence of equal justice under law.

[35] Were this Court to read the MCA to remove this Court's pretrial jurisdiction over Hamdan's case, the statute would violate the Fifth Amendment because it discriminates in the allocation of fundamental rights, and, in particular, the fundamental rights of habeas corpus and access to courts. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 217 (1982). As the text of the MCA makes clear, it is not only those—like Hamdan—whom the Government has held under its control for the past six years in Guantanamo that have their habeas rights removed. The MCA deprives *all* aliens of those rights, even lawful resident aliens living within the United States, and violates equal protection for this reason as well.

Moreover, the Supreme Court has applied heightened review to government efforts to discriminate in access to courts, even based on non-suspect classifications. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 522-23 (2004) (stating that "the right of access to the courts" is subject to "more searching judicial review" under equal protection). Thus, the Court has struck down state statutes depriving the poor of appellate counsel, *see Douglas v. California*, 372 U.S. 353 (1963), trial transcripts, *see Griffin v. Illinois*, 351 U.S. 12 (1956), and appeal rights, *see M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), even though poverty is not a suspect classification, *see Harris v. McRae*, 448 U.S. 297 (1980). The unequal access to the Great Writ, leaving American citizens with pretrial habeas challenges but not green-card holders or foreigners, violates equal protection. *See Coolidge v. New Hampshire*, 403 U.S. 443, 454 n.4 (1971) (listing the right to the writ of habeas corpus among rights that are "to be regarded as of the very essence of constitutional liberty") (citation omitted); *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968) (declaring that the right to habeas corpus is "shaped to guarantee the most fundamental of all rights").

The MCA's attempt to remove habeas jurisdiction fails under this standard. The fight against terrorism neither necessitates nor justifies stripping aliens detained in U.S. territory of their most fundamental rights. The government has no more interest in revoking court access of alien detainees than they do citizen detainees; both classes must be treated evenly.

who, though they may be housed within our territory, are not similarly sheltered by our political process. While America has had military commissions before, it has never, to undersigned counsel's knowledge, exempted American citizens from the process—be it the trials in World War II at issue in *Quirin*, or those in the Mexican-American war. *See Quirin*, 317 U.S. at 37; David Glazier, Note, *Kangaroo Court or Competent Tribunal?: Judging the 21st Century Military Commission*, 89 VA. L. REV. 2005, 2030 (2003).

Even if Congress can set up military commissions, it cannot set them up only for foreigners. Creating an inferior trial system that discriminates between aliens and citizens serves no legitimate government interest.  There is no reason why the government must subject aliens who are alleged to have participated in acts of terrorism to military commissions, but need not do so for citizens suspected of the same crimes. If it is necessary to treat aliens this way to combat terrorism effectively, then the same need must exist for citizens as well. A citizen who commits a terrorist act is just as culpable as the alien who commits that act. Indeed, the citizen's actions may be worse—since he is guilty of treason in addition to his terrorism crimes. If Congress wishes to set up military commissions, at a minimum it must do so for all persons and not selectively target only those without a political voice. Accordingly, the commission slated to try Hamdan violates the Constitution's guarantee of equal protection.

### H.  The Commission Violates the Geneva Conventions and Hamdan's Right to Due Process of Law

Common Article 3 of the Geneva Conventions further prohibits trying Hamdan on the referred charges because it incorporates the ex post facto principle, the right to equal protection, and other legal norms as among those judicial guarantees that are indispensable. The Supreme Court has already ruled that Common Article 3 applies and protects Hamdan in any proceeding before a commission. *Hamdan*, 126 S. Ct. at 2796

("Common Article 3, then, is applicable here and . . . requires that Hamdan be tried by a 'regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.'") (quoting 6 U.S.T. 3316, 3320, art. 3, ¶ 1(d)). The MCA contemplates that Common Article 3 must be respected. *See* 10 U.S.C. § 948b(f).

In *Hamdan*, a plurality of the Supreme Court pointed out that Common Article 3 "must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many of these are described in Article 75 of Protocol I to the Geneva Conventions of 1949, adopted in 1977 . . . ." 126 S. Ct. at 2797. Article 75, ¶ 4(c) of Protocol I explicitly prohibits ex post facto trials. Protocol Additional to the Geneva Conventions of 12 August 1949, art. 75, ¶ 4(c), *opened for signature* 8 June 1977, 1125 U.N.T.S. 3.[36] Because neither charge against Hamdan existed as a criminal offense under international law at the time of his alleged conduct, the commission violates Common Article 3 and lacks jurisdiction.[37]

[36] The *Law of War Handbook* recognizes that international law prohibits ex post facto prosecutions. *Law of War Handbook* at 206. In addition, the International Committee of the Red Cross identifies the ex post facto principle as a fundamental tenet of customary international law. *See* 1 Int'l Comm. of the Red Cross, *Customary International Humanitarian Law* 371-72 (Jean-Marie Henckaerts & Louise Doswald-Beck eds., 2005) (mirroring the text of the provision in Article 75 of Protocol I). The prohibition on ex post facto prosecution has also been codified in the statute governing the ICC. Rome Statute of the International Criminal Court, arts. 22, 24, July 17, 1998, 2187 U.N.T.S. 90. Likewise, the International Covenant on Civil and Political Rights states that observation of the ex post facto principle (listed as a guarantee to all persons standing trial in Article 15) is non-derogable. International Covenant on Civil and Political Rights, art. 4, ¶ 2, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171. Both the American Convention on Human Rights and the European Convention on Human Rights echo these provisions regarding ex post facto prosecutions. *See* American Convention on Human Rights, arts. 9, 27, *opened for signature* Nov. 21, 1969, 1144 U.N.T.S. 123; European Convention on Human Rights, arts. 7, 15, Nov. 4, 1950, 213 U.N.T.S. 221. Further, the ICTY has stated that although its statute gives it the power to try persons for certain crimes, it will only permit prosecution for conduct proscribed by customary international law at the time of commission. *Prosecutor v. Blaskic*, Case No. IT-95-14-A, Judgment, ¶ 78 (July 29, 2004).

[37] Any contention that Common Article 3 provides no protection to Hamdan based upon MCA § 948b(g) ("No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights") must be rejected, as Congress cannot strip Hamdan of preexisting rights recognized by the Supreme Court in this very case. *See* Brief of Federal Courts and International Law Professors as Amici Curiae in Support of Petitioners, *Boumediene*, 128 S. Ct. 2229, 2007 WL 2441588). Such an effort would constitute an impermissible intrusion into the judicial function. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545-46 (2001) (striking down as "inconsistent with accepted separation-of-powers principles" a statute as an impermissible "attempt . . . to exclude from litigation those arguments and theories Congress finds unacceptable but which by their nature are within the province of the courts to consider"); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227 (1995) ("Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was."); *United States v. Klein*, 80 U.S. 128, 146 (1871)

Numerous other procedures in Hamdan's case further violate Common Article 3, and so divest the commission of jurisdiction. *See Hamdan*, 126 S. Ct. at 2803 (Kennedy, J. concurring) (noting that "the *Eisentrager* Court itself considered on the merits claims that 'procedural irregularities' under the 1929 Convention 'deprive[d] the Military Commission of jurisdiction'") (citation omitted). All of the following violations of Common Article 3 also state violations of the Constitution's Due Process Clause. For brevity's sake, Hamdan has not repeated the facts and legal claims in a separate section.

The MCA offends Common Article 3 by discriminating on the basis of national origin, affording an inferior procedure to aliens who fall within the jurisdiction of commissions. The distinction between citizens and foreigners discussed above offends the principle of equality (a fundamental judicial guarantee in matters of criminal procedure), and it undermines any claim that military commissions are "regularly constituted courts." The principle of parity and non-discrimination in criminal procedure is clearly set forth in paragraph 1 of Article 75 of Additional Protocol I.

In this case, the commission has already noted the different treatment in one crucially important area, the right against self-incrimination protected by the Fifth Amendment, the UCMJ, and Article 75 of Protocol I (at ¶ 4(f)). In denying Hamdan's motion to suppress statements taken from him without informing him of his right to remain silent, the commission recognized that "the result is at odds with the balance of American jurisprudence" and that "in any other criminal trial held in American courts, an

---

(striking down a statute that prevented courts from giving effect to a presidential pardon, which would violate separation of powers by "prescrib[ing] rules of decision to the Judicial Department of the government in cases pending before it"); *see also Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2684 (2006) ("If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law 'is emphatically the province and duty of the judicial department,' headed by the 'one supreme Court' established by the Constitution.") (quoting *Marbury*, 5 U.S. (1 Cranch) at 177). Such an application of § 948b(g) would operate as an invalid Bill of Attainder and ex post facto law. *See Cummings v. Missouri*, 71 U.S. 277, 320 (1866) ("deprivation of any rights, civil or political, previously enjoyed, may be punishment" and constitute a bill of attainder); *Collins v. Youngblood*, 497 U.S. 37, 49 (1990) ("A law that abolishes an affirmative defense" violates the Ex Post Facto Clause); *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925) ("depriv[ing] one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.").

accused who was questioned before trial, without warning regarding his right to remain silent, could not later be prejudiced by the admission of those statements against him." Ruling on Motion to Suppress at 3, McMillan Decl., Ex. E. An allegedly unlawful combatant who happens to be a U.S. citizen would be tried in a civilian court, where the "level of protection" would be markedly greater, *i.e.*, the "remedy of suppression for pre-trial statements taken without the rights warnings" would be applied. *See, e.g., United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002).

The MCA provides disparate and inferior treatment in other areas. For example, the MCA shifts the burden with respect to the use of hearsay evidence, placing on the party opposing admission of the evidence the burden of showing its unreliability. *See* 10 U.S.C. § 949a. This shift dramatically alters the rules of evidence applied in American courts, and gravely undermines the confrontation rights of a criminal defendant protected by the Sixth Amendment. *See Crawford v. Washington*, 541 U.S. 36, 49 (2004) ("'[I]t is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine'") (quoting *State v. Webb*, 2 N.C. 103 (1794)). This is not a theoretical problem. Rather, the Government has submitted a ten-page "Hearsay Notice" of the voluminous hearsay evidence it intends to introduce at trial before the military commission. (McMillan Decl., Ex. F.)  This Notice lists a wide array of materials of precisely the sort that the *Hamdan* Court took special note of, quoting with approval the dissenting opinion of Justice Rutledge in *Yamashita*:

> The dissenters' views [in *Yamashita*] are summarized in the following passage: "It is outside our basic scheme to condemn men without giving reasonable opportunity for preparing defense; in capital or otherwise serious crimes to convict on official documents…; affidavits…; documents or translations thereof; diaries…; photographs, motion picture films, and …newspapers or on hearsay, once, twice or thrice removed, more particularly when the documentary evidence or some of it is prepared *ex parte* by the prosecuting authority and includes not only opinion but conclusions of guilt. Nor in such cases do we deny the rights of confrontation of witnesses and cross-examination."

*Hamdan*, 126 S. Ct. at 2789 n.46 (quoting *Yamashita*, 327 U.S. at 44 (Rutledge, J., dissenting)). Confrontation is also an indispensable guarantee protected by Common Article 3, as Article 75 provides that "anyone charged with an offence shall have the right to examine, or have examined, the witnesses against him." Protocol I, art. 75, ¶ 4(g).[38]

The use of evidence obtained through coercion, a practice that the MCA permits, *see* 10 U.S.C. § 948r, further violates Common Article 3. In any other American court, evidence produced by coercion is inadmissible. *See, e.g., Chambers v. Florida*, 309 U.S. 227, 238-41 (1940) (reversing conviction and excluding evidence from five days of coercive interrogation). Among other things, Common Article 3 prohibits "violence to life and person," ¶ 1(a), and "outrages upon personal dignity, in particular humiliating and degrading treatment," ¶ 1(c).  Article 75 of Protocol I also bans "threats to commit any of the foregoing acts." Hamdan has endured both physical and mental abuse in American custody, including beatings, threats of death to himself and his family, isolation in solitary confinement for protracted periods, the withholding of medical treatment, false inducements, unnecessary forced feedings, offensive sexual contact, and other forms of humiliation and pressure designed to foster despair and complete dependence on the favor of his interrogators. Indeed, the Standard Operating Procedure at

---

[38] Likewise, Hamdan is having significant difficulty in "obtain[ing] the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him," *id.*, another fundamental judicial guarantee protected by both the Sixth Amendment and Common Article 3. This issue has already seriously prejudiced Hamdan at preliminary proceedings before the commission. At a jurisdictional hearing held at Guantanamo in December 2007, the commission denied Hamdan's motion for the production of three detainees held at the Guantanamo Naval Base (Khalid Shaykh Muhammad, Ramzi Bin al-Shib, and Abu Faraj al-Libi). Each was expected to provide important exculpatory testimony, if Hamdan could obtain it. For a synopsis of their expected testimony and its relevance, *see* McMillan Decl., Ex. G. At the jurisdictional hearing, the commission denied the Defense motion to compel the production of these witnesses after the Government first refused to even respond to the request for their production, and later argued that national security would be jeopardized. The commission's denial was based on the assertion that the Defense request for these witnesses was untimely, despite the fact that the Defense had made the request by the deadline that the commission itself set. (*See* email requests and orders, and December 5 transcript, McMillan Decl., Ex. H.) Subsequently, written answers received from Muhammad confirmed the Defense expectations about the highly relevant and exculpatory information in his possession. Had Muhammad been permitted to testify at the December 2007 hearing, it is possible that the commission would have reached a different conclusion on the jurisdictional fact of unlawful combatancy. Hamdan continues to be denied access to Muhammad and at least six other detainees who are believed to have exculpatory evidence.

Guantanamo entailed use of a "Behavior Management Plan" calculated to "disorient and disorganize" the detainees in the hope of extracting useful intelligence. (McMillan Decl., Ex. I.)  The conditions of solitary confinement are probably the most debilitating at the present time, as they have seriously undermined (and continue to undermine) his ability to assist in his own defense. (May 10 Declaration of Dr. Emily Keram, McMillan Decl., Ex. J.)  In light of this carefully planned regime of coercion, none of the statements of Hamdan to his interrogators should be admissible as evidence against him.[39]

Finally, the MCA purports to strip from defendants the ability to assert defenses or invoke rights based on the Geneva Conventions. *See* 10 U.S.C. § 948b(g). One of the indispensable guarantees protected by Common Article 3 is the right to invoke law—including Common Article 3—in one's defense in a judicial proceeding. Similarly situated defendants in other American courts are not deprived of potential defenses or substantive rights based on the Geneva Conventions, which have the status of domestic law under the Supremacy Clause. In addition, these rights may be separately enforced under a 1946 Treaty between the United States and Yemen.[40] Because Hamdan has a strong likelihood of showing that the irregular procedures already implemented in commission proceedings violate Common Article 3 and due process of law, and so divest the commission of jurisdiction, this Court should issue a preliminary injunction.

## CONCLUSION

For the above reasons, this Court should issue a preliminary injunction.

---

[39] The commission has denied Hamdan's initial motion to exclude these statements, albeit with leave to refile if greater specificity in identifying individually coerced statements can be obtained (a daunting prospect in light of discovery rules that allow the Prosecution to assess whether discovery requests are relevant and to withhold material it deems irrelevant). *See* Rule of Military Commission 703.

[40] The treaty guarantees Hamdan the right to be "treated in accordance with the requirements and practices of generally recognized international law" and also guarantees "the fullest protection of the laws and authorities of the country" and that nationals "not be treated in any manner less favorable than the nationals of any third country." Treaty No. 43, Art. 3, at  http://untreaty.un.org/unts/1_60000/1/2/00000096.pdf.   It explicitly extends to "all territory under the sovereignty *or* authority of either of the parties, except the Panama Canal Zone," thereby including Guantanamo Bay. *See id*. Art. 6.

Respectfully submitted this 3rd day of July, 2008,

*/s/*    Neal Katyal
Neal Katyal (D.C. Bar No. 462071)
Justin Florence
Stephen I. Vladeck
600 New Jersey Avenue, NW
Washington, D.C. 20001
(202) 662-9000

Harry H. Schneider, Jr. (*pro hac vice*)
Joseph M. McMillan (*pro hac vice*)
Eric S. Merrifield
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101
(206) 359-8000
(206) 359-9000 (facsimile)

Charles D. Swift (*pro hac vice*)
Emory University School of Law
850 Ralph McGill Bldv. NE, #39
Atlanta, GA 30306
(404) 727-1190

*Attorneys for Petitioner Salim Ahmed Hamdan*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 3, 2008, the foregoing was filed electronically.  Notice of this

filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

DATED at Seattle, Washington, this 3rd day of July, 2008.


**PERKINS COIE LLP**


*/s/*     Joseph M. McMillan
Joseph M. McMillan (*pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101
(206) 359-8000
(206) 359-9000 (facsimile)