IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
SALIM AHMED HAMDAN, et al.,        )
                    Petitioner,                  )
                                                )
        v.                                       )        Civil Action No. 1:04-cv-01519-JR
                                                )
ROBERT GATES,                          )
        Secretary, U.S. Department of     )
        Defense, *et al.,*                      )
                         Respondents.           )
_____)

## RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO ENJOIN MILITARY COMMISSION PROCEEDINGS

### PRELIMINARY STATEMENT

Following the Court's original decision in this case and the Supreme Court's subsequent decision – holding that the President needed, and lacked, congressional authorization to convene a military commission to try persons such as petitioner utilizing procedures other then those in the Uniform Code of Military Justice (UCMJ) – the President "return[ed] to Congress to seek the authority" necessary to try unlawful enemy combatants captured on the battlefield during a time of war. *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2799 (2006) (Breyer, J., concurring). Congress had "the power and prerogative" to confer such authority, *id*. at 2800 (Kennedy, J., concurring in part), and Congress responded swiftly and clearly, enacting the Military Commissions Act of 2006 ("MCA") only months later, with bipartisan support in both Houses. Now, on July 21, 2008, trial is scheduled to begin in petitioner's duly constituted military commission – a commission convened pursuant to an express Act of Congress, in which he is guaranteed by law an impartial judge and jury (the members of the commission), 10 U.S.C. § 949f, the presumption of innocence until proven guilty beyond a reasonable doubt, *id.* § 949*l*, the assistance of defense counsel, *id.* § 949c, the right to be

present, *id.* § 949d(b), the right to discovery (including a right to exculpatory evidence), *id.* § 949j, the right to take depositions, *ibid.*, the right to call witnesses, *ibid.*, and a full panoply of other substantive and procedural rights that are carefully described in the MCA.  Such rights for an alien charged with war crimes are utterly unprecedented and far exceed the protections given to the defendants in *Ex parte Quirin*, 317 U.S. 1 (1942), and *Johnson v. Eisentrager*, 339 U.S. 763 (1950), cited approvingly by the Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229, 2259-60, 2271 (2008).

As this Court previously observed, "Hamdan is to face a military commission newly designed, because of his efforts," by Congress "acting according to guidelines laid down by the Supreme Court."  *Hamdan v. Rumsfeld*, 464 F. Supp. 2d 9, 18 (D.D.C. 2006).  Yet, despite congressional sanction and these unprecedented rights, petitioner again on the eve of trial asks this Court to take the extraordinary measure of enjoining his military commission trial and all subsequent commission proceedings until this Court can conduct a review of the legality of commission procedures and undertake its own investigation of the Government's basis for detaining petitioner. Petitioner's motion is not without some irony.  In the days since the Supreme Court's decision in *Boumediene*, the Guantanamo habeas petitioners have urged the judges in this District to hasten the arrival of their day in court.  For petitioner Hamdan, that day has arrived; yet, he would have this Court delay an adjudication of the facts and second-guess preliminary legal determinations made by the commission, which may be reviewed in full by the D.C. Circuit on appeal.  This he may not do, particularly through the "extraordinary and drastic remedy" of a preliminary injunction.  *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008).

Congress has funneled challenges such as petitioner's into the military commission itself, with review by the Article III courts to follow *after* adjudication, not before.  Thus, the situation here is radically different from the commission previously before this Court, where review lay only with

the Executive as of right.  In channeling review, Congress precluded this Court from considering claims such as petitioner's, including claims couched as a collateral attack under habeas, that "relat[e] to the prosecution, trial, or judgment of a military commission."  10 U.S.C. § 950j(b). Petitioner candidly acknowledges that his motion does not challenge the lawfulness of his detention at all, Mem. of Law in Supp. of Mot. at 20 (docket entry 93) ("Hamdan's commission challenge could not possibly lead to his release"); accordingly, he disclaims reliance upon the key element that animated the Supreme Court's decision in *Boumediene*, namely, the constitutional right to challenge the lawfulness of executive detention through habeas corpus. Petitioner, thus, has no chance for success on the merits, because the Court lacks jurisdiction over these claims.

Even if the Court has jurisdiction, it would be inappropriate to exercise it.  As the Supreme Court reiterated unanimously in *Munaf*, on the same day it decided *Boumediene*, "the orderly administration of criminal justice may 'require a federal court to forgo the exercise of its habeas corpus power.'"  128 S. Ct. at 2220 (quoting *Francis v. Henderson*, 425 U.S. 536, 539 (1976)). Given Congress's enactment of the MCA, which unquestionably confers jurisdiction on the military court to try petitioner and sets forth in great detail elaborate procedures for his trial (including an appeal process that includes appeal as of right to the D.C. Circuit), petitioner cannot and does not seriously challenge "the right of the military to try [him] at all." *Schlesinger v. Councilman*, 420 U.S. 738, 763 (1975).  As such, this Court must properly abstain from considering this collateral challenge, and allow petitioner to pursue his claims in the military commission, the Court of Military Commission Review, the D.C. Circuit, and ultimately the Supreme Court on writ of certiorari.

Implicitly acknowledging that he has no serious challenge to the commission's jurisdiction (much less a likelihood of success on the merits), petitioner instead argues that his trial by the military commission would result in a violation of various asserted constitutional rights.  The Court need not reach these issues if it decides either that it lack jurisdiction or that abstention is

appropriate.  In any event, it is far from clear that petitioner even has any claim to the constitutional

rights asserted.  Even assuming that he might, there would not be a violation of these rights from his

trial by the commission and any hypothetical violations could be fully vindicated by an Article III

court on appeal as of right.  Such posited constitutional violations in no way cast doubt on the

*jurisdiction* of the commission over petitioner.  As such, the orderly administration of justice

requires that they be litigated before the commission in the first instance, with appeal to follow; not

the other way around.  *Accord Councilman*; *Younger v. Harris*, 401 U.S. 37 (1971).  Because

petitioner has no likelihood of success on the merits, his motion should be denied.

The other preliminary injunction factors also require denial.  As the D.C. Circuit held only

a few weeks ago, "[t]here is no substantial public interest at stake in this case that distinguishes it

from the multitude of criminal cases for which post-judgment review of procedural and jurisdictional

decisions has been found effective."  *Khadr v. United States*, — F.3d —, 2008 WL 2468496, at *6

(D.C. Cir. June 20, 2008).  Indeed, the court of appeals squarely held that "the 'substantial public

interest' claimed by the petitioner cannot be solely his 'right not to stand trial.'"  *Ibid*.  Thus, the

public interest in the orderly administration of justice decisively favors the Government, not

petitioner. Moreover, the balance of harms tips decidedly against the issuance of an injunction in

these circumstances.  Petitioner's motion is akin to seeking a continuance on the eve of trial, when

the Government has poured substantial resources – by arranging for the movement of attorneys,

witnesses, commission members, security, and translation personnel, and overcome daunting

scheduling issues to proceed on July 21.  By contrast, for the reasons suggested by the D.C. Circuit

in *Khadr*, petitioner's claim of a right not to stand trial is wholly insufficient.  Accordingly,

petitioner's motion should be denied.

## BACKGROUND

On September 11, 2001, Usama Bin Laden and his terrorist network, al Qaeda, operating out

of Taliban-controlled Afghanistan, attacked the United States. Nearly three thousand Americans were killed in what was the worst attack on American soil by a foreign aggressor in our nation's history. On September 18, 2001, Congress adopted the Authorization for the Use of Military Force, authorizing the use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001). Within weeks, American forces were deployed in Afghanistan.

In November 2001, petitioner Salim Hamdan, Usama Bin Laden's personal bodyguard and driver, was captured on the battlefield in Afghanistan during the course of active hostilities. He was subsequently transferred to the U.S. Naval Station at Guantanamo Bay, Cuba, for detention. In July 2003, the President designated petitioner as an individual eligible for trial before a military commission and, in July 2004, petitioner was charged pursuant to a military commission convened under Military Commission Order No. 1. Hamdan then filed the instant habeas petition challenging the lawfulness of his military commission. *See* Petition (dkt. no. 1). The Supreme Court ultimately held that the commission used procedures that deviated impermissibly from those afforded by the UCMJ. *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).

In response, Congress enacted the MCA, establishing a detailed regime governing the establishment and conduct of military commissions. *See* 10 U.S.C. §§ 948a-950p. The MCA provides for the trial by military commission of unlawful enemy combatants, 10 U.S.C. § 948c, defined as a person who "has engaged in hostilities or who has purposefully and materially supported the hostilities against the United States . . . who is not a lawful enemy combatant." 10 U.S.C. § 948a(1).[1] A military commission is made up of at least five members who are military

---

[1]A lawful enemy combatant is defined as, among other things, the "member of the regular forces of a State party engaged in hostilities against the United States" or a "member of a militia,

officers, 10 U.S.C. §§ 948i, 948m, and is  presided over by a military judge, 10 U.S.C. § 948j, the same judges who preside over courts-martial.  The defendant is appointed military defense counsel and may also retain private civilian counsel.  10 U.S.C. §§ 948k, 949c.  The defendant is presumed innocent unless his guilt is established beyond a reasonable doubt.  10 U.S.C. § 949*l*(c).  All military commission proceedings must take place in the presence of the accused unless, after the accused is warned, he persists in conduct that would justify exclusion to ensure the physical safety of individuals or to prevent disruption of the proceedings.  10 U.S.C. § 949d(b), (e).

The defendant has broad appellate rights.  10 U.S.C. § 950b(b).  If convicted, the defendant may appeal to the Court of Military Commission Review, an intermediate military court.  10 U.S.C. § 950f.  The defendant then may appeal to the D.C. Circuit, 10 U.S.C. § 950g, which has "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission"; it may review "matters of law" and consider "whether the final decision was consistent with the standards and procedures specified in this chapter" and with "the Constitution and the laws of the United States."  10 U.S.C. § 950g(a)-(c).

On February 2, 2007, petitioner was charged with two offenses under to the MCA – conspiracy in violation of 10 U.S.C. § 950v(b)(28) and providing material support for terrorism in violation of 10 U.S.C. § 950v(b)(25).  Charge Sheet (Ex. B to McMillan Decl.), pp. 3-4.  The conspiracy charge specified that petitioner had entered into an agreement with other members of al Qaeda to commit one or more substantive offenses triable by military commission, and committed several overt acts in support thereof, including serving as Usama Bin Laden's bodyguard and personal driver and transporting and delivering weapons to al Qaeda members and associates.  *Id.*,

---

volunteer corps, or organized resistance movement belonging to a State party engaged in such hostilities, which are under responsible command, wear a fixed distinctive sign recognizable at a distance, carry their arms openly, and abide by the law of war."  10 U.S.C. § 948a(2).

p. 3.  The conspiracy charge also specified that petitioner entered into an agreement with members of al Qaeda to murder United States service members serving as pilots, crew, or passengers of United States aircraft and delivered SA-7 surface-to-air missiles to be used in such acts.  *Id.*, p. 4. The material support charge alleged that petitioner provided material support to al Qaeda by joining the group, serving as bin Laden's driver and armed bodyguard, delivering weapons to al Qaeda members, including SA-7 surface-to-air missiles, and receiving weapons training.  *Id.*, pp. 4-7.

Petitioner challenged the jurisdiction of the military commission over him, arguing to the commission that he was not an "unlawful enemy combatant" pursuant to the definition in 10 U.S.C. § 948a.  The military judge initially dismissed for lack of jurisdiction on the ground that a CSRT finding did not establish military commission jurisdiction.  The Court of Military Commission Review subsequently held in another case, however, that under such circumstances the military judge should conduct an evidentiary hearing to determine his own jurisdiction.  Accordingly, the military judge reconsidered and heard evidence on whether petitioner qualified as an unlawful enemy combatant.  Military Commission Ruling on Reconsideration at 1 (Ex. A to McMillan Decl., docket entry 94) (herein, "Jurisdictional Ruling").  Several witnesses testified at the hearing, stipulated testimony was introduced, and each side submitted documentary and photographic evidence.  *Ibid*.  The commission found that petitioner met the definition of "unlawful enemy combatant."

The commission found, for purposes of jurisdiction, that beginning in 1997, petitioner became bin Laden's personal driver and also served as his bodyguard.  *Ibid*.  Petitioner was aware of bin Laden's 1998 *fatwa* to 'kill Americans and their allies" and pledged "unquestioned allegiance" to bin Laden's campaign.  *Id*. at 2.  Petitioner also delivered weapons to Taliban and other fighters on bin Laden's behalf.  *Ibid*.  After the attacks of 9/11, petitioner "drove bin Laden . . . around Afghanistan . . . helping [him] escape retaliation by the United States."  *Ibid*.  On

November 24, 2001, petitioner was captured in a car carrying SA-7 surface to air missiles in the immediate vicinity of the battle to control Takta Pol, a village between Kandahar and the Pakistani border. *Id*. at 3-4.

Turning to the legal definition of unlawful enemy combatant, the commission first evaluated whether petitioner "engaged in hostilities" (10 U.S.C. § 948a). Jurisdictional Ruling at 5. The commission reasoned that Congress "intended to comply with the International Law of Armed Conflict when it enacted the [MCA]" definition and reasoned that it was well established that someone "driving . . . 'close to the front line'" to deliver ammunition to combatants was a direct participant in hostilities under the laws of war. *Ibid*.; *see id*. at 6 ("delivery of ammunition to a firing position" qualifies as direct participation in hostilities). The important considerations are the "direct causal relationship between the activity engaged in and the harm done to the enemy"; whether there is an "inten[t] to cause actual harm"; and whether the acts are intended to "hit specifically the personnel and the material of the armed forces of the adverse Party." *Id*. at 5.

The commission concluded that petitioner was "engaged in hostilities" because the battle in Takta Pol was continuing; petitioner was carrying surface to air missiles "in both temporal and spatial proximity" to that ongoing combat; and the "U.S. and coalition forces had the only air assets against which the missiles might have been used." *Id.* at 6.

The commission next considered whether petitioner was a "lawful enemy combatant." 10 U.S.C. § 948a. Petitioner did not contend that he qualified as a lawful combatant under the definition in the MCA, 10 U.S.C. § 948a(2), *i.e.*, he did not claim to be a member of the regular armed forces of a State engaged in hostilities or a member of a militia or volunteer corps that was under a responsible command and in circumstances where he was wearing a distinctive sign and carrying arms openly. *Id*. at 7. Instead, he relied on Article 4 of the Third Geneva Convention. *Ibid*. The commission concluded that there was no evidence supporting petitioner's claim under the

Geneva Convention definition: petitioner was not "a member of . . . [a] militia or volunteer corps"; he did not qualify as a "civilian accompanying the armed forces" because of his direct participation in hostilities; and he did not "engage[] in the traditional *levee-en-masse*." *Id.* at 8.

Accordingly, the military commission determined that it had jurisdiction to try petitioner. Petitioner's trial is currently scheduled to commence in seven days, on July 21, 2008.

## ARGUMENT

This Court lacks jurisdiction to entertain the challenge to the military commission proceedings raised in Hamdan's habeas petition.  Section 3 of the MCA includes a review-channeling provision, 10 U.S.C. § 950j(b), that specifically eliminates this Court's jurisdiction over "any claim or cause of action whatsoever . . . relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter."  10 U.S.C. § 950j(b).  Under the MCA, the D.C. Circuit has "exclusive jurisdiction" to review a challenge "relating to" a military commission and only after a final decision of the military commission has been reviewed by the Court of Military Commissions Review.  *See* 10 U.S.C. § 950g.  *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), which, by its terms, only applies to claims of *detention*, where detention is based solely on a non-adversarial CSRT determination that the detainee is an enemy combatant, has no bearing on this jurisdictional limitation.

Even beyond this statutory jurisdictional bar, the comity-based abstention doctrine recognized in *Councilman* would require this Court to stay its hand until the completion of the military commission process.  The doctrine bars civilian courts from interfering with ongoing military proceedings, and applies in this case because *Congress* channeled review of challenges like petitioner's to the military commission and the D.C. Circuit.   Failure to abstain would deny "due respect to the autonomous military judicial system created by Congress."  *New v. Cohen*, 129 F.3d

639, 643, (D.C. Cir. 1997).  There will be ample opportunity for an Article III court to review petitioner's legal challenge should he be convicted, at the conclusion of the military commission proceedings.  This is not a case in which no Article III court may review the constitutional and legal issues petitioner seeks to raise; the only question is *when*, and Congress has resolved that in favor of post-judgment review.  In any event, petitioner's "jurisdictional" arguments are not challenges to the military commission's jurisdiction at all – they are challenges to the *merits* of the military commission's determinations and to the charges and procedures in the military commission.  Whatever may be said of his challenges, this much is clear: they may be reviewed and resolved by the D.C. Circuit on appeal if petitioner is convicted.  This Court may, thus, resolve the case on jurisdictional or abstention grounds.

In any event, petitioner's assertions are meritless.  The military commission correctly determined, after an evidentiary hearing, that petitioner is an unlawful enemy combatant subject to trial by military commission.  Petitioner is not protected by the constitutional provisions he cites and, even if he were, his claims that they are violated are meritless.  The charges against petitioner could not possibly violate the Ex Post Facto Clause because they reflect long-standing law of war violations that Congress has codified under the Law of Nations Clause.  Nor does the MCA constitute an illegal bill of attainder.  His Due Process Clause challenge is both premature and meritless.  Finally, petitioner's claims under the equal protection component of the Due Process Clause lack merit because it is well established there is nothing improper with the national government treating aliens differently from the citizenry, particularly in an armed conflict with a foreign enemy, so long as there is a rational basis for doing so, which there plainly is in these circumstances.

The remaining preliminary injunction factors tip decidedly against the issuance of an injunction.  The prosecution of individuals suspected of war crimes is an important aspect in the

armed conflict with al Qaeda, and of United States efforts to find a long-term solution to the combatants detained at Guantanamo Bay.  Indeed, after the Supreme Court's decision in *Hamdan* in June 2006, Congress swiftly enacted the MCA to address the problems identified in *Hamdan*, and within months, the Secretary of Defense promulgated the rules and procedures for military commissions, all in an effort to ensure that combatants accused of war crimes be brought to justice as soon as possible. Putting the military commission proceedings on hold now would be contrary to these interests and hamper the government's war efforts, not to mention constitute a significant intrusion into areas within the province of the Executive Branch.  The potential violation of the separation of powers principle would be particularly egregious here because the Legislative Branch has specifically divested this Court of the power to act in this circumstance.  The government has also expended significant resources to make a trial possible next week.

By contrast, as the D.C. Circuit recently held in dismissing for lack of jurisdiction a similarly ill-timed challenge, "[t]here is no substantial public interest at stake in this case that distinguishes it from the multitude of criminal cases for which post-judgment review of procedural and jurisdictional decisions has been found effective."  *Khadr*, 2008 WL 2468496, at *6.  Petitioner has identified no irreparable harm that would be caused by requiring that his legal claims be resolved in the military commission proceedings with ultimate review, if necessary, by a fully independent Article III court.   His allegations largely boil down to arguing that the court must ensure his proceedings will be just.  However, "[t]hat interest does not warrant . . . interruption of this criminal proceeding just because it is a military commission."  *Ibid*.  Hamdan, like any criminal defendant in an Article III prosecution, must wait until after trial to mount a challenge to his conviction, if he is convicted, or the lawfulness of any decision or proceeding leading thereto.  Accordingly, the Court should deny petitioner's request to enjoin his military commission proceedings.

**PETITIONER HAS NOT CARRIED HIS BURDEN OF SHOWING THAT HE IS ENTITLED TO THE EXTRAORDINARY RELIEF OF A PRELIMINARY INJUNCTION**

As the Supreme Court reiterated in a recent habeas challenge, "[a] preliminary injunction is an 'extraordinary and drastic remedy,'" that is "never awarded as of right." *Munaf*, 128 S. Ct. at 2219. Rather, the movant must, "by a clear showing, carr[y] the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and quotation marks omitted). To obtain such extraordinary relief, the movant must establish: (1) that he is substantially likely to succeed on the merits; (2) that in the absence of an injunction, he will suffer irreparable harm for which there is no adequate legal remedy; (3) that the injunction would not substantially harm other parties; and (4) that the injunction would further the public interest. *Davenport v. Int'l Brotherhood of Teamsters, AFL-CIO*, 166 F.3d 356, 361 (D.C. Cir. 1999).

Petitioner suggests that these standards can be loosened in his case because he has presented "'a serious legal question'" (Mot. at 3 (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977)); indeed, petitioner goes so far as to suggest that the "Court need not resolve any of these legal issues" given the importance of those issues (Mot. at 10). But the Supreme Court squarely rejected that reasoning just weeks ago in *Munaf*. It is "an abuse of discretion . . . to grant a preliminary injunction on the view that the . . . issues . . . were tough, without even considering the merits." *Munaf*, 128 S. Ct. at 2219 (rejecting D.C. Circuit conclusion "that it 'need not address' the merits of Omar's habeas claim" because there was a serious argument that the court had habeas jurisdiction). Accordingly, because a preliminary injunction is "an 'extraordinary and drastic remedy,'" absent petitioner establishing that he "'a likelihood of success on the merits,'" a preliminary injunction cannot issue. *Ibid.*

## I.     PETITIONER HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

Petitioner has no likelihood of success for three separate reasons. First, this Court lacks

jurisdiction to consider petitioner's claims or issue the injunction sought.   Second, even if jurisdiction were proper, this Court would be required to abstain.  Finally, petitioner's constitutional claims, which do not go to the commission's *jurisdiction* over petitioner, lack merit.  In any event, the Court need not reach any of these constitutional questions if it denies the motion either on jurisdictional grounds or on the basis of abstention.

**A.      This Court Has No Jurisdiction to Consider Petitioner's Claim that Military Commission Proceedings Should be Enjoined.**

**1.**  Petitioner has no likelihood of success on the merits because Section 3 of the MCA includes a channeling provision, 10 U.S.C. § 950j(b), that deprives this Court of jurisdiction to consider the claims raised in petitioner's motion for a preliminary injunction.   Section 950j(b) provides that "no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever . . . *relating to the prosecution, trial, or judgment of a military commission* under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter." 10 U.S.C. § 950j(b) (emphasis added).  The provision specifies that it applies "notwithstanding any other provision of law (including section 2241 of title 28 or any other habeas corpus provision)."  *Ibid.*

In enacting section 950j(b), Congress did not simply deprive the courts of jurisdiction over such claims.  Instead, section 950j(b) serves to channel claims such as the ones raised by petitioner into the military commission process itself and subsequent appeals to an Article III court, a practice that is a familiar method of making judicial review more efficient and limiting collateral actions. *See* 8 U.S.C. § 1252(a)(5) (eliminating habeas review of removal orders and channeling review to court of appeals); *Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 114 (2d Cir. 2008) (collecting cases); *Puri v. Gonzales*, 464 F.3d 1038, 1042 (9th Cir. 2006) ("We hold that the Suspension Clause is not violated by judicial review by this court of Puri's constitutional challenges to his removal order

because the Suspension Clause does not demand an evidentiary hearing before an Article III court in lieu of judicial review of the administrative proceeding."). *Cf. INS v. St. Cyr*, 533 U.S. 289, 313 (2001) (referring to exclusive review provision "as a 'zipper clause'" designed to "consolidate 'judicial review' of immigration proceedings into one action in the court of appeals").  Accordingly, claims that are subject to section 950j(b) must first be considered by the military commission, *see*, *e.g.*, 10 U.S.C. §§ 949d(a), 949*l*(b); next such claims may be reviewed in the Court of Military Commissions Review, 10 U.S.C. §§ 950c, 950f(c); and finally review is available in the D.C. Circuit, with possible *certiorari* review by the Supreme Court.  *See* 10 U.S.C. § 950g(c), (d). Indeed, petitioner asks the Court to second-guess determinations that have been made by, or are pending before, the commission itself, precisely what Congress sought to avoid.

Petitioner does not dispute that section 950j(b) sweeps broadly (Mot. at 14-15), but he claims that it preserves claims that raise "challenges to the *jurisdiction* of the military commission."  Mot. at 15.  He suggests that otherwise, the provision would violate the Suspension Clause.  These arguments are mistaken.  First, Congress spoke in broad terms in prohibiting "any claim . . . whatsoever" that "relat[es] to the prosecution, trial, or judgment of a military commission."  A challenge to the commission's "jurisdiction . . . over . . . the defendant" (Mot. at 15) plainly "relat[es] to" the "trial" before the commission for the obvious reason that to try a defendant, the military commission must establish its jurisdiction.  In fact, after an evidentiary hearing in which petitioner fully participated, the commission specifically made the determination that petitioner is an unlawful enemy combatant *before* he was subject to trial.[2]  10 U.S.C. 948c(a).  The relief sought

---

[2]The commission is charged with making the determination whether a detainee is an "unlawful enemy combatant" over which it has jurisdiction.  10 U.S.C. § 948c; R.M.C. 201(b)(3) ("[a] military commission always has jurisdiction to determine whether it has jurisdiction"); *see Apple v. Greer*, 554 F.2d 105, 109 (3d Cir. 1977) (a "claim that there is a lack of jurisdiction can be made to a military tribunal"); *United States v. Khadr*, No.07-001, slip op. at 20 (Ct. Mil. Com. Rev. Sept. 24, 2007) ("unambiguous language of the MCA, in conjunction with a clear and compelling

here – an injunction barring the "trial" from commencing – cannot be treated as a claim unrelated

to the military trial.  *See* Motion for Preliminary Injunction Enjoining Petitioner's Trial by Military

Commission at 1 (seeking an order "enjoining the imminent military commission proceedings"

including the "trial at Guantanamo Bay [that] will begin on July 21, 2008").  The jurisdictional bar

thus clearly applies.

     If petitioner is found guilty, he has full appellate rights first to the Court of Military

Commissions Review and then to the D.C. Circuit.  10 U.S.C. §§ 950f(d), 950g(b).  In conducting

its review, the court of appeals can evaluate the legal sufficiency of the evidence underlying the

military commission's exercise of jurisdiction – it is authorized to consider whether the

commission's "final decision was consistent with the standards and procedures" for military

commissions (10 U.S.C. § 950g(c)(1)), including the standard that jurisdiction may be exercised

only over "an alien unlawful enemy combatant," 10 U.S.C. § 948d(a), as well as the standards

governing jurisdictional litigation that are set forth in the Rules for Military Commissions.  *See*

R.M.C. 905c(1) (prosecution must establish jurisdiction by "a preponderance of the evidence");

R.M.C. 905c(2)(B) (prosecution has burden to prove jurisdiction in response to a motion to dismiss

for lack of jurisdiction); *Khadr*, 2008 WL 2468496, at *5 (challenge to personal jurisdiction "is

reviewable on appeal from final judgment"); *see also Jackson v. Virginia*, 443 U.S. 307, 324 (1979)

(recognizing that a federal court may review state court judgment for sufficiency of the evidence on

direct review).  Accordingly, the jurisdictional determination made by the commission is part and

---

line of federal precedent on the issue of establishing jurisdiction in federal courts, convince us the
military judge possessed the independent authority to decide this critical jurisdictional
prerequisite"), *available at* http://www.defenselink.mil/news/Copy%20of%20CMCRKHADR.html.
*Cf. United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("a federal court always has jurisdiction to
determine its own jurisdiction").  The commission presiding over petitioner's trial determined that
it had jurisdiction in a December 2007 ruling.  Jurisdictional Ruling at 1.

parcel of petitioner's trial that is subject to direct appellate review by the D.C. Circuit and over which Congress precluded collateral review pursuant to section 950j(b).

**2.**  Section 950j(b) raises no substantial Suspension Clause issue in these circumstances for two reasons.  First, the constitutional right to habeas corpus is concerned with the core habeas right to be free from unlawful detention.  *See Munaf*, 128 S. Ct. at 2221.  But petitioner's motion does not purport to show that any aspect of his detention is unlawful.  Second, no Suspension Clause issue is raised because section 950j(b), in conjunction with section 950g, channels judicial review of petitioner's claims into the D.C. Circuit and that review is a wholly adequate substitute for habeas. *Cf. Ruiz-Martinez*, 516 F.3d at 114; *Mohammed v. Gonzales*, 477 F.3d 522, 526 (8th Cir. 2007); *Puri*, 464 F.3d at 1042; *Alexandre v. U.S. Att'y Gen.*, 452 F.3d 1204, 1206 (11th Cir. 2006).

**a.**  The Suspension Clause is concerned with the core habeas right to be free from unlawful detention, but petitioner's motion does not purport to establish that petitioner is illegally detained. It is well established that a habeas action has historically been understood as a vehicle for challenging only the fact of detention or its duration.  *See Munaf*, 128 S. Ct. at 2221.  The *Boumediene* Court recognized the essential function of habeas, which at its core is to test the legality of detention.  128 S. Ct. at 2240 (remanding to consider "questions regarding the legality of the detention").  As the Court has explained, "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see Boumediene*, 128 S. Ct. at 2277 ("first principles" secured by habeas are "freedom from arbitrary and unlawful restraint"); *id*. at 2247 ("The Clause protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account."); 3 Blackstone 131 (describing habeas as "the great and efficacious writ, in all manner of illegal confinement").[3]

_____

[3]*Cf. Bell* v. *Wolfish*, 441 U.S. 520, 527 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement,

Indeed, the *Munaf* Court – decided the same day as *Boumediene* – emphasized that "[h]abeas is at its core a remedy for unlawful executive detention. The typical remedy is, of course, release." 128 S. Ct. at 2221 (citation omitted). Accordingly, the *Munaf* Court held that "habeas is not appropriate" when the goal is not "release." *Ibid.*; *see also id.* at 2228 (Souter, J., concurring) ("habeas is aimed at securing release, not protective detention"); *cf. Aguilar v. United States Immigration and Customs Enforcement*, 510 F.3d 1, 11 (1st Cir. 2007) (distinguishing between permissible habeas challenge to detention and impermissible collateral attack on removal proceedings through habeas). It is this core constitutional function of habeas that was left intact after Congress repealed statutory habeas for Guantanamo detainees. *Boumediene*, 128 S. Ct. at 2278 (Souter, J., concurring) ("Subsequent legislation eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all.").

In holding that the Suspension Clause applies to those detained at Guantanamo, the *Boumediene* Court concluded that petitioners "are entitled to the privilege of habeas corpus to challenge *the legality of their detention*," when they have not had the benefit of an adversarial proceeding to determine their status. 128 S. Ct. at 2262 (emphasis added), 2259-60. And in evaluating whether the DTA provided an adequate substitute, the Court asked whether the "Court of Appeals has jurisdiction . . . to inquire into *the legality of the detention*." *Id.* at 2265 (emphasis added). Indeed, in significant tension with petitioner's claim that he is entitled, as a constitutional matter, to pre-trial review of the commission proceedings, the *Boumediene* Court reaffirmed the well-established requirement that "defendants in courts-martial [must] exhaust their military appeals before proceeding with a federal habeas corpus action." 128 S. Ct. at 2274; *cf. id.* at 2268 (in cases

_____

as distinct from the fact or length of the confinement itself."); *Doe* v. *Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95, 100 n.3 (3d Cir. 2008) (habeas is limited to "[a]ttacks on the fact or duration of the confinement"); *Pischke* v. *Litscher*, 178 F.3d 497, 499 (7th Cir. 1999) (stating that habeas action is proper "only if the prisoner is seeking to 'get out' of custody in a meaningful sense").

involving state court criminal proceedings, "the prisoner should exhaust adequate alternative remedies before filing for the writ in federal court") (citing *Ex parte Royall*, 117 U.S. 241, 251-52 (1886)). In sum, the purpose of constitutional habeas is to test the legality of detention, not to challenge a trial in advance.

Petitioner's motion will not succeed on the merits because he does not claim an entitlement to injunctive relief based on a claim of illegal *detention*, and the injunction he seeks will not affect his confinement in any respect. Petitioner does not claim in his motion that his detention as an enemy combatant is illegal. Instead, he concedes that the "challenge [in his instant motion for a preliminary injunction] could not possibly lead to his release" because the purpose of the motion is not to establish that his executive detention is unlawful, but instead the purpose is to halt his military trial irrespective of his continued detention. Mot. at 20.[4] Thus, he has failed to establish that he is likely to succeed in his habeas petition. *See Munaf*, 128 S. Ct. at 2219 (court erred in granting preliminary injunction after concluding that "it "need not address" the merits of Omar's habeas claims").[5]

    **b.** There is a second independent reason why section 950j(b) does not suspend the writ:

---

[4]Petitioner maintains that his habeas petition "challenges his detention as well" but concedes that his preliminary injunction motion does not raise that issue which instead "presumably must await a resolution of this motion." Mot. at 20 n.12.

[5]Section 950j(b)'s preclusion of suits *other than* habeas actions does not, obviously, violate the Suspension Clause and is not challenged by petitioner. (Similarly, section 7 of the MCA, in addition to repealing habeas jurisdiction, also precludes any "other action against the United States . . . relating to any aspect of the . . . trial . . . of" an enemy combatant like petitioner. This aspect of Section 7 was not addressed in *Boumediene* and, to the extent it precludes actions other than habeas action, also cannot run aground of the Suspension Clause.). These provisions serve to bar the other bases for jurisdiction cited in petitioner's complaint (Complaint ¶ 1). *See* Mot. at 2-3 (asserting jurisdiction under "28 U.S.C. §§ 1331, 1361, 1391, 1651, 2201, 2202, 2241-42; 5 U.S.C. § 702"). Accordingly, to the extent this Court's authority to enjoin military proceedings would derive from one of these jurisdictional grants, that jurisdiction has been repealed. *See Councilman*, 420 U.S. at 744 (reasoning, in suit to enjoin military trial, that "[p]resumably the District Court found jurisdiction under 28 U.S.C. § 1331").

with respect to military prosecutions, the MCA provides the adequate, alternative remedy for considering the claims channeled by section 950j(b) to post-trial review that was lacking in the provisions governing review of enemy combatant determinations by CSRTs.  More specifically, petitioner cannot show that habeas is needed to address *any* of the claims raised in his motion for a preliminary injunction.  Military commission proceedings are vastly different that the CSRT procedures found wanting by the Supreme Court.  First and foremost they are adversarial, which itself is a dispositive difference.  *See Boumediene*, 128 S. Ct. at 2259-60 (citing approvingly military trial with a "rigorous adversarial process" to test the legality of detention in *Eisentrager*).  And unlike CSRTs, military commissions provide adequate means for the introduction of evidence by defendants, the right to discovery, the right to call witnesses, the right to cross-examine presenting witnesses, and, most fundamentally, the presumption of innocence until proven guilty beyond a reasonable doubt.  Additionally, and for the same basic reasons, because those who are charged by military commission are provided "adequa[te] . . . process through which [their] status determination [is] made," that process is not only an adequate substitute for habeas, it satisfies the *Boumediene* Court's three-factor test such that the Suspension Clause does not apply in the first place.  128 S. Ct. at 2259; *ibid.* (distinguishing *Eisentrager*'s conclusion that the Suspension Clause does not apply because, in that case, "there had been a rigorous adversarial process to test the legality of their detention," namely, a "trial by military commission for violations of the laws of war").

*Boumediene* thus recognized that Congress could limit access to the habeas writ, in circumstances where a "trial has been held."  128 S. Ct. at 2264 (citing *Felker v. Turpin*, 518 U.S. 651, 662-64 (1996)).  Moreover, like other provisions designed to channel and streamline challenges, section 950j(b) does not "eliminate[] traditional habeas corpus relief."  *Id.* at 2265.  *Cf. Ruiz-Martinez*, 516 F.3d at 114; *Mohammed*, 477 F.3d at 526; *Puri*, 464 F.3d at 1042; *Alexandre*, 452 F.3d at 1206.  Instead, by precluding collateral attack, it simply requires that petitioner's legal

and constitutional claims be brought in the military commission forum in the first instance, with appeal to the D.C. Circuit to follow. *See Boumediene*, 128 S. Ct. at 2268 ("the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings," an idea that "accords with our test for procedural adequacy in the due process context").

Military commission proceedings, in conjunction with review by an Article III court, certainly comprise a sufficient habeas substitute for considering the covered claims. The touchstone for an adequate substitute is to provide "the prisoner . . . a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Id.* at 2266 (quoting *St. Cyr*, 533 U.S. at 302).[6] The most "relevant consideration in determining the [habeas] courts' role is whether there are suitable alternative processes in place to protect against the arbitrary exercise of governmental power." *Id.* at 2275. "What matters is the sum total of procedural protections afforded to the detainee at all stages, direct and collateral." *Id.* at 2269. Here, Congress has afforded more than adequate procedures.

First, petitioner has the tools needed in the military commission proceedings "to rebut the factual basis for the Government's" charges. *Id.* at 2269. Unlike the CSRT process at issue in *Boumediene*, the defendant has "the assistance of counsel." *Ibid.*; *see* 10 U.S.C. § 949c(b). Further, unlike the CSRT process at issue in *Boumediene*, the defendant in military commission proceedings

---

[6]One element of a habeas court's function is to "allow[] prisoners to introduce exculpatory evidence that was either unknown or previously unavailable to the prisoner" at the time an executive detention decision was made. *Boumediene*, 128 S. Ct. at 2267; *see id*. at 2270 (habeas court "must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding"). That role is not nearly so critical, and may not be necessary, in cases like this one where a defendant is represented by counsel in the initial proceedings, where those proceedings are entirely adversarial, and where the opportunity to introduce exculpatory evidence is manifestly robust. *Id.* at 2272, 2273 ("an opportunity for the detainee to present relevant exculpatory evidence that was not made part of the record in the earlier proceedings" is "constitutionally required *in this context*" where "the underlying detention proceeding lack[s] the necessary adversarial character") (emphasis added).

is "aware of the most critical allegations" against him, *i.e.*, the criminal charges and all the evidence submitted to establish them. *Boumediene*, 128 S. Ct. at 2269; *see* 10 U.S.C. § 948q(b) ("the accused shall be informed of the charges against him"); *see also* 10 U.S.C. § 949d(f) (procedures for using classified information at trial). Moreover, unlike the CSRT procedures at issue in *Boumediene*, where there were "in effect no limits on the admission of hearsay," *Boumediene*, 128 S. Ct. at 2269, the defendant in military commission proceedings is given an opportunity to challenge the use of hearsay evidence. *See* 10 U.S.C. § 949a(b)(2)(E). In sum, the proceedings are not "'closed and accusatorial,'" *Boumediene*, 128 S. Ct. at 2270, but "ha[ve] an adversarial structure that [was] lacking" in the CSRT process, *id*. at 2271. *See* 10 U.S.C. § 949d(d).

Second, the review procedures confer upon an Article III court "some authority to assess the sufficiency of the Government's evidence against the detainee." *Boumediene*, 128 S. Ct. at 2270. Specifically, in conducting its legal review, the court of appeals can evaluate the legal sufficiency of the evidence just as a federal court may do so in reviewing a state court judgment. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979). In providing for appellate review by an Article III court as of right, Congress granted protection to the accused that goes above and beyond the procedures in the UCMJ, which provides only for a petition for certiorari to the Supreme Court. *See* 10 U.S.C. §§ 867-867a. This direct appellate review in a "court of record," *i.e.*, an Article III court of general jurisdiction, is a critical factor in determining whether Congress has provided an adequate habeas substitute. *See Boumediene*, 128 S. Ct. at 2268 (placing importance on whether "relief is sought from a sentence that resulted from the judgment of a court of record").

Third, the court of appeals has ample authority to order the defendant released from punitive custody (the only custody implicated by Hamdan's challenge to the commission). The court of appeals is charged with "determin[ing] the validity of a final judgment rendered by a military commission." 10 U.S.C. § 950g. Because it is that judgment of conviction (10 U.S.C. § 949m(a))

which forms the basis of punitive detention, there is no doubt that the court of appeals has the authority to terminate punitive detention.  Likewise, if the court of appeals were to determine that the commission lacked jurisdiction, it would necessarily vacate the judgment of conviction which would also work to terminate punitive detention.

Finally, the military commission statute "allow[s] the [defendants] to assert . . . all[] of the legal claims they seek to advance" before an Article III court.  *Boumediene*, 128 S. Ct. at 2271.  And indeed, petitioner has advanced the claims he raises here in the military commission proceedings. The court of appeals has jurisdiction to consider "matters of law," including whether the conviction is consistent with military commission "standards and procedures"; whether the conviction is consistent with the "laws of the United States"; and whether the conviction is consistent with the "the Constitution."  10 U.S.C. § 950g(b) & (c).  Petitioner has raised no claim in his motion that is not fully cognizable on direct review if he is convicted by a military commission.  This is radically different from the commission previously before this Court where review lay only with the Executive as of right.  *See Hamdan*, 126 S. Ct. at 2788.  The military courts, as well as the court of appeals on direct review, will be able to consider every claim asserted by petitioner in his instant motion: those courts can determine whether the military commission lacked personal jurisdiction over petitioner (Mot. at 23-26 (arguing that petitioner not "properly determined to be [an] unlawful enemy combatant[] by a correct application of relevant law"); *see Khadr*, 2008 WL 2468496, at *6); they can decide whether, if petitioner is ultimately convicted, that conviction violates the Ex Post Facto Clause of the Constitution (Mot. at 26-31), the Law of Nations Clause (Mot. at 31-33), the Bill of Attainder Clause (Mot. at 33-37), or the Due Process Clause, including its equal protection component (Mot. at 37-45).[7]  He therefore has not shown a likelihood of establishing that section

---

[7]Petitioner also argues that a conviction would violate Common Article 3 of the Geneva Conventions. Mot. at 40-45. However, petitioner is precluded from relying on the Conventions "as

950j(b) violates the Suspension Clause when applied to his claims.

The result under the Suspension Clause is no different with respect to claims that petitioner characterizes as "jurisdictional." Such challenges are fully cognizable in commission proceedings and by the court of appeals thereafter. *Khadr*, 2008 WL 2468496, at *6 ("This Court will have opportunity to review * * * whether the commission properly determined its jurisdiction and acted in conformity with the law"). Indeed, if the rule were different, the Supreme Court's abstention jurisprudence – crystallized in *Schlesinger v. Councilman*, 420 U.S. 738 (1975) – whereby the court will abstain from involvement in most military criminal proceedings until a judgment is final – would work an unconstitutional suspension of the writ. Moreover, the same logic would invalidate *Younger* abstention so long as the challenge to state court criminal proceedings could be couched in the language of "jurisdiction." But the norm in criminal proceedings is that even "jurisdictional" challenges can be reviewed only post-conviction.

*Councilman* was itself a case where petitioner claimed that he had been charged for a crime that was "not within the military court-martial jurisdiction." *Councilman*, 420 U.S. at 740. As the Supreme Court has explained, in another case where military court jurisdiction was challenged, an exhaustion requirement in the context of a military prosecution "is [in] no sense a suspension of the writ of habeas corpus." *Gusik*, 340 U.S. at 132. Instead, it is entirely appropriate for a court to decline to resolve "the collateral attack of military judgments" when there is "an available procedure . . . to rectify the alleged error." *Id*. at 131-32.[8] The rule can be no different when Congress

a source of rights," a provision that applies to preclude invocation of the Conventions equally whether in these habeas proceedings or an appeal from a military commission verdict. 10 U.S.C. § 948b(g).

[8]*See Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 236 (1960) (petitioner first "challenged the jurisdiction of the court-martial over her" in those proceedings and, after exhausting military appeals, "filed this petition for habeas corpus"); *Grisham v. Hagan* 361 U.S. 278, 278 (1960); *Burns v. Wilson*, 346 U.S. 137, 138 (1953) ("petitioners exhausted all remedies available

channels review to a particular forum rather than when a court imposes an exhaustion requirement though its equity power – if anything, the rule has more force in such instances. *Cf. Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) ("If the statute does mandate exhaustion, a court cannot excuse it."). Indeed, there is nothing unusual or anomalous about statutory exhaustion requirements in the context of habeas review. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) (the "exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)"); *see also Gusik*, 340 U.S. at 131-32 ("The policy underlying that rule [that a habeas court will not interfere when a state court provides a remedy] is as pertinent to the collateral attack of military judgments as it is to collateral attack of judgments rendered in state courts."). And none of the handful of cases that considered collateral jurisdictional challenges while military proceedings were ongoing did so in the face of a statute requiring review to be channeled through the military proceedings.[9]

Thus, a key element cited by courts conducting immediate jurisdictional review through habeas proceedings was their concern that no impartial tribunal was otherwise open petitioners to address petitioners' claims on appeal as of right. In *Hamdan*, the Supreme Court noted that one

---

to them under the Articles of War for review of their convictions by the military tribunals"); *Gusik*, 340 U.S. at 129 ("[a]fter conviction by the court-martial petitioner exhausted all his remedies" and "[w]hen he secured no relief from the military authorities he filed this petition in which he challenges the jurisdiction of the court-martial both under the Articles of War and the Constitution"); *id.* at 131 (normally, court would "not have been justified in entertaining the petition unless the remedy afforded by the Article [of War] had first been exhausted"); *Duncan v. Kahanamoku*, 327 U.S. 304, 310-11 (1946) (both petitioners convicted by military tribunals); *Yamashita*, 327 U.S. at 5 (petitioner had been "found guilty of the offense as charged" prior to petitioning for habeas); *Ex parte Reed*, 100 U.S. 13, 20 (1879) (habeas challenging jurisdiction of court-martial sought after petitioner found guilty and sentenced by court-martial).

[9]*See Reid v. Covert*, 354 U.S. 1, 5 (1957) (one petitioner serving sentence after conviction; second petitioner awaiting retrial after conviction reversed in military appeal)*; United States ex rel. Toth v. Quarles*, 350 U.S. 11, 13 (1955) (habeas granted before trial); *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281, 282-83 (1960) (habeas granted after conviction but while military appeals pending).

important factor in determining whether to abstain was the availability of a "military court system established by Congress–with its substantial procedural protections and provision for appellate review by independent civilian judges [that] 'will vindicate service-men's constitutional rights.'" 126 S. Ct. at 2770.  Similarly, in *Burns*, the Court explained that the case "poses important problems concerning the proper administration of the *power of a civil court* to *review the judgment of a court-martial* in a habeas corpus proceeding."  *Burns*, 346 U.S. at 139 (emphasis added); *see id.* at 140 (observing that the Supreme Court "ha[s] exerted no supervisory power over the courts which enforce" military law).  And in *Quirin*, the court addressed the validity of military commission procedures that petitioners argued would "invalidate any conviction" and "render[] their detention for trial . . . unlawful" only after explaining that the governing military procedures might "preclude a later opportunity to test the lawfulness of the detention."  317 U.S. at 46-47; *see also Reid*, 354 U.S. at 39 (expressing concern for the "blending of functions in one branch of the Government"); *Toth*, 350 U.S. at 16 (Article III "designed to give judges maximum freedom from possible coercion or influence by the executive or legislative branches of the Government").  Here, these concerns are inapplicable given the statutorily authorized review of claims subject to section 950j(b) in the D.C. Circuit.  *See* 10 U.S.C. § 950g.

Thus, none of the cases that have considered habeas challenges to a military tribunal's jurisdiction justify ignoring the statutory abstention principles embodied in section 950j(b).  These decisions, including the Supreme Court's decision in *Hamdan*, do not suggest that the Constitution requires a court to disregard a statutory requirement that challenges to military commission proceedings occur in the proceeding, only to be reviewed on appeal.  There is, therefore, no basis for disregarding Congress's judgment that commissions have sufficient authority to render a "final decision," and that judicial review should await such a decision.  *See* 10 U.S.C. § 950g.

In sum, the procedures and review afforded by the MCA is far more robust than that of the

CSRTs at issue in *Boumediene*, and raises no Suspension Clause problem if it is exclusive and, with respect to the claims covered by section 950j(b), replaces traditional habeas review.  But at a minimum, there can be no Suspension Clause violation by precluding *pre-trial* habeas review of military commission jurisdiction and procedures.[10]

> **B.**    **Even if the Court has Jurisdiction, *Councilmen* Requires that the Court Abstain.**

Even if this Court has jurisdiction to grant the injunction sought, abstention is appropriate under the Supreme Court's decision in *Councilman* because this Court must give "due respect to the autonomous military judicial system created by Congress."  *New v. Cohen*, 129 F.3d 639, 643 (D.C. Cir. 1997).  Indeed, in light of the substantial procedural safeguards codified by Congress in a comprehensive military court system and Congress's clear intent to foreclose collateral attacks to

---

[10]As we have shown, section 950j(b) applies to preclude a court from collaterally considering claims that can be made as a part of the military commission process.  And we have shown that this interpretation does not raise Suspension Clause concerns in this context.  But even if section 950j(b) were viewed as raising serious Suspension Clause concerns under that interpretation, another interpretation is "fairly possible" (*St. Cyr.*, 533 U.S. at 299-300) that raises no such concerns: section 950j(b) at the very least requires *exhaustion* of military procedures and appellate review in the D.C. Circuit.  *See Gusik*, 340 U.S. at 131-32 ("The policy underlying that rule [that a habeas court will not interfere when a state court provides a remedy] is as pertinent to the collateral attack of military judgments as it is to collateral attack of judgments rendered in state courts. . . . Such a principle of judicial administration is [in] no sense a suspension of the writ of habeas corpus.").  The statute specifies that it bars claims "[e]xcept as otherwise provided in this chapter."  With that language and its focus on the procedures available in the MCA, the statute could be interpreted to foreclose collateral claims ("including section 2241" claims) *only when* MCA remedies are "otherwise provided."  Once those procedures are exhausted, they are no longer provided, and the jurisdiction strip might cease to operate.  Such an interpretation, while close to the "limits [of the] principle" of "constitutional avoidance" (*Boumediene*, 128 S. Ct. 2271), is arguably plausible given past precedent interpreting an admittedly differently-worded provisions in the UCMJ. *See Councilman*, 410 U.S. at 744 n.10 & 749 (Article 76 of the Articles of War, which specifies that "all action taken pursuant to [court martial] proceedings are binding upon all departments, courts, agencies, and officers of the United States" "only defines the point at which military court judgments become final and requires that they be given res judicata effect" but does not preclude them from being "impeached collaterally in suits otherwise within a court's subject-matter jurisdiction").

that system, it would be anomalous not to abstain.[11]

**1.** In *Hamdan*, the Supreme Court explained that "as a matter of comity, federal courts should normally abstain from intervening in pending court-martial proceedings against members of the Armed Forces." 126 S. Ct. at 2770. Thus, "federal courts should respect the balance that Congress struck between military preparedness and fairness to individual service members when it created 'an integrated system of military courts and review procedures, a critical element of which is the Court of Military Appeals, consisting of civilian judges 'completely removed from all military influence or persuasion.'" *Ibid.* (quoting *Councilman*, 420 U.S. at 758). However, as this Court observed, "whatever can be said about the Military Commission established under the President's Military Order, it is not autonomous, and it was not created by Congress." *Hamdan*, 344 F. Supp. 2d at 157. Both problems have now been solved. Indeed, four members of the *Hamdan* majority specifically recognized that "Congress . . . has the power and prerogative to" authorize a military commission trial system. *Hamdan*, 126 S. Ct. at 2800 (Kennedy, J., concurring in part); *see also id.* at 2799 (Breyer, J., concurring) ("Nothing prevents the President from returning to Congress to seek the authority he believes necessary"). And with the President and Congress acting in concert to channel review through the military proceedings, their authority "is at its maximum, for it includes all that [the President] possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube, Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Indeed, all three branches of government are in concert on this score: as this Court explained, "Hamdan is to face a military commission . . . designed . . . by a Congress that . . . act[ed] according to guidelines laid down by the Supreme Court." *Hamdan v. Rumsfeld*, 464 F. Supp. 2d 9, 18 (D.D.C. 2006).

---

[11]*Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 89-90 (1998), does not prohibit the Court from addressing abstention prior to the jurisdictional arguments presented in Section I.A. Thus, the Court can, if it so chooses, resolve this case on abstention grounds without deciding the jurisdictional issues discussed above.

In the MCA, as we have explained, Congress created an autonomous military judicial system to try unlawful enemy combatants, with a right of appeal to an Article III court. The review provided here is even more "removed from all military influence or persuasion" than was the case in *Councilman* and other cases involving court-martial proceedings: whereas those procedures provided for "appellate review by independent civilian judges," *Hamdan*, 126 S. Ct. at 2770, the MCA provides for review by an Article III court (10 U.S.C. § 950g), the most "independent review" forum possible. *Id.* at 2771; *see Boumediene*, 128 S. Ct. at 2268 (requiring the prisoner to "exhaust adequate alternative remedies before filing for the writ in federal court" is "justified because . . . . the prisoner already has had a chance to seek review of his conviction in a federal forum through a direct appeal").[12] If anything, Congress's decision to channel review to a *superior* federal court should militate even more strongly in favor of abstention. *See Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals").

In fact, in providing the requisite congressional authorization, the MCA also fully addressed other structural and procedural flaws identified in *Hamdan*. For example, whereas the prior tribunal convened to try petitioner was not part of the integrated system of military courts with independent review panels that Congress has created,[13] *see Hamdan*, 126 S. Ct. at 2771 (noting that the prior

---

[12]The scope of review authorized by the MCA is also modeled on the "plenary review exercised by the Court of Appeals for the Armed Forces." *Hamdan*, 126 S. Ct. at 2771 n. 19. Both courts may "act[] only with respect to matters of law." 10 U.S.C. § 867(c); *see* 10 U.S.C. § 950g(b) (same). And, as we have explained, the authority of the court of appeals to consider whether the military commission decision is "consistent with the standards and procedures" of the MCA, with the "laws of the United States," and with "the Constitution" (10 U.S.C. § 950g(c)) allows the sort of "plenary review" of legal issues to which the *Hamdan* majority spoke.

[13] The independent judicial review provided by the DTA was not applicable in Hamdan's case because the Supreme Court found that the DTA did not apply to cases pending at the time of

review bodies "lack the structural insulation from military influence that characterizes the Court of Appeals for the Armed Forces, and thus bear insufficient conceptual similarity to state courts to warrant invocation of abstention principles"), now the military commission judges are the same military judges who sit for courts-martial, and a final decision of the military commission may now be appealed as of right to the D.C. Circuit,[14] 10 U.S.C. § 950g(a), with Supreme Court review available by writ of certiorari, *id.* § 950g(d).

Similarly, whereas petitioner in *Hamdan* argued that he would be excluded from his own trial, *see Hamdan*, 126 S. Ct. 2788, and denied access to evidence against him in the form of protected information, *id.* at 2787, the MCA grants that same accused the right to "be present at all sessions of the military commission," 10 U.S.C. § 949a(b)(1)(B) and to have access to all the evidence admitted before the trier of fact, *see id.* § 949a(b)(1)(A).[15]  Hamdan can make no argument here that he will be excluded from any hearing at his upcoming public trial.

At bottom, as this Court has recognized, *see Hamdan*, 464 F. Supp. 2d at 18, the MCA and the Manual for Military Commissions ("MMC") promulgated thereunder cured what the Supreme Court in *Hamdan* found to be the most fundamental structural flaw in the prior military commission system – it "operate[d] free from many of the procedural rules prescribed by Congress for courts-

---

the DTA's enactment.  *Hamdan*, 126 S. Ct. at 2762-69.

[14]  Previously, under the DTA, D.C. Circuit review was automatic only with respect to a capital case or a case in which the alien was sentenced to a term of imprisonment of 10 years or more.  *See* DTA, § 1005(e)(3) (2005).

[15]  Of course, consistent with federal court practice, the accused may be excluded where his own conduct requires his exclusion, 10 U.S.C. § 949a(b)(1)(B), or from *in camera* and *ex parte* presentations to the military judge (who is not a trier of fact) related to information that is classified or subject to a national security privilege.  *See Holy Land Found. v. Ashcroft*, 333 F.3d 156, 163-64 (D.C. Cir. 2003) (classified information withheld in case under International Emergency Economic Powers Act); *compare* Classified Information Procedures Act ("CIPA"), Pub. L. No. 96-456, 94 Stat. 2025, § 4 (1980), *with* 10 U.S.C. § 949d(f)(2)(C) and MCRE 505(e)(3).  Even then an unclassified substitution may be required for the classified information.  10 U.S.C. § 949d(f)(2)(A).

martial – rules intended to safeguard the accused and ensure the reliability of any conviction." *Hamdan*, 126 S. Ct. at 2772; *see id.* at 2800 (Kennedy, J., concurring in part) ("If Congress, after due consideration, deems it appropriate to change the controlling statutes, in conformance with the Constitution and other laws, it has the power and prerogative to do so.").   Congress has now "stepped up to its responsibility, acting according to guidelines laid down by the Supreme Court." *Hamdan*, 464 F. Supp. 2d at 18.   There can be no serious doubt as to the validity of the present military commission system; and thus, abstention is required, not only by statute but also under *Councilman*.

    **2.**   As the Court recognized in *Hamdan*, abstention is appropriate unless a petitioner makes a "substantial argument[] denying the right of the military to try them at all" because the "legal challenge 'turn[s] on the status of the person[] as to whom the military asserted its power.'" 126 S. Ct. at 2770 n. 16 (quoting *Councilman*, 420 U.S. at 759).   However, the invocation of "jurisdictional" challenges is not talismanic.   Rather, courts should decline to abstain only when "there is a substantial question whether a military tribunal has personal jurisdiction over the defendant."   *Ibid*.   Importantly, a claim that the military tribunal "lack[s] jurisdiction" over the subject matter of the case – the criminal charges at issue – does *not* warrant abstention, as was the case in *Councilman* itself.   420 U.S. at 741.

    All of petitioner's claims, save one, do not concern the military commission's personal jurisdiction over him.   Three of petitioner's claims challenge the charges brought against him as violating the Constitution: he argues that the criminal provisions he is alleged to have violated, as applied to him, violate the Ex Post Facto Clause; he claims that the Congress lacked the power under the Law of Nations Clause to criminalize his offenses; and that the MCA constitutes an unconstitutional bill of attainder.   Mot. at 26-37.   His remaining claims are that the commission procedures violate the Due Process Clause, including its equal protection component, and the

Geneva Conventions.  Mot. at 37-45.  Petitioner does not claim that any of these challenges address the military commission's "personal jurisdiction" over him – the only sort of claim that warrants abstention.  Instead, petitioner urges that the commission lacks "subject-matter jurisdiction" based on his Ex Post Facto Clause, Law of Nations Clause, and bill of attainder claims.  Mot. at 26, 31, 33, 37.  He makes no attempt to argue that his equal protection, due process, or Geneva Convention claims are jurisdictional.  These are, of course, precisely the types of *merits* arguments properly presented to the commission itself, and then the D.C. Circuit on ultimate appeal.

Even assuming petitioner's challenges went to the military commission's subject matter jurisdiction, a dubious proposition, such challenges are no different than those in *Councilman* itself, where the Court required abstention in a case where the defendant "contend[ed] that the court-martial lacked jurisdiction" over the "alleged offenses" because the Constitution did not confer authority on the commission to try such offenses by court-martial.  420 U.S. at 741, 744; *see O'Callahan v. Parker*, 395 U.S. 258 (1969), *overruled by Solorio v. United States*, 483 U.S. 435 (1987); *Cf. United States v. Hollywood Motor Car Co., Inc.*, 458 U.S. 263, 271 (1982) (per curiam) ("in the run of cases, the correctness of a trial court's rejection even of a constitutional claim made by the accused in the process of prosecution must await his conviction before its reconsideration by an appellate tribunal") (internal quotations omitted); *United States v. Baucum*, 80 F.3d 539, 540 (D.C. Cir. 1996) (trial court not deprived of jurisdiction even if a statute forming the basis of criminal prosecution is unconstitutional); *Deaver v. Seymour*, 822 F.2d 66 (D.C. Cir. 1987) ("That [defendant's] challenge is a serious one with far-ranging and troubling constitutional implications does not support his argument for accelerated and unorthodox judicial review.").[16]  Accordingly,

---

[16]Constitutional challenges to the propriety of criminal proceedings are routinely reviewed either on direct appeal or in post-conviction proceedings.  *See United States v. Alston-Graves*, 435 F.3d 331 (D.C. Cir. 2006) (due process and ex post facto challenges); *United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994) (equal protection challenge).

these claims, even if viewed as substantial and involving "subject-matter jurisdiction," do not relate to the personal jurisdiction of the commission to try petitioner, *i.e.*, they have nothing to do with the "'status of the person[] as to whom the military asserted its power.'" 126 S. Ct. at 2770 n. 16 (quoting *Councilman*, 420 U.S. at 759). Petitioner's only claim that relates to personal jurisdiction is his claim that the military commission erred in concluding that petitioner is an unlawful enemy combatant "based on a misapplication of relevant law." Mot. at 24. But abstention is appropriate for that claim as well.

First, petitioner has not made a substantial showing that the military commission lacks personal jurisdiction, as is required to evade abstention. *Hamdan*, 126 S. Ct. at 2772 n. 20. Petitioner argues that the military commission "made a finding of unlawful enemy combatancy . . . based on a misapplication of relevant law." Mot. at 24. But he does not explain how the commission erred in applying the standards set forth in 10 U.S.C. § 948a(2). *See Mot.* at 24-25. Instead, he states that the commission failed to consider constitutional arguments; misapplied the Geneva Conventions; and denied petitioner's request for three live witnesses. *Ibid.* None of these issues relate to the application of the governing legal standard for establishing the commission's personal jurisdiction, 10 U.S.C. § 948a.[17] Indeed, in the commission proceedings, the military commission explained that petitioner "*does not* argue that he is entitled to lawful combatant status" under the requirements of 10 U.S.C. § 948a(2), but instead claimed Article 4 of the Third Geneva Convention precludes his trial as an unlawful enemy combatant. Jurisdictional Ruling at 7-8. But

---

[17]Petitioner's constitutional issues are the same issues as are addressed elsewhere in the motion and this response. As to the witness subpoenas, the commission has broad discretion in resolving such evidentiary matters, and petitioner concedes that the motion was denied based upon timeliness. Mot. at 44 n.38. In any event, petitioner has not substantiated this claim in his pleading and concedes that he was eventually able to get "written answers" from the most important witness that included the "relevant and exculpatory information." *Ibid.* Nothing would prevent petitioner from seeking reconsideration by the commission of the jurisdictional ruling based upon those answers if they are in fact as critical as he asserts.

the standard governing the commission's personal jurisdiction is the one set out in the statute, not the one in Article 4, which does not apply to this armed conflict (*see Hamdan*, 126 S. Ct. at 2795 (holding only that Common Article 3 applies to the conflict with al Qaeda)), and which confers no substantive rights on petitioner.  10 U.S.C. § 948b(g) ("No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights."); *see also* MCA § 5.

The legal arguments petitioner summarily makes with respect to his unlawful combatant status are meritless under the applicable standards of section 948a.  First, petitioner claims that he was "not a member of the armed forces of any nation at war with the United States."  Mot. at 25.  But, as section 948a makes plain, a combatant is defined not only as a formal member of the military but also any "person who has engaged in hostilities" or has "purposefully and materially supported hostilities."  10 U.S.C. § 948a(1).  Congress's statutory definition reflects the background law of war principles discussed in *Hamdan* and in any event, the statute would control over any previously ratified treaty, *see*, *e.g.*, *Breard v. Greene*, 523 U.S. 371, 376 (1998); *Reid*, 354 U.S. at 18 (plurality opinion).  Moreover, the text of Common Article 3 recognizes that a nation may be engaged in an armed conflict against a non-state actor, and the Supreme Court's decision in *Hamdan* applied Article 3 to the particular armed conflict against al Qaeda.  Petitioner also argues that he cannot be found to be an enemy combatant based simply on "[a]ffiliation with or membership in a terrorist organization."  Mot. at 25.  But the commission found much more than simple affiliation – it concluded that petitioner was directly participating in hostilities by transporting surface-to-air missiles in an active combat zone that could only be used to shoot down American or coalition planes.  Jurisdictional Ruling at 6-7.  This conclusion also contradicts petitioner's unsupported

assertion that he did not "participate[] directly . . . in any hostilities." Mot. at 25.[18] Thus, petitioner

has not presented a substantial likelihood of success on the claim that the commission lacks personal

jurisdiction.

In any event, abstention is appropriate because petitioner does not and cannot allege that

"Congress had no constitutional power to subject [him] to the jurisdiction of courts-martial."

*Councilman*, 420 U.S. at 759.   Instead, he concedes that the military *does* have jurisdiction to

prosecute him. Mot. at 24 (arguing that "[u]nder the facts adduced at the hearing" he is entitled to

"POW status"); *id.* at 23 (arguing that as a POW, his "trial . . . must be before a court-martial");

*Hamdan*, 126 S. Ct. at 2759 ("He concedes that a court-martial constituted in accordance with the

[UCMJ] . . . would have authority to try him."); *Hamdan v. Rumsfeld*, 415 F.3d 33, 37 (D.C. Cir.

2005) ("he does not deny the military's authority to try him").   Thus, this is not a case where "[t]he

issue presented concerned not only the military court's jurisdiction, but *also* whether under Art. I

Congress could allow the military to interfere with the liberty of civilians even for the limited

purpose of forcing them to answer to the military justice system."   *Councilman*, 420 U.S. at 759

(emphasis added); *see Quirin*, 317 U.S. at 41 (recognizing the established "practice of trying, before

military tribunals without a jury, offenses committed by enemy belligerents against the law of war").

Moreover, because petitioner is being detained as an enemy combatant, there is no "disruption

caused to petitioner['s] civilian lives and the accompanying deprivation of liberty" which make "it

'especially unfair to require exhaustion.'" *Councilman*, 420 U.S. at 759 (quoting *Noyd v. Bond*, 395

U.S. 683, 696 n.8 (1969)); *see Khadr*,   2008 WL 2468496 at *6 (reasoning that "[t]here is no

substantial public interest at stake in this case [where Khadr challenged a military commission's

---

[18]In a footnote, petitioner argues that he was not an unlawful combatant.  Mot. at 25 n.16.
But other than quoting inapplicable provisions of the Geneva Conventions, he does not explain how
he qualifies under the definition of 10 U.S.C. § 948a(2).

personal jurisdiction and sought interlocutory review of that determination] that distinguishes it from the multitude of criminal cases for which post-judgment review of procedural and jurisdictional decisions has been found effective"). Given section 950j(b) it would be particularly anomalous not to at least require petitioner to exhaust his claims in the process contemplated by Congress. The *Boumediene* Court also contemplated that in the normal course, habeas review would only be appropriate after an exhaustion of other remedies. 128 S. Ct. at 2275-76. Indeed, such exhaustion of remedies before habeas relief may be pursued is the norm. *See* 28 U.S.C. § 2254(b)(1).

Further, the substance of petitioner's personal jurisdiction claim is merely that the commission misapplied the law to the facts after an adversarial proceeding, including an evidentiary hearing. The determination that petitioner is an unlawful enemy combatant was made by the commission *before* it exercised its jurisdiction actually to *try* petitioner. Such a routine claim that is intimately tied to the facts that give rise to his prosecution is precisely the sort of issue that falls comfortably within the commission's expertise and should be resolved by the commission in the first instance, even though it pertains to the issue of the court's personal jurisdiction. *See Councilman*, 420 U.S. at 759 (observing that another reason the court declined to abstain was because the court "'did not believe that the expertise of military courts extended to the consideration of constitutional claims of the type presented'") (quoting *Noyd*, 395 U.S. at 696 n.8); *id.* at 760 (exhaustion necessary when resolution of claims depends on the "precise set of facts in which the offense has occurred"); *United States ex rel. Guagliardo v. McElroy*, 259 F.2d 927, 929 (D.C. Cir. 1958) (exhaustion required when claim pertains to "alleged errors in the court-martial proceedings"), *aff'd*, 361 U.S. 281 (1960); *see also Apple*, 554 F.2d at 109 (a "claim that there is a lack of jurisdiction can be made to a military tribunal").

In sum, petitioner provides no reason to displace the military court in conducting its assigned role or to preempt the appellate review to which petitioner is entitled under the MCA.

**C.      Petitioner Is Not Likely to Succeed Because His Constitutional Challenges to the Military Commission Process Have No Merit**

If the Court concludes either that it lacks jurisdiction over petitioner's challenge at this juncture, or that abstention is required out of respect for the autonomous and comprehensive military justice system established by Congress, that is the end of the matter and the court need go no further. Should the court reach the merits, for the reasons set forth in Section I.B.2., the military commission has personal jurisdiction.  And, as set forth below, petitioner has little likelihood of success on his constitutional claims and thus the motion should be denied.

**1.  Petitioner Can Claim No Benefit From the Constitutional Provisions He Cites.**

As an initial matter, the constitutional provisions cited by petitioner do not apply to him, since he is an enemy combatant who has not established any voluntary connection but instead is at war with the United States.  In *Boumediene*, the Court addressed a narrow question under the Suspension Clause.  The Court signaled no intention of extending the individual rights protections of the Constitution to alien enemy combatants tried by military commission.  To the contrary, the Court emphasized that "[i]t bears repeating that our opinion does not address the content of the law that governs petitioners' detention." *Boumediene*, 128 S. Ct. at 2240; *see also id*. at 2277.

Thus, *Boumediene* did not upset the well-established holding that the Fifth Amendment and other individual rights secured by the Constitution do not apply to alien enemy combatants lacking any voluntary connection to the United States.  The Supreme Court has recognized that the writ of habeas corpus historically has had an "extraordinary territorial ambit." *See Rasul v. Bush*, 542 U.S. 466, 482 n.12 (2004).  By contrast, the Court has made clear that the individual rights provisions of the Constitution run only to aliens with a substantial connection to our country and not to alien enemy combatants detained abroad. *See United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990); *Eisentrager*, 339 U.S. at 783.

Indeed, even when an alien is found within United States territory the degree to which constitutional protections apply depends on whether the alien has developed substantial voluntary contacts with the United States. *Verdugo-Urquidez*, 494 U.S. at 271. Nothing in *Boumediene* casts doubt on these well-established holdings that the Constitution does not apply in toto to nonresident aliens. *Boumediene* certainly does not extend the Constitution's individual-rights protections, contrary to *Eisentrager*, *Verdugo-Urquidez* and other cases, to alien unlawful enemy combatants before congressionally-constituted military commissions. To paraphrase the *Boumediene* Court itself, "if the [petitioner's] reading of [*Boumediene*] were correct, the opinion would have marked not only a change in, but a complete repudiation of" long-standing precedent. *Id*. at 2258.

Because the Supreme Court did not disturb those holdings in *Boumediene*, they remain binding precedent. *See Agostini v. Felton*, 521 U.S. 203, 237-38 (1997) ("[i]f a precedent of this Court has direct application in a case, yet appears to rest on reason rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"). Contrary to *Agostini*, however, petitioner would read *Boumediene* as, *sub silentio*, overruling the Court's existing precedents and providing a multi-factored test for the analysis of other constitutional rights. It is clear, however, that the test enunciated by the Court to determine whether the Suspension Clause applied to the *Boumediene*-petitioners was specifically geared to measuring whether the Suspension Clause—and not any other constitutional provision—applies to those petitioners. *See* 128 S. Ct. at 2237. That three-part test was clearly intended by the Court only to resolve the specific issue before it, and is therefore inapposite to the question of whether others portions of the Constitution apply to alien detainees at Guantanamo. Even so, under that functional analysis endorsed in *Boumediene* for purposes of the Suspension Clause, it is clear that enemy aliens abroad who have not established any voluntary connection with the United States do not come within the protection of the various constitutional

provisions cited by petitioner.   The Government has broad latitude when it operates in the international sphere, where the need to protect the national security and conduct our foreign relations is paramount.  *See Haig v. Agee*, 453 U.S. 280, 292, 307-08 (1981); *see also Palestine Information Office v. Schultz*, 853 F.2d 932, 937 (D.C. Cir. 1988).

With respect to the Due Process Clause and its equal protection component, it is well established that they do not apply to someone in petitioner's position who has established no voluntary contacts with the United States. *Verdugo*, 494 U.S. at 271.  This petitioner's contacts with the United States, which consist solely of unlawfully waging war against the nation and being detained in a U.S. military base, "is not of the sort to indicate any substantial connection with our country." *Id.*; *see Eisentrager*, 339 U.S. at 783 (finding "no authority whatever for holding that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses"); *Hamdan*, 464 F. Supp. 2d at 18-19.  As the *Eisentrager* Court explained, "[i]f [the Fifth] Amendment invests enemy aliens in unlawful hostile action against us with immunity from military trial, it puts them in a more protected position than our own soldiers" because "American citizens conscripted into the military service are thereby stripped of their Fifth Amendment rights and as members of the military establishment are subject to its discipline, including military trials for offenses against aliens or Americans."   339 U.S. at 783. Similar reasoning also should preclude petitioner from seeking the benefit of the Ex Post Facto Clause, the Bill of Attainder Clause, and the Law of Nations Clause.  Accordingly, petitioner has not established that the various constitutional provisions he cites apply to him.[19]

---

[19]Petitioner's assertion of constitutional rights would also, oddly, endow nonresident alien enemies with far greater protections than resident enemy aliens have had since the Founding.  The Enemy Alien Act, 50 U.S.C. § 21, has, since 1798, allowed the Executive to detain enemy aliens after summary process, a practice upheld against constitutional challenge on due process grounds. *See Ludecke v. Watkins*, 335 U.S. 160, 171-72 (1948).

Drawing a distinction between aliens abroad, on the one hand, and those who make up part of our political community, on the other hand, is a basic feature of sovereignty. *See Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982); *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978); *cf. Mathews v. Diaz*, 426 U.S. 67, 80, 85 (1976) (recognizing that it is "a routine and normally legitimate part" of the business of the Federal Government to classify on the basis of alien status and to "take into account the character of the relationship between the alien and this country"). In this context, application of these various constitutional principles to aliens who have established no voluntary contact with the United States would interfere with the role of the political branches to implement our foreign policy and successfully prosecute a foreign war.

For the reasons explained, we believe that it is neither necessary nor appropriate for the Court to weigh and rule on the applicability of each and every constitutional claim raised by petitioner. In view of the pendency of petitioner's trial, however, we summarize here why, even if these various constitutional provisions applied, petitioner has failed to show that they will be violated by the military commission.

1.    **The MCA Does Not Violate the Ex Post Facto Clause because the Offenses for which Petitioner is Charged are Well-Established Violations of the Law of War**

Petitioner has been charged by military commission with conspiring with Usama bin Laden and other members of the al Qaeda organization to commit a number of offenses subject to trial by military commission, including attacking protected persons and property, hijacking or hazarding a vessel or aircraft, and murder in violation of the laws of war, all in violation of 10 U.S.C. § 950v(b)(28). Charge Sheet, at pp. 3-4. He has also been charged with providing material support to terrorism, by providing personnel, *i.e.*, himself, and services to al Qaeda, in violation of 10 U.S.C. § 950v(b)(25). Charge Sheet, at pp. 4-7.

These offenses and others were codified through the MCA in 2006, although they have deep

historic roots as violations of the laws of war that have been addressed not only by military commissions but by other war crimes tribunals.  Indeed, Congress specifically found that the MCA "codif[ied] offenses that have traditionally been triable by military commissions.  [The MCA] does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission."  10 U.S.C. § 950p; *see Quirin*, 317 U.S. at 30 ("Congress had the choice of crystallizing in permanent form and in minute detail every offense against the law of war, or of adopting the system of common law applied by military tribunals").  Notwithstanding this clear congressional interpretation of the law of war, petitioner asserts (Mot. at 26) that the offenses with which he is charged violate the Constitution's prohibition against ex post facto laws.

Petitioner's assertion is without merit, and certainly does not present the substantial likelihood of success that would justify enjoining the Military Commission scheduled to try him.  The MCA does exactly what Congress said it was doing—it codifies longstanding violations of the law of war for these commissions rather than creating new offenses.  The MCA's codification of such proscribed conduct does not violate the Ex Post Facto Clause, *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70 (1994), and thus petitioner has not met his burden of demonstrating a substantial likelihood of success on the merits.

Before addressing the merits of petitioner's assertion that conspiracy and material support were not violations of the law of war prior to the MCA, it is necessary to address the effect of 10 U.S.C. § 950p.  The defendant gives short shrift to this statute, declaring that "this bootstrapping provision cannot cure the Ex Post Facto Clause violation," Pet. Mot. at 27, before offering his interpretation of international law.  But the Constitution expressly grants to *Congress* the authority to "define and punish . . . Offenses against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10.  *See also Hamdan*, 126 S. Ct. at 2809 (2006) (Kennedy, J., concurring in part) (refusing to join the plurality's opinion that conspiracy is not a violation of the law of war because "Congress, not the

Court, is the branch in the better position to undertake the 'sensitive task of establishing a principle not inconsistent with the national interest or international justice'") (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964)).  This Court thus owes substantial deference to the legislative branch's judgment about what offenses have constituted long-standing violations of the laws of war.

### a.   The offense of conspiracy was a violation of the law of war even prior to the MCA's enactment.

Petitioner asserts as a preliminary matter that "[i]n this very case, the Supreme Court has already held that Conspiracy is not an offense against the law of war that is triable by commission." Pet. Mot. at 28 (citing *Hamdan*, 126 S. Ct. at 2780–81).  This assertion is disingenuous – only four Justices in *Hamdan* would have held that conspiracy was not a recognized violation of the law of war in the absence of congressional legislation, and thus not triable by the commissions then constituted.  *See id.* at 2780–81.[20]  Needless to say, it is well-established that the opinion of plurality does not constitute a holding of the Court.  *See Horton v. California*, 496 U.S. 128, 136 (1990). Accordingly, contrary to petitioner's claims, the Supreme Court has not held that conspiracy is not an offense against the law of war.  Nor does the plurality's conclusion regarding conspiracy's status as a violation of the law of war constitute law of the case for petitioner.  *See Ex parte Discount Foods, Inc.*, 789 So. 2d 842, 845-46 & n.4 (Ala. 2001) (holding that a court is not required to defer, under the doctrine of "law of the case," to prior plurality decisions in that case).

To the extent that *Hamdan* says anything about the issue, it reflects the Court's broad agreement that this is a matter within Congress's authority under the Law of Nations Clause.  Three justices would have expressly held that conspiracy was a violation of the law of war.  *See Hamdan*,

---

[20]Justice Kennedy specifically declined to adopt the plurality's view, noting that it was for Congress to determine.  *Id.* at 2809 (Kennedy, J., concurring in part).

126 S. Ct. at 2834 (Thomas, J., dissenting). Justice Kennedy, who declined to join the plurality, expressly noted that "Congress, not the Court, is the branch in the better position to undertake the sensitive task" of determining whether conspiracy is a war crime). *See id.* at 2809 (Kennedy, J., concurring) (internal quotation marks omitted). And the plurality emphasized, in reaching their conclusion, that Congress had not expressly determined that conspiracy was a law of war violation. *See Hamdan*, 126 S. Ct. at 2779-80 (emphasizing that "there is no suggestion that Congress, in exercise of its constitutional authority to 'define and punish . . . Offences against the Law of Nations,' U.S. Const., Art. I, § 8, cl. 10, positively identified 'conspiracy' as a war crime"). Thus, it is not even clear that those justices would continue to adhere to this view now that Congress has acted pursuant to the Law of Nations clause and *Hamdan* should be read as recognizing Congress's discretion over the issue.

In addition, and contrary to petitioner's claim, the plurality's view is not an accurate description of conspiracy and the law of war and, in any event, it is hardly so clear as to preclude the exercise of congressional power under the Law of Nations Clause. Throughout the history of the United States, individual enemy combatants have been tried before military commissions for conspiring to commit war crimes. Both the Nazi saboteurs in *Ex parte Quirin*, 317 U.S. 1, 23 (1942), and the saboteur in *Colepaugh v. Looney*, 235 F.2d 429, 431-33 (10th Cir. 1956), were charged with conspiracy. Conspiracy was recognized as an offense against the laws of war, and triable by military commission, in the authoritative treatise of Colonel William Winthrop, "the Blackstone of Military Law." *Reid v. Covert*, 354 U.S. 1, 19 (1957). In that late-nineteenth-century work, Winthrop listed examples of conspiracies against the law of war triable by military commission. *See* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 839 & n.5 (2d ed. 1920)

(originally published 1895).[21]

Given this history, there was ample precedent from which Congress might reasonably conclude that conspiracy was a recognized violation of the law of war.  In such circumstance, it is for *Congress* to "define" what the law of war requires, *id.* at 2809 (Kennedy, J., concurring in part), and that determination is entitled to substantial deference.

b.    **Providing material support to terrorists is an application of long-standing rules of the law of war to the present conflict.**

Petitioner also asserts that the charge of material support to terrorism is a new offense, created by the MCA, and not a recognized violation of the law of war.  This claim is meritless.  Congress has used the term "terrorist" to define the subset of enemy combatants with which we are at war—as is its prerogative under the Constitution—but that subset is well-established in the law of war.  Terrorists are either "guerillas" (or other irregular forces), or are persons who violate the most fundamental tenet of the law of war by intentionally targeting civilians, or are both.

Irregular forces were, under the laws of war, subject to summary punishment.  Lieber Code

---

[21]Petitioner's overly restrictive view of conspiracy as a violation of the law of war is contradicted by recent international practice.  The International Military Tribunal established to try major Nazi war criminals after World War II did try, and convict, some defendants of conspiring to wage aggressive war, *see Hamdan*, 126 S. Ct. at 2784 (plurality opinion), and, as the *Hamdan* plurality admitted, conspiracy to commit genocide has been recognized as a war crime, *id.* (plurality opinion).  In fact, the Tribunal also convicted several organizations on a group liability theory that was virtually indistinguishable from that of conspiracy.  *See* 1 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL 256 (1947)  ("A criminal organisation is analogous to a criminal conspiracy in that the essence of both is cooperation for criminal purposes."); 3 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10 ("THE JUSTICE CASE") 1029 (1951) (applying same principle in subsequent war crimes trial); *see also* TELFORD TAYLOR, THE ANATOMY OF THE NUREMBERG TRIBUNALS: A PERSONAL MEMOIR 584–85 (1992); Allison Marston Danner & Jenny S. Martinez, *Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law*, 93 CAL. L. REV. 75, 102–17 (2005) ("Although the term 'common plan' (which is used synonymously in contemporary international criminal law cases with 'joint criminal enterprise') appears in the Nuremberg Charter, Indictment, and Judgement, it was not discussed in these documents separately from conspiracy.").

¶ 82, *Instructions for the Government of Armies of the United States in the Field*, Gen. Order No. 100 (1863); *see* FRANCIS LIEBER, GUERILLA PARTIES CONSIDERED WITH REFERENCE TO THE LAWS AND USAGES OF WAR 7 (1862) ("[A] guerilla party means an irregular band of armed men, carrying on an irregular war, not being able, according to their character . . . to carry on what the law terms a *regular* war"). As Winthrop explained, "[i]rregular armed bodies or persons not forming part of the organized forces of a belligerent . . . are not in general recognized as legitimate troops or entitled, when taken, to be treated as prisoners of war, but may upon capture be summarily punished even with death." WINTHROP, *supra*, at 783.

Not surprisingly, "engaging in illegal warfare as a guerilla" and acts of sabotage were among the offenses that Winthrop noted were "cognizable by military tribunals only." *Id.* at 839-40; *see also id.* at 784 (guerillas were "liable to be shot, imprisoned or banished, either summarily when their guilt was clear or upon trial and conviction by military commission"). Under any reasonable interpretation of the law of war, terrorism committed in furtherance of armed conflict is a war crime. And like its guerilla forebears, al Qaeda's operations constitute terrorism in violation of the law of war, subject to trial by military commission.[22]

The other characteristic of terrorism – the intentional targeting of civilians – is a violation of the most fundamental law of war. One element of the MCA definition of terrorism is a person who "intentionally kills . . . one or more protected persons," *i.e.*, among others, "civilians." 10 U.S.C. § 950v(a)(2) & (24). The intentional targeting of civilians is and has always been a heinous

---

[22]It is difficult to imagine a crime more offensive to the law of war than what occurred on September 11, 2001, when al Qaeda operatives hijacked commercial aircraft and used them to kill almost 3,000 people. Indeed, the United Nations has repeatedly denounced al Qaeda's actions in particular as war crimes. *See, e.g.*, S.C. Res. 1189 (Aug. 13, 1998); S.C. Res. 1267 (Oct. 15, 1999); S.C. Res. 1333 (Dec. 19, 2000); S.C. Res. 1390 (Jan. 16, 2002); S.C. Res. 1455 (Jan. 17, 2003); *see also* S.C. Res. 1373 §§ 1–5 (Sept. 28, 2001) (condemning international terrorism as a threat to international security and calling on member states to criminalize material support for terrorism).

war crime.  *See* Lieber Code, ¶ 44 ("All wanton violence committed against persons in the invaded country . . . all rape, wounding, maiming, or killing of such inhabitants, are prohibited under the penalty of death").

Just as terrorism is a specific application of the well-established law of war prohibitions against guerilla activity or targeting civilians under the law of war, the provision of material support to such groups is also a specific definition of offenses of long-standing vintage.  Indeed, the provision to guerillas of the type of material support charged in petitioner's case – that of personnel, *i.e.*, oneself – has long been tried by military commission as a violation of the law of war.  *See, e.g.*, *Military Commissions*, 11 Op. Att'y Gen. 297, 312 (1865) ("[T]o unite with . . . guerillas, or other unauthorized marauders is a high offence against the laws of war; the offence is complete when the band is organized or joined."); U.S. WAR DEP'T, GENERAL COURT MARTIAL ORDER (GCMO) No. 51, at 1 (1866) (charging defendant by military commission with "being a guerilla"); GCMO No. 93, at 9 (1864) (charging defendant by military commission with joining "a band of insurgents and armed rebels").[23]  Providing other types of support to irregular armed forces is an equally long-

---

[23]  In defining the MCA offenses, Congress was compelled to translate the common law of war as it was understood and practiced by the United States in the context of the law of belligerents into the context of the struggle against terrorism, which is generally a transnational armed conflict against non-state actors.  "Providing material support for terrorism" is a broad statutory restatement of a number of offenses under the common law of war that punished as war criminals those "who take up arms and commit hostilities without having complied with the conditions prescribed for securing the privileges of belligerents."  *See* War Department Document No. 467, Rules of Land Warfare (April 25, 1914), 130-32, available online at http://www.loc.gov/rr/frd/Military_Law/pdf/rules_warfare-1914.pdf.   Those offenses included piracy of war, highway robbery, war treason, and aiding the enemy as it was understood around the beginning of the 20th Century.  *Id.*  The MCA modified the common law of war offense of "aiding the enemy" by attaching an element of a duty of allegiance to the United States, *see* MCA, Subchapter VIII, § 950v.(b)(26); MMC, part IV, § 950v(26), an element that was not present in the common law war crime.  Previous codifications of "aiding the enemy" in Article 81 of the Articles of War or Article 104 of the UCMJ also lacked this allegiance element.  *See* Articles of War, 1920, available online in Volume 2 of Revision of the Articles of War, The Judge Advocate General's Office (1920) at http://www.loc.gov/rr/frd/Military_Law/RAW_volumes.html, and 10 U.S.C. § 904.

standing violation; in essence, material support to terrorism is simply a more precise definition of the established principle that providing aid, comfort or support to the enemy in time of armed conflict is a violation of the law of war. *See* Winthrop, *supra*, at 840 (noting offenses triable by military commission only, including "furnishing [enemies] with money, arms, provisions, medicines, &c." and "acting as a guide to [the enemy's] troops").[24]

In short, the provision of material support to terrorists, like conspiracy, was not created by the MCA. To the contrary, as Congress provided in the MCA's statement of substantive offenses, the provisions of offenses in the MCA are merely "declarative of existing law;" they do not "establish new crimes that did not exist before [the MCA's] enactment and thus, "they do not preclude trial for crimes that occurred before the date of the enactment of this chapter." 10 U.S.C. § 950p(a)-(b). The MCA therefore does not violate the Ex Post Facto Clause.

**2.      Congress Validly Exercised its Constitutional Authority to Define and Punish Offenses Against the Laws of Nations in Enacting the MCA.**

Petitioner asserts that the MCA exceeds Congress's authority under the Law of Nations Clause to "define and punish . . . Offenses against the Law of Nations," U.S. Const. Art. I, § 8, cl. 10, because the offenses codified in the MCA are, in his view, not recognized as such. As described above, that assertion fails; the offenses with which he is charged are well-established violations of

---

[24]The crime of "providing material support for terrorism" is not new. Not only does the offense have roots in the common law of war, a similar offense – "providing material support to terrorists" – has been in existence in the United States domestic criminal code since 1994. *See* Violent Crime Control and Law Enforcement Act of 1994, P.L. 103-322, Title XII, § 120005, 18 U.S.C. § 2339A; *see also* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 303(a), 110 Stat 1250, 10 U.S.C. § 2339B ("Providing material support or resources to designated foreign terrorist organizations"). Petitioner argues that 10 U.S.C. § 2339A did not have extraterritorial application until October 26, 2001, when the provision was amended to delete the phrase requiring that the prohibited conduct occur "within the United States." That argument misses the point. As petitioner acknowledges, he is not charged with violating § 2339A. Moreover, even if the October 26, 2001 date is somehow relevant, the charge against petitioner includes conduct by petitioner after that date. *See* Charge Sheet at pp. 5-7

the law of war.

At the outset, it is telling that petitioner cites *no* case in which a court held that a statute violated Congress's authority under the Law of Nations Clause.[25] That is because *there are no such cases*; in order for petitioner to succeed on the merits of his claim here, this Court would have to be the first in the history of the United States to hold that Congress unconstitutionally defined and punished an offense against the law of nations. Far from demonstrating a substantial possibility of success on the merits, the absolute lack of precedent for petitioner's challenge makes it almost certain that his claim will fail.

The uniqueness of the Law of Nations Clause bears emphasis. Petitioner attempts to link his theory of the Law of Nations Clause to, for example, the Commerce Clause, arguing that the "Congress is not free to unilaterally determine what constitutes a substantial effect on interstate commerce when exercising its Commerce Clause power." Pet. Mot. at 31. Accordingly, in petitioner's view, Congress may only exercise its authority under the Law of Nations Clause to the extent that it legislates a "recognized" violation of the law of nations. *Id.* at 32. But the power to "define" the law of nations is textually one of the most sweeping powers granted to Congress by Article I, § 8 of the Constitution, and it stands in sharp contrast to other provisions, such as the Commerce Clause, which does not in any respect grant Congress the power to "define" interstate commerce. Congress therefore has significant discretion in exercising its constitutional authority to define and punish offenses against the law of nations. *See United States v. Smith*, 18 U.S. (5 Wheat.) 153, 159 (1820) ("Offenses . . . against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent

---

[25] The case that petitioner cites, *United States v. Furlong*, 18 U.S. (5 Wheat.) 184 (1820), is not to the contrary. *Furlong*'s description of the outer boundaries of the Law of Nations Clause was not necessary to the decision reached in that case, which was grounded in the intent of Congress. *Id.* at 198.

of nations."); JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 565, at 407 (R.D. Rotunda & J.E. Nowak eds., 1987); *see also* Curtis A. Bradley*, Universal Jurisdiction and U.S. Law*, 2001 U. Chi. Legal F. 323, 335 (2001) (noting that even in circumstances where it is unclear whether conduct violates international law, courts should defer to Congress in making the determination).

Petitioner selectively quotes from *United States v. Arjona*, 120 U.S. 479, 488 (1887), for the proposition that "[w]hether an offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by Congress." Mot. at 27. But at issue in *Arjona* was whether a statute promulgated under the Law of Nations Clause required an express statement from Congress to that effect. And in rejecting that requirement, the Court stated, in the same paragraph as the quoted language: "Upon its face, therefore, [the statute] defines an offense against the law of nations as clearly *as if congress had in express terms so declared*." *Id.* (emphasis added). *Arjona* therefore supports the proposition that it is for Congress to determine the parameters of the law of nations, which it clearly and expressly did in the MCA. Given the constitutional authority to "define" violations of the law of nations, and the respect that this Court accordingly owes those determinations, substantial deference is due Congress's definition of the boundaries of customary international law. *See Hamdan*, 126 S. Ct. at 2809 (Kennedy, J., concurring in part) ("Congress, not the Court, is the branch in the better position to undertake the sensitive task of establishing a principle not inconsistent with the national interest or international justice.") (internal quotation marks and citation omitted). Here, for the same reasons the enactments do not violate the Ex Post Facto Clause, they are an eminently reasonable exercise of Congress's authority under the Law of Nations Clause.

### 3.       The MCA Is Not an Unconstitutional Bill of Attainder

A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Serv. Sys.*

*v. Minnesota Pub. Interest Research Group*, 468 U.S. 841 (1984).  But here, there has been no legislative determination of guilt.  Congress merely enacted a comprehensive military judicial system to *adjudicate* guilt with regard to a certain class of offenses and offenders – it did not itself purport to adjudicate any such questions.[26]  If that were sufficient to violate the Bill of Attainder Clause, then the entire UCMJ would be a bill of attainder because it sets up special rules for a discrete class of people.  The Bill of Attainder Clause acts as "safeguard against legislative exercise of the judicial function or more simply - trial by legislature," *United States v. Brown*, 381 U.S. 437, 442 (1965), it has rarely been invoked to condemn legislation.  *See United States v. Munsterman*, 177 F.3d 1139, 1141 (9th Cir. 1999) (violating the Bill of Attainder Clause requires: "[s]pecification of the affected persons, punishment, and lack of a judicial trial.").  In light of the separation of powers principles underlying the Bill of Attainder Clause,[27] the Supreme Court has held that only "the clearest proof" suffices "to establish the unconstitutionality of a statute on such a ground." *Communist Party of United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961).  The MCA neither singles out petitioner nor of its own force imposes punishment and thus cannot be a Bill of Attainder.  *See Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) ("Both 'specificity' and 'punishment' must be shown before a law is condemned as a bill of attainder.").  To the contrary, the government must prove petitioner's guilt to an impartial tribunal beyond a

---

[26]It would be different if Congress had itself simply declared that Guantanamo detainees had violated the law of war and were to be punished.  It, of course, did nothing of the sort.

[27]"[T]he Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness, of, and levying appropriate punishment upon, specific persons." *United States v. Brown*, 381 U.S. 437, 445 (1965).  Put simply, "[t]he distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt." *De Veau v. Braisted*, 363 U.S. 144, 160 (1960).  Indeed, the Supreme Court has struck down statutes on bill of attainder grounds only five times in the nation's history. *See BellSouth Corp. v. F.C.C.*, 162 F.3d 678, 683 (D.C. Cir. 1998).

reasonable doubt.

a.      **The MCA Does Not Target Specific Individuals.**

According to petitioner, the MCA violates the specificity provision of the Bill of Attainder clause insofar as it applies to all non-citizens presently designated or designated in the future by the government as "unlawful enemy combatants."  *See* Petr's Opp'n at 33.  Petitioner thus concedes that the MCA does not unlawfully "single out" petitioner *alone* for punishment – the historical hallmark of a bill of attainder, *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 471 n.34 (1977); *Selective Serv. Sys.*, 468 U.S. at 847 – rather, this argument concerns a group designation.  But just as the MCA does not meet the specificity requirements for a bill of attainder because it does not apply "either to named individuals" it also does not apply to "easily ascertainable members of a group."  *United States v. Lovett*, 328 U.S. 303, 315-16 (1946).

Indeed, the bill of attainder prohibition could not bear on the MCA because it applies to an open-ended class of individuals – aliens *otherwise determined* by someone other than Congress to be unlawful enemy combatants.  *See Korte v. Office of Personnel Management*, 797 F.2d 967, 972 (Fed. Cir. 1986) (rejecting bill of attainder challenge where alleged finding of "guilt" was not imposed on plaintiff by federal statute, but by agency-level adjudicative body whose decision was subject to judicial review).  Moreover, petitioner's bill of attainder argument is essentially an attempt to recast his equal protection argument – both arguments essentially contend that the MCA unlawfully discriminates against non-citizen enemy combatants by limiting the scope of judicial review.  The Supreme Court, however, has held that the Bill of Attainder Clause "surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals."  *Nixon*, 433 U.S. at 470.

Finally, the broad reading of the Bill of Attainder Clause petitioner advances would extend

the prohibition far beyond its intended scope.  Accepting petitioner's argument would "cripple the

very process of legislating" because "every person or group made subject to legislation which he

or it finds burdensome" would complain that "he or it is being subjected to unwarranted

punishment." *Nixon*, 433 U.S. at 470.  Such reasoning would impermissibly transform any law into

a bill of attainder, including the UCMJ, merely because it regulates conduct on the part of designated

individuals or classes of individuals.  *See Wilson v. Yaklich*, 148 F.3d 596, 605-06 (6th Cir. 1998);

*Marozsan v. United States*, 90 F.3d 1284, 1287 (7th Cir. 1996); *Nagac v. Derwinski*, 933 F.2d 990,

990-91 (9th Cir. 1991).  For this reason, petitioner notably does not identify a single case in which

a statute regulating the jurisdiction of the federal courts with respect to certain classes of litigants

has been struck down on bill of attainder grounds.

> **b**.      **The MCA Does Not Inflict Legislative Punishment.**

Assuming *arguendo* that the MCA impermissibly singled out a group as petitioner assert,

his claim would still fail because "the proscription on bills of attainder reaches only statutes that

inflict punishment" by their own force.  *Selective Serv. Sys.*, 468 U.S. at 851.  Although the MCA

identifies punishable offenses and the penalties for such offenses, in that its no different than an

ordinary criminal law.  To be a bill of attainder the law must *itself* impose the punishment.  It does

nothing of the sort.  The MCA sets up a system for adjudication, it does not itself do the adjudicating

or punishing.

According to petitioner, the "punishment" imposed by the MCA is "subjecting [him] to trial

before unfair military commissions" because of his status as an unlawful enemy combatant.  *See*

Mem. at 34. But under that theory, trying him, or for that matter, any member of the U.S. armed

forces, before a court martial, rather than the Article III courts, would constitute "punishment."  In

any event, whatever the burden of trial, it is certainly not "punishment."  It is well-established that

to "decid[e] whether a statute inflicts forbidden punishment," a court must make "three necessary

inquiries:  (i) whether the challenged statute falls within the historical meaning of legislative punishment; (ii) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes;' and (iii) whether the legislative record 'evinces a congressional intent to punish.'"[28]  *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 475-76).  The MCA easily passes this test.

First, historically, legislative punishment, and thus the Bill of Attainder Clause, has generally been limited to death, imprisonment, banishment, the punitive confiscation of property, and legislative bars to participation by individuals or groups in specific employments or professions. *Selective Serv. Sys.*, 468 U.S. at 852; *Nixon*, 433 U.S. at 474.  By contrast, the MCA simply specifies the forum in which permissible claims by unlawful enemy combatants must be brought, sets forth trial procedures, and clarifies the scope of review.[29]  Second, the MCA plainly "can be said to further nonpunitive legislative purposes."  *Selective Serv. Sys.*, 468 U.S. at 852.  The MCA's purpose is to create a military judicial system, an obviously valid purpose.  Moreover, there can be no serious question that the MCA is a rational means of furthering nonpunitive purposes.  *See Foretich*, 351 F.3d at 1221.  Notably, petitioner has not suggested other "less burdensome alternatives," or what it would mean for an alternative to be "less burdensome" in this context.  *Nixon*, 433 U.S. at 482.

---

[28] Thus, in "determining whether a statute inflicts punishment within the proscription against bills of attainder," the severity of the sanction imposed "is not determinative of its character as punishment."  *Selective Serv. Sys.*, 468 U.S. at 851.  Neither is the fact that the statute "regulates conduct on the part of designated individuals or classes of individuals," or compels "an individual or defined group . . . to bear burdens which the individual or group dislikes."  *Nixon*, 433 U.S. at 470-71.

[29] Petitioner's reliance on *Pierce v. Carskadon*, 83 U.S. (16 Wall.) 234 (1872), *see* Mem. at 35 n.30, is inapposite.  *Pierce* arose in the unique context of the Reconstruction period following the Civil War and involved a statute that deprived non-residents of all access to West Virginia state courts to protect property rights, unless they provided a loyalty oath that they had not supported the Confederacy.  Conversely, the MCA involves no similar circumstance and, in fact, expressly *creates* procedures for judicial review of permissible enemy combatant claims.

Indeed, there is nothing inherently "more burdensome," much less irrational or unfair about creating

a military justice system for adjudication of war crimes by accused enemy aliens closely modeled

on that used for courts-martial of our own citizens.  The alternative would be to put such aliens "in

a more protected position than our own soldiers."  *Eisentrager*, 339 U.S. at 783.  In any event, as

the D.C. Circuit has observed, "the inclusion of protective measures designed to safeguard the rights

of the burdened individual or class weighs against a finding that a statute is a bill of attainder."

*Foretich*, 351 F.3d at 1222 (D.C. Cir. 2003).  The MCA is filled with numerous protections for

enemy aliens to be tried in military commissions, belying the notion that it serves punitive legislative

purposes.

Finally, the legislative record is clear in showing that congressional intent was not to punish

anyone, but to clarify the procedures for the fair and efficient trial of unlawful enemy combatants

outside federal courts while still permitting judicial review.  Thus, far from punishing petitioner,

Congress exercised its legitimate constitutional authority over the scope of federal court jurisdiction,

*see* U.S. Const. Art III, § 1, to provide a comprehensive legislative solution to the unique situation

presented by trying alien combatants during wartime.  Although petitioner contends that Congress's

intent was punitive, the isolated statements from the floor debates cited by petitioner simply reflect

legitimate distinctions between the judicial process afforded to United States citizens and alien

enemy combatants.  *See* Mem. 36-37 & nn.31-32.  In any event, such "isolated statements are not

sufficient to show a punitive intent."  *Navegar, Inc. v. United States*, 192 F.3d 1050, 1067 (D.C. Cir.

1999); *see also BellSouth Corp. v. F.C.C.*, 144 F.3d 58, 67 (D.C. Cir. 1998).  In sum, the MCA is

no bill of attainder.

**4.     Petitioner's Equal Protection Claim is Meritless Because the MCA's Application To
          Only Alien Unlawful Enemy Combatants is a Rational Distinction When the United
          States is at War with Foreign Enemies.**

Petitioner argues that the military commission scheduled to try him for violating the law of

war violates his right to equal protection under the Fifth Amendment.  This assertion is based on the

remarkable premise that the MCA, which subjects only alien unlawful enemy combatants to trial by

military commission, discriminates against the "five billion foreigners and millions of green-card

holders" *worldwide* who are not United States citizens.  Pet. Mot. at 37.  Distilled to its essence,

petitioner's equal-protection argument is that any distinction that the United States Congress makes

between United States citizens and the rest of the world is inherently suspect.  The Constitution does

not require such an absurd result.

In *Verdugo-Urquidez*, the Court squarely rejected the claim, substantively identical to that

advanced by this petitioner, that "treat[ing] aliens differently from citizens with respect to the Fourth

Amendment somehow violates the equal protection component of the Fifth Amendment," because

"the result of accepting [this] claim would have significant and deleterious consequences for the

United States in conducting activities beyond its boundaries."  494 U.S. at 273.  The cases cited by

petitioner do not hold otherwise.  *Graham v. Richardson*, 403 U.S. 365 (1971), for example, stands

for the unremarkable proposition that discrimination in administering state welfare programs based

on the classification of *resident* aliens, voluntarily residing in the United States (legally or

otherwise), will be strictly scrutinized.  *See also Plyer v. Doe*, 457 U.S. 202 (1982) (same); *Yick Wo*

*v. Hopkins*, 118 U.S. 356 (1886) (same).  The Supreme Court has itself rejected the extension of

these precedents to the claim advanced by this petitioner.  *See Verdugo-Urquidez*, 494 U.S. at 271

("These cases, however, establish only that aliens receive constitutional protections when they have

come within the territory of the United States and developed substantial connections with this

country.").

At the threshold, petitioner argues that the MCA's application only to aliens should be

subject the most strict judicial scrutiny.  However, as noted above, the cases petitioner cites for this

extraordinary proposition are inapposite, because they either addressed a different context or a

different class of persons.  For example, *Graham* held that *resident* aliens may be a suspect class for equal protection purposes, and that state policies differentiating between that group and other similarly-situated persons are subject to close scrutiny.  *Graham*, 403 U.S. at 372.  Indeed, the Supreme Court has recognized alienage as a suspect classification *only* when reviewing the actions of state or local governments that employ the classification to disadvantage foreign nationals, and even then only when those state laws affect permanent resident aliens.  *See Le Clerc v. Webb*, 419 F.3d 409, 415 (5th Cir. 2005) ("The Supreme Court has reviewed with strict scrutiny only state laws affecting permanent resident aliens.").  This is so simply because resident aliens, "like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society."  *In re Griffiths*, 413 U.S. 717, 722 (1973).  These same considerations do not apply, as petitioner would have this Court believe, to the entirety of the rest of the world, and they certainly do not apply to nonresident aliens who wage unlawful war against the United States.

Indeed, contrary to the cases cited by petitioner, the Supreme Court has made clear that *federal* policies regarding aliens are entitled to a great degree of deference, even in times of peace.  *See, e.g.*, *Nyquist v. Mauclet*, 432 U.S. 1, 7 n.8 (1977) ("Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States."); *Mathews v. Diaz*, 426 U.S. 67, 80 (1976) ("The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious'").  The Court has further observed:

> [A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference. . . . Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution.

*Diaz*, 426 U.S. at 81 & n.17 (internal quotation marks and citations omitted).

The United States can draw, and historically has drawn, distinctions between alien enemies and citizens who join and assist our enemies. As members of our political community, citizens who assist foreign powers are not identically situated to aliens lacking any duty of allegiance to the United States. The Constitution itself draws this distinction by defining the offense of treason, which as recognized under federal law, creates an offense with a penalty up to and including death, for citizens and others with a duty of allegiance to the United States, who take up arms against the country. *See* U.S. Const. Art. III, § 3; *see also* 18 U.S.C. § 2381. In both the current and in our past armed conflicts, the United States has distinguished between citizen and enemy combatants, including in the use of federal courts or military commission trials. Justice Scalia described these historical distinctions in the course of dissenting in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004):

> In more recent times, too, citizens have been charged and tried in Article III courts for acts of war against the United States, even when noncitizen co-conspirators were not. For example, two American citizens alleged to have participated during World War I in a spying conspiracy on behalf of Germany were tried in federal court. *See United States v. Fricke*, 259 F. 673 (S.D.N.Y. 1919); *United States v. Robinson*, 259 F. 685 (S.D.N.Y. 1919). A German member of the same conspiracy was subjected to military process. *See United States ex rel. Wessels v. McDonald*, 265 F. 754 (E.D.N.Y. 1920). During World War II, the famous German saboteurs of *Ex parte Quirin*, 317 U.S. 1 (1942), received military process, but the citizens who associated with them (with the exception of one citizen-saboteur . . . ) were punished under the criminal process. *See Haupt v. United States*, 330 U.S. 631 (1947); L. Fisher, Nazi Saboteurs on Trial 80-84 (2003); *see also Cramer v. United States*, 325 U.S. 1 (1945).

*Hamdi*, 542 U.S. at 560. Although a majority of the Court in *Hamdi* held that citizen enemy combatants could be subject to military detention (just as the Court in *Quirin* had held that a citizen could be subject to prosecution by military commission, *see Quirin*, 317 U.S. at 37-38), no member of the Court disputed that citizens historically had been treated differently from alien enemy combatants or that such historical treatment was fully consistent with the Equal Protection Clause of the Constitution. Congress appropriately relied on such historical precedents in passing the

Military Commissions Act.

Given the deference that courts owe the political branches in this area, distinctions based on alienage by the federal government are subject only to the most deferential rational-basis review. Such laws will be upheld as long as the classification is rationally related to a legitimate government interest. *See United States v. Ferreira*; 275 F.3d 1020 (11th Cir. 2001) (applying rational basis review of 18 U.S.C. § 1203, which criminalizes conduct by aliens when the same conduct committed by U.S. citizen would not be criminal); *United States v. Montenegro*, 231 F.3d 389 (7th Cir. 2000) (same); *United States v. Lue*, 134 F.3d 79 (2d Cir. 1998) (same). Indeed, the need for deferential review in the present context is even greater. Distinctions between citizens and aliens drawn by the political branches are especially appropriate when the United States is in a state of war with foreign enemies. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 586-87 ("Under our law, the alien in several respects stands on an equal footing with citizens, but in others has never been conceded legal parity with the citizen. . . . So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure.").

By any measure, the MCA's application to aliens is rational. Congress enacted the MCA in response to the most serious aggression ever against the United States on its soil by aliens affiliated with a foreign-based terrorist organization. In time of war, the government must use the forces at its disposal, including military forces and intelligence assets, to prevent the enemy from harming American lives and interests. In doing so, the government may make distinctions between citizens and aliens in matters of detention and punishment: a violent act committed against the United States by a citizen may be an act of war, but it is always a criminal offense; a violent act committed by an enemies is an act of war, whether lawful or unlawful, even if it does not constitute a domestic criminal offense. *See Harisiades*, 342 U.S. at 587 ("War, of course, is the most usual occasion for extensive resort to the power" to treat aliens differently). Moreover, citizens have a

greater panoply of both constitutional and statutory rights that they may invoke than do aliens abroad.  Thus, inherently, they are differently situated.  Nothing in the Constitution requires that aliens and citizens be held to the same standard with respect to acts of war against the United States. *See id.* at 586-87.  It is appropriate and necessary for the government to distinguish between aliens and citizens in the very act of defending the Nation from its enemies.

Congress, mindful of this and consistent with longstanding executive practice, created a system of military tribunals to try alien enemies for violations of the laws of war.  The MCA's procedures strike a careful balance between the process due defendants in an Article III court, the process by which a court-martial tries United States servicemembers and the practicalities of trying enemy combatants captured on a battlefield half a world away during military operations.  The MCA adapts rules of procedure and evidence to these practicalities by, among other things, providing mechanisms by which classified sources and methods may be protected from disclosure to the enemy.  It is appropriate and rational for Congress to apply these adapted procedures only to enemy aliens in light of the broader set of rights enjoyed by citizens and the fact that enemy aliens obviously do not have the same ties to the United States as do our citizens.[30]

5.    **Petitioner's Due Process challenge is both premature and without merit.**

**a.**  Petitioner argues that the military commission process violates the Due Process Clause in several respects.  None of these claims have merit.  As an initial matter, review of these Due Process challenges will not be ripe until the conclusion of the military commission process because they will depend on actions that may or may not be taken during the commission, including actions with respect to actual evidence used at trial and the prospect of possible acquittal.  Whether

---

[30]  Indeed, given the context and Congress's careful balancing of procedural protections with the practicalities of trying unlawful enemy combatants, the MCA would survive under any level of scrutiny.

petitioner has been deprived of due process during his commission proceeding resulting in a deprivation of his liberty interest is a question that can only be determined following the completion of commission proceedings and imposition of the sentence, if any. *See Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990) (a due process violation is "not complete unless and until the State fails to provide due process"). Further, without knowing at this point whether petitioner will even be convicted, he cannot demonstrate the injury from any potential due process violation necessary to have Article III standing to press this claim.

Petitioner, in effect, is attempting to challenge the military commission rules and procedures in the abstract. However, he has made no attempt whatsoever to meet the heavy burden in such a challenge to establish that "no set of circumstances exists under which the [rules challenged] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1992). Indeed, he cannot meet that burden. A facial challenge to any statutory scheme is the "most difficult challenge to mount successfully," *id.*, because there are most certainly a large number of circumstances in which due process would not be violated. The same is even more true here, when petitioner seeks to challenge judicial processes, in the abstract, absent any consideration into whether or what evidence that the Government actually may seek to introduce in the upcoming trial.

**b.** First, petitioner claims that the rules allowing the admission of hearsay and evidence allegedly obtained through coercion violate the Clause. Mot. at 43-44. This claim lacks merit. Instead, while the MCA provides for the consideration of reliable hearsay evidence, it includes substantial protections for defendants: anytime the government wishes to use hearsay evidence, it must notify the defendant "sufficiently in advance to provide the adverse party with a fair opportunity to meet the evidence" and must explain "the particulars of the evidence (including information on the general circumstances under which the evidence was obtained)." 10 U.S.C. 949a(b)(2)(E)(i); *see id.* § 949a(b)(2)(E)(ii) (if party demonstrates evidence is "unreliable or lacking

in probative value," it will not be admitted).  In light of the ongoing nature of the war, many witnesses may well not be available to testify in person, and some allowance for hearsay is essential. Despite petitioner's theoretical challenge to the admissibility of hearsay evidence, there is nothing inherently improper about admitting hearsay in the circumstances allowed by the MCA.  Most nations and international courts allow hearsay, as do our courts in certain circumstances.  *See, e.g.,* Fed. R. Evid. 803 (listing 23 exceptions to the rule against hearsay when declarant is available); Fed. R. Evid. 804 (listing five exceptions to the rule against hearsay when declarant is unavailable); Fed. R. Evid. 807 (creating residual exception to hearsay rule for statements with circumstantial evidence of trustworthiness).

As for petitioner's objection to the potential admissibility of "coerced" statements, the MCA similarly strikes a balance between the various competing interests, including the accused's rights to a full and fair trial, the commission's need to consider all reliable and probative evidence, and the integrity of the commission proceedings.  The MCA permits the admission of statements upon the military judge's finding that the statements were not obtained by torture or in violation of the DTA's prohibition on "cruel, inhuman, or degrading treatment," 10 U.S.C. § 948r(b)-(c), and that the totality of the circumstances renders the statements reliable and that the interest of justice further support their admission.  *Id.* § 948r(c)-(d).  It is impossible to conclude, in the abstract, that any statement admitted under this standard would necessarily violate due process, and petitioner's claim is meritless.

In any event, any potential prejudice to the accused from application of the rule permitting hearsay or coerced statements is highly speculative.  First, the rules are reciprocal; the accused may present statements favorable to his defense.  Second, the accused is free to show that the evidence proffered for admission is unreliable, obtained under impermissible standards, or that admission would be contrary to the interest of justice.  If he is unsuccessful, he may argue to the trier of fact

that the weight of the evidence should be affected in light of those rules.  *See* 10 U.S.C. § 948r; MCRE 803(c).  Most importantly, petitioner may raise his due process concerns after the trial so that there is an actual record for a court to review in determining whether due process was satisfied.  The speculation that some hearsay evidence or allegedly coerced statement might be improperly admitted against petitioner during the commission proceeding – which could readily be corrected by the D.C. Circuit on appeal – certainly is insufficient to mount a successful facial challenge to these rules.

Second, petitioner claims that the Due Process Clause is violated because petitioner cannot "assert defenses or invoke rights based on the Geneva Conventions" pursuant to 10 U.S.C. § 948b(g).  Mot. at 45.  This claim is meritless – nothing in the Due Process Clause requires that petitioner receive the benefit of a substantive legal provision, including Common Article 3. Moreover, the only arguably relevant substantive provision is Common Article 3's requirement that the tribunal provide "judicial guarantees which are recognized as indispensable by civilized peoples," which, even accepting the *Hamdan* plurality's view protects only the "barest of those trial protections that have been recognized by customary international law" (*Hamdan*, 126 S. Ct. at 2797 (plurality)), and thus cannot work to alter the scope of the Due Process Clause.[31]  In any event, as this Court previously recognized, 344 F. Supp. 2d at 165-66, as did Justice Kennedy, 126 S. Ct. at 2809, the court should properly abstain from consideration of a claim that military commission proceedings would violate Common Article 3.

---

[31]Petitioner's due process challenge is intermingled with a claim that the commission operates in violation of Common Article 3 of the Geneva Conventions and with challenges more in the nature of equal protection claims.  Mot. at 40-45.  Petitioner's equal protection claims are addressed elsewhere in this brief.  To the extent petitioner separately invokes the Convention as a source of rights, his claim is statutorily barred.  10 U.S.C. § 948b(g).  Further, Congress concluded that the MCA implements Common Article 3, 10 U.S.C. § 948b(f), a conclusion that is not subject to judicial challenge.  Petitioner argues in a footnote that this enactment improperly "intru[des] into the judicial function."  Mot. at 41 n.37.  But the *Hamdan* Court *invited* Congress to act in addressing military commission trials so as define the standards under Common Article 3.  *Hamdan*, 126 S. Ct. at 2799 (Breyer, J., concurring); *see also id.* at 2800 (Kennedy, J., concurring in part).

### III.   THE BALANCING OF HARMS TIPS DECIDEDLY AGAINST THE ISSUANCE OF AN INJUNCTION

The injunction requested by petitioner also should be denied because granting it would result in substantial injury to respondents and be contrary to the public interest.  Issuing an injunction would substantially defeat the public interest to try unlawful combatants such as petitioner by military commission, as is reflected by Congress's enactment of the MCA, which created the trial procedures in response to this very case and pursuant to the Supreme Court's direction that the President consult with Congress in devising a military commission trial system.  Undoubtedly, the ability to try alien enemy combatants suspected of war crimes in a timely fashion is an important part of the United States' war effort, and the public has a strong interest in seeing such individuals brought to justice as soon as possible.  *See Quirin*, 317 U.S. at 28-29 ("[a]n important incident to the conduct of war is the adoption of measures by the military command not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war").  For this Court to enjoin the ongoing military commission proceedings now (when Congress has declared that this court has no power to do so) would harm those significant interests as well as undermine the separation of powers principle that is so fundamental to our government.  Moreover, significant resources have been brought to bear to begin petitioner's trial in one week – that expenditure of resources will be wasted if an injunction is granted.

On the other hand, petitioner has not shown that he will suffer irreparable harm that is "both certain and great," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), if this Court does not enjoin his military commission proceedings.  As the D.C. Circuit explained in the context of a military commission trial of another detainee, "[t]here is no substantial public interest at stake in this case that distinguishes it from the multitude of criminal cases for which post-judgment review

of procedural and jurisdictional decisions has been found effective." *Khadr*, 2008 WL 2468496, at *6. Similarly, as we have explained, this is not the sort of case that involves the types of harms recognized in *Councilman* and that warranted immediate habeas review. *Councilman*, 420 U.S. at 759 (citing the "disruption caused to petitioner[']s civilian lives and the accompanying deprivation of liberty" which make "it 'especially unfair to require exhaustion'").

Petitioner cites an immigration case, *Rafeedie v. INS*, 880 F.2d 506 (D.C. Cir. 1989) for the proposition that he will suffer harm by revealing his defense strategy (Mot. at 4-5), but this is no different than the risk present in any domestic or military criminal trial that is reversed on appeal (and petitioner does not acknowledge that this concern works in both directions - the government, too, will have revealed its prosecution strategy to petitioner). Thus, the reasoning in *Rafeedie* is not applicable in the criminal context. As the Supreme Court has noted in the context of criminal trial of U.S. citizens, "[b]earing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship." *Hollywood Motor Car. Co.*, 458 U.S. at 268 n.2 (quoting *Cobbledick v. United States*, 309 U.S. 323, 325 (1940)). Petitioner, of course, is neither a citizen of this country nor even a resident alien. If convicted, however, even he will have the fully adequate remedy of automatic review by the court of appeals and will suffer no harm.

The public interest also militates strongly against granting the injunction. As we explained, the court of appeal held just weeks ago that there is "no substantial public interest" to"warrant our interruption of this criminal proceeding just because it is a military commission" in order to "ensur[e] that all [the] proceedings are just." *Khadr*, 2008 WL 2468496, at *6. By contrast, there is a significant public interest in avoiding unnecessary delay. In the days since the Supreme Court's decision in *Boumediene*, the Guantanamo habeas petitioners have urged the judges of this District to hasten the arrival of their day in court. For petitioner Hamdan, that day has arrived; yet, he would have this Court *delay* an adjudication of the facts. However, "encouragement of delay is fatal to the

63

vindication of the criminal law." *United States v. MacDonald*, 435 U.S. 850, 854 (1978). Rather, the "public has a strong interest in the prompt, effective and efficient administration of justice." *United States v. Poston*, 902 F.2d 90, 96 (D.C. Cir. 1990).

In sum, petitioner will not be harmed by allowing by allowing his criminal proceedings to move forward, but the harm to the United States and the public interest would be significant. Accordingly, a preliminary injunction is not warranted.

## **CONCLUSION**

For the foregoing reasons, this Court should deny petitioner's extraordinary request to enjoin his military commission proceedings.

Dated: July 14, 2008          Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN C. O'QUINN
Deputy Assistant Attorney General

   /s/ Alexander K. Haas
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
JUDRY L. SUBAR (D.C. Bar No. 347518)
TERRY M. HENRY
AUGUST E. FLENTJE
ALEXANDER K. HAAS
PAUL AHERN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-1278
Fax:  (202) 514-7964

Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
SALIM AHMED HAMDAN, et al.,                   )
                    Petitioner,               )
                                              )
          v.                                  )          Civil Action No. 1:04-cv-01519-JR
                                              )
ROBERT GATES,                                 )
          Secretary, U.S.  Department of      )
          Defense, *et al.,*                  )
                    Respondents.              )
_____)

     Upon petitioner's Motion for Preliminary Injunction,, it is hereby ordered as follows:

     1.  Petitioner's motion is hereby denied.


Date: _____          _____
                                       UNITED STATES DISTRICT JUDGE