IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

SALIM AHMED HAMDAN,                          )
　　　　　　　　*Petitioner*,               )
　　　　　　　　　　　　　　　　　　　　　　　)         Judge Robertson
　　　*v.*                                   )         No. 04-CV-1519-JR
　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
ROBERT GATES, *et al.*,                      )
　　　　　　　　*Respondents*.               )
_____)

## PETITIONER'S REPLY BRIEF IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJUNCTION

Recognizing the seriousness of the legal issues, the Government devotes a remarkable 61 out of 64 pages of its brief to just one of the four preliminary injunction factors—addressing why it may ultimately prevail on the merits. But Hamdan has requested only temporary relief to give this Court the opportunity to fully consider his serious challenges to the constitutionality and jurisdiction of the novel "military commission" slated to try him. And the Government can hardly muster any reason at all for why that temporary relief is not in the best interests of all involved.

The Government's over-length brief merely confirms the basis for Hamdan's Motion— that there are substantial grounds to believe that the commission on the verge of trying him lacks jurisdiction and is unconstitutional. Hamdan has asked this Court to pause his commission (but not other commissions) until this Court has the opportunity to resolve the legal issues.[1]

While downplaying the issue that is actually before this Court, the Government rests its opposition on the assertion that *Boumediene* "has no bearing" (Opp. 9) on Hamdan's claims. This position contradicts the Government's prior position in this very case. Less than a year ago,

_____

[1] Hamdan has had 40 hours since the Government filed its 64-page brief (on July 14, at 10 P.M.) to write this Reply, during which time most of his counsel were in Guantanamo in pretrial motions. The extreme rush is another reason justifying a temporary pause to permit this Court's full review of the merits.

Hamdan asked the Supreme Court to consider his case alongside *Boumediene* to resolve the constitutionality and jurisdiction of his trial. At that time, the Government told the Court that it need not do so because *Boumediene* would govern Hamdan's claims. The issues at stake in this case are too serious, for Hamdan and the nation, for bait-and-switch litigation. Having escaped Supreme Court review of Hamdan's claims on the assertion that they would be controlled by *Boumediene*, the Government cannot now—having lost decisively in *Boumediene*—ask this Court to ignore Hamdan's claims on the notion that *Boumediene* is irrelevant.

Though it asks this Court to do so, the Government itself does not ignore the profound impact *Boumediene* has for Hamdan. For the Government opens and closes its brief with the remarkable claim that trial by a Guantanamo Bay military commission actually constitutes the "day in court" (Opp. 2, 63) to which *Boumediene* has just held Hamdan is entitled. As explained in Petitioner's opening brief, rather than fulfill *Boumediene*'s mandate, allowing Hamdan's military commission to proceed will frustrate Hamdan's chance to ever get a fair habeas hearing. The Government's stunning claim, however, reveals that to be precisely its goal—to use trial by military commission as an end-run around the Supreme Court's holding in *Boumediene*.

Now *is* the time for Hamdan to get his day in court—*this* Court. Hamdan should not be tried at Guantanamo until this Court has a full opportunity to consider the grave issues he presents on the merits. Accordingly, this Court should grant the preliminary injunction.

## I.  A FEW RELEVANT FACTS

Hamdan has been detained for over six years, much of that time in solitary confinement. He has been subjected to the Government's euphemistically termed "Behavior Management Plan," which calls for "isolating the detainee" and "fostering dependence" in order to "enhance and exploit the disorientation and disorganization felt" by the detainee. McMillan Decl., Ex. I. He has been held motionless in painful positions for protracted periods; subjected to sexually

offensive and degrading contact by a female interrogator; personally threatened with death, torture, and life in prison; had his medical treatment manipulated by his interrogators; and experienced countless other deceptive, cruel, inhumane, and coercive interrogation techniques.

The Government's treatment of Hamdan is consistent with the training materials for interrogators at Guantanamo.[2] The focus of the interrogation training was on "coercive management techniques," which include "isolation," "induced debility and exhaustion," "threats," and "degradation." *Id.* The training materials caution, however, that while they often result in "compliance," any resulting statement "is not always a willful or voluntary act." *Id.*

After years of being subjected to the Government's self-described "coercive management techniques," Hamdan now faces trial solely on newly minted criminal charges in a process that permits the introduction of both hearsay evidence and evidence obtained through the Government's undisputed use of coercive interrogation. Moreover, the Government's 10-page list of proposed hearsay trial evidence includes the alleged interrogation statements of many other detainees, statements also obtained as the result of cruel, inhumane, and degrading practices. McMillan Decl., Ex. F. All this follows a pretrial process in which discovery has been limited not only by the Government's frequent invocation of the national security privilege to prevent the defense from accessing witnesses and documents, *see, e.g.*, Second McMillan Decl., Ex. L, but also by the MCA's standards that permit the Government, in its discretion, to determine what documents are relevant to the case, Rule of Military Commission 703.

To take just one example, on July 12, only one week before trial is set to start, the Government produced a document to the Defense (despite a longstanding discovery request and commission order requiring production of all detention records) revealing that Hamdan was

---

[2] *See* Second Decl. of Joseph McMillan in Support of Mot. for Preliminary Injunction ("Second McMillan Decl."), Ex. K (Memorandum, After Action Report Joint Task Force Guantanamo Bay Training Evolution (Jan. 15, 2003)).

subjected to "Operation Sandman" for 50 days in 2003. Sandman has been described in the media as a program of systematic sleep deprivation. The document revealing the use of this program on Hamdan was buried in a mass of disorganized and unidentified records produced at the eleventh hour in the case, at a point when the Defense is unable to take adequate discovery on this abusive practice and its potential role in generating evidence favorable to the Prosecution. *See* Declaration of LCRD Brian L. Mizer, submitted herewith.

This last minute disclosure neatly illustrates the manner in which the process afforded to Hamdan is not nearly as "robust" as the Government would have the Court believe. Opp. 20 n.6, 25. This was also apparent in the jurisdictional hearing held in December 2007 (which led to a finding that Hamdan was an unlawful enemy combatant). That hearing was held before discovery was even provided to the Defense on the current set of charges (particularly discovery relating to Hamdan's alleged possession of missiles), and the Defense effort to call other detainee witnesses at that hearing was *denied* at the insistence of the Prosecution based on alleged national-security grounds. The Government's national-security stance is that every word uttered by any "High Value Detainee" is classified "Top Secret," and accordingly, even though Hamdan is alleged to have entered into a conspiracy with them, they cannot be permitted to testify in his defense. That position was effectively accepted by the Commission at the December 2007 hearing, and it remains the *status quo* at the date of this writing. Despite trial being days away, Defense counsel has not been permitted access to eight detainees held at Guantanamo who there is strong reason to believe have highly relevant and exculpatory information.

Nevertheless, the Government complains of the "irony" that Hamdan, afforded this "utterly unprecedented" process, would show such ingratitude as to challenge the process. Opp. 2. Hamdan has consistently challenged his detention and prosecution not to obtain *any* process

but to obtain a valid one that complies with international norms. The military commission proceeding that Hamdan seeks to stay does not meet those standards. All he wants is a fair trial.

## II. AS THE GOVERNMENT PREVIOUSLY ARGUED, THE ISSUES RAISED BY HAMDAN ARE CONTROLLED BY THE ANALYSIS IN *BOUMEDIENE*

When the Government sought to prevent Hamdan from obtaining review in the Supreme Court, it argued that Hamdan's case raises "the same basic issues" the Court had before it in *Boumediene*. Br. in Opp'n to Cert., *Hamdan v. Gates*, No. 07-15, at 10. The Government now entirely reverses tack and argues that *Boumediene* has no bearing on Hamdan's challenge to the Military Commissions Act (MCA). Yet it has conceded that this is not so:

- The Government argued to the Supreme Court that Hamdan "is in exactly the same position as the detainees in *Boumediene* and *Al Odah* insofar as he challenges his detention. The fact that he is also subject to trial by military commission does not distinguish his case from those of the detainees in *Boumediene* and *Al Odah*." *Id.* at 11.

- The Government argued to the Supreme Court that "[t]he jurisdictional provision of the MCA makes no distinction between aliens detained as enemy combatants and those who are also subject to trial by military commission, see MCA § 7(a), 120 Stat. 2636, and petitioner provides no reason why any decision of this Court in *Boumediene* and *Al Odah* would not apply to him." *Id.*

- The Government argued that the Supreme Court's decision in *Boumediene* would also apply to Hamdan: "If this Court holds in *Boumediene* and *Al Odah* that enemy combatants at Guantanamo Bay may petition for habeas corpus to challenge their detention notwithstanding the MCA, there is no reason to suppose that its holding would not apply to those enemy combatants who have been designated for trial by military commission." *Id.* at 12.

- The Government argued that the Supreme Court need not consider the merits of Hamdan's challenge because the decision in *Boumediene* "might well resolve the additional constitutional claims asserted by petitioner" – "specifically, the validity of the MCA under separation of powers principles, the Bill of Attainder Clause, and the equal-protection component of the Due Process Clause." *Id.* at 13-14.

The Government's representations speak for themselves. *Boumediene* involves the same jurisdictional and constitutional issues as this case and its analysis governs Hamdan's challenge.

## III.    THIS COURT SHOULD GRANT A PRELIMINARY INJUCTION

The Government evades the standard for preliminary relief to preserve the status quo. To

succeed, Hamdan need not establish beyond doubt that the commission is unlawful: "[t]o justify the granting of a stay, a movant need not always establish a high probability of success on the merits. . . . A stay may be granted with either a high probability of success and some injury, or *vice versa*." *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985).

Although the Government discards *Boumediene*, it mines a different case decided the same day, *Munaf v. Geren*, 128 S. Ct. 2207 (2008), for any hint of help. In one of several different arguments, the Government purports to quote *Munaf* stating that it is "an abuse of discretion…to grant a preliminary injunction on the view that the…issues…were tough, without even considering the merits." Opp. at 12 (quoting 128 S. Ct. at 2219). The Government's selective quotation misrepresents the Court's point by striking the word "jurisdictional" before "issues." To be sure, "A difficult question as to jurisdiction is…no reason to grant a preliminary injunction." 128 S. Ct at 2210. Here, in contrast, this Court has jurisdiction, for the reasons explained below, and Hamdan's opening brief raises no fewer than seven different reasons based on constitutional, statutory, and treaty law for why he is likely to succeed on the merits.

The central point, anchored in caselaw, is that at this stage, this Court need not finally resolve the scope of Hamdan's habeas right; the constitutionality of the commission; or its jurisdiction. For these questions are "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted).

### A.   HAMDAN WILL SUFFER IRREPARABLE INJURIES IF TRIED NOW

As Hamdan's Motion explained, forcing Hamdan to undergo trial at Guantanamo before this Court has the opportunity to address his challenges to the jurisdiction and legality of the military commission will result—at a minimum—in the following irreparable injuries:

1. Violating Hamdan's right not to be tried by an unlawful commission that lacks jurisdiction over him. Mot. 3-6.

2. Placing Hamdan in a catch-22 situation where he is forced to preview his defense in a trial that will ultimately be found to lack jurisdiction. Mot. 4.

3. Providing for the introduction of evidence against Hamdan that would be inadmissible under any constitutional regime. Mot. 4.

4. Forcing Hamdan to evaluate any plea offer without knowing whether the proceedings are lawful. Mot. 4.

5. Frustrating Hamdan's constitutional habeas right to challenge the legality of his detention by delaying or eliminating his habeas hearing in this Court. Mot. 6-7.

6. Forcing Hamdan either to abandon one of the few possible defenses in his trial (that he is entitled to POW protections), or to forfeit much of his habeas hearing and waive his right to challenge the CSRT's flawed determination of combatancy. Mot. 6-7.

The Government does not turn to these injuries until the penultimate page of its brief—and even then addresses just one of them with a scant response. Specifically, the Government invokes a pair of cases about ordinary criminal trials in civilian courts to suggest that *Rafeedie*—a case about immigration proceedings—"is not applicable in the criminal context." Opp. at 63 (citing *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 268 n.2 (1982); *Cobbledick v. United States*, 309 U.S. 323, 325 (1940)). The fact that *Rafeedie* concerned immigration, as opposed to a criminal life sentence and the accompanying stigma, suggests that its reasoning applies with even stronger force here. It is the Government's citations to appeals of ordinary criminal trials in federal courts which are inapposite, for in those situations the prosecution takes place in an established forum under constitutional rules where there is little question as to jurisdiction.[3]

---

[3] Although an ordinary trial is designed to ascertain whether a defendant is innocent or guilty, Hamdan's is designed—according to its own former Chief Prosecutor—to achieve "strategic political value" "before elections this year" for the Administration. Josh White, *From Chief Prosecutor To Critic at Guantanamo*, Wash. Post, Apr. 29, 2008, at A1 (quoting former Chief Prosecutor Col. Morris Davis). An ordinary criminal trial is designed to acquit the innocent and convict the guilty. The military commission created to try Hamdan "can't have acquittals." *Id.* ("[The Defense Department general counsel said:] 'We've been holding these guys for years. How can we explain acquittals? We have to have convictions.'"). An ordinary criminal trial does not permit a defendant to be convicted based on evidence obtained through cruel and degrading treatment. In the commission created to try

Since the Government fails to respond at all to the five other irreparable injuries he raises in his opening brief, Hamdan can only conclude that they have been conceded. If this Court had not enjoined the commissions in 2004, Hamdan would have been forced to trial, and his conviction reversed by the Supreme Court. Not only would Hamdan's right to avoid being tried have been forever lost, but the Government and the public interest would have suffered. The proper course now, as then, is to fully resolve any doubt about the commission's legality, fundamental fairness, and jurisdiction—and only then, if at all, commence prosecution.

**B.  THE GOVERNMENT WILL NOT BE HARMED BY A BRIEF DELAY**

The Government has little to say about how a preliminary injunction would harm it. First, it summarily alleges that granting temporary relief would be improper because "the ability to try alien enemy combatants suspected of war crimes in a timely fashion is an important part of the United States' war effort." Opp. 62. Allowing the commission to try Hamdan before this Court resolves the merits of his claims will increase any delay in final resolution of this case, for the result is likely to be overturned. Far more damaging to our "war effort" would be allowing a trial to proceed when the foundations of that trial have just been undermined by the Supreme Court. The Government's talk of delay—over six years after Hamdan was captured—would be humorous if the circumstances were not so severe. As the Supreme Court put it, "Any urgent need for imposition or execution of judgment is utterly belied by the record; Hamdan was arrested in November 2001 and he was not charged until mid-2004." 126 S. Ct. at 2785 (plurality); *id.* at 2805 (Kennedy, J., concurring) (similar); *see also* Mot. 8, n.4.[4]

Finally, the Government claims that unspecified but "significant resources have been

---

Hamdan, "everything was fair game," even evidence prosecutors knew to be "from waterboarding." *Id.*
[4] The Government asserts that an injunction would "undermine the separation of powers principle." Opp. 62. Yet Hamdan seeks an injunction to protect the principle. The commission slated to try Hamdan violates the separation of powers tenets of the Ex Post Facto, Bill of Attainder, Define and Punish, and Suspension Clauses.

brought to bear to begin petitioner's trial in one week." Opp. at 62. Petitioner does not doubt the "significant resources" that would go into any military commission. But this is one more reason supporting a preliminary injunction so that this Court has the opportunity to address Hamdan's challenges in advance. Otherwise, if Hamdan's trial is thrown out after the fact, all of the "significant resources [that] have been brought to bear" will have been expended needlessly.

## C.  THE PUBLIC INTEREST FAVORS GRANTING A PRELIMINARY INJUNCTION

Hamdan's Opening Brief explained in detail why Judge Kollar-Kotelly was correct when she explained that "It would not be in the public interest to subject Petitioner to a process which the highest court in the land may determine to be invalid. It is in the public interest to have a final decision, leaving no doubts as to this key jurisdictional issue, before Petitioner's military commission proceedings begin." *Hicks v. Bush*, 397 F. Supp. 2d 36, 43 (D.D.C. 2005). Ignoring these points, the Government bases its claims about the "public interest" on a recent Court of Appeals decision concerning the scope of the so-called "collateral order doctrine."

The D.C. Circuit's recent construal of its interlocutory appellate jurisdiction in *Khadr v. United States*, 2008 WL 2468496 (June 20, 2008), has no bearing on a preliminary injunction. Khadr's claim did *not* arise through a habeas petition, but instead concerned whether a statute (either the MCA or 28 U.S.C. § 1291 under the collateral order doctrine) gave the Circuit jurisdiction to review a specific interim decision of the Court of Military Commission Review. In contrast, Hamdan argues, through his right to habeas, that the entire commission slated to try him is unlawful. To ask the question whether there is a difference between the scope of statutory appellate jurisdiction and the availability of the constitutional Writ is to answer it.

The relevant precedent for his claim is thus the Supreme Court's habeas holding at an earlier stage of this case that "Hamdan and the Government both have a compelling interest in

knowing in advance whether Hamdan may be tried by a military commission that arguably is without any basis in law and operates free from many of the procedural rules prescribed by Congress for courts-martial—rules intended to safeguard the accused and ensure the reliability of any conviction." *Hamdan*, 126 S. Ct. at 2772.[5] Indeed, one reason why the Circuit may have declined to read interlocutory review into Khadr's MCA claim is the availability of the Writ to challenge the foundations of the commission. The cryptic opinion, decided just days after *Boumediene* and which does not cite the case, is, at best, difficult to apply here.

The discussion in *Khadr* is inapposite to Hamdan's request to stay his commission for a doctrinal reason as well. The legal standard under the collateral order doctrine *requires* a "*substantial* public interest" for the Circuit to assume interlocutory jurisdiction. *Khadr*, at *5 (quoting *Will v. Hallock*, 546 U.S. 345, 350-53 (2006)) (emphasis added). In contrast, the legal standard in this case only asks whether, as one of four factors, the public interest favors relief. For "[a]n order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." *Holiday Tours*, 559 F.2d at 844. *Khadr* was not in a similar posture, and the collateral order doctrine is not relevant here.[6]

---

[5] *Khadr* thus differed not only from *Hamdan*, but also *Hamdan*'s touchstone, *Quirin*, 317 U.S. 1, 19 (1942), which explicitly found interrupting the ongoing commission to be in the public interest. See *Hamdan*, 126 S. Ct. at 2771 ("*Quirin* is the most relevant precedent… Far from abstaining pending the conclusion of military proceedings, which were ongoing, we convened a special Term to hear the case and expedited our review.").

[6] These different standards follow from the fact that the collateral order doctrine and preliminary injunctions serve opposite purposes. The former derives from a statutory requirement to promote efficiency and finality in the course of everyday judicial proceedings. See *Will*, 546 U.S. at 350 (describing "the substantial finality interests § 1291 is meant to further: judicial efficiency…and cost of a succession of separate appeals"). The preliminary injunction standard, by contrast, expressly contemplates the potential injuries arising from the threat of extraordinary Government conduct like the commissions convened here; it provides private parties with a means of forestalling those irreparable harms where they are likely to prevail on the merits and the injunction is consistent with a wider public interest. The preliminary injunction is not a prudential rule of judicial administration, like the collateral order doctrine, but a substantive tool explicitly designed to protect parties, when necessary, from overreaching Government actions. Accordingly, it contemplates a very different measure of "public interest" – one attentive to the public's interest in a Government that follows the law. *See, e.g., Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest.").

Finally, the Government notes that "the 'public has a strong interest in the prompt, effective, and efficient administration of justice.'" Opp. 64 (quoting *United States v. Poston*, 902 F.2d 90, 96 (D.C. Cir. 1990)). Hamdan could not agree more. But as Hamdan has explained, Mot. 9-10, rushing to try him just weeks after the Supreme Court has upended the foundations for his commission and acknowledged his right to habeas will lead to confusion, inefficiencies, and uncertainty. The effective administration of justice requires complying with the decisions of the Supreme Court, not seeking to evade them. Indeed, rushing forth at this juncture may do immense and irreparable damage not only to Hamdan, but to international law, as hundreds of Members of the European Parliament from all political parties have stated.[7]

## D.   HAMDAN IS LIKELY TO SUCCEED ON THE MERITS

The Government seems to view the Great Writ as a technicality that can be altered at will. *Boumediene* teaches otherwise: "Habeas corpus is a collateral process that exists, in Justice Holmes' words, to 'cu[t] through all forms and g[o] to the very tissue of the structure. It comes in from the outside, not in subordination to the proceedings, and although every form may have been preserved opens the inquiry whether they have been more than an empty shell.' Even when the procedures authorizing detention are structurally sound, the Suspension Clause remains applicable and the writ relevant." 128 S. Ct. at 2270 (alterations in original; citation omitted).

### 1.   This Court Has Authority to Grant the Requested Relief at This Time

#### a.   This Court May Grant a Preliminary Injunction to Preserve the Status Quo

To the extent this Court has any uncertainty as to whether 10 U.S.C. § 950j(b) applies and is constitutional, the Court still has authority to grant a preliminary injunction to preserve the status quo. To begin, questions about the scope of the constitutional habeas right are subsumed

---

[7] *See* Amicus Br. of U.K. and E.U. Parliamentarians at 19 (an injunction "is required to secure the public interest in maintaining and upholding the very freedoms that are being fought for in the war on terror" and "irreparable harm that will be done to the fabric of international law . . . if an unlawful process is allowed to proceed.").

within the ultimate merits of Hamdan's challenge, and so need not be resolved to grant preliminary relief at this stage of the case. *See, e.g.*, *Omar v. Harvey*, 416 F. Supp. 2d 19, 27 (D.D.C. 2006), *aff'd*, 479 F.3d 1 (D.C. Cir. 2007), *vacated on other grounds sub nom. Munaf, supra* (considering jurisdiction as an element of the likelihood of success on the merits). Given the "need to avoid 'an exaggeratedly refined analysis of the merits at an early stage in the litigation,' particularly where the requested injunctive relief seeks to maintain the status quo, the possibility that formulaic concepts of habeas may deprive the court of jurisdiction at a later stage of the litigation is not enough for this court to deny the motion for a preliminary injunction." *Id.* (quoting *Holiday Tours*, 559 F.2d at 844). To ensure that Hamdan "does not become a victim of a lack of precedent" this Court should likewise conclude that "the jurisdictional issues in the present case do not pose a fatal obstacle at this stage." *Id.* The Government acknowledges (Opp. 12) that this Court's decision about jurisdiction goes to the "likelihood of success on the merits."

Courts "unquestionably ha[ve] the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction." *United States v. United Mine Workers*, 330 U.S. 258, 290 (1947). Thus, even "if a case presents a 'substantial' jurisdictional question, . . . under the All Writs Act, 28 U.S.C. § 1651, a district court may act to preserve its jurisdiction while it determines whether it has jurisdiction." *Belbacha v. Bush*, 520 F.3d 452, 456 (D.C. Cir. 2008) (citations omitted); *see also Alhami v. Gates*, No. 05-cv-359 (GK) (D.D.C. Oct. 2, 2007) (granting injunctive relief to preserve jurisdiction over a Guantanamo habeas petition, pending a determination as to whether the court had jurisdiction).

Indeed, *Belbacha* held that a district court had jurisdiction to issue injunctive relief preserving the status quo in a Guantanamo habeas case even while binding circuit precedent held that Guantanamo detainees had no constitutional habeas rights. Now that the Supreme Court has

held that the detainees have constitutional habeas rights, the case for temporary relief is far stronger. If Hamdan's trial commences, this Court will forever lose the ability to vindicate Hamdan's pre-trial challenge to the jurisdiction and constitutionality of the commission.

### b.  The MCA Does Not Eliminate This Court's Jurisdiction

In any event, in light of *Boumediene* there can be no doubt that this Court has jurisdiction. Hamdan raises "substantial arguments denying the right of the military to try [him] at all." *Noyd v. Bond*, 395 U.S. 683, 696 n.8 (1969). The Suspension Clause protects his right to raise those arguments prior to trial. And because the Clause so provides, the MCA should either be construed as not applying to preclude this court's jurisdiction, or as unconstitutional. There has simply never been a case where an individual protected by the Clause was prevented from raising such "substantial arguments" before trial, and there are compelling legal, constitutional, and policy reasons not to set such a disastrously myopic precedent today.

The Government's weak and contradictory theories for why this Court lacks jurisdiction are unavailing. First, the Government suggests that under *Boumediene*, the commission itself somehow provides an adequate substitute for Hamdan's habeas right to challenge his detention. (This cannot be so, for even if Hamdan is acquitted, his unlawful detention at Guantanamo will continue until he has a proper hearing before this Court.) Then, the Government suggests that notwithstanding *Boumediene*, Hamdan has no right at all to collaterally challenge the military commission that seeks to detain him for the rest of his life. The inherent contradiction between these claims – that trial by commission functions as a habeas substitute, and yet habeas does not encompass challenges to military trial – reveals the weakness of the Government's arguments.

More than contradictory, the Government's contentions are self-defeating. It is *because* the MCA prevents defendants from vindicating a right not to be tried that it provides an

inadequate substitute for habeas. The Government's attempt to analogize the MCA process to the process available to courts-martial defendants only proves the point: Unlike under the MCA, court-martial defendants under the UCMJ both (1) have the right to take interlocutory appeals of particular pre-trial rulings;[8] and (2) have the right to pursue habeas corpus relief where the UCMJ process is inadequate.[9] The contradiction continues with the Government's claims that the MCA at once *bars* Hamdan's Geneva Convention claims (Opp. 61) but nonetheless provides an adequate substitute for these claims. MCA review is, by the Government's own admission, not adequate. Finally, *Boumediene* rejected the Government's assertion (Opp. 1, 27) that this Court should defer to Congress on the MCA's jurisdictional provisions—holding that the Judiciary "proceeds to its *own* independent judgment on the constitutional question." 128 S. Ct. at 2243.[10]

      c.   Collateral Attacks on Military Jurisdiction are Protected by the Suspension Clause

*In re Yamashita*, 327 U.S. 1 (1946), concluded that the political branches of the federal government "could not, unless there was suspension of the writ, withdraw from the courts the duty and power to make such inquiry into the authority of [General Yamashita's military] commission as may be made by habeas corpus." *Id.* at 9. This statement reflects an unbroken line of precedents dating to the earliest days of the Republic which recognize an individual's right to

---

[8] The MCA only authorizes interlocutory appeals by the Government, even where the defendant prevails in the trial court, only to have that decision reversed on the government's interlocutory appeal to the CMCR. Thus, the defendant has no means for vindicating rights that might be defeated by further proceedings before the commission. In contrast, the Court of Appeals for the Armed Forces has recognized the ability of *defendants* to take interlocutory appeals since its predecessor's decision in *United States v. Tucker*, 20 M.J. 52, 53 (C.M.A. 1985); *see also United States v. Lopez de Victoria*, 66 M.J. 67, 68–69 (C.A.A.F. 2008). Moreover, the military courts have long-recognized the availability of an interlocutory appeal through an extraordinary writ under the All Writs Act, 28 U.S.C. § 1651, *see, e.g.*, *Denedo v. United States*, 66 M.J. 114, 120 (C.A.A.F. 2008). *Neither* procedure is available under the MCA.

[9] Nothing in the UCMJ bars individuals subjected to court-martial proceedings from collaterally attacking the jurisdiction of those proceedings via habeas corpus beforehand, or after the fact. *See, e.g.*, *Adams v. Harrison*, No. 05-3427, 2008 WL 2051099 (D. Kan. May 13, 2008). In marked contrast, on the Government's reading, the MCA's preclusion of habeas corpus review is complete. No commission defendant may file a habeas petition, ever.

[10] Similarly, nothing in Justice Breyer's *Hamdan* opinion gave Congress a blank check. And Justice Kennedy's language about Congress was followed by a key limit: "The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment." 126 S.Ct. at 2799 (Kennedy, J., concurring).

use the Great Writ to challenge in the civilian courts his amenability to military jurisdiction.[11]

The Supreme Court has consistently recognized that military jurisdiction is harsh even at its best, and has therefore carefully policed the scope of that jurisdiction before trials begin.[12] Indeed, such challenges to military tribunals are generally limited to attacks on the constitutionality, jurisdiction, and fundamental fairness of the proceedings, *see, e.g.*, *Burns v. Wilson*, 346 U.S. 137 (1953) (plurality); *United States v. Grimley*, 137 U.S. 147 (1890). The fact that the civilian courts as a general matter do not exercise "supervisory" jurisdiction over final decisions of military courts, *see, e.g., Grimley*, 137 U.S. at 150; *Hiatt v. Brown*, 339 U.S. 103, 110–11 (1950), only strengthens the vital role played by pretrial habeas; in the context of commissions, pretrial habeas allows Article III courts to review what is a form of executive detention, *not* the proceedings of an independent court of record. *Cf. Boumediene*, 128 S. Ct. at 2270–71 (suggesting that the scope of habeas review depends on the nature of the proceedings). As *Schlesinger v. Councilman* explained: "this general rule [barring post-conviction supervisory jurisdiction] carries with it its own qualification—that the court-martial's acts be 'within the scope of its jurisdiction and duty,'" 420 U.S. 738, 746 (1975), and a series of cases in the 1950s—in which the Court reached the merits of habeas petitions brought by citizens detained abroad despite substantial doubt as to *statutory* jurisdiction in light of *Ahrens v. Clark*, 335 U.S. 188 (1948)—further bolsters that conclusion. Mot. 15-16.

The Supreme Court has never held that an individual protected by the Suspension Clause is precluded from collaterally attacking military jurisdiction via habeas. Instead, *Boumediene*

---

11. *See, e.g.*, *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006); *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234 (1960); *Reid v. Covert*, 354 U.S. 1 (1957) (plurality); *United States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955); *Madsen v. Kinsella*, 343 U.S. 341 (1952); *Duncan v. Kahanamoku*, 327 U.S. 304 (1946); *Ex parte Quirin*, 317 U.S. 1 (1942); *Ex parte Reed*, 100 U.S. 13 (1879); *Ex parte Yerger*, 75 U.S. (8 Wall.) 85 (1869); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866); *cf. Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807) (Marshall, C.J.);.*Houston v. Moore*, 18 U.S. (5 Wheat.) 1 (1820); *Wise v. Withers*, 7 U.S. (3 Cranch) 331 (1806); *cf. Chancey's Case*, 77 Eng. Rep. 1360 (K.B. 1611); *Mrs. Barney's Case*, 87 Eng. Rep. 683 (K.B. 1701);

12 *E.g., Toth*, 350 U.S. at 11; Amicus Br. of Richard D. Rosen et al., *Hamdan*, at 1-28, available at 2006 WL 53987.

emphasized the Writ's "adaptable" and "equitable" nature; it is not a "static, narrow, formalistic remedy." 128 S. Ct. at 2267 (citations omitted). "[T]he common-law habeas court's role was most extensive in cases of *pretrial* and noncriminal detention." *Id.* at 2267 (emphasis added).

The Government claims that *Munaf* limits habeas to detention challenges. This is a semantic quibble—Hamdan is challenging his *punitive detention*.[13] As the Court observed, what the *Munaf* petitioners wanted was to *not* be released from U.S. protective custody. 128 S. Ct. at 2214.[14] Hamdan would welcome release, and challenges his commission because it seeks a lifetime detention. Hamdan's challenge falls squarely within the scope of dozens of other challenges to military trials, such as *Quirin* and *Hamdan*, that the Court has historically entertained.[15] The fact that the Government asserts some other authority for detaining him does not mean his challenge is not to his current detention.[16]

If individuals merely being detained have a right to challenge their detention, then detainees who are set to be tried must have an even stronger right to challenge a trial that may result in life imprisonment or death. Those merely detained *must be released* at the end of the "particular conflict in which they were captured." *Hamdi*, 542 U.S. at 518, 521 (plurality). Individuals tried by commissions face no such prospect of freedom. Moreover, the Government's

---

[13] As the Government acknowledges, moreover, Hamdan's Petition *does* challenge his detention as an enemy combatant. Opp. 18 n.4 (citing Mot. 20 n.12). And he claims that without habeas review of his commission, his right to challenge his detention as an enemy combatant, under *Boumediene*, will be delayed if not vitiated outright. Mo. 6.

[14] *Munaf* denied relief where Petitioners sought protection from foreign trial because its "cases make clear that Iraq has a sovereign right to prosecute Omar and Munaf for crimes committed on its soil." 128 S. Ct. at 2221 (citing *Neely v. Henkel* in which the Court "held that habeas corpus was not available to defeat the criminal jurisdiction of a foreign sovereign"); *id.* at 2224 ("To allow United States courts to intervene in an ongoing foreign criminal proceeding and pass judgment on its legitimacy seems at least as great an intrusion as the plainly barred collateral review of foreign convictions."). That analysis is misplaced here, as Hamdan faces trial by the United States.

[15] Indeed, as this Court has noted, the writ of habeas corpus has its origins in precisely such inquiries. *Hamdan v. Rumsfeld*, 464 F. Supp. 2d 9, 13 (D.D.C. 2006) ("central courts would grant such writs to assert the primacy of their jurisdiction"); *see also* Gerald L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 COLUM. L. REV. 961, 982-83 (May 1998) (describing cases).

[16] The Government unwittingly concedes the point when stating that a commission can release him from "punitive detention." Opp. 22. A contrary rule would mean that habeas would be unavailable for any defendant being detained for more than one reason (such as crimes in different jurisdictions).

suggestion that trial by commission constitutes the "day in court" to which *Boumediene* held the detainees entitled makes the need for habeas review all the more imperative. Since the Government views the commission as substituting for Hamdan's right to a hearing to challenge his detention, Hamdan's challenge goes directly to the lawfulness of his detention.[17]

Separate from the constitutional deficiency, there is thus a logical fallacy in the Government's position, for if the Executive could frustrate an individual's right under the Suspension Clause to civilian courts merely by subjecting him to trial before a commission, the right that Blackstone called "the stable bulwark of our liberties," 1 WILLIAM BLACKSTONE, COMMENTARIES *137, would be rather flimsy—not just for Hamdan, but for all detainees, any of whom could be "charged" and have their habeas proceedings delayed indefinitely.

### d.   The MCA Fails To Provide an Adequate Habeas Substitute

Because Hamdan's right to contest the jurisdiction and fundamental fairness of his military tribunal in advance lies at the heart of the Suspension Clause, the Government's argument that 10 U.S.C. § 950j(b)[18] is a valid "channeling" provision lacks merit. As explained in Petitioner's Opening brief at 14-15, the better reading is that it merely codifies the rule that civilian courts lack post-conviction supervisory jurisdiction over military tribunals but that they retain the power to hear pretrial jurisdiction challenges. Otherwise, § 950j(b) is unconstitutional.

*First*, the MCA provides no opportunity—let alone an *adequate* opportunity—for Hamdan to vindicate his right not to be tried before the trial begins. As the Court has recognized time and again, where the defendant claims a right not to be tried, that right would necessarily be frustrated without the ability to seek pre-trial relief. *E.g.*, *Lauro Lines S.R.L. v. Chasser*, 490 U.S.

---

[17] *Boumediene* cites many pre-trial cases to define the Writ. *E.g., Hamdan, supra; Reid* 354 U.S. at 4 (cited at 128 S. Ct. at 2251); *Quirin*, 317 U.S. at 19 (cited at 128 S. Ct. at 2271); *Ex parte Royall*, 117 U.S. 241, 244 (1886) (cited at 128 S. Ct. at 2268); *Bollman, supra; People v. Martin*, 7 N.Y. Leg. Obs. 49 (1848) (cited at 128 S.Ct. at 2267).

[18] In the interest of brevity, Petitioner focuses on the Government's arguments concerning MCA § 3. MCA § 7, if read to remove this Court's jurisdiction, would violate the Suspension Clause in the same way.

495, 499–500 (1989) ("[I]n cases involving criminal prosecutions…the deprivation of a right *not to be tried* is effectively unreviewable after final judgment and is immediately appealable."); *Helstoski v. Meanor*, 442 U.S. 500 (1979); *Abney v. United States*, 431 U.S. 651 (1977).[19]

A majority of the Supreme Court, in *Hamdan*, has already stated that Hamdan's challenges go to the jurisdiction of the military commission. In discussing Hamdan's Common Article 3 challenge, the Court said "it appears that the [jurisdictional] exception would apply here…. Hamdan raises a substantial argument that, because the military commission that has been convened to try him is not a 'regularly constituted court' under the Geneva Conventions, it is ultra vires and thus lacks jurisdiction over him." 126 S. Ct. at 2772 n.20; see also *id.* at 2793 n.55 ("The text of the Geneva Conventions does not direct an accused to wait until sentence is imposed to challenge the legality of the tribunal that is to try him."). Hamdan makes the very same challenge in this motion. These claims are cleanly distinct from Petitioner's guilt or innocence, and concern the same matters that led this court, and the Supreme Court, to enjoin Hamdan's last commission. They do not concern an accidental "classic 'trial error,'" *Arizona v. Fulminante*, 499 U.S 279, 309 (1991), but rather an unlawful application of military jurisdiction and systemized and foreseeable denial of rights that are "structural defects in the constitution of the trial mechanism [itself], [and] which defy analysis by 'harmless-error' standards." *Id.*[20]

*Second*, the MCA would postpone Hamdan's access to federal court for years (if not forever). The review provided by the MCA is only triggered once the "convening authority"

---

[19] *Gusik v. Schilder*, 340 U.S. 128 (1950), is not to the contrary. In *Gusik*, the Court held that a habeas petition had been erroneously granted due to exhaustion. *Id.* at 132; see also *Boumediene*, 128 S. Ct. at 2281 (Roberts, C.J., dissenting) (discussing *Gusik*). Such a rule necessarily presupposes the existence of adequate and available remedies in the military courts, something that is woefully lacking here. See also *Councilman*, 420 U.S. at 758–59 (noting the distinction between *Gusik* and cases such as *Toth*, *Reid*, and *McElroy*, where exhaustion was not required).

[20] Nor does the commission employ a jury–and encroachment on the jury function traditionally warrants interlocutory review. *E.g.*, *Beacon Theat. v. Westover*, 359 U.S. 500, 501 (1959) ("We granted certiorari because 'Maintenance of the jury as a fact-finding body is of such importance…that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.'") (citations omitted).

approves the "final decision" of the military commission, *see* 10 U.S.C. § 950c(a), even though the statute nowhere specifies a timeframe within which such action must be taken – allowing the Government to indefinitely avoid review. *Boumediene* emphasized the unacceptable delay attendant to waiting for the DTA review process. See 128 S. Ct. at 2275 (noting that waiting for the Circuit "would be to require additional *months*, if not years, of delay") (emphasis added). *Boumediene* even distinguished *Swain v. Pressley*, 430 U.S. 372 (1977), because "the purpose and effect of the statute was to expedite consideration of the prisoner's claims, not to delay or frustrate it." 128 S. Ct. at 2264*; see also Hamdan*, 126 S. Ct. at 2770 n.17 ("'Under accepted principles of comity, the court should stay its hand only if the relief the petitioner seeks…would also be available to him with reasonable promptness and certainty through the machinery of the military judicial system'") (quoting *Parisi v. Davidson*, 405 U.S. 34, 41-43 (1972)).

*Third*, the statute does not even provide an adequate opportunity for Hamdan to vindicate his jurisdictional and other structural challenges to the proceedings *after the fact*. The MCA provides even less of an adequate substitute for challenges to trial than the DTA does for challenges to detention.[21] As the Court has already held the DTA to provide an inadequate

---

[21] The DTA and MCA's convoluted provisions may not provide military commission defendants with any recourse at all to the federal courts. DTA § 1005(e)(3) provided for limited review of decisions of military commissions. But MCA § 3 explicitly states that "[e]xcept as otherwise provided *in this chapter* and *notwithstanding any other provision of law* (including section 2241 of title 28 or any other *habeas corpus* provision), no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever . . . relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter." 10 U.S.C. § 950j(b)) (emphasis added). Since DTA section 1005(e)(3) is codified in Chapter 47 of Title 10 as opposed to Chapter 47A (where the MCA is codified), the MCA explicitly shuts off any recourse to DTA review procedures. See MCA § 3(a)(1) ("Subtitle A of title 10, United States Code, is amended by inserting after chapter 47 the following new chapter: Chapter 47A-Military Commissions").

Section 7 of the MCA, however, states that "[e]xcept as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005, no court, justice, or judge shall have jurisdiction to hear or consider any other action . . . relating to any aspect of the . . . trial . . . of an alien" detained as an enemy combatant. This provision seems to nullify the review provided in section 3(a). Thus, one could fairly read the MCA as providing *no* valid provision at all for review of commissions by an Article III court. On the one hand, the provisions of DTA section 1005(e)(3) are inapplicable because they appear in a different chapter of the U.S. Code than the MCA. On the other hand, the MCA's own provisions for review of commission decisions appearing in section 3(a) appear to be inapplicable by virtue of section 7(a)'s mandate that only DTA section 1005(e)(3) can be used to challenge trials.

alternative, *see* 128 S. Ct. at 2263–69, the MCA scheme is *a fortiori* inadequate in this case.

Even if meaningful post-trial review *could* ever be an adequate substitute for the habeas right not to be tried by an unlawful commission that lacks jurisdiction, the MCA does not provide for such comprehensive post-trial review. The relevant provision states:

> The jurisdiction of the Court of Appeals on an appeal [of a final judgment rendered by a military commission] shall be limited to the consideration of—
> (1)    whether the final decision was consistent with the standards and procedures specified in this chapter; and
> (2)    to the extent applicable, the Constitution and the laws of the United States.

10 U.S.C. § 950g(c). The second subsection derives from section 1005(e)(3)(D) of the DTA, which limited the scope of the D.C. Circuit's review to

> (i)    whether the final decision was consistent with the standards and procedures specified in [Military Commission Order No. 1]; and
> (ii)    to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to reach the final decision is consistent with the Constitution and laws of the United States.

DTA § 1005(e)(3)(D), 119 Stat. at 2743. As this comparison reveals, the MCA limits judicial review of a commission even more than the DTA does of a CSRT. To the extent the MCA's cryptic provision allows federal courts any recourse to the Constitution and laws, it does not specify whether the D.C. Circuit may evaluate the commission's procedures and standards against those laws or whether it may consider only the commission's final decision in a particular case.[22] Either way, this is more limited than the (already inadequate) review prescribed by the DTA, which actually does specify the role of federal law and the Constitution.[23]

---

[22] The Government claims the appeals process is fully independent of the Executive. E.g., Opp. 28. But unlike CAAF, the Court of Military Commission Review is hand-picked. Its Chief Judge, Frank Williams, is not a member of the military. He has previously written: "Certainly, one cannot seriously argue that the MCA and DTA with their four levels of review before four separate bodies of jurists are in any way inadequate or ineffective. The United States Government has stood firmly committed to affording 'full and fair' trials before military commissions." Frank Williams et al., *Still a Frightening Unknown*, 12 Roger Williams U. L. Rev. 675, 739 (2007).

[23] Removing district judges from the process undermines the adequacy of the substitute, as *Boumediene* held, by compromising the factfinding capacity. 128 S.Ct. at 2266. This is equally true with respect to military commissions. The Court also criticized the open-ended use of hearsay, *id.* at 2269, which is true of commissions as well.

As Justice Kennedy wrote of the DTA language, "If Congress had envisioned DTA review as coextensive with traditional habeas corpus, it would not have drafted the statute in this manner." 128 S. Ct. at 2265; *see also id.* at 2266 (noting Congress's intent to make review of commission convictions narrower than habeas). In particular, the MCA appears to prohibit review of claims that the commission lacked jurisdiction over the defendant or subject-matter; and that the commission's standards and procedures violated the defendant's treaty rights.

Moreover, contrary to the Government's claims (20, 21), the MCA prohibits review of facts: "the Court of Appeals may act only with respect to matters of law." 10 U.S.C. § 950g(b). The DTA, in contrast, requires judicial review of facts for challenges to CSRTs. *See* DTA § 1005(e)(2)(C)(i) (with respect to CSRTs the D.C. Circuit must ensure "that the conclusion of the Tribunal be supported by a preponderance of the evidence"). This DTA provision requiring factual review of CSRTs has led the D.C. Circuit to enunciate evidentiary and procedural rules. *Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007). Because the MCA forbids the Circuit to consider factual issues regarding commissions, it will be unable to issue similar orders.

The government's separate attempt to analogize § 950j(b) to 8 U.S.C. § 1252(a)(5) further testifies to its fundamental misappreciation of Hamdan's claims. Section 1252(a)(5) was enacted as part of the REAL ID Act, the purpose of which was to *expand* judicial review of removal orders in the context of federal immigration law, not to *eliminate* such review altogether. *Cf. Boumediene*, 128 S. Ct. at 2264 ("The statutes at issue were attempts to streamline habeas corpus relief, not to cut it back."). As the Eleventh Circuit has explained,

> While limiting the avenues of judicial review, the REAL ID Act expanded courts of appeals' jurisdiction to consider constitutional and legal questions presented in a petition for review. Congress believed that "[b]y placing all review in the courts of appeals, [the REAL ID Act] would provide an 'adequate and effective' alternative to habeas corpus." The thinking was that the Act "would not change the scope of review that criminal aliens currently receive, because habeas review does not cover

discretionary determinations or factual issues that do not implicate constitutional due process." Because Congress gave courts of appeals jurisdiction to review all legal and constitutional errors in a removal order, habeas review became unnecessary.[24]

There is simply no analogue in the context of removal proceedings, moreover, to the right not to be tried at issue here. Thus, whereas plenary appellate jurisdiction upon the *completion* of administrative proceedings suffices to make "habeas review . . . unnecessary" in the context of removal proceedings, it is wholly *inadequate* (assuming that it is even plenary, a point that is itself very much doubtful) in the context of a right not to be tried by a commission.[25]

*Fourth*, a tribunal of limited jurisdiction cannot be the judge of its own jurisdiction. The Writ has long distinguished between persons tried by civilian criminal courts of general jurisdiction, and those tried by the military.[26] Because habeas is at its zenith when challenging the validity of these inferior courts, any adequate substitute must allow a full opportunity to challenge the legal and factual basis of their trial. The MCA provides defendants before military commissions with neither, and so is inherently inadequate as a habeas replacement. Indeed, this question has been largely settled by *Boumediene*. The majority stated that "where relief is sought from a sentence that resulted from the judgment of a court of record . . . considerable deference

---

[24] *Alexandre v. U.S. Att'y Gen.*, 452 F.3d 1204, 1206 (11th Cir. 2006) (per curiam) (alterations in original; citations omitted); *see Ramirez-Molina v. Ziglar*, 436 F.3d 508 (5th Cir. 2006); *Enwonwu v. Gonzales*, 438 F.3d 22 (1st Cir. 2006); *see also* 8 U.S.C. § 1252(a)(2)(D) (noting that no provision "which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section").

[25] The same analysis also applies to the Government's attempt to analogize the MCA to 28 U.S.C. § 2254 (Opp. 24). Section 2254 expressly *exempts* from its exhaustion requirement cases where "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). Relying on this provision, the federal courts routinely entertain habeas petitions from state criminal defendants seeking to vindicate rights not to be tried, including those derived from the Double Jeopardy and Speedy Trial Clauses. *See, e.g.*, *Bies v. Bagley*, 519 F.3d 324, 330 & n.4 (6th Cir. 2008).

[26] As Chief Justice Marshall explained, on habeas review a judgment from a military tribunal – an "inferior court[] of limited jurisdiction" – is "not placed on the same high ground with the judgments of a court of record" such as a civilian court. *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 209 (1830). At common law, "[t]he judgments or orders of these tribunals of special and limited jurisdiction did not carry the same presumption of validity as the judgments of a superior court [i.e. a court of general jurisdiction]." Gerald Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 Colum. L. Rev. 961, 982 (1998). These tribunals "might employ less protective procedures than the common law courts," *id.* at 982 n.115, so habeas requires greater scrutiny of their jurisdiction and legality.

is owed to the court . . . [and] the prisoner should exhaust adequate alternative remedies before filing for the writ in federal court." 128 S. Ct. at 2268. *But*, as the Court then noted, "[m]ilitary courts are not courts of record. And the procedures used to try General Yamashita have been sharply criticized by Members of this Court." *Id.* at 2271 (citations omitted). The commission's procedures are far inferior to those of a court of record; in fact, Respondents do not defend their process against allegations by their own former chief prosecutor that it is politicized and illegal.

In sum, the MCA does not channel Hamdan's claims into a meaningful post-conviction appeal; rather, it channels them into the very military process whose jurisdiction he disputes, and provides no meaningful opportunity for timely independent review by the Article III courts.

### 2. Abstention Would be Inappropriate in This Case

The previous section fully rebuts the Government's request that this Court abstain for prudential reasons. The discussion above establishes that: (1) Abstention would be topsy-turvy, forcing dozens of defendants to go through a trial that may be invalidated (as it was the last time, in 2006); (2) Abstention does not apply to jurisdictional challenges as a right not to be tried cannot be rectified after trial—and the bulk of Hamdan's claims go to the commission's lack of personal and subject-matter jurisdiction; (3) Abstention does not apply when someone is challenging the very legitimacy and legality of the tribunal that will try him—particularly a novel tribunal whose basic ground rules are entirely up in the air; (4) Abstention is inappropriate when the challenges involve no particular facts that trial would illuminate (as is the case with Hamdan's claims); and (5) Abstention is inappropriate when there is no guarantee of prompt review. There is absolutely no timetable for review of a conviction in a commission, and the 6-year delay thus far (and 2 year delay under the MCA) does not augur well. Indeed, Hamdan's Ex Post Facto challenge was briefed in January and argued in February before the military

commission, and was just denied today, moments before this brief was to be filed.

The Government makes much of the rights defendants receive at trial (e.g., Opp. 1-2), but even if its summary is accurate, those protections have little to do with jurisdictional habeas challenges, even for non-novel tribunals such as courts-martial. *See Noyd, supra*. In any event, these representations are strikingly similar to those offered last time. E.g., Oral Arg. Tr., at 16-19 (Oct. 25, 2004); Govt Mot. Dismiss, *Swift v. Rumsfeld*, at 8-9 (Aug. 6, 2004); U.S. Br., Hamdan v. Rumsfeld, No. 05-184, at 4 (Feb. 2006). Yet every court rejected abstention.

The Government also embraces a narrow view of "jurisdictional" challenges that *Hamdan* rejected. 126 S. Ct. at 2772 n.20 (noting that jurisdictional exception is well beyond "personal" challenges and includes "ultra vires" ones). And in any event, *Noyd* rejected abstention because the Court "did not believe that the expertise of military courts extended to the consideration of constitutional claims of the type presented." 395 U.S. at 696 n.8; see also *Councilman*, 420 U.S. at 758 (quoting *Noyd*). Those arguments are at their apogee here.

*Boumediene* reaffirmed these points, going out of its way to quote *Hamdan* approvingly. 128 S. Ct. at 2262 ("[A]bstention is not appropriate in cases…in which the legal challenge 'turns on the status of the persons as to whom the military asserted its power.'") (internal citations and punctuation omitted); *id.* at 2302 (Scalia, J., dissenting) (stating that an implication of the opinion is that "those prisoners whom the military plans to try by full-dress Commission at a future date may file habeas petitions and secure release before their trials take place.").[27]

Controlling Circuit precedent also establishes that abstention is inappropriate. *See*

---

[27] The Government rightly points out that *Boumediene* noted that there was an "adversarial structure" in past commissions, 128 S. Ct. 2271, but the Court did not say that this factor required abstention. Indeed, in one of the cases it cited, *Quirin*, the Court pointedly did not abstain despite that structure. And the commission in *Hamdan* itself had an adversarial structure, but that was not enough to preclude abstention. For that matter, the Court's decision to grant rehearing in *Boumediene* was itself a repudiation of the Government's abstention argument. *See* 128 S.Ct. at 2280 (Roberts, C.J., dissenting) (emphasizing that exhaustion required ruling against detainees).

*Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152, 157 (D.D.C. 2004) (discussing *New v. Cohen*, 129 F.3d 639 (D.C. Cir. 1997)). The Government pretends *New* was only about congressional authorization (Opp. 9-10)—but *New* itself rejected this notion. 129 F.3d at 643 (stating that there are "two principal reasons" for abstention, servicemember discipline and the assumption that Congress' military court system will vindicate rights). As this Court has already found, servicemember discipline is absolutely inapposite. 344 F. Supp. 2d at 157.[28] And the MCA analogy to the UCMJ is weak; the MCA is of recent vintage, was rushed through Congress, already invalidated (in part) by the Supreme Court, and only applies to people who cannot vote.

As with the Government's jurisdictional arguments, to the extent this Court is uncertain about abstention, that is no bar to preserving the status quo. The Government acknowledges that abstention only goes to one of the preliminary injunction factors--likelihood of success on the merits (Opp. 12-13). Temporary relief would give the parties, and this Court, the opportunity to fully address this issue. If the commission proceeds, this Court will lose that chance forever.

### 3. The Constitution Applies at Guantanamo Bay

Hamdan's opening brief explained in detail why the Constitution's protections apply to Guantanamo. Mot. 18-23. Because the entire military commission system was predicated on the opposite assumption, this alone strongly counsels in favor of a preliminary injunction.

The Government's core premise is that Hamdan is "abroad." Opp. 36. This assumption sets up a cascading, and irrelevant, discussion of *Agostini v. Felton*, 521 U.S. 203 (1997). Opp.

---

[28] None of the Government's other cases are helpful. *O'Callahan v. Parker*, 395 U.S. 258 (1969), and *Solorio v. United States*, 483 U.S. 435 (1987), concern subject matter jurisdiction for courts-martial, not abstention to new-fangled commissions. *Hollywood Motor*, 458 U.S. at 271, *United States v. Baucum*, 80 F.3d 539, 540 (D.C. Cir. 1996), and *Deaver v. Seymour*, 822 F.2d 66 (D.C. Cir. 1987), involve the regular *civilian* criminal system.

Nor is *Munaf* (Opp. 3) helpful. First, trial by a Guantanamo commission is anything but "the orderly administration of criminal justice"— that is the essence of Hamdan's claims. A preliminary injunction would be appropriate precisely to foster the "orderly administration of criminal justice." Second, the point made in *Munaf* originally comes from *Fay v. Noia*, which held that federal courts possess habeas jurisdiction even if criminal defendants do not exhaust other avenues of relief. 372 U.S. 391, 434 (1963).

37. *Boumediene* put this notion to rest: "Guantanamo . . . is no transient possession. *In every practical sense*, Guantanamo is not abroad; it is within the constant jurisdiction of the United States." 128 S. Ct. at 2261 (citations omitted) (emphasis added). *Boumediene* does not change the calculus when one is truly abroad—where there is some other controlling entity in practice. But it does articulate the binding framework for applying the Constitution at Guantanamo.

*Boumediene*'s central logic is that "[o]ur basic charter cannot be contracted away" with artificial notions of sovereignty. 128 S. Ct. at 2259. The Government is conducting these trials, with its most awesome powers at issue, in a place where it claims it may "switch the Constitution on or off at will"—except for one aspect—the Suspension Clause for some detention. *Boumediene* rejected that notion because it would "lead[] to a regime in which Congress and the President, not this Court, say 'what the law is.'" *Id.* (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)). This situation at Guantanamo is, as *Boumediene* held, unique. 128 S. Ct. at 2262.

The *Insular Cases* (which did extend fundamental rights to territories)[29] were grounded in the fear of "uncertainty and instability that could result from a rule that displaced altogether the existing legal systems in these newly acquired Territories." 128 S.Ct. at 2254. Even that principle does not apply to Guantanamo. "[N]o law other than the laws of the United States applies at the naval station." 128 S. Ct. at 2251. "The United States has maintained complete and uninterrupted control of the bay for over 100 years." *Id.* at 2258. Nor can it be seriously contended that Hamdan would be in a "more protected position that our own soldiers." Opp. 38. Hamdan has been detained for six years, in military prison, without credible charges or access to any process whatsoever. It would be foolhardy to suggest that such treatment could be dispensed to U.S.

---

[29] 128 S.Ct. at 2254-55 (citing *Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922), for the proposition that "the real issue" in the *Insular* cases was not *if*, but rather *what* constitutional provisions apply).

soldiers in the name of military justice.[30] Rather, Hamdan seeks merely the bare modicum of rights *already* extended to territories in the *Insular Cases* and now *Boumediene*.

The Government simply ignores *Boumediene*'s analysis about the effect of structural constraints. 128 S. Ct. at 2259. Outside of a cryptic nod to "[s]imilar reasoning," (Opp. 38), it offers no response to Hamdan's point that the Ex Post Facto, Bill of Attainder, and Define and Punish Clauses are, like the Suspension Clause, enforceable structural constraints. Mot. 20-21; *Downes v. Bidwell*, 182 U.S. 244, 291-292 (1901).

Furthermore, the Government is wrong that due process does not apply at Guantanamo. First, *Boumediene* requires a "practicality" determination, and the Government offers nothing in that regard. The test is not whether the rights are inconvenient, but whether they would destabilize a host government or be contrary to local cultural norms. 128 S. Ct. at 2254. *Boumediene* hampers the ability of the Government to make such claims.[31] Second, the Government ignores circuit precedent.[32] *Ralpho v. Bell* concluded that the Due Process Clause applied, "because even under the most restrictive standard it is settled that 'there cannot exist under the American flag any governmental authority untrammeled by the requirements of due process of law.'" 569 F.2d 607, 618-19 (D.C. Cir. 1977) (citation and footnote omitted).[33]

---

[30] Nor can it be contended that Hamdan would receive greater protections than resident aliens at the Founding. Opp. at 38. Not only did the Enemy Alien Act, 50 U.S.C. § 21, contain myriad procedural and jurisdictional safeguards, it also "only applied—explicitly by its terms—to *declared* wars." Most critically, the Act applied only "to *nations* at war with the United States." Katyal, *Equality in the War on Terror*, 59 Stan. L. Rev. 1365, 1377-1378 (2007).

[31] Mo. 19-20. *Boumediene* inductively reasoned not from structural principles, but individual rights. 128 S.Ct. at 2246 ("Because the Constitution's separation of powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments, see *Yick Wo v. Hopkins*, protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation of powers principles.") (citations omitted).

[32] Nor is *Verdugo-Urquidez* to the contrary, since the Court limited its analysis to the objective factors presented in that case and focused heavily on the textual 4th Amendment guarantee to "the people." 494 U.S. 259, 271-272 (1990) ("The extent to which respondent might claim the protection of the Fourth Amendment if the duration of his stay in the United States were to be prolonged—by a prison sentence, for example—we need not decide.").

[33] The history of the Fifth Amendment is replete with examples of its application to aliens in U.S. territory. *Cf. Yick Wo v. Hopkins*, 118 U.S. 365, 369 (1886) (Clauses are "universal in their application and, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality.") Yet, the clauses are not so geographically limited, and in recent cases the Court has strongly hinted, if not implicitly held, that due process

### 4.       The Commission Violates the Ex Post Facto Clause and Lacks Jurisdiction

As laid out in Hamdan's opening brief, Mot. 26-31, the crimes with which Hamdan is charged violate the Ex Post Facto Clause and Common Article 3. The conspiracy charge is functionally identical to the one a Supreme Court plurality has found was not a violation of the laws of war at the time of Hamdan's alleged conduct in 2001. 126 S. Ct. at 2780-81.

The Government now urges this Court to discard this considered precedent.[34] In support of its position, the Government describes the Supreme Court plurality's view as "not accurate" (42) and proffers the same arguments rejected in its first unsuccessful attempt – citing to the charges in *Ex Parte Quirin*, 317 U.S. 1, 23 (1942), and William Winthrop's treatise. These issues were briefed thoroughly by both sides and amici in *Hamdan*, and were rejected after lengthy discussion. The Government's attempt to analogize conspiracy to joint criminal enterprise fails, as that is a form of liability for particular substantive offenses and not a stand-alone offense; the plurality rejected this theory when they found that the original conspiracy charge, which claimed to punish Hamdan's participation in a joint enterprise, had no basis in international law. *See* Br. of Petitioner at 30 n.21, *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) (No. 05-184).

Like conspiracy, material support for terrorism was not a violation of the law of war in 2001. The Government puts great effort (Opp. 43-45) into demonstrating that its definition of terrorism for the purposes of this litigation– harming protected persons or acting as a guerilla—is illegal under international law. The relationship between stateless, territory-less terrorists and "guerillas" is far from clear. In any event, Hamdan does not contest the point that harming

---

extends extraterritorially. *C.f. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J., concurring) (citing Justice Harlan's observation in *Reid v. Covert*, "the question of which specific safeguards . . . are appropriately to be applied in a particular context . . . can be reduced to the issue of what process is 'due' a defendant in the particular circumstances of a particular case." 354 U.S. 1, 75 (1957)).

[34] That the only authority the Government can find to rebut Hamdan's observation that this precedent functions as law of the case is a single Alabama state court decision speaks for itself. See Opp. at 41.

protected persons violates the laws of war. But Hamdan is not charged with being a guerilla or participating in a terrorist plot, but instead with *material assistance*. As to that charge, the Government offers nothing suggesting that assisting a guerilla organization is a war crime. All of the relevant precedents, including past commissions, utterly rebut that notion. Mot. 29. [35]

Congress' inaccurate statement in 10 U.S.C. § 950p that it is merely codifying existing crimes cannot retroactively make these offenses war crimes in 2001. A generic statutory statement that a piece of legislation does not violate the Constitution does not make it so; it is for the courts to decide "what the law is" and whether the MCA violates the Constitution. *Boumediene*, 128 S. Ct. at 2262. The Government attempts to twist *United States v. Arjona*, 120 U.S. 479 (1887), to imply that the Define and Punish Clause gives Congress the power to decide for itself what is a crime under international law. Opp. 48. In fact, *Arjona* stands for the opposite. 120 U.S. at 488 ("Whether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by congress."). The Government also cites Justice Kennedy's *Hamdan* concurrence in support of its novel view. Opp. 40-41. When read in context, it is clear that Justice Kennedy is discussing Congress's power to define crimes committed in the future, not to retroactively reinterpret existing law. 126 S. Ct. at 2809.

Because neither conspiracy nor material support was a violation of the law of war at the time of the conduct, prosecuting Hamdan for them violates the Ex Post Facto Clause. The Government has available to it numerous crimes, including terrorism or attempted terrorism with which it might charge Hamdan under the MCA. See 10 U.S.C. §§ 950v(b)(24), 950t. That the Government has declined to prosecute Hamdan for them reveals the weakness of its claims that

---

[35] The Government (Opp. 45) cites to Civil War cases in which rebels were tried for joining guerilla bands. But those defendants were actually tried for their active violations of the law of war, not for "material assistance." Similarly, the War Department's *Rules of Land Warfare* (1914) demonstrates that there was no such offense as material support. Every charge except treason requires the accused to have personally participated in a violent act.

he violated the laws of war in 2001. Those crimes, like any notion of joint enterprise liability recognized by the law of war, require significant, personal culpable action by an individual, as opposed to the more nebulous conduct for which the Government wishes to convict Hamdan.

Nor does the trial judge's ruling[36] today provide any additional support for the Government. Most fundamentally, despite the standard announced by the Supreme Court that precedent for identifying such conduct as war crimes "must be plain and unambiguous," *Hamdan*, 2749 S. Ct. at 2780 (plurality), and despite the finding by four of the Justices that conspiracy "is not a violation of the law of war," *id.* at 2784, the commission opted for a far lower standard. It held that "the Government has shown, by *a preponderance of the evidence*, that Congress had an adequate basis upon which to conclude that conspiracy and material support for terrorism have traditionally been considered violations of the law of war." Ruling at 6. Rather than hold to "universal agreement and practice," *Quirin*, 317 U.S. at 30, or independently engage in an inquiry,[37] the commission largely deferred to Congress's express declaration in the MCA that it was not establishing new crimes: "[T]he Commission is inclined to defer to Congress's determination that [these are] not [ ] new offense[s]." Ruling at 6.

Thus, here again, the commission concedes to the political branches the power to say "what the law is" despite the separation of powers concerns highlighted in *Boumediene*. 128 S. Ct. at 2259. The commission permitted Congress to turn back the clock and make something not a crime. The *Hamdan* plurality concluded to the contrary, in interpreting an Act of *Congress* that limited the jurisdiction of commissions to "offenses that . . . by the law of war may be tried by military commissions." 10 U.S.C. § 821. If conspiracy was not such an offense in June 2006, it simply does not follow that it became one simply by virtue of a subsequent Act of Congress (the

---

[36] Ruling on Motion to Dismiss (Ex Post Facto), Second McMillan Decl., Ex. M, attached herewith.

[37] E.g., 317 U.S. at 29 ("We must therefore first inquire into whether any of the acts charged is an offense against the law of war")

MCA) that expressly disclaimed that it was defining new crimes. 10 U.S.C. § 950p(a).

In addition, with regard to material support, the trial judge completely ignored Hamdan's argument that he is charged only with providing material *assistance*, concluding merely that the MCA's definition of "material support" includes within its scope conduct that has traditionally been recognized as an offense against the laws of war. *See, e.g.*, Ruling at 5 ("Intentionally killing or inflicting great bodily harm upon a protected person is clearly a violation of the law of war."). While that statement is accurate, it is beside the point. Although the MCA's definition of "material support" would *include* such conduct, it sweeps far more broadly. It is simply no defense that *some* of the proscribed conduct was previously an offense against the law of nations.

Finally, the Government has no answer at all to Hamdan's claims that the MCA violates the Ex Post Facto Clause because it (1) increases punishment and (2) changes the rules of evidence. Mot. 26. The Court has found that unfair changes to evidentiary rules violate the Clause.[38] In 2001, when Hamdan was detained, he had every reason to expect that any trial would afford him these fundamental guarantees. However, realizing that it would be impossible to make its case against Hamdan using the ordinary criminal evidentiary rules, the Government has now simply changed them. The MCA's sudden removal of his procedural rights severely prejudices his ability to make the case for his innocence. This is precisely the sort of governmental overreaching that the Ex Post Facto Clause was designed to protect against, and Hamdan's inability to appeal the trial judge's ruling to the contrary only provides further

---

[38] For instance, in *Stogner v. California*, 539 U.S. 607 (2003), the Court struck down retroactive application of an extension of its statue of limitations for child sex crimes. The court reasoned that "the new law would 'violate' previous evidence-related legal rules by authorizing the courts to receive evidence . . . which the courts of justice would not previously have admitted as sufficient proof of a crime." *Id*. at 616 (punctuation omitted). A "Constitution that permits such an extension, by allowing legislatures to pick and choose when to act retroactively, risks both arbitrary and potentially vindictive legislation, and erosion of the separation of powers." *Id*. at 611. Hamdan's prosecution under MCA rules of evidence raises fairness and separation of powers issues more serious than those in *Stogner*. The MCA admits previously inadmissible evidence: hearsay, secret evidence (including evidence tending to show the innocence of the accused), and coerced testimony. It also denies confrontation rights to the accused.

testament to the conclusion that the MCA is a woefully inadequate substitute for habeas corpus.

### 5.   The Commission Violates the Define and Punish Clause

Because neither crime with which Hamdan is charged is a violation of international law, the MCA also violates the Define and Punish Clause. As laid out in Petitioner's Opening Brief, the Court has long held that Congress can use the Define and Punish Clause only to punish conduct that violates international law. See *Quirin*, 317 U.S. at 29 ("We are concerned only with the question whether it is within the constitutional power of the National Government to place petitioners upon trial before a military commission for the offenses with which they are charged. We must therefore first inquire whether any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial.")

The Government tellingly does not address *Quirin*, and it mischaracterizes the holding of *Arjona*. The Government instead directs the Court's attention to a law review article, and mischaracterizes even that, which in fact supports Hamdan's position that Congress's power to define and punish is limited in scope to crimes under international law.[39] The Government's claim that no court has yet held an act of Congress to violate the Clause merely reaffirms the point that Congress has never before attempted to criminalize conduct that, like conspiracy or material support, is so far afield from anything recognized by the laws of war.

### 6.   The Commission Violates the Bill of Attainder Clause

"A law is prohibited under the bill of attainder clause if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (internal quotations omitted). Respondents identify this two-prong test, but fail to apply it.

*First*, contrary to the Government's claims, Opp. 49-50, the MCA does not escape the

---

[39] As the article states: "The Supreme Court has indicated that this clause gives Congress broad authority to regulate *criminal activity that violates international law.*" Curtis A. Bradley, Universal Jurisdiction and U.S. Law, 2001 U. Chi. Legal F. 323, 335 (2001) (emphasis added).

specificity requirement simply because it does not identify Hamdan. *See id.* ("[T]he element of specificity may be satisfied if the statute singles out a person or class by name *or* applies to easily ascertainable members of a group."); *see also United States v. Brown*, 381 U.S. 437, 461 (1965). The MCA establishes rules that apply exclusively to easily ascertainable members of a group – aliens labeled "unlawful enemy combatants" by an executive tribunal. *See* 10 U.S.C. § 948a. Respondents emphasize that Congress does not do the labeling. Opp. 50. But "the Constitution intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment, under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1866).

The Government's only support, *Korte v. Office of Personnel Management*, 797 F.2d 967 (Fed. Cir. 1986), is inapposite. *Korte* emphasized that the determination was made under "the safeguards of a judicial trial." *Id.* at 972. Hamdan, however, was declared an enemy combatant under ex post facto standards and without *any* safeguards, let alone those attendant to a trial. Because the Clause is concerned with "protections of a judicial trial," *id.*, the fact that Congress passed the unlawful enemy combatant determination to an executive tribunal that wholly lacks basic judicial safeguards does not solve the constitutional problem—it compounds it.

Nor does it follow that if the MCA is an Attainder, so is the UCMJ. Even if the UCMJ specifies a group, the analysis does not end there. "Specificity alone does not render a statute an unconstitutional bill of attainder." *Foretich*, 351 F.3d at 1217. If the MCA, like the UCMJ, simply specified a group of persons to be subject to a fair system of justice, it would not deprive defendants of fundamental rights, Hamdan would have no bill of attainder objection. But the "principal touchstone of a bill of attainder is punishment," *id.* at 1218, and thus the deprivation

of basic judicial protections is precisely what sets the MCA apart from other laws authorizing constitutionally grounded judicial proceedings to target groups or classes.

*Second*, a bill of attainder can "punish" Hamdan by subjecting him to an exclusive system of adjudication that lacks fundamental judicial protections. *See Cummings*, 71 U.S. (4 Wall.) at 322 ("Any deprivation or suspension of any of these rights for past conduct is punishment, and can be in no otherwise defined.") The MCA does just that. The three factors for determining whether a law imposes punishment (history, function, and intent) are weighed together, *Foretich*, 351 F.3d at 1218, and with the MCA, they weigh heavily for punishment.

As to the first factor, a bill of attainder can be consistent with "historical notions of punishment" without being "precisely identical to any of the burdens historically recognized as punishment." *Foretich*, 351 F.3d at 1219. Since at least 1866, the Supreme Court has recognized that the legislative deprivation of rights is tantamount to punishment. *Cummings*, 71 U.S. at 320. That the specific bill challenged in those cases did not deprive their targets of the *same* rights as those deprived by the MCA is of no moment. *Foretich*, 351 F.3d at 1219 (finding Attainder even though "there are no past cases that involve the precise situation that we face here").

The second factor is a functional inquiry into whether the statute, by "sufficiently clear and convincing" evidence, *Foretich*, 351 F.3d at 1221, furthers nonpunitive legislative purposes proportionate to the burden imposed. *Id.* This factor is "the most important," *id.* at 1218 (internal quotations omitted), and it is telling that the Government is at a loss to identify any *non*punitive purpose to the MCA. Its one and only stated purpose, "to create a military judicial system," Opp. 52, ignores that there is *already* a military system, the UCMJ.

The MCA was *intended* to impose punishment. Its legislative record is clear. Mot. 37. Moreover, the timing of the MCA, in conjunction with Guantanamo litigation, clearly reveals the

motivation of Congress to deprive Hamdan and others of rights recognized by the Supreme Court. *See Boumediene*, 128 S. Ct. at 2243. Because such a deprivation is clearly a type of punishment, the third factor–motivation to punish–weighs in favor of unconstitutionality.[40]

### 7.   The Commission Lacks Personal Jurisdiction Over Hamdan

As Hamdan's opening brief explains, the commission lacks personal jurisdiction to try him because he is not an unlawful enemy combatant. Mot. 23-26. Both the MCA and the Constitution restrict the personal jurisdiction of commissions to unlawful enemy combatants. *Id.* As articulated in *Boumediene*, Hamdan has a right to a proper habeas hearing in this Court to review his designation as an enemy combatant. This habeas hearing is a necessary prerequisite to any finding that he is an *unlawful* enemy combatant and so subject to trial by commission.

Rather than confront this reality, the Government's opposition tries to obscure the fact that Hamdan's habeas petition also disputes his designation as an enemy combatant. But his petition has had that claim since it was filed in 2004.  Thus, it is highly misleading for the Government to assert that "petitioner's motion does not purport to establish that petitioner is illegally detained."  Opp. 16.  This motion is simply designed to preserve the status quo until a proper habeas inquiry can be had into the factual and legal bases, if any, for Hamdan's detention. While it may be directed toward preventing irreparable damage arising from an illegal trial, that does not mean that Hamdan's underlying habeas action is similarly limited.  The repeated efforts of the Executive to subject Hamdan to criminal prosecution by commission – without the procedural protections essential "to safeguard the accused and ensure the reliability of any conviction" (*Hamdan*, 126 S. Ct. at 2772) – as well the Government's stubborn refusal to

---

[40] The Government claims Hamdan's reading is "burdensome." Opp. 51 (internal citations omitted). But Hamdan does not claim that the MCA merely labels the group he is in as alien enemy combatants; he argues that the MCA *punishes* them. A law does not violate the Clause by singling out a group and subjecting it to a rational nonpunitive burden, such as a business regulation. *Foretich*, 351 F.3d at 1219. But it does when it specifies a group and imposes punishment. *Id.* at 1217. Because the MCA falls under the latter category, it is an attainder.

acknowledge and provide full habeas rights to all Guantanamo detainees (a position first repudiated in *Rasul*, and now in *Boumediene*) have simply delayed the advent of the habeas relief ultimately sought by Hamdan.  That relief is, of course, release from illegal detention.[41]

The  Government  is  also  profoundly  mistaken  in  asserting  that  habeas  review  into Hamdan's  designation  as  an  enemy  combatant  is  not  necessary  because  the  commissions themselves, "in conjunction with review by [the D.C. Circuit], certainly comprise a sufficient habeas substitute. . . ."  Opp. 20.  *Boumediene* has already disposed of this argument by finding that the far more generous DTA process is an inadequate substitute.

The Guantanamo commission's personal jurisdictional hearing in December 2007 was far from sufficient, both in procedure and application of relevant law. The proceeding permitted by the  MCA  dramatically  departs  from  fundamental  principles  of  due  process.   For  example, testimony extracted by coercion is admissible in commission proceedings.  10 U.S.C. § 948r. This is not a theoretical issue.  Hamdan was interrogated while being subjected to a regime of systematic sleep deprivation, dubbed "Operation Sandman," that lasted for some 50 days.  The Government  has  listed  an  interrogation  summary  from  within  that  period  on  its  extensive "Hearsay Notice," indicating its intention to obtain admission of this document pursuant to RMC 803(b).[42]   McMillan Decl., Ex. F, item XLV, at 9.   Such hearsay is readily admissible in commission  proceedings,  gravely  undermining  the  right  of  confrontation.    10  U.S.C. § 949a(b)(2)(E).  In addition, the commission has already ruled that the sharply curtailed right against self-incrimination afforded to defendants under the MCA "is at odds with the balance of

---

[41] The challenge to the personal jurisdiction of the commission is based on the same predicate as the challenge to detention, *i.e.*, the fact that Hamdan is not an enemy combatant.  Unfortunately, greater procedural hurdles have been placed in Hamdan's way than in the way of those not facing charges unknown to the law of war, making a robust and effective habeas process more necessary here, not less necessary as the Government contends.

[42] RMC 803(b) allows for the admission of hearsay if the proponent of the evidence provides written notice of its intention to introduce the hearsay, along with any available summary information about the time, place, and conditions under which the evidence was obtained.

American jurisprudence." Ruling on Motion to Suppress (D-030) at 3.[43] Moreover, defendants are stripped of their right to invoke the Geneva Conventions. 10 U.S.C. § 948b(g).[44] Thus, the commission defers entirely to the statute that establishes it, thereby creating "a striking anomaly in our tripartite system of government, leading to a regime in which Congress and the President, not this Court, say 'what the law is.'" *Boumediene*, 128 S. Ct. at 2259 (quoting *Marbury, supra*).

It has long been recognized that detention based on the misapplication of relevant law is grounds for issuance of the writ. *I.N.S. v. St. Cyr*, 533 U.S. 289, 302 (2001). In this case, as noted in Petitioner's opening brief, the jurisdictional finding of the military commission was based on misapplication of relevant law. First, it is undisputed that in assessing personal jurisdiction, the commission declined to enforce constitutional mandates relating to the exercise of power, including the equal protection guarantees of the Due Process Clause. (McMillan Decl., Ex. A at 10.) That position was based on the now reversed holding of the D.C. Circuit in *Boumediene* that the Constitution does not protect detainees at Guantanamo.

Likewise, the Government's response to Petitioner's argument that the commission failed to properly apply the combatancy standards in the Geneva Conventions (including the argument that under Article 4 of the Third Geneva Convention, "[p]ersons who accompany the armed forces without actually being members thereof, such as civilian . . . labour units" must be afforded POW status), is to fall back on the MCA provision that persons tried before the military commissions may not "invoke the Geneva Conventions as a source of right." MCA § 984b(g). But this provision raises precisely those separation of power issues that the Supreme Court said the habeas inquiry is designed in part to monitor. *Boumediene*, 128 S. Ct. at 2259 (identifying

---

[43] The commission held that this hollow shell of a right, which only protects a defendant from being forced to testify at trial, but affords no protection against self-incrimination prior to trial, "is clearly what Congress enacted." Ruling on Motion to Suppress (D-030) at 3.

[44] The commission has ruled that "even if these treaties do apply to detainees before military commissions, Congress has expressly determined that the MCA satisfies them." Ruling on Motion to Suppress (D-030) at 4.

the writ as "an indispensable mechanism for monitoring the separation of powers").   The Government insists that in assessing its jurisdiction, the commission must apply only the standard "set out in the statute," Opp. 33, and the MCA does not include reference to the civilian category of POWs identified in Article 4(A)(2)(4) of the Third Geneva Convention.[45]

In addition, the Supreme Court has long recognized that procedural irregularities can eliminate the jurisdiction of an inferior tribunal.  *See, e.g., Ex parte Wilson*, 114 U.S. 417, 422 (1885).  Thus, the failure of Mr. Hamdan to be afforded the right to call witnesses in his favor at the December 2007 jurisdictional hearing was an error that vitiates the validity of the jurisdictional finding.  As with the alleged right in the context of CSRTs, that alleged procedural protection proved more illusory than real—as Part I of this Reply explains.

For these reasons, the commission's own proceedings, conducted under the flawed MCA, cannot be the basis for asserting personal jurisdiction over Hamdan. As *Boumediene* holds, Hamdan is entitled to a habeas hearing to determine whether he is an enemy combatant. Only then, if this Court so finds, can a commission have personal jurisdiction to try him.

### 8.      The Commission Violates the Constitution's Equal Protection Principles

This is the first U.S. military commission to have jurisdiction only over the powerless— those who lack a vote in our political system. The Government's precedents, drawn from areas such as welfare benefits, are totally irrelevant to this criminal context. Hamdan's claim is obviously not that any alienage distinction is "inherently suspect." Opp. 54. Rather, it is the simple and irrefutable assertion that the United States has never set up an entire separate judicial

---

[45] To the extent that the commission addressed this issue, it improperly drew inferences from the evidence in favor of the Government to support a finding that Mr. Hamdan was "engaged in hostilities" and thereby not entitled to the POW protection conferred by this section of Article 4.  These inferences, based in large part on a misapplication of the concept of "engaged in hostilities" as recognized under international law, is subject to habeas review.  *See* Neuman, *supra* at 982, "An inferior court's determination of its own jurisdiction could be reexamined on habeas."

system just for foreigners. Ever.[46] Before taking that radical step, this Court should examine the consequences to the Constitution's commitment to equality.

The Government first rehashes its claims about *Verdugo*, Opp. 54, but that argument depends, once again, on the notion that Guantanamo is "abroad," which *Boumediene* rejected. It then argues that federal alienage distinctions receive rational-basis review. But those cases all concern government benefits, not rank discrimination regarding the most fundamental of all rights—Equal Justice Under Law in criminal adjudication. The Government offers no precedent whatsoever to support the notion that it can discriminate so severely, with legislation that only affects those without political representation, and still receive rational-basis review. Exacting scrutiny is appropriate not only because the classification concerns criminal punishment of the powerless, but also because the MCA withdraws fundamental rights. Katyal, *supra*, at 1371-73 (describing Reconstruction Congress' concern about different punishment schemes for aliens). "[T]he central aim of our entire judicial system" is that "all people charged with crime must, so far as the law is concerned, stand on an equality before the bar of justice in every American court." *Griffin v. Illinois*, 351 U.S. 12, 17 (1956) (citation and quotation marks omitted).

Nonetheless, the MCA fails rational-basis review. There is no justification for subjecting aliens to a totally different, and inferior, judicial system than that to which citizens are subjected for similar crimes.[47] The Government acknowledges precisely this when citing the Treason

---

[46] The Government's quote from Justice Scalia's *Hamdi* dissent concerning *Quirin* (Opp. 56) illustrates the point. All *principals*, including the citizen were charged in a commission. The facilitators were all charged in civilian court.

[47] The government's citation of 18 U.S.C. § 1203 is irrelevant. There is a dramatic difference between a single criminal offense levied only at aliens, and an entire (inferior) punishment regime imposed upon them. Section 1203 violations are still tried in federal criminal court, not Guantanamo. Rather, in keeping with our international treaty obligations, it targeted hostage taking in the service of international terrorism–i.e., with some international element-- producing differential burdens and consequences for aliens versus U.S. nationals that were consistent with that scheme and purpose. Most of those discriminations had to do with the alienage of the *victim*, not perpetrator. And in any event, Section 1203 does not discriminate against aliens; it discriminates against international hostage taking, as opposed to purely domestic hostage taking.

Clause, which only establishes that a citizen is subject to more, not *less*, harm for the same criminal act.  The protection of classified information and the use of intelligence assets (Opp. 57) are just as much an issue where citizens are accused of war crimes as where noncitizens are so accused. There is no rational basis at all for such a distinction, and it gives rise to the inference that the real purpose was to insulate the MCA from ordinary political accountability.[48]

The alienage distinction also means that the MCA violates Common Article 3 and other international guarantees, Mot. 42, something the Government does not dispute.

Because the MCA violates Equal Protection, and because accepting this challenge would not undermine the Government's ultimate flexibility to use commissions when applied evenhandedly, Hamdan's commission should be enjoined. *Cf. A v. Secretary,* [2004] UKHL 56, [2005] 2 A.C. 68 (House of Lords striking down terrorist detention scheme on equality grounds).

### 9.  The Commission Violates the Geneva Conventions and Due Process

Hamdan's opening brief articulated the many ways in which the procedures employed by Guantanamo military commissions violate his Fifth Amendment right to due process of law and Common Article 3 of the Geneva Conventions. Mot. 40-45.[49] The Government casually dismisses Hamdan's concerns as speculative abstractions, not ripe for review. But there is nothing abstract or speculative here. See *Hamdan*, 126 S. Ct. at 2788 (rejecting claim that procedural violations are speculative because the rules and track record thus far permit the Court to reach the matter). The MCA allows for the admission of statements obtained through coercion,

---

*Harisiades* v. *Shaugnnessy*, 342 U.S. 580 (1952) is also irrelevant.   It concerned deportation, which it noted "has been consistently classified as a *civil* rather than a criminal procedure," *Id.* at 594

[48] The claim that some alien activity is not a domestic crime, Opp. 57, is beside the point, since Material Support and Conspiracy are both federal civilian crimes that do not depend upon citizenship.

[49] An immense literature from disinterested experts details numerous ways in which the MCA violates Common Article 3 and bedrock international law.  *E.g.*, James Stewart, *The Military Commissions Act's Inconsistency with the Geneva Conventions: An Overview*, 5 J. Intl Crim. Just. 26 (2007) (author is prosecutor at International Criminal Tribunal for former Yugoslavia); Statement of Phil Alston, U.N. Special Rapporteur, 30 June 2008, available at http://axisoflogic.com/artman/publish/article_27376.shtml; Report of Special Rapporteur Martin Scheinin, App. C.

where the commission finds the statements are "reliable," "probative," and serve "the interests of justice." 10 U.S.C. § 948r(c). This standard is wholly foreign to due process. *Bram v. United States*, 168 U.S. 532, 543-45 (1897); *Chambers v. Florida*, 309 U.S. 227, 238-41 (1940).[50]

As Part I demonstrates, Hamdan has alleged, and the Government has not denied, persistent coercion in many forms, including physical and psychological mistreatment, prior to and during his detention at Guantanamo.[51] Yet the Government has offered Hamdan's statements into evidence, citing § 948r. Although Hamdan objected, the commission has so far declined to suppress any. Hamdan should not be forced to endure a proceeding for which the rules, on their face, permit what the Fifth Amendment prohibits. Here, the commission has stated unequivocally that it is guided solely by the MCA: "In light of these clear statutory commands, the Commission concludes that Congress did indeed intend that . . . there should be no remedy for suppression for pre-trial statements taken without the rights warnings that are common in American law. *While this result is at odds with the balance of American jurisprudence, it is clearly what Congress enacted.*" McMillan Decl., Ex. E (Ruling on Motion to Suppress) at 3 (emphasis added).[52]

Moreover, the MCA permits the admission of hearsay evidence and shifts the burden to the defendant to show its unreliability. 10 U.S.C. § 949a(b)(2)(E) ("hearsay evidence . . . may be admitted in a trial by military commission"). This provision is directly at odds with the Sixth Amendment's guarantee of the right of the accused "to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 49 (2004). Nevertheless, under the MCA, the

---

[50] Military courts have likewise universally stated the unqualified and unequivocal rule that admission of coerced out-of-court statements violates the Fifth Amendment. *E.g.*, *United States v. Monge*, 2 C.M.R. 1, 4 (C.M.A. 1952).

[51] As Dr. Emily Keram, a clinical and forensic psychiatrist, has stated after spending approximately 100 hours with Hamdan, the prolonged periods of isolation and other aspects of the Government's regime of coercive interrogation have resulted in symptoms of "depression, hopelessness, anger, irritability, and impaired concentration and memory," symptoms that "have worsened substantially." McMillan Decl., Ex. J at 4. These symptoms show precisely why coercive interrogation techniques result in statements that are unreliable and should be excluded.

[52] The Government responds that "the rules are reciprocal," available to the defense just as to the prosecution. Opp. 60. The notion that a defendant—held in isolation and interrogated in secret for six years—could enjoy the "reciprocal" nature of rules governing admission of coerced testimony obviously provides little comfort to Hamdan.

Government has notified the defense of "its intent to seek admission of" hearsay statements.

The Government asserts that the MCA strips Hamdan of his ability to assert Geneva Convention claims. If so, it yet again underscores the inadequacy of MCA review compared to the Writ and is another violation of Due Process. The Supreme Court has already held that Common Article 3 applies and protects Hamdan in a commission. *Hamdan*, 126 S. Ct. at 2796.[53]

As a self-executing treaty, the Geneva Conventions provide Hamdan with independently enforceable rights. This is supported by the mandate of the Supremacy Clause, which states that "treaties . . . shall be the supreme law of the land." [54] U.S. Const. Art. VI. This Court previously held the Geneva Conventions are self-executing in this case. 344 F. Supp. 2d at 165.[55]

Moreover, even were Common Article 3 not enforceable on its own, habeas would independently enforce it.[56] Historically, courts have used habeas to "enforce rights under treaties that do not themselves create private rights of action." Amicus Br. of Federal Courts and Int'l Law Professors, at 7-8, at 2007 WL 2441588 [Fed. Ct. Prof. Br.]; *see also United States v. Rauscher*, 119 U.S. 407 (1886); *Chew Heong v. United States*, 112 U.S. 536 (1884) (granting habeas relief based on a treaty that did not create a private right of action); Henkin Br. 14-21.[57]

Nowhere in the MCA is the term "a source of rights" defined. It does not preclude enforcement. *See* Carlos Vazquez, *The Military Commissions Act, the Geneva Conventions, and the Courts: A Critical Guide*, 101 Am. J. Int'l L. 73, 92-93 (2007) (explaining how the Geneva Conventions could be invoked despite these sections and concluding that the MCA does not

---

[53] The Government asserts that *Hamdan* invited a redefinition of Geneva obligations. That appears nowhere in the opinion. If anything, it was rejected by Justice Kennedy. 126 S. Ct. at 2800 (Kennedy, J., concurring in part); *id.* at 2803 (courts must already be in force in advance of crisis to comply with Common Article 3).

[54] *See* Amicus Br. of Law Professors Louis Henkin, et al., at 7-8, *Hamdan*, 2006 WL 53974 [Henkin Br.].

[55] Although the D.C. Circuit reversed this Court's opinion, the Supreme Court subsequently reversed that circuit opinion. 126 S. Ct. at 2798. Moreover, the D.C. Circuit relied almost exclusively on *Eisentrager*. 415 F.3d at 39-40. The Court discredited this reasoning in *Hamdan*, 126 S. Ct. at 2794, and *Boumediene*, 128 S. Ct. at 2260-62.

[56] Interpreting treaties is a judicial function. *See Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2684 (2006).

[57] There is authority suggesting that habeas creates a cause of action for violations of a non-self-executing treaty as well. *See Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 218 (3d Cir. 2003); Fed. Ct. Prof. Br. at 9.

render the Geneva Conventions unenforceable). And the legislative history clarifies this term:

> [T]his legislation would not bar individuals from *raising to our Federal courts* in their pleadings any allegation that a provision of the Geneva Conventions--or, for that matter, any other treaty obligation that has the force of law--has been violated. *It is not the intent of Congress to dictate what can or cannot be said by litigants in any case.*[58]

The best way to read MCA Section 5 is simply to say it does not permit an independent cause of action, but that it permits the Geneva Conventions to authoritatively define the law of war. The MCA drafters were well aware of *Hamdan*'s decision that even if the prospect of diplomatic enforcement "preclude[s] Hamdan's invocation of the Convention's provisions as an *independent source of law* binding the Government's actions and furnishing petitioner with *any enforceable right* . . . regardless of the nature of the rights conferred on Hamdan, they are . . . part of the law of war." 126 S. Ct. at 2794. The Conventions, under *Hamdan* are not "sources of rights" as much as they are canons of construction by which statutes are to be understood.[59]

Furthermore, under *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804), "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." See also Br. of Urban Morgan Institute at 6, *Hamdan*, at 2006 WL 42045. Reading the MCA to bar enforcement of Common Article 3 would conflict with our nation's obligations. Congress clearly had no intention of doing so when it passed the MCA, and this Court should not do so now.[60] A final interpretive canon relevant here is constitutional

---

[58] Joint Statement of Senators McCain, Warner, and Graham on Individual Rights Under the Geneva Conventions, 152 Cong. Rec. S10,402 (daily ed. Sept. 28, 2006) (emphases added); ; *id.* at S10,401 ("[T]his legislation would not stop in any way a court from exercising any power it has to consider the United States' obligations under the Geneva Conventions . . . ."). *See also* Vazquez, *supra*, at 87 (explaining that this statement should receive "considerable weight in the interpretive process" because it was made to convince wavering senators).

[59] Reading "a source of rights" to mean "a cause of action" would render Section 5 inapplicable here, since Hamdan's cause of action actually derives from habeas corpus, as discussed above.

[60] Under the last-in-time rule, Congress theoretically could enact a statute that nullifies the United States' obligations under a treaty such as Common Article 3. *See Whitney v. Robertson*, 124 U.S. 190, 194 (1888). But the last-in-time rule operates in concert with the rule against implied repeals. That is to say, "[a] treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress *has been clearly expressed.*" *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) (emphasis added). As explained above, Congress made no such statement. Other sections of the MCA demonstrate that Congress did not

avoidance. *Boumediene*, 128 S. Ct. at 2271. The Government's interpretation violates separation of powers to the extent it limits the invocation of Common Article 3. At the very least, it raises serious constitutional doubts, and this Court should interpret the MCA to avoid them.[61]

This case presents a unique situation in which specially created procedural and evidentiary rules governing commission proceedings make violations of constitutional and international standards a certainty. Some of those violations have occurred already; others are a foregone conclusion given the commission's inclination to adhere to the MCA rather than "the balance of American jurisprudence." Because the MCA deprives Hamdan of protections afforded by the U.S. Constitution and Common Article 3, Hamdan is likely to prevail on the merits.

### 10. The Commission Violates the 1946 Yemen Treaty

Even if the Geneva Conventions were not enforceable, their provisions are independently enforced by the 1946 Yemen Treaty. Mot. 45. Nothing in the MCA strips that Treaty of enforceability in this Court, and it guarantees that Hamdan be treated in accordance with international law and most-favored national treatment. Whatever might be said about the Guantanamo commission, it handily fails the Treaty's guarantee to provide "the fullest protection of the laws" of the United States, as the Government's Opposition makes perfectly clear.

The Government has not a single word in answer to the 1946 Treaty.

### CONCLUSION

The Motion for a Preliminary Injunction should be granted.

---

repeal the Geneva Conventions, and in fact reaffirmed their applicability. E.g., MCA § 948b(f).

[61] A statute violates separation of powers when it requires courts to exercise their jurisdiction "in a manner repugnant to the text, structure, and traditions of Article III." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995). *Plaut* identified two types of unconstitutional legislation: (1) statutes that "'prescribe rules of decision to the Judicial Department,'" *id.* (quoting *United States v. Klein*, 80 U.S. (13 Wall) 128, 146 (1872)); and (2) statutes that vest review of Article III courts' decisions in Executive branch officials. *Id.* The MCA is the first. *See* Fed. Ct. Prof. Br. 27. The MCA "does not override, 'un-execute,' or 'un-implement' the United States' treaty obligations under the Geneva Conventions." *Id.* at 28. Accordingly, "section 5 is the paradigm *Klein* statute, for it tells the courts what they can and cannot do *without* rewriting the underlying substantive law." Id. at 29 (emphasis in original).

Respectfully submitted,

_/s/     Neal Katyal_

Neal Katyal (D.C. Bar No. 462071)
Justin Florence
Steven Vladeck
600 New Jersey Avenue, NW
Washington, D.C. 20001
(202) 662-9000

Harry H. Schneider, Jr. (*pro hac vice*)
Joseph M. McMillan (*pro hac vice*)
Eric S. Merrifield
PERKINS COIE LLP
607 Fourteenth Street, N.W., Suite 800
Washington, D.C. 20005-2011
(202) 628-6600
(202) 434-1690 (facsimile)

Charles D. Swift (*pro hac vice*)
Emory University School of Law
850 Ralph McGill Bldv. NE, #39
Atlanta, GA 30306
(404) 727-1190

*Attorneys for Petitioner Salim Ahmed Hamdan*

Dated: July 16, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2008, the foregoing was filed electronically.  Notice of

this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

DATED at Seattle, Washington, this 16th day of July, 2008.


**PERKINS COIE LLP**


<u>/s/     Joseph M. McMillan          </u>
Joseph M. McMillan (*pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101
(206) 359-8000
(206) 359-9000 (facsimile)